<pre>
1                    ngUNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2
                                    .   Chapter 11
3    IN RE:                         .
                                    .   Case No. 20-11779 (LSS)
4    VIVUS, INC., et al.,           .
                                    .   Courtroom No. 2
5                                   .   824 North Market Street
                                    .   Wilmington, Delaware 19801
6                                   .
7                     Debtors.      .   August 25, 2020
     . . . . . . . . . . . . . . . .    1:30 P.M.
8
          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
9                 UNITED STATES BANKRUPTCY JUDGE

10   TELEPHONIC APPEARANCES:

11   For the Debtors:          Cory Kandestin, Esquire
                               RICHARDS, LAYTON & FINGER, P.A.
12                             920 N. King Street
                               Wilmington, Delaware 19801
13
                               - and -
14
15   For the Debtors:          Jared Friedman, Esquire
                               Matthew Barr, Esquire
16                             Gabe Morgan, Esquire
                               Natasha Hwangpo, Esquire
17                             WEIL GOTSHAL & MANGES LLP
                               767 Fifth Avenue
18                             New York, New York 10153

19
     Audio Operator:           Ginger Mace, ECRO
20
     Transcription Company:    Reliable
21                             1007 N. Orange Street
                               Wilmington, Delaware 19801
22                             (302)654-8080
                               Email:  gmatthews@reliable-co.com
23
     Proceedings recorded by electronic sound recording,
24   transcript produced by transcription service.

25
</pre>

APPEARANCES (Continued):

For U.S. Trustee:          Linda Casey, Esquire
                           OFFICE OF UNITED STATES TRUSTEE
                           844 King Street
                           Wilmington, Delaware 19801

For Steven Chlavin:        John Demmy, Esquire
                           SAUL EWING ARNSTEIN & LEHR LLP
                           1201 North Market Street
                           Wilmington, Delaware 19801

Propria Persona:           Bruce Makosky

Propria Persona:           Vasilios Manousiouthakis

Propria Persona:           Dennis Dijkstra

INDEX

#15) Motion of Debtors for Entry of Order Authorizing Debtors to (I) Assume Restructuring Support Agreement, and (II) Modify the Automatic Stay [Docket No. 82; filed July 10, 2020].

**Ruling: ..**

#16) Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief [Docket No. 29; filed July 8, 2020].

**Ruling: ..**

#17) Joint Prepackaged Chapter 11 Plan of Reorganization of VIVUS, Inc. and its Affiliated Debtors [Docket No. 13; filed July 7, 2020].

**Ruling: ..**

DEBTORS' WITNESS(s)

**BRIAN KARPUK**

Direct Examination through Proffer          14

Cross Examination by the Court              15

Cross Examination by Mr. Manousiouthakis    17

Cross Examination by Mr. Dijkstra           17

**TERI STRATTON**

Direct Examination by Mr. Friedman          21

Cross Examination by Mr. Demmy              57

Cross Examination by Mr. Manousiouthakis    99

Cross Examination by Mr. Makosky            134

1        Cross Examination by Mr. Dijkstra          143

2        Redirect Examination by Mr. Friedmann      180

3        Recross Examination by Mr. Manousiouthakis 199

4

5   EXHIBITS                                 I.D.   REC'D

6   Declaration of Jill Frizzley                     13

7   Declaration of Brian Karpuk                      13

8   Declaration of Teri Stratton                     20

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings commenced at 1:41 p.m.)

2           THE COURT:  Thank you.  Good afternoon, counsel.

3  This is Judge Silverstein.  We are here in VIVUS, Inc.; case

4  No. 20-11779.

5           Ginger, please give everyone the protocol for the

6  hearing.

7           THE CLERK:  It is extremely important that you put

8  your phones on mute when you are not speaking. When speaking,

9  please do not have your phone on speaker as it creates

10 feedback and background noise and it makes it very difficult

11 to hear you clearly.

12          Also, it is very important that you state your

13 name each and every time you speak for an accurate record.

14 Your cooperation in this matter is greatly appreciated.

15 Thank you.

16          THE COURT:  Thank you.

17          Let me turn this over to debtors' counsel.

18          MR. BARR:  Thank you, Your Honor.  This is Matt

19 Barr from Weil Gotshal.  Can you hear me okay?

20          THE COURT:  Yes.

21          MR. BARR:  Thank you, Judge.

22          Your Honor, we have filed an amended agenda at

23 Docket Number 214 that has roughly seventeen items.  Just for

24 the record, thank you very much, the first fourteen have

25 already been entered by Your Honor, either on certification

1   of counsel or there were no objections in the second day

2   hearings with respect to the first day motion, so thank you

3   very much, Your Honor, for you and your chambers taking care

4   of that.

5           We then have three matters that are going forward

6   today. We have item number 15 which is the motion to assume

7   our restructuring support agreement.  We have item number 16

8   -- I'm sorry.  And on 15 we did file, Your Honor,

9   certification of no objection with respect to that matter.

10          Item number 16 is the cash collateral matter and

11  then item number 17 is the combined motion with respect to

12  the disclosure statement, the solicitation procedures motion,

13  and our confirmation hearing with respect to our joint

14  prepackaged Chapter 11 plan.

15          If it's okay with Your Honor what we would like to

16  do is to go forward with the combined hearing on the

17  disclosure statement, solicitation and confirmation hearing,

18  and then take up the other matters at the end of the hearing.

19          THE COURT:  That's fine.

20          MR. BARR:  Thank you, Judge.

21          So, again, thank you for the record.  Matt Barr of

22  Weil Gotshal on behalf of the debtors.

23          I'm joined here today by my colleagues, Mr. Gabe

24  Morgan, Mr. Jared Friedmann and Ms. Natasha Hwangpo.

25          Also present, Your Honor, are certain members of

1  the management team: Ms. Jill Frizzley is virtually with us

2  today. She's one of the independent directors of the company

3  who filed a declaration in connection with today's hearing.

4  And that's at Docket Number 188;

5        Mr. Thomas King, another one of our independent

6  directors of the company who filed a declaration in

7  connection with todays hearing at Docket Number 189;

8        Ms. Teri Stratton, managing director,

9  restructuring in special situations at Piper Sandler, the

10  retained investment banker in these cases filed a declaration

11  in connection with today's hearing at Docket Number 191.

12        Mr. Ben Pickering, the principal in the

13  restructuring advisory services group of Ernst Young,

14  financial advisor retained in these cases and his declaration

15  is at Docket 190 and;

16        Mr. Brian Karpuk who is a director of corporate

17  restructuring at Stretto, debtors' claim agent and noticing

18  agent who filed a declaration in connection with today at

19  Docket Number 187.

20        Again, Your Honor, I know I speak for all of VIVUS

21  employees, the board of directors, all of the debtors'

22  advisors, I thank you and your colleague and chambers for

23  scheduling today's hearing and making accommodations

24  necessary through our virtual confirmation hearing for this

25  very important hearing in VIVUS' corporate life cycle.

1        I'll provide some details in a moment but today is

2    the culmination of an extensive process taking place over the

3    course of several years. As the company has sought to repay,

4    refinance and, ultimately, restructure its significant debt

5    obligations in order to ensure the business continues as a

6    going concern, preserve value for all stakeholders, including

7    our equity holders and save jobs.

8        Unfortunately, despite those efforts, we were

9    unable to avoid a Chapter 11 filing.  But I am very pleased

10   to stand here virtually today in our view with a confirmable

11   prepackaged Chapter 11 plan that provides recoveries to all

12   stakeholders in our capital structure, irrespective of the

13   fact, as our expert testimony will demonstrate for Your Honor

14   here today, that the enterprise value of the company does

15   not, unfortunately, support such an outcome.

16       And that's a testament, Your Honor, for the

17   efforts of the management team and the board here who, as the

18   record show, turned over every stone in an effort to

19   refinance or restructure this balance sheet before coming to

20   these Chapter 11 cases.

21       Notably, the management team and the board

22   insisted on negotiating recoveries for public shareholders

23   and payment in full, in cash for unsecured creditors. Those

24   are our vendor, trade creditors, employees, all other

25   unsecured creditors save of our convertible noteholders.

1          So, Your Honor, with your permission, what we

2    would like to do today is since our confirmation hearing is

3    an evidentiary hearing, if it's okay with you, I would start

4    with an opening.  Obviously, if there's any parties that

5    would like to provide any opening remarks, Your Honor I'm

6    sure would allow them to do that.

7          We're then prepared to put on our case in chief

8    through our witnesses, both by declaration and live

9    testimony.  We would then offer our witnesses to any parties

10   that would like to cross examine them.

11         I'm having a hard time.  I'm looking at you, but I

12   know my camera is there, so please bear with me, as well as

13   cross-examine any objectors if they put any of their

14   witnesses forward.  And Mr. Friedmann would handle that, Your

15   Honor; after which the parties can provide Your Honor with

16   argument on any of the outstanding objections.  And Mr.

17   Morgan from our firm would be handling and taking the lead on

18   that.

19         And then, finally, if Your Honor was inclined to

20   approve the plan, disclosure statement and solicitation, we

21   did file a proposed amended plan and confirmation order which

22   a combination of Ms. Hwangpo and I would go through with Your

23   Honor at the end of the hearing.

24         So if that works for you, Your Honor, I would

25   start with a brief opening.

1          THE COURT:  I will hear openings, but I really

2   want to make sure we get through the evidence, so that's up

3   to you.

4          MR. BARR:  Sure.  So why don't we just right into

5   evidence then.

6          THE COURT:  That's fine.

7          MR. BARR:  Okay. Great.  So with that said, Your

8   Honor, I'm going to turn it over to Mr. Friedmann.

9          MR. FRIEDMANN:  Good morning, Your Honor.  Jared

10  Friedmann from Weil Gotshal on behalf of VIVUS and its

11  affiliated debtors, debtors-in-possession.  In advance of

12  this afternoon's hearing, Your Honor, we coordinated with

13  counsel from Saul Ewing who represents objecting stockholder,

14  Steven Chlavin, on a proposal for how to present the evidence

15  this afternoon, if I may share that with you.

16         We agreed, subject to Your Honor's approval, of

17  course, that for two of debtors' witnesses, Ms. Frizzley

18  Mr. Karpuk, both of who are present in the courtroom today

19  that we would simply enter those witnesses declarations into

20  evidence, subject to cross examination or any objections in

21  lieu of any live direct testimony from those two witnesses.

22         With respect to Ms. Stratton, Mr. King and Mr.

23  Pickering, all of whom are also present in the courtroom, we

24  agreed, again, subject to Your Honor's approval, that we

25  would enter those witness' declarations into evidence,

1  subject, again, to cross-examination or any objections.  That

2  for those three witnesses we'd also conduct a live direct

3  examination in order to introduce them, credential those

4  witnesses which we did not do at the equity committee hearing

5  a couple weeks ago, have them highlight certain facts in

6  their declarations and certain issues that have arisen,

7  including the supplemental objections since they submitted

8  their declarations last Tuesday.

9          The goal, obviously, is to not have to cover

10 everything in their declaration, but, of course, they would

11 subject to cross on everything in their declaration, as well

12 as their live testimony.  So, Your Honor, if that proposal is

13 acceptable to you, we would move forward with the witnesses.

14         THE COURT:  That's acceptable.  Make certain with

15 respect to your witnesses that your direct testimony gets out

16 the important facts that you think this case hinges on.

17         MR. FRIEDMANN:  Understood, Your Honor.

18         THE COURT:  Okay.

19         MR. FRIEDMANN:  All right, thank you.

20         MR. FRIEDMANN:  So, Your Honor, we would propose

21 to begin with Ms. Frizzley and for the presentation of that

22 witness, I'd like to turn the virtual podium over to Cory

23 Kandestin of Richards Layton.

24         THE COURT:  Mr. Kandestin.  Mr. Kandestin, you

25 must still be muted which I appreciate, but now I need you

1  live.

2           MR. KANDESTIN:   May I please the court.  Can you

3  hear me now?

4           THE COURT:  Yes.

5           MR. KANDESTIN:  Good. Okay. Sorry about that.

6           For the record, Cory Kandestin, Richards Layton &

7  Finger, co-counsel to the debtors.

8           The debtors filed a declaration in support of

9  confirmation from Jill Frizzley. Ms. Frizzley, as Mr. Barr,

10  mentioned, is the independent director who was appointed in

11  connection with these bankruptcy cases.  She also is the

12  chair and sole member of the special independent committee

13  that conducted the investigation of the debtor release that

14  is proposed in the plan.

15           The sole topic of Ms. Frizzley's declaration was

16  the debtor release investigation.  She is here on Zoom today.

17  She's available to answer any questions on cross, if

18  necessary.  There have been no objections, that I'm aware of,

19  to the debtor release under the plan.

20           So, at this time, Your Honor, I'd move Ms.

21  Frizzley's declaration into evidence.

22           THE COURT:  Is there any objection to Ms.

23  Frizzley's declaration being admitted into evidence?

24      (No verbal response)

25           THE COURT:  I hear none.  Does anyone have any

1  questions, wish to cross-examine Ms. Frizzley?

2      (No verbal response)

3          THE COURT:  I hear no one.

4      (Declaration of Jill Frizzley, received into evidence)

5          MR. KANDESTIN:  In that case, Your Honor, I yield

6  the podium back to Mr. Friedmann.

7          MR. FRIEDMANN:  Thank you.

8          Your Honor, Jared Friedmann, again, from Weil

9  Gotshal.

10         We next respectfully move to enter into evidence

11 the declaration of Brian Karpuk on behalf of Stretto which is

12 debtors' solicitation and tabulation agent.

13         Mr. Karpuk's declaration was filed at Docket

14 Number 187 and seek to have his declaration enter into

15 evidence, subject to cross-examination or any questions that

16 Your Honor may have for Mr. Karpuk.

17         THE COURT:  Does anyone object to the entry into

18 evidence of Mr. Karpuk's declaration?

19     (No verbal response)

20         THE COURT:  I hear no one.  Does anyone have any

21 cross-examination of Mr. Karpuk?

22     (No verbal response)

23         THE COURT:  I hear no one.

24         Mr. Karpuk, I have a couple of questions.

25         MR. KARPUK:  Yes, Your Honor.

1          THE COURT:  Do you know how many opt-out notices

2   were mailed?

3          MR. KARPUK:  We mailed out approximately 14,000

4   opt-out notices with plan and disclosure statement to the

5   underlying beneficial holders of existing equity.

6          THE COURT:  14,000?

7          MR. KARPUK:  14,000; yes, Your Honor.

8          THE COURT:  And I saw in your declaration the opt-

9   out detail, form details that there were opt-out forms that

10  were withdrawn.

11         MR. KARPUK:  That is correct, Your Honor.

12         THE COURT:  Were there subsequent communications

13  with, I guess, with parties to whom the opt-out notices were

14  mailed?

15         MR. KARPUK:  Yes, there were, Your Honor.

16         THE COURT:  Can you tell me what those were?

17         MR. KARPUK:  Sure.  In approximately late July,

18  based upon inquiries that we had received from existing stock

19  equity holders and from parties who had submitted their opt-

20  out forms at that time, the information that was being

21  provided in those forms we determined that there would be

22  difficulty in making a distribution to the existing stock

23  equity holders without additional information from those

24  parties.  Specifically, we needed to know the nominees at

25  which they held their stock so that those parties could be

1   instructed to withhold a distribution under the plan.

2          And so, as part of -- we reached out to the

3   debtors' counsel and had conversation whereby we were asked

4   to reach out to existing equity holders who had opted out as

5   of that time. We were instructed to call them first and if we

6   weren't able to get ahold of them or didn't have a telephone

7   number for those parties, we reached out by email.  And we

8   asked them for, one, whether they have the nominee

9   information that was going to be required in order to make

10  the distribution and we also asked them if they had any other

11  questions or whether they wish to revoke that opt-out form.

12         A significant number of parties, as we discussed

13  with them, it seemed that they did not understand what the

14  purpose of the form was.  They needed our help or

15  clarification as to if they wished to participate whether

16  they should submit the form or not.

17         As you'll also see in my declaration, we received

18  approximately 370 forms back, but over 200 of those or

19  approximately 200 of those did not check the opt-out box.

20  They just sent the form back in, signing it, but not opting

21  out.

22         THE COURT:  What did that mean to you?

23         MR. KARPUK:  It was consistent with the questions

24  that we were seeing from equity holders, what do I do with

25  this form?  Should I send it in?  If I wish to participate in

1  the settlement, do I send this in or not?  And so, I think,

2  you know, based upon all of the communications that the

3  Stretto team has had with existing equity holders, there were

4  significant numbers -- a significant percentage of the party

5  that returned their form were not intending were not

6  intending to opt-out when they submitted the form.

7            THE COURT:  Thank you.

8            Does that prompt any questions by anyone else?

9            MS. CASEY:  Your Honor, this is Linda Casey on

10 behalf of the United States Trustee.  Thank you, Your Honor,

11 for allowing me to appear solely by the (indiscernible) and I

12 appreciate that.

13            I do not have any current questions for the

14 witness; however, the debtors and I had discussed a statement

15 from the debtors' counsel regarding this issue that I

16 anticipate that they will be reading in later.  And I'm not

17 going to go back on my agreement not to cross-examine the

18 witness, but this will be raised in argument and there will

19 be additional facts presented to the court.  Thank you.

20            THE COURT:  Thank you.,

21            MR. MANOUSIOTHAKIS:  I have a question, Your

22 Honor.  This is Vasilios Manousiouthakis.

23            THE COURT:  Yes.

24            MR. MANOUSIOUTHAKIS:  Was there any information

25 requested that could have been violating the privacy rights

1   of the individuals involved, especially information on where

2   shares were held and so on?  And was there some similar

3   request made to those people that did not opt out or was this

4   -- could this be done in an effort to just reduce the number

5   of opt-outs?

6          THE COURT:  Mr. Karpuk, do you understand the

7   question?

8          MR. KARPUK:  I do, Your Honor.

9          The only information that we requested from

10  stockholders who wished to opt-out was information necessary

11  to withhold the distribution to them under the plan.  We did

12  not ask that information of parties who did not opt-out.

13         THE COURT:  Thank you.

14         MR. DIJKSTRA:  Your Honor, I have a question, if I

15  may.  Dennis Dijkstra.

16         THE COURT:  Mr. Dijkstra, yes.

17         MR. DIJKSTRA:  Mr. Karpuk, I went through the

18  process very early on -- actually already of opting out

19  through the form, also through my actions, but that's another

20  story.  And can you explain to me what that email was about,

21  about the revoke in, revoke out?  And I have no clue what it

22  was about until (indiscernible) or Stretto never really gave

23  me an answer as well.  Can you please explain to me what the

24  revoke in, revoke out?  I couldn't understand it.

25         MR. KARPUK:  That email was sent in order to

1  request additional information that was required in order to

2  withhold a distribution.  In order for every party that

3  submitted an opt-out in order to make a distribution under

4  the plan, we needed to know either that the nominee where

5  those shares were held.

6               MR. DIJKSTRA:   Can I respond to that?

7               So, I opted out and I got a revoke out email.  My

8  mother also owns shares with VIVUS and she thought she takes

9  the box right.  She filled everything in and she sent it out,

10 but she never got a response.

11              And only by my doing saying why are you contacting

12 me and not my mother I found that, by accident, just by

13 accident she sends an opt form back without checking the box,

14 so it means everybody else, maybe not so computer savvy or

15 didn't check it right, they send out an opt-out and never got

16 any response back. So you were only responding to people with

17 a renewed or revoke in, revoke out when they check the box.

18 But the people who do check the box they don't get any

19 response back.

20              THE COURT:  Let me ask a question based on that

21 Mr. Karpuk.  Did the email only -- did a follow-up email only

22 go to people who had checked the opt-out box and it did not

23 go to people where you received the form who did not check

24 the opt-out box, is that correct?

25              MR. KARPUK:  That is correct, Your Honor.  We only

1 reached out to those parties who submitted an opt-out form

2 with the box checked.

3        THE COURT:  Okay.  That gives factual information

4 which I understand going to be somehow addressed later, so

5 I'll withhold any thoughts I have until I hear what that

6 discussion is.

7        If there are any more facts that we need to get

8 from Mr. Karpuk?

9     (No verbal response)

10        THE COURT:  Okay.  I hear no one else.

11        Mr. Friedmann, does that prompt any questions from

12 you?

13        MR. FRIEDMANN:  None, Your Honor.  Thank you.

14        THE COURT:  Okay.  I'm informed by my staff that I

15 did not swear Mr. Karpuk in for his responses, so please, Mr.

16 Karpuk, can you confirm to me that the responses that you

17 provided were the truth, the whole truth, and nothing but the

18 truth, to the best of your knowledge and ability?

19        MR. KARPUK:  I can affirm that, Your Honor.

20        THE COURT:  Thank you.

21        Okay.  Mr. Karpuk, you may be excused.

22        MR. KARPUK:  Thank you, Your Honor.

23     (Witness excused)

24        MR. FRIEDMANN:  Your Honor, this is Mr. Friedmann

25 again.  Before we call the next witness, is it -- get your

1  permission for Ms. Frizzley also to be excused from this

2  hearing?

3          THE COURT:  Yes.

4          MR. FRIEDMANN:  Thank you, Your Honor.

5          THE COURT:  Can everyone hear me?  I'm getting a

6  note from my staff that it's difficult to.

7          Mr. Friedmann, can you hear me fine?

8          MR. FRIEDMANN:  I can hear you fine, Your Honor.

9  Thank you.

10          THE COURT:  Okay.  I'll certainly try and make

11  sure I'm close to the microphone when I speak. Thank you.

12          MR. FRIEDMANN:  Your Honor, with your permission,

13  the debtors next wish to call Ms. Teri Stratton of Piper

14  Sandler.  And as an initial matter, before she is sworn in,

15  we would respectfully move to enter into evidence Mr.

16  Stratton's declaration which was filed as Docket Number 191,

17  subject, of course, to cross-examination following her live

18  direct testimony.

19          THE COURT:  Is there any objection to the entry

20  into evidence of Ms. Stratton's declaration, subject to

21  cross-examination?

22      (No verbal response)

23          THE COURT:  I hear no objection.  It's admitted.

24      (Declaration of Teri Stratton, received into evidence)

25          And, Ms. Stratton, can you please raise your right

1  hand, please?

2           TERI STRATTON, DEBTORS' WITNESS, AFFIRMED

3               THE WITNESS:  Yes.

4           THE COURT:  Please state your full name and spell

5  your last name for the record?

6           THE WITNESS:  Teri L. Stratton; T-E-R-I, S-T-R-A-

7  T-T-O-N.

8           THE COURT:  Mr. Friedmann.

9           MR. FRIEDMANN:  Thank you, Your Honor.

10                    DIRECT EXAMINATION

11 BY MR. FRIEDMANN:

12 Q    Ms. Stratton, can you please describe your occupation

13 for the court?

14 A    Yes, I'm a managing director in the restructuring and

15 special situations group at Piper Sandler.  We are a national

16 investment bank and I work with clients who are stressed or

17 distressed, helping them get through their issues whether in

18 court or out of court, (indiscernible) et cetera.

19 Q    And, Ms. Stratton, do you have any particular field or

20 fields of expertise?

21 A    My areas of expertise are restructuring and bankruptcy

22 topics, financing and valuation work.

23 Q    And, Ms. Stratton, what do you mean when you say

24 bankruptcy and restructuring topic?

25 A    There's many areas in finance that are specific

1  restructuring and bankruptcy, even how to value the company

2  is very different than how to value a (indiscernible)

3  company, knowing the different parts of the law and how plan

4  of reorganization works, waterfall analyses, and the process.

5  Q     And, Ms. Stratton, what do you mean when you say that

6  you're an expert in the area of valuation?

7  A     I have an MBA from the Anderson School at UCLA with

8  honors with an emphasis in finance.  I took many valuation

9  courses.  I have taught valuation courses for the Association

10  of Insolvency and Restructuring advisors, Part II of the

11  Certified Insolvency and Restructuring Advisors program with

12  about plan of reorganization valuation.  I've taught that

13  class more than twenty or thirty times.

14       I train my staff in valuation.  And I'm on the Fairness

15  Opinion Committee for Piper Sandler where I review fairness

16  opinions before they're approved by the committee.

17            THE COURT:  Ms. Stratton, you're a little fuzzy

18  for me, so can you make sure you're close to your microphone.

19  Thank you.

20            THE WITNESS:  Is that better?  Is that better?

21            THE COURT:  Maybe.

22            THE WITNESS:  Let me see if I can make it higher.

23  Is that any better?  I'll just speaker louder.

24            THE COURT:  I think it's a little better and just

25  make sure you're speaking slowly.

1        THE WITNESS:  Okay.  Okay.

2        THE COURT:  Mr. Friedmann.

3        MR. FRIEDMANN:  That is better.

4  BY MR. FRIEDMANN:

5  Q    And, Ms. Stratton, I want to break down what you

6  explained.  But, first off, and when you say the term

7  valuation can you just explain what you mean by that?

8  A    A valuation for the purpose of enterprise valuation

9  where the company worth as a going concern.

10  Q    Okay.  How long have you been practicing in the fields

11  of restructuring and corporate valuation?

12  A    I've been doing restructuring for probably about

13  twenty-five years.  Prior to my investment banking career, I

14  was a workout lender at a bank in California.  I've been

15  doing valuation work for about twenty years.

16  Q    And, Ms. Stratton, as we just had submitted into

17  evidence, you submitted a declaration in these cases in

18  support of debtors' prepackaged plan of reorganization,

19  correct?

20  A    Yes.

21  Q    And does that declaration describe your analysis of the

22  estimated enterprise value of the debtors' businesses as a

23  going concern?

24  A    Yes, it does.

25  Q    Have you ever performed this type of valuation analysis

1  before?

2  A    Yes.  At least fifty times in my career.

3  Q    You mentioned your academic background before, Ms.

4  Stratton, but it was a little fuzzy.  We couldn't hear you

5  that way.  I just want to briefly go through that again.

6       Can you just very briefly describe your academic

7  background?

8  A    I have a Bachelor of Arts in economics from UCLA.  I

9  graduated in December '92 and I have an MBA with honors with

10 emphasis in finance from the Anderson School at UCLA. I

11 graduated in 2000.

12 Q    And I apologize because also when it was a little

13 difficult to hear you, but do you hold any specific

14 certifications?

15 A    I'm a CIRA, which is a certified insolvency and

16 restructuring advisor.  I also hold FINRA (indiscernible) and

17 63.

18 Q    How long have you been certified as an insolvency and

19 restructuring advisor?

20 A    It's been about fifteen years.

21 Q    And, again, I think you may have mentioned this, but

22 have you ever taught any courses or lectured in your fields

23 of expertise?

24 A    Yes.  I have regularly taught the CIRA Level II course

25 which is specifically for valuation components of

1   reorganization.  I've also spoke a number of times at

2   industry events, including the American Bankruptcy Institute

3   for turnaround management associations, the Association of

4   Insolvency and Restructuring Advisors on many topics

5   including valuation.

6   Q    And have you authored any publications regarding

7   corporate valuations?

8   A    Yeah, I have one white paper that I wrote with a lot of

9   other attorneys and a fellow investment banker on Chapter 11

10  bankruptcy sales which also went into value.

11  Q    Great.  And do you ever speak on the field of corporate

12  valuation?

13  A    Yeah.  I think I just covered that.  But as far as most

14  of the organizations but ABI, TMA, ARRA, Valcon and several

15  times have spoken specifically about valuation.

16  Q    Okay.  Great.  I think you mentioned earlier also that

17  you're a member of Piper Sandler's Fairness Opinion

18  Committee.  Can you explain exactly what that is?

19  A    So a fairness opinion is often required for

20  shareholders, especially public shareholders when they are

21  buying or selling assets.  The investment bankers in those

22  different industry groups prepare the fairness opinion and

23  schedule a meeting with a fairness opinion.  We then go

24  through and ask questions and try to poke holes into the

25  valuation to make sure it stands -- that it's reasonable and

1 tested.

2 Q    And in that role approximately how many other

3 valuations have you reviewed?

4 A    Probably thirty.  I don't really know.  I get an email

5 that says I need be on the committee and I joined.

6 Q    Okay.

7         MR. FRIEDMANN:  Your Honor, pursuant to Federal

8 Rule of Evidence 702 made applicable to these proceedings by

9 Federal Rule of Bankruptcy Procedure 9017, at this time I

10 respectfully wish to tender the witness, Ms. Teri L.

11 Stratton, as an expert in the field of corporate valuation.

12         THE COURT:  Are there any objections?

13     (No verbal response)

14         THE COURT:  I hear none.  I will recognize her as

15 an expert in corporate valuation.

16         MR. FRIEDMANN:  Thank you, Your Honor.

17 BY MR. FRIEDMANN:

18 Q    Ms. Stratton, have you arrived at an opinion concerning

19 the enterprise value of the debtors on a going concern basis

20 as of the effective date?

21 A    Yes.

22 Q    Can you please tell us what that opinion is?

23 A    My opinion is that the going concern value is $225

24 million dollars or less.

25 Q    And have you arrived at an opinion, Ms. Stratton,

1  concerning whether the debtors will be solvent as of the

2  effective date?

3  A    I have.

4  Q    And can you please share with us that opinion?

5  A    The debtors are not solvent as of the effective date.

6  Q    What is the basis of that opinion?

7  A    The information was used from Mr. Pickering on the

8  claim are greater than the value that was concluded in Piper

9  and my analysis.

10 Q    Do you understand, Ms. Stratton, that a number of VIVUS

11 stockholders have challenged Piper Sandler's valuation

12 analysis?

13 A    Yes.

14 Q    And how do you understand that?

15 A    We have received many objections and additional

16 information, as well as the equity committee hearing.

17 Q    Have you had an opportunity to review all of those

18 objections?

19 A    I have.

20 Q    Did your team consider any of the opposing

21 stockholder's criticisms of Piper Sandler's valuation and the

22 conclusions that you reached?

23 A    Yes, we did.

24 Q    In what way did you consider them?

25 A    There were some requests for a different analyses and

1  in the week since the equity committee hearing, we have

2  conducted additional analyses to (indiscernible) that none of

3  those concerns were valid.

4  Q    Did any of those criticisms ultimately change your

5  opinion concerning debtors' enterprise value as of the

6  effective date?

7  A    No, they did not.

8  Q    And did any of those criticisms ultimately change your

9  opinion concerning whether the debtors would be solvent as of

10 the effective date?

11 A    No, they did not.

12         MR. FRIEDMANN:  Your Honor, with your permission,

13 I'd like to bring up as a demonstrative Exhibit B to Ms.

14 Stratton's declaration.

15         THE COURT:  Okay.  Do you know if you have

16 permission?

17         MR. FRIEDMANN:  I believe that that was

18 coordinated in advance and my colleague, Taylor Dougherty, I

19 believe, was given the permission to be able to put that up

20 on the screen.

21         THE COURT:  Well that's fine then.

22         MR. FRIEDMANN:  Thank you, Your Honor.

23         Thank you, Taylor.

24 BY MR. FRIEDMANN:

25 Q    Ms. Stratton, do you recognize this presentation that's

1  just been put on the screen and can you explain to the court

2  what this is briefly?

3  A     Yes.  This is a presentation that summarizes the

4  conclusions of the valuation analysis by Piper Sandler that

5  was used in the disclosure statement.

6           MR. FRIEDMANN:  And, Ms. Dougherty, can you please

7  turn to the presentation to page 4?

8  BY MR. FRIEDMANN:

9  Q     Ms. Stratton, can you please explain what this slide of

10  your presentation is showing?

11  A     This shows the different methods of financial analysis

12  that Piper used in coming to a valid conclusion.

13  Q     And what were those methods of financial analysis that

14  Piper Sandler used?

15  A     We used a three generally accepted valuation method.

16  The analysis had selected public companies comparable to the

17  analysis of selected precedent transactions and the

18  (indiscernible) cash flow analysis.

19  Q     You used the term generally accepted, Ms. Stratton, can

20  you explain for the court why these methods are generally

21  accepted in your view?

22  A     You know, obviously, there's new valuation theories and

23  methodologies that come to past from time to time

24  academically.  These are the three methods that are almost

25  always used.  And almost every disclosure statement I have

1  ever read or a valuation I have done needed these three

2  methodologies, so these are the three methodologies for

3  decades have been used by valuation experts.

4  Q     And you mentioned earlier, Ms. Stratton, that you had

5  reviewed the objections of some of the objecting

6  stockholders, correct?

7  A     Yes.

8  Q     Does that include Mr. Makosky's objection which had

9  attached to it a letter from Mr. Ahmadi?

10 A     Yes.

11 Q     Okay.  Do you recall that Mr. Ahmadi suggested in his

12 letter that Piper Sandler should have also conducted a twice

13 to earnings for EBITDA-based valuation of the debtors?

14 A     I do.

15 Q     Do you agree with Mr. Ahmadi's suggestion in that

16 regard?

17 A     I do not.

18 Q     Can you explain for the court why?

19 A     So each industry has different metrics that you would

20 use for valuing on a comparable and market basis, market

21 approach basis.  So both have selected public comparables and

22 have selected precedent transactions or market approaches

23 where you compare other transactions or company to the target

24 company.

25         And in this case, I would say argue first that a P/E

1  ratio is generally used by research analysts to determine

2  whether or not a company is trading above or below comparable

3  companies and not as much for valuation.  And in this case,

4  we did not an EBITDA- base approach.

5       We used a revenue-based approach because in both of

6  those cases, earning and EBITDA while they're very wildly

7  across pharmaceutical companies, depending on what they have

8  drugs in development, where they are in development, what

9  their marketing structure is, what their G&A structure is.

10      Some companies in pharmaceuticals don't have earnings.

11 So the most used approach to pharmaceutical companies are

12 metric in revenue because most -- usually publicly disclosed

13 without precedent transactions and on public companies.

14           THE COURT:  Mr. Friedmann, I can't hear you now.

15           MR. FRIEDMANN:  I'm sorry.  Thank you.  I forgot

16 to unmute myself.

17 BY MR. FRIEDMANN:

18 Q    Turning back to Slide 4, Ms. Stratton, where you

19 described the three methodologies that you used.  I'd like to

20 talk about them, but one at a time.

21      Can we start with the analysis of selected public

22 comparables?  Can you please walk us through your analysis

23 using that methodology, please?

24 A    Can we go to page 7 where we actually have the numbers

25 behind it?

1        So in reviewing selected public comparables, the key is

2   to find a set of companies that are comparable to the target.

3   In this case VIVUS.  My team and I spent considerable time

4   coming up with the metrics we would need for this public

5   company.  These sixteen companies (indiscernible) all North

6   American branded specialty pharmaceutical companies.  They

7   have enterprise values of approximately $150 million to one

8   billion. They market one or more branded specialty

9   pharmaceutical products.  And they are companies that have

10  20/20 revenue estimates available.

11  Q    Ms. Stratton, in blessing these companies for your

12  comparable public companies' analysis, were there any

13  companies that you chose not to include?

14  A    No.  Once we came up with the appropriate criteria and,

15  again, that is (indiscernible) system of my specialty

16  pharmaceutical partner.  We've kept every company that met

17  that critieria.

18  Q    And how can you be confident that you're not leaving

19  out any relevant companies, that those were the right

20  criteria?

21  A    We spent hours discussing the criteria and am very

22  confident that my specialty pharmaceutical partner and the

23  healthcare team at Piper knows the appropriate companies that

24  we should be looking at.

25  Q    Ms. Stratton, what were the results of Piper Sandler's

1   comparable public company analysis?

2   A     So if you see they applied the median, the median

3   revenue multiples and that gave us a range of 208 to 224, the

4   midpoint is 216.  Actually, I should say we went above and

5   below the median in their value to revenue.

6   Q     Thank you, Ms. Stratton.

7            MR. FRIEDMANN:  Ms. Dougherty, can we turn to back

8   to Slide 4?

9   BY MR. FRIEDMANN:

10  Q     Ms. Stratton, can you please walk us through the

11  methodology that you have listed in the middle there, the

12  analysis of selected precedent transactions?

13  A     If I can go to page 8.  This is the background for the

14  precedent acquisition. We chose to include acquisitions of

15  North American and European specialty pharmaceutical

16  companies.  It doesn't announce since January 1st 2015.

17        These are companies with commercial sage, branded

18  specialty pharmaceutical products and have been five-target

19  enterprise valuations from $40 million to $1.5 billion.  They

20  (indiscernible) any transactions that did not disclose LTM

21  revenue.

22        (indiscernible) to page 9.  These are purchases of

23  North Americana and European Specialty Pharmaceutical

24  products.  Again, announced since January 1st of 2015.  These

25  are commercial sage branded specialty pharmaceutical

1  products.

2      And, again, just to point out, we excluded any

3  transactions that would not disclose these target products,

4  last twelve months revenue.

5  Q    Ms. Stretton, let me ask you the same question as I did

6  before.  Are you confident that these twenty-seven precedent

7  transactions represent the universe of all relevant precedent

8  transactions to be included in your analysis?

9  A    And, again, if there were more companies that had

10 disclosed revenue, not every company who makes an acquisition

11 before using information publicly.  There may be some more

12 that we would add.  But they did meet the criteria because

13 the information is not disclosed.  Therefore, we wouldn't

14 have a number to compare the enterprise value to last twelve

15 months revenue.

16 Q    Ms. Stratton, can you please let us know what Piper

17 Sandler concluded was the result of its precedent

18 transactions analysis?

19 A    Yes, we came up with a range from $220 million to $249

20 million with a midpoint of $234.

21 Q    Thank you.

22          MR. FRIEDMANN:  And, Ms. Dougherty, if we can move

23 back to Slide 4 again, please?  Thank you.

24 BY MR. FRIEDMANN:

25 Q    Ms. Stratton, can you now please describe the third

1  methodology that you have that Piper Sandler performed, the

2  discounted cash flow analysis?

3  A    Yeah.  If you want to go page 10 that is the page that

4  has the discounted cash flow analysis.

5       We performed a discounted cash flow analysis by bidding

6  the projections of the company together to get to a free cash

7  flow.  You can see in the bottom of the screen.  The present

8  value, those four cash flows with your rated average cost of

9  capital.  And then you add the present value of a terminal

10 value.

11      To come up with a terminal value, we used the

12 perpetuity growth method.  The perpetuity growth rate that we

13 used, as you can see here, is a range from zero to

14 (indiscernible) 5 percent.  And the rated average cost of

15 capital we used was 18.8 percent.  I'm sorry, we used a range

16 from 17.8 to 18.8.

17 Q    Ms. Stratton, to what extent does Piper Sandler's DCF

18 take into account the debtors' anticipated future profits and

19 anticipated future performance?

20 A    As you can see in this net revenue, the numbers jump

21 quite a bit so this is all of the -- this is from the

22 company's projections.  And what they believe they will

23 change over the next couple of years with their existing

24 commercial products.

25 Q    And the projections that you're using, Ms. Stratton,

1  were those prepared solely for the purpose of debtors'

2  Chapter 11 filing?

3  A    No, they were not.

4  Q    What else were they used for, to the best of your

5  knowledge?

6  A    They were used as the company's -- this was slightly

7  changed before I would say for the year -- the projections

8  are based on projections that were the company's 2020

9  budgets, so it was approved by the board to be used for

10 various company internal policies.  It was also used for the

11 financing and equity raising.

12 Q    And, Ms. Stratton, I see you have a three-year

13 projection period that you've used.  Is that the right period

14 of time, in your view?

15 A    It's three and a half years, but yes.  The

16 pharmaceutical industry is subject to a competition, change

17 in technology.  It would be very difficult to project beyond

18 this period of time.  And this is a reasonable projection

19 period to which we would say that these projections are

20 reasonable.

21 Q    And, Ms. Stratton, what were the results of Piper

22 Sandler's discounted cash flow analysis?

23 A    Using that range, it is $202 million to $257 million

24 with a midpoint of 226.

25              MR. FRIEDMANN:  And, Ms. Dougherty, if we go back

1  to Slide 5, please?

2  BY MR. FRIEDMANN:

3  Q        And, Ms. Stratton, I see that on this slide it's

4  showing the three methodologies that you used and then

5  there's a fourth column as well labeled, "Weighted

6  Illustrative Enterprise Value Range," can you please explain

7  what that is?

8  A     So when you do your valuation not every valuation

9  approach -- not one method is more accurate than others.

10  They all have some downsides.  So the most appropriate way to

11  look at a total valuation is to weight them so that you get

12  to a weighted -- a weight of all of the valuation techniques.

13  Q     Ms. Stratton, if you can just explain in a little bit

14  more detail why wouldn't you just take one of these

15  methodologies and, perhaps, pick the one that best shows what

16  your -- you know, what someone may want to approve and,

17  instead, why are you doing this weighted average of all

18  three?

19  A     So each method has its own downside or positive

20  attribute.  The public comparable method sometimes you may

21  not have the most comparable companies that you're looking

22  at.  It's also a valuation at a point in time, using the

23  stock prices and information from those public companies on

24  one date.

25        The precedent transactions, again, you may not have the

1  comparability in each of the transactions.  In this case, for

2  lack of public release information, may limit your total

3  universe of transactions.

4       And, finally, a discounted cash flow analysis is

5  subject to a lot of assumptions, anyone of which could alter

6  your conclusion by a lot.  It's generally better for steady

7  and predictable industry which this one is not

8  (indiscernible) predictable.

9  Q    I see here, Ms. Stratton, that Piper Sandler chose to

10 assign the result of each valuation methodology a 33 percent

11 weight.  Can you explain that?

12 A    So when weighting a different valuation method, you

13 have to take in those different downfalls and consider what

14 the appropriate weighting is.  It's not always 33 percent for

15 each method.  Sometimes, you might weight one method more.

16      In this case, we felt that all three methods were

17 valid, all three methods had positive attributes and negative

18 attributes and that each should be taken equally and is

19 waiting for the conclusion on the value range.

20 Q    And, Ms. Stratton, what were the results of Piper

21 Sandler's weighting calculation?

22 A    The range for the final conclusion is 210 million to

23 243 million with a midpoint of 225 million.

24 Q    Ms. Stratton, are the results of Piper Sandler's June

25 2020 valuation analysis the only data point that you and your

1  team considered in connection with its valuation analysis?

2  A     No, it is not.

3  Q     To what extent, if at all, did Piper Sandler also

4  consider the outcome of debtors' efforts to refinance their

5  funded debt?

6  A     So this is a, you know, a valuation exercise.  Market

7  testing is a reality check and in that reality check we

8  determine that the value that the market had come up with in

9  that (indiscernible) and debt rating was 197 million, so it

10 gave us more comfort in the range and in each of our

11 valuation methods.

12        MR. FRIEDMANN:  And if we can turn to -- sorry.

13 BY MR. FRIEDMAN:

14 Q     Ms. Stratton, is what you just described is that what

15 is commonly called a market test?

16 A     Yes.  Again, valuation is an exercise.  It's when you

17 actually go to sell a company or, in this case, market the

18 company with the equity that you see what the true value may

19 be.  While it's not a valuation method, it's a factor into

20 our final conclusion as we determine this is a very good

21 reality check.

22 Q     In your experience, Ms. Stratton, are the results of a

23 market test like this helpful as an indicator of what an

24 enterprise's value may be?

25 A     Yes, it is.

1        MR. FRIEDMANN:  Ms. Dougherty, please move over to

2   page 3, please of the presentation?

3   BY MR. FRIEDMANN?

4   Q    Ms. Stratton, can you please explain or the court what

5   this slide is showing?

6   A    Since you are dealing with a public company you do have

7   the implied market valuation based on its market

8   capitalization.  I would say usually with a public company

9   that's distressed we usually have a valuation (indiscernible)

10  lowers on the market.  Each year we actually have a value

11  (indiscernible) above the market.

12       So I think this was also a good reality check for as

13  you see here the stocks trading is at 629 with 82 cents per

14  share.  We added the market capitalization to the net debt

15  and there was an implied enterprise value from the market as

16  of 6/29 of 215.4 million.

17  Q    And why did you pick the stock price as of June 29th,

18  2020 for this analysis, Ms. Stratton?

19  A    Our valuation was of June 29th so it had the public

20  comparable information as of 6/29.  The precedent

21  transactions are all as of 6/29 and the information used is

22  the discounted cash flow and the weight average cost of

23  capital are also as of 6/29.

24  Q    Okay.  Ms. Stratton, why didn't you simply incorporate

25  the results of your prepetition market valuation into your

1  overall enterprise valuation?

2  A    Again, are you -- it's unique here and that it's

3  actually lower than our conclusion, but often times it's

4  higher simply because the market didn't have all the

5  information that these professionals do or understand the

6  distress process.

7  Q    So what value, if any, does this prepetition market

8  valuation have in connection with your enterprise valuation?

9  A    It shows that in this case even without understanding

10  distress the market value of the company lower than Piper

11  concluded the value was.

12         MR. FRIEDMANN:  And, Ms. Dougherty, if we can go

13  back to page 5?  Thank you.

14  BY MR. FRIEDMANN:

15  Q    Do you recall, Ms. Stratton, that counsel for the

16  opposing stockholder at the equity committee hearing asked a

17  number of questions about whether the result of some of the

18  parts valuation rather than enterprise valuation might, in

19  some way, undermine your enterprise valuation analysis?

20  A    Yes.

21  Q    And since the equity committee hearing has Piper

22  Sandler done anything to address or investigate those

23  concerns that were raised by the opposing stockholders?

24  A    Yes.  We conducted a (indiscernible) of the parts

25  valuation analysis.

1  Q      And what were the results of that analysis?

2  A      The results were 219.2 million.

3  Q      Okay. And can you explain -- I probably jumped ahead a

4  little too much.  Can you explain for the benefit of the

5  court as well as the stockholders that are online here

6  exactly what a some of the parts analysis is?

7  A      Some of the parts is appropriate when you have many

8  business lines or (indiscernible) products.  It's not always

9  relevant.  We did not think it was relevant here.  But it may

10  be relevant in other companies or other transactions.

11  Q      So why also didn't Piper Sandler do this valuation

12  analysis back in June like in all the other analyses?

13  A      So, as I explained in the market approaches, that's a

14  public trading comparable.  There's no precedent transaction.

15  The metric used in this industry is revenue.  So it is

16  duplicative.  In our exercise, we actually took the last

17  twelve months (indiscernible) revenue, so last twelve months

18  (indiscernible) revenue) and the last twelve months

19  (indiscernible) or FINRA revenue and times it by the

20  precedent assets median multiple to come up with that value

21  conclusion.

22      So it's highly duplicative because the sum of those

23  revenues is the same revenue as a going concern valuation.

24  Q      Okay. And what multiple did you use?

25  A      3.1 times which is the median and the precedent asset

1  transaction.

2  Q    Okay.  And I know you answered this already, but what

3  did you say was the result of your sum of the parts analysis?

4  A    219.2 million.

5  Q    To what extent does that take into consideration a

6  value that was ascribed by Piper Sandler for the VI-0106 drug

7  that heard so much about at the equity committee hearing?

8  A    It does not ascribe any value to that.

9  Q    Why not?

10  A    We still believe that it is a speculative asset.  So,

11  that does not include any value for VI-0106.

12  Q    Can you explain a little bit more specifically why you

13  reached that result?

14  A    So, I think in my declaration it states that, I would

15  say, Denida [phonetic] had and I had to give a value to VI-

16  0106 it would be no more than $1 million dollars which would

17  then get me to Q-100 20 million point two million to 220.2

18  million.  That is because that is what the company paid for

19  this asset in January of 2017 and thus far have no new

20  efficacy data.

21  Q    Ms. Stratton, if you absolutely had to assign some

22  value to VI-0106, like I can imagine that, you know, someone

23  would pay something for it.  Would you be able to give it

24  some kind of value in a sum of the parts analysis?

25  A    Yes.  Up to one million.

1  Q     Okay.  And why not more than that?

2  A     The asset is not in a development stage where you would

3  say, and especially pharmaceuticals, is value inflexion.  It

4  is in phase one.  It has some safety data.  It does not have

5  any efficacy data or how the drug works so it can be used.

6  They have not started any phase two trials for this

7  formulation or for the classes that they are targeting.

8        So, there is no new information since they purchased

9  the assets.

10  Q     Ms. Stratton, during the time that Piper Sandler has

11  been engaged as debtor's investment banker has anyone

12  contacted you about purchasing any of the company's assets?

13  A     Yes.

14  Q     And has any of those interested parties approached you

15  about potentially acquiring this VI-0106 drug?

16  A     No.

17  Q     Are you aware as to whether or not debtors have ever

18  received any offers to buy the VI-0106?

19  A     It's my understanding that Mr. Chlavin had submitted an

20  offer to purchase VI-0106.

21  Q     Do you know when that was?

22  A     I believe it was last week.

23  Q     And what do you know about Mr. Chlavin's offer?

24  A     That he has proposed a purchase price of $1 million

25  dollars.

1  Q    Do you know anything else about his offer?

2  A    I believe its contingent.  So, it's not a fully

3  committed offer or final offer.  It would take some work in

4  order for that to be a final and committed offer.

5  Q    Does Mr. Chlavin's proposed purchase price of $1

6  million dollars reflect a market test, so to speak, of what

7  debtors would ultimately realize from such a sale?

8  A    I believe it may, yes.

9  Q    So, if debtors have now received an offer to purchase

10  Vi-0106 for $1 million dollars should you be adding that to

11  your sum of the parts analysis?

12  A    Yes.  And, coincidentally, my million dollars wasn't

13  based on his offer. We did that sum of the parts prior to his

14  offer.  Again, that would make it 220.2 million.

15  Q    Okay.  I asked you earlier, Ms. Stratton, about some of

16  the points that Mr. Ahmadi [phonetic] made in the August 9th

17  letter that was submitted to the court as part of Mr.

18  Makosky's objection.  Do you recall that?

19  A    Yes.

20  Q    And do you recall Mr. Ahmadi suggesting that Vi-0106

21  has significant value and that Piper Sandler failed to

22  include it in its valuation analysis?

23  A    Yes, I do.

24  Q    And do you recall Mr. Ahmadi pointing to two

25  transactions in particular that he believes demonstrates Vi-

1  0106's value?

2  A    Yes, I do.

3  Q    And with respect to the first of those transactions do

4  you recall it being a September 2018 transaction between

5  MannKind Corporation and United Therapeutics for the rights

6  to develop MannKind's Trade C [phonetic]?

7  A    Yes.

8  Q    In your view, Ms. Stratton, do you believe that the

9  MannKind transaction, in fact, demonstrates that VI-0106 has

10 significant value that in retrospect Piper Sandler should

11 have included in its valuation analysis?

12 A    I think it's not an appropriate transaction and

13 irrelevant to VI-0106.

14 Q    Why is that?

15 A    So, I will explain the transaction because the one area

16 here is it is a phase one asset.  The reason that United

17 Therapeutics bought a phase one asset for value was it is a

18 different method of delivery for the drug Treprostinil.

19 Treprostinil is already approved for the treatment of PAH

20 and, in fact, United Therapeutics has the commercial drug in

21 the market using Treprostinil to treat PAH.

22       So, by making this acquisition they, one, took out a

23 competitor in their drug which they thought had a superior

24 method of delivery and, two, they also have the rights for

25 this method of delivery not only for Treprostinil, but also

1  for other drugs in their portfolio.

2  Q    Ms. Stratton, let me also ask you about the other

3  transaction that Mr. Ahmadi pointed out.  That is, if you

4  recall, was a November 2018 transaction between Arena

5  Pharmaceuticals and United Therapeutics for Ryland [phonetic]

6  -- Relling Tag [phonetic], I believe.  Is that correct?

7  A    Yes.

8  Q    And do you believe, Ms. Stratton, that the Arena

9  transaction demonstrates that VI-0106 has significant value

10 that Piper Sandler should have included in its valuation

11 analysis.

12 A    The -- no, I do not.

13 Q    Why is that?

14 A    The purchase of Relling Tag was for a drug that had

15 gone through phase two safety and efficacy data.  So, it's at

16 very different point in its development stage as well as its

17 now starting phase three.

18 Q    Ms. Stratton, do you recall that counsel for the

19 opposing stock holders at the equity committee hearing asked

20 you a number of questions concerning whether or not Piper

21 Sandler had endeavored to determine whether the debtor's

22 enterprise value had perhaps increased as of that June 29th,

23 2020 date?

24 A    I do.

25 Q    And since the equity committee hearing has Piper

1  Sandler done anything to either address or investigate those

2  concerns that were raised?

3  A     Yes, we have.

4  Q     Can you explain for the court what you have done?

5  A     We updated all of the information in the public trading

6  comparables as of August 11th.  We reviewed to make sure

7  there were no new precedent transactions that have been

8  announced.  We updated the (indiscernible) average cost of

9  capital calculations for the DCF analysis.  And had a

10  discussion with the management team on whether the

11  projections should change either positive or negative based

12  on any new information.

13  Q     What was the result of your team's work?

14  A     It had a mid-point rated enterprise value range of 231

15  million.

16  Q     So, am I correct that's about, looking at the chart we

17  have up here, $6 million dollars more than the mid-point of

18  the illustrative enterprise value range you had in your

19  initial enterprise valuation?

20  A     That's correct.

21  Q     Can you explain for the court what you understand to be

22  the primary causes of that $6 million dollar increase in the

23  mid-point?

24  A     There's two main issues that are outside of the

25  company:

1        One is in the public trading comparables there are a

2   few companies that have traded a little bit higher as well as

3   a few companies who have higher net debt which increases

4   enterprise value.  So, the multiple in public trading

5   comparables was slightly higher.

6        The other change is that we used the Duff & Phelps risk

7   free rate in our weighted average cost of capital.  And in

8   July they provided guidance that decreased the risk-free rate

9   from three percent to 2.5 percent.

10  Q    In your view is the observed $6 million dollar increase

11  material?

12  A    No, it is not.

13  Q    Why not?

14  A    It's a very small percentage of the total range and not

15  a large movement from our mid-point.

16  Q    Okay.  Ms. Stratton, we've been going for a little

17  while now and we've thrown a lot of numbers out at the court.

18  So, I thought maybe we could briefly just run through and

19  summarize them for everyone's benefit, probably.

20       Let me just run through from the top.  Can you remind

21  us what the mid-point of Piper Sandler's enterprise valuation

22  range was?  That will be the easiest one because its right up

23  there, I think.

24  A    225 million.

25  Q    And what we just spoke about, what were the results of

1   Piper Sandler's updated valuation analysis?

2   A    231 million.

3   Q    Okay.  And we spoke earlier about the prepetition

4   market valuation. What was the result of that?

5   A    215 million.

6   Q    Okay.  And then we also talked about the sum of the

7   parts analysis.  What were the results of that analysis?

8   A    220 million.

9   Q    That is with including VI-0106?

10  A    That's correct.

11  Q    Okay.  And then, finally, what were the results of the

12  market test?

13  A    197 million.

14  Q    Okay.  Ms. Stratton, I'd like to ask you a couple

15  questions about some of the issues that came up in the

16  supplemental objection that was filed by one of the

17  stockholders, Mr. Dijkstra.

18       Have you had an opportunity to review his two

19  supplemental objections since you filed your declaration?

20  A    Yes, I have.

21  Q    Okay.  So, in the first of those supplemental

22  objections Mr. Dijkstra, do you recall him suggesting that

23  Piper Sandler failed to consider the value of a compound

24  called Ascomycin in its valuation analysis?

25  A    Yes, I do.

1  Q     How do you respond to Mr. Dijkstra's concerns with

2  respect to Ascomycin?

3  A     My understanding of Ascomycin is it was part of the

4  purchase when the company purchased VI-0106.  So, they paid

5  $1 million dollars for both the Ascomycin and VI-0106.  The

6  company has never intended to develop Ascomycin.  They

7  believe that VI-0106 is superior, but as it was offered as a

8  package they didn't see any reason not to take it.

9  Q     Do you know, Ms. Stratton, from your discussions with

10 company management or the board as to the extent to which the

11 company has invested any money in the development of

12 Ascomycin?

13 A     There has not been any money spent in the development

14 of Ascomycin.

15 Q     And do you recall Mr. Dijkstra also suggesting that

16 Piper Sandler failed to consider a number of the debtor's

17 granted and pending patents?

18 A     Yes.

19 Q     How do you respond to that concern raised by Mr.

20 Dijkstra?

21 A     We did consider them in our various valuation methods.

22 Do you want me to go further on that?  We would say it is not

23 unusual and, in fact, very common for pharmaceutical

24 companies to obtain a variety of patents to protect their

25 commercial products.  The other patents that he has listed or

1  given the information on relates to the existing commercial

2  products.

3       To the extent that they protect those markets or those

4  applications it is reflected in the company's projections

5  which are used in the discounted cash flow analysis.

6  Q     Ms. Stratton, I'd like to ask you about some of the

7  other criticisms of your work by Dr. Ahmadi in his letter

8  that was attached to Mr. Makosky's objection.  In particular,

9  do you recall, Ms. Stratton, that Mr. Ahmadi claimed that

10 because VI-0106 has obtained orphan drug status it could

11 qualify for fast track breakthrough therapy designation?

12 A     Yes.

13 Q     And I think before I ask any other questions why don't

14 we, for the benefit of everyone, in particular the court, can

15 you explain what orphan drug status means?

16 A     Yes.  Orphan drug status is often awarded by the FDA to

17 pharmaceutical companies who are pursuing therapies for rare

18 diseases.  Knowing that it is a smaller addressable market

19 they get certain tax incentives and most importantly eligible

20 for up to seven years of exclusivity upon approval in the US.

21 And (indiscernible), but in the EU of similar programs who

22 would have ten years of exclusivity upon approval.

23 Q     And can you also explain what a fast track designation

24 is?

25 A     So, the FDA has many other programs including fast

1  track, breakthrough technology, et cetera, or breakthrough

2  therapy.  Those can be applied for after an IMB is filed and

3  after there is some positive phase two data in which the FDA

4  thinks it is best for the public for those drugs to be fast

5  tracked.

6  Q     And are those two programs, the orphan drug status and

7  the fast track breakthrough therapy designation, how, if at

8  all, are those two tied together?

9  A     They're not tied together at all.

10 Q     So, if a drug has obtained orphan drug status does that

11 in some way accelerate its ability to, you know, qualify for

12 the fast track breakthrough program?

13 A     The orphan drug status relates to the disease.  Again,

14 the FDA will look at the particular disease and if there's

15 already therapies in place if it's better than others in the

16 market.  So, once you have phase two data and get a fast

17 track that's not related; although, I imagine more orphan

18 drugs obtain fast track approval then others.

19 Q     Okay.  And is a drug entitled to accelerate approval

20 simply because it's an orphan drug?

21 A     No.

22 Q     Ms. Stratton, I now want to turn to some of the issues

23 regarding NOL's.  You understand that certain of the opposing

24 stockholders and I believe also in Mr. Ahmadi's letter have

25 criticized Piper Sandler for failing to account for the value

1  of debtor's NOL's in its valuation analysis.

2  A      Yes.

3  Q      What is your response to that criticism?

4  A      That's not true.

5  Q      Can you elaborate on that?

6  A      Yes.  So you can't just sell an NOL.  So, it wouldn't

7  be an excess asset that you could sell.  And in the case of

8  the discounted cash flows we applied the NOL's in the

9  projection period.  So, while the company would have had

10 taxable income in 2021, 2022, and 2023 we applied the net

11 operating losses.  So, they are not paying taxes.

12       In addition, when we determined the gross factor for

13 our perpetuated growth method, we used a mid-point of 2.5

14 percent to account for those NOL's.  Had we not had NOL's we

15 would have used a more negative gross factor.

16 Q      So, when Mr. Ahmadi asserts that the value of debtor's

17 NOL's is $235.5 million dollars do you agree with that

18 assessment?

19 A      I do not.

20 Q      Why not?

21 A      First, he used the wrong rate.  So, again, federal

22 NOL's need to be applied to federal taxable income.  State

23 NOL's need to be applied to state taxable income.  He used a

24 rate of 25.7 percent.  We would apply a federal rate to the

25 federal taxes, more like at 21 percent, and a five percent

1 rate to the state NOL's.

2      In addition, even if you use the right tax rates to

3 come up with a value, you're ignoring the time value of

4 money.  This company can't use all of those NOL's this year.

5 Q    Ms. Stratton, Mr. Ahmadi also suggests, in his August

6 9th letter, to the court that if the debtor's management team

7 had simply offered 30 million VIVUS shares at $9 dollars per

8 share back in November 2019 it could have raised enough money

9 to pay-off all of its funded debt.  Do you recall that?

10 A    Yes, I do.

11 Q    Do you agree with Mr. Ahmadi's suggestion?

12 A    No, I don't.

13 Q    Why not?

14 A    First of all, he obtained that $9 dollars from a target

15 share price of the (indiscernible) report.  So, at the time

16 the company's actual share price was $3.20.  So, I think it's

17 completely unreasonable to have an equity offering at three

18 times your market value.  In fact, it would normally be a

19 discount to your market value.

20 Q    Ms. Stratton, are you aware of any precedent where a

21 company has done something like this, offered shares at three

22 times its market price in order to raise --

23 A    No.

24 Q    Ms. Stratton, Mr. Ahmadi also has a calculation at the

25 end of his letter.  Do you recall seeing that where he

1  tabulates his overall value of the debtors?

2  A    Yes.

3  Q    What do you understand his method to be?

4  A    He took the Piper valuation range of 210 to 243 and

5  added his value for NOL's of 235.5 and took a range of

6  valuation for the VI-0106 from 84.5 to 1.2 billion and added

7  to get to his total range.

8  Q    Do you agree with his methodology and his calculations?

9  A    No.

10 Q    Why not?

11 A    He -- well, one, we went through why that NOL is not

12 valued at 235 and it also double counts because we did

13 include the NOL's in our discounted cash flow.  In addition,

14 I don't believe that there should be any value ascribed to

15 VI-0106.  In fact, he took two transactions that are very

16 dissimilar to VI-0106 even if you agreed that you should

17 provide value to come up with his range.

18 Q    Ms. Stratton, did you attend Mr. Ahmadi's deposition?

19 A    I did.

20 Q    And do you recall Mr. Ahmadi describing an enterprise

21 valuation as a simple analysis that, that it's just a matter

22 of adding two plus two?

23 A    I do.

24 Q    Do you agree with Mr. Ahmadi?

25 A    I do not.

1  Q      Why not?

2  A      While this presentation has the summary of our

3  valuation analysis and it may look like we just did math it

4  takes hours and hours of discussions to know the industry, to

5  know the right metrics, to think about transactions.  There

6  is a lot of theory that you must know and discuss.  My team

7  spent countless hours going through information to come up

8  with this conclusion.

9           MR. FRIEDMAN:  Thank you, Ms. Stratton.

10          Your Honor, I have no further questions for Ms.

11 Stratton at this time.

12          THE COURT:  Thank you.

13          I would like to take five minutes and then we will

14 do cross.

15          Ms. Stratton, during this time please do not

16 discuss your testimony with anybody.  Thank you.

17      (Recess taken at 3:08 p.m.)

18      (Proceedings resumed at 3:15 p.m.)

19      (Proceedings resumed in the middle of testimony)

20      . . . No.

21 Q    Okay.  Would you have any reason to disagree, and I

22 will just represent to you that I did that I did that and I

23 came up with the number of 3.6.

24 A    I have not done it, so I couldn't tell you.

25 Q    Okay.  I would ask you to accept my representation.  It

1  is math and people can check, and I'm sure they will if I've

2  done it wrong.  But I did that calculation and came up with a

3  mean of 3.6.  Obviously, if you have a different multiplier,

4  a higher multiplier and apply it to the 2020 estimated

5  revenue of 77.2 million you're going to come up with a much

6  higher valuation number, right?

7  A    In theory, yes.

8  Q    Well not in theory if you actually used the higher

9  number and apply it to the 2020 estimated revenues you will,

10  in fact, come up with a higher valuation number?

11  A    Yes.

12  Q    Again, I'm not going to ask you to do the math

13  necessarily. I would be happy for you to do it if you would

14  like to, to check me, but would that use of the 3.6 million

15  number -- I'm sorry, 3.6 multiplier with a 77.2 million

16  estimated revenue for 220 produce about 278 million in value.

17  Do you have any reason to disagree with my math on that

18  point?

19  A    No.

20  Q    So, we go back to Page 5 again.  And the multiplier

21  numbers were applied against 2020 estimated revenue of 77.2

22  million, right?

23  A    Yes.

24  Q    And is 2020 a fair representation of the revenue

25  potential for VIVUS considering the year is a year in which

1  the company has been in bankruptcy for a few months, two

2  months at least, the impact of COVID-19 and also the

3  company's efforts to restructure prior to the bankruptcy

4  case?

5  A    This is the general accepted method. It's to use the

6  2020 year. I don't know what we're suggesting we would do

7  differently. We don't believe that the bankruptcy has

8  affected the company's operations.

9  Q    Well, your valuation depends on revenue-based model. I

10 heard you say that you disagreed with Mr. Ahmadi's EBITDA

11 based valuation because revenues was a better marker for

12 valuation purposes, right?

13 A    Yes.

14 Q    Okay. So, I think we could disagree, but maybe we

15 agree that 2020 would not be a great revenue year for the

16 debtor. And I think that is possibly shown by the fact that

17 the 2020 estimated revenues jumps from 77 million to a 2021

18 estimated revenue figure of almost 120 million, correct?

19 A    Yes.

20 Q    And, obviously, in your calculation, you know, once

21 you've done all the work in selecting the public companies it

22 is in some essence a math problem at that point and we can

23 agree also that if you use a higher revenue figure with

24 whatever multiple you are using you are going to have a

25 higher valuation. That math will produce a higher number,

1  correct?

2  A    Yes.

3  Q    So, for example, if you use the 2.8 median multiplier

4  and apply it to what the company anticipates earning for

5  2021, which is only a few months from now, the beginning of

6  it, my calculation, and I'll ask if you have any reason to

7  disagree with it, 2.8 million times approximately 120 million

8  results in a valuation of about $334 million dollars.

9  A    But you're not comparing it to the public trading

10 comparable.  So, if you argue that 2020 is a bad year for

11 COVID -- because of COVID it would also be a bad revenue year

12 for many of these other pharmaceutical companies that are

13 listed on Page 7.  So, you have to compare like years.

14 Q    Well, except are you aware of whether any of these

15 companies went through a bankruptcy case in 2020?

16 A    Again, the bankruptcy has nothing to do with the

17 revenues on this company.

18 Q    Well that's your opinion, that's not a statement of

19 fact, correct?

20 A    The projections that the company put together started

21 in November of 2019 and are based on the company's

22 projections.  There have been no alterations for bankruptcy.

23 Q    What explains the jump in the estimated revenues in

24 2020 of 77 million to 120 million in 2021?  What are the

25 factors that contribute to that pretty sizeable, I think, 60

1  to 70 percent jump in revenues?

2  A     So, if you wanted to use 2021 revenues, which I would

3  not suggest using.  I would use the last column and we would

4  take the estimated enterprise value to revenue for 2021.  And

5  if you apply it, you would apply that number to a lower

6  multiple as you can see on my page.  My informed opinion and

7  valuation expertise I believe that 2020 is the right year to

8  compare, but you can't compare apples to oranges.

9  Q     Okay.  But if you take the 2021 figure, the multiplier,

10 rather, for 2021 of 2.3 and multiply it against anticipated

11 2021 revenues of 120 million, again, its simple math that

12 results in $276 million dollars, correct?

13 A     The company has not achieved that revenue.

14 Q     Understood.  And I understand that and I understand

15 that the company hasn't achieved 77 million in 2020, yes.  It

16 might achieve more it might achieve less.  Is that correct?

17 A     Yes.

18 Q     And just to go back to my simple math problem using the

19 2021 $120 million dollars and multiplying it by the 2.3

20 multiplier which, again, is the median number, not a mean

21 number which I think is a higher number, but using that

22 simple calculation 2.3 times 120 million.  I get 276 million

23 as a product of that calculation. Do you have any reason to

24 disagree with that math?

25 A     That is just a math equation.

1  Q    Right.  So, you would agree with that?

2  A    I agree with your math.  I don't agree with your

3  application.

4  Q    Understood.  But 276 million -- a valuation of this

5  company at 276 million means that it's solvent, correct?

6  A    Again, I don't agree with your application.  So, I

7  can't agree with the solvency question.

8  Q    You're an expert witness so I can ask you

9  hypotheticals.  I am asking you hypothetically if this

10 company has a $276 million dollar valuation it would be

11 solvent, correct?

12 A    That is correct.

13 Q    All right.  So, let's turn to Page 9 -- I'm sorry, Page

14 8 of your report.  This is the selected precedent

15 acquisitions.  There are two charts showing the universe of

16 selected precedent acquisitions.  The chart on Page 8

17 represents what?

18 A    This represents the purchase of going concern

19 companies.

20 Q    Okay.  And the chart on Page 9 represents what?

21 A    The purchase of assets.

22 Q    Okay.

23 A    Specific drugs.

24 Q    And with respect to the asset purchases how did you

25 come up with the enterprise value numbers that appear on this

1  chart?

2  A     It is based on company filings and company press

3  releases of either the target or the acquirer.

4  Q     Now that is -- these numbers are not the same as the

5  consideration that is paid in that asset purchase, correct?

6  A     I have not reviewed asset purchase agreements.  I don't

7  understand your question.

8  Q     Well, in an asset sale you can have consideration for

9  the sale of cash or assumption of debt or any number of other

10 things that go into the purchase price for the assets, right?

11 A     This is the implied enterprise value based on the

12 information that we received.  So, enterprise value would

13 include debt assumed.

14 Q     Well, all I am suggesting is the assumed enterprise

15 value is not necessarily the same as what was paid for the

16 assets, right?

17 A     I am not understanding your point.  The enterprise

18 value should be what they paid for the assets.

19 Q     Should be, but you don't know in all cases whether it

20 was, in fact, what was paid for the assets?

21 A     I believe that it is.  I have no information to think

22 that it is not.

23 Q     But do you have any information that it is?

24 A     I don't have each of the backup information for this in

25 front of me.  I would have to review the backup information,

1  but enterprise value means that is what the company paid or

2  assumed in liability for the assets.

3  Q    And, again, the median number 3.1 that's the multiplier

4  that's used to derive value in your selected precedent asset

5  purchase analysis, correct?

6  A    We actually used a wider range here because we, in

7  fact, have two sets of precedent transactions.  So, one at

8  3.1 and on Page 8 3.3.  So, we used from 3 to 3.4.

9  Q    Okay.  And the application of the 3 to 3.4 produces

10 your range and then from that you get the mid-point, correct?

11 A    That is correct.

12 Q    All right.  So, for this calculation you used LTM,

13 which is last twelve months, in calculation, not estimated

14 2020 revenue, right?

15 A    Correct.

16 Q    And we're on -- for Ms. Dougherty we're on Page 5.

17      Why is LTM used for the precedent transaction?

18 A    Because in a precedent transaction you likely don't

19 what their estimate of revenue is.  Again, you have to

20 compare it like to like.  None of these transactions are like

21 at the dates of the transactions.  They were done over time

22 from 2015.  So, the most comparable number is to look at

23 these last twelve months of your target which is VIVUS versus

24 the last twelve months of these companies that were sold or

25 for the assets that were sold.

1  Q    Okay.  So, then, in effect, wouldn't this valuation be

2  more accurately stated as being as of March 31st of 2020 as

3  opposed to June 29th of 2020 or the effective date of the

4  plan?

5  A    Again, in valuation you make your valuation as of the

6  date, which I think I misspoke earlier. It is 6/29/20.  And

7  you have to use the available information you have.

8  Q    I understand, but what I'm saying is --

9  A    The available information that we have on 6/29/20 was

10  an LTM of 73.3.  If you want to use the LTM as of 6/30, which

11  I now know, it is lower.

12  Q    Well how do you now know that?

13  A    Because the company has completed its second quarter

14  financial statement.

15  Q    I'm sorry, I'm confused.  I thought a little while ago

16  I asked you what it was and you did not know.  So, how did

17  you come to know that?

18  A    I don't have the exact number in front of me.  I do

19  know that that number is lower.  If you remember in my

20  testimony it's a couple million, but if you remember in my

21  testimony, we refreshed the valuation. I don't have it in

22  front of me.  I just know that it was slightly lower.

23  Q    I'm sorry, I didn't hear that very well.  Your

24  testimony about what you are referring to?

25  A    I said we refreshed this analysis based on the

1  questions from the equity committee hearing a few weeks ago

2  and I do know that we moved the LTM as of 6/30/20, again

3  because that's the most updated information at the time, and

4  it is slightly lower than the LTM revenue of 73.3 at 331.

5  Q     Okay.  So for the precedent transactions, again, the

6  inputs of the multiplier would impact the valuation.  If your

7  multiplier is higher your value is going to be higher.  Isn't

8  that true?

9  A     Yes.

10 Q     And were market conditions considered in connection

11 with any of the transactions on Pages 8 and 9?

12 A     So, the reason that precedent transaction -- actually,

13 one of the pros to using the precedent transaction analysis

14 is that you have transactions over a period of time which

15 incorporate different economic cycles, different capital

16 market cycles.  So, you actually have less of the issue that

17 you do with a public comparable which is on one day.

18 Q     Ms. Stratton, can you look at your declaration,

19 specifically Paragraph 9 on Page 9?

20 A     I'm sorry, Paragraph 9?

21 Q     Actually, that's my mistake.  It's Paragraph 9 on Page

22 4.  My apologies.

23 A     Okay.

24 Q     And you see that you state in the last sentence of that

25 Paragraph 9, the valuation analysis, your Piper Sandler

1  valuation analysis is based upon, one, facts and conditions

2  known and existing as of June 29th, 2020 and, two, financial

3  projections provided by the debtor's management.

4       What financial projections did Piper Sandler use?

5  A    They're the financial projections that are part of the

6  disclosure statement.

7  Q    Okay.  Can you look at what you have been provided as,

8  what I'll call, Chlavin Exhibit 2?

9  A    Yes.

10 Q    I would ask you to look at Page 5 of that exhibit,

11 numbered Page 5.

12 A    Okay.

13 Q    And are those the financial projections you are

14 referring to?

15 A    So, I am -- I don't see financial projections on my

16 Page 5 for Exhibit 2.  Let me --

17 Q    Well, what I'm looking at is its -- I'll identify it as

18 Exhibit E to the disclosure statement.  What I have is

19 numbered Page 5, the numbers at the bottom.  It's also

20 labeled at the top its Page 228 of 235.  And it should be --

21 I don't know -- Ms. Stratton, I don't know if you're looking

22 at the electronic exhibits or the book that I understand that

23 debtor's counsel may have sent you.

24 A    They printed the book for me.  Okay.  I'm sorry,

25 there's a couple Page 5's in this section.  I found it, yes.

1  Q      Okay.  You're right about that. I think it's the first

2  Page 5.  So, what I'm looking at now is, again, you have this

3  page on the top it says Page 228 of 235.  Are we looking at

4  the same thing?

5  A      Yes.

6  Q      Okay.  I'll ask the question again.  Are these, the

7  financial projections that you just referred to in your

8  testimony and also are referred to in your declaration at

9  Paragraph 9 as the ones that Piper Sandler relied upon in

10 connection with its valuation analysis?

11 A      Yes, it is.

12         MR. DEMMY:  All right.  Can we then turn, Ms.

13 Dougherty -- I appreciate all your help.  Would you turn to

14 Page 10 of the presentation that is on the screen?

15 BY MR. DEMMY:

16 Q      Is this the same as Page 5 from Exhibit E to the

17 disclosure statement?

18 A      Those numbers are based on the same projections.

19 Q      But its not the same chart, correct?

20 A      This has the revenue.  It's not the same chart.  The

21 revenue, you can see, is the same.

22 Q      I acknowledge that the revenue is the same, but almost

23 none of the other numbers are the same correct?  And even the

24 categories of numbers and columns are not the same, right?

25 A      That is correct.

1  Q     Okay.  So, did you use Page 5 from Exhibit E to the

2  disclosure statement or did you use what is in your

3  presentation that is on the shared screen right now?

4  A     So, we used the projections for which a summary is

5  contained on Page 5.

6  Q     But there are numbers in your --

7  A     There's not two sets of projections.  There are numbers

8  in ours that we obtained -- what you are saying, have you

9  seen a set of projections.  A set of projections would be

10 much more than this chart on Page 5 if you had a full set of

11 projections from the company.  So, we used a full set of

12 projections from the company.  The summary of it is on Page 5

13 and then on Page 10 of my analysis these are items that are

14 pulled out of those financial projections that are the exact

15 projections for which you see a summary of in the disclosure

16 statement.

17 Q     Okay.  What I'm hearing from you is that the full set

18 of projections that Piper Sandler relied upon don't appear in

19 the disclosure statement and also don't appear in the report

20 that we are looking at on the screen.

21 A     It would not be common to provide a full set of

22 projections in a disclosure statement.

23 Q     Well, that wasn't my question.  It's really a yes or no

24 question.  The full set of projections are not included in

25 the disclosure statement, correct?

1  A     No, they aren't.

2  Q     And they're also not included in your presentation that

3  we are looking at now?

4  A     No, they aren't.

5  Q     And what's in your presentation is markedly different

6  then what is in the Page 5 -- I'm sorry, what's in your

7  presentation is very different from the Page 5 of Exhibit E

8  to the disclosure statement, correct?

9  A     It's for a different purpose and the numbers that we

10  need to do a discounted cash flow are different numbers that

11  need to be disclosed into a disclosure statement.

12  Q     Page 5 to Exhibit E of the disclosure statement near

13  the bottom of the chart produces for each year 2020 estimated

14  2021, 2022, 2023 an EBITDA number, E-B-I-T-D-A.  Do you see

15  that?

16  A     Yes.

17  Q     Is that the number that you used for your discounted

18  cash flow analysis?

19  A     The discounted cash flow does not use EBITDA.  It uses

20  the free cash flow as we have calculated on this page with

21  these numbers on Page 10.

22  Q     And is your free cash flow numbers, do they appear

23  anywhere in Exhibit E to the disclosure statement or anywhere

24  else in the disclosure statement to your knowledge?

25  A     No, they do not.

1  Q      And is free cash flow and EBITDA the same number or an

2  analogous number?

3  A      No.

4  Q      How are they different?

5  A      EBITDA is simply (indiscernible) interest taxes,

6  depreciation and amortization.  For a free cash flow that you

7  would discount back as a (indiscernible) you need to use net

8  operating profit after tax.  Then you add changes -- you add

9  depreciation and amortization.  You add stock-based

10  compensation.  You would change less capital expenditures and

11  a change in working capital.

12  Q      Is it your testimony that the use of an EBITDA number

13  is never appropriate in a discounted cash flow analysis?

14  A      That's correct.

15  Q      So, I take it then that you have never used EBITDA in a

16  discounted cash flow analysis, correct?

17  A      No.  You would use free cash flow.

18  Q      So, I take it that Piper Sandler did not do a valuation

19  for VIVUS using EBITDA rather than free cash flow?

20  A      No, we do not.

21  Q      Was Piper Sandler involved in the creation of Exhibit E

22  to the disclosure statement?

23  A      It is based on -- it is the company's projections that

24  we assisted in preparing the model for.

25  Q      I'm going to take that as a no, you didn't assist in

1  the preparation of Exhibit -- the chart that is appearing in

2  Exhibit E, isn't that correct?

3  A    No.  I'm saying we did.  It is the company's

4  projections that we assisted them.  We assisted the company

5  with their projections.

6  Q    Okay. Did you review the chart that appears in Exhibit

7  E to the disclosure statement before it was filed?

8  A    Yes, I did.

9  Q    Is that a note in the disclosure statement about the

10 discounted -- the valuation being based on free cash flow as

11 opposed to the EBITDA numbers?

12 A    It's not relevant to the financial forecast.  It is

13 standard valuation in discounted cash flow.

14 Q    But your valuation is based on the projections which

15 are billed as being in Exhibit E to the disclosure statement,

16 correct?

17 A    That's correct.

18 Q    Now I think you will recall testifying at the equity

19 committee hearing that there was a presentation to the board

20 of directors on or about July 3rd of this year at which Piper

21 Sandler's valuation analysis was presented.  Do you recall

22 that?

23 A    Yes.

24 Q    And do you recall that board meeting on or about July

25 3rd at which the valuation analysis was presented?

1  A    Yes.

2  Q    And was there any discussion with the board at that

3  time about the company's statements from June 19th, 2020, the

4  June 19th, 2020 presentation which is attached as Exhibit B

5  to your declaration in the context of the valuation analysis

6  that was being presented?

7  A    There was no discussions tying those two together.

8  Q    I'm sorry, I didn't catch that.  There was no

9  discussion --

10 A    No.

11 Q    -- and then you trailed off.

12 A    I said no.  There was no discussions about the

13 company's corporate presentation and the valuation.

14 Q    Okay.  Thank you.

15      Prior to that board meeting was there any discussion

16 about the company's June 19th, 2020 presentation?

17 A    You mean that I was part of or the board discussed? I'm

18 confused at the question.

19 Q    Was there any discussion prior to that board meeting

20 between Piper Sandler and the company about the company's

21 June 19th, 2020 presentation?

22 A    No.

23 Q    Was Piper Sandler involved in any way in the

24 preparation of the company's June 19th, 2020 presentation?

25 A    No.

1  Q     And you do also recall testifying at the August 7th

2  hearing that in your mind there is a difference in revenue

3  potential and projections.  There is a difference in those

4  two concepts?

5  A     Yes, there is.

6  Q     And in the preparation of its valuation analysis Piper

7  Sandler did not adopt any of the statements in the June 19th,

8  2020 company presentation about projected revenues for VI-

9  0106 and Pancreaze, correct?

10 A     We used the company's projections and we actually had

11 quite a few discussions in that time frame about the

12 company's projections and what they thought was appropriate

13 and reasonable to achieve.

14 Q     I appreciate that.  I don't think that answered my

15 question, though, which was that in your valuation analysis

16 Piper Sandler did not adopt the revenue projections that the

17 company included in its June 29th -- I'm sorry, June 19th,

18 2020 presentation with respect to VI-0106 and Pancreaze.

19 A     No.

20 Q     Cause those revenue projections for those two products

21 or potential products were much higher than what is

22 ultimately included in the financial projections that Piper

23 Sandler used, right?

24 A     They are -- they were revenue opportunities.  I don't

25 think that they were exactly projections.

1  Q      Okay.  And with respect to Pancreaze, as I understand

2  it, and correct me if I'm wrong, the company in its June

3  19th, 2020 presentation placed the revenue projection or

4  opportunity for Pancreaze at 100 million and the number that

5  ultimately made its way into the financial projections was 68

6  million, correct?

7  A      Correct.

8  Q      Now in a DCF analysis, the discounted cash flow

9  analysis, if the 100 million had been used for Pancreaze as

10  opposed to 68 million that would impact the valuation under a

11  discounted cash flow analysis, right?

12  A      Yes.

13  Q      It would make the valuation go higher, right?

14  A      Yes.

15  Q      Can you estimate the magnitude of that increase if you

16  use 100 million for Pancreaze as opposed to the 68 million

17  that, in fact, was used in the projections?

18  A      I couldn't do that for you right now.

19  Q      I -- so, I appreciate that, but, you know, it would be

20  helpful, I think, to understand at least within a range of

21  reason.  Not to say that I'm asking you for a precise

22  calculation, but can you give us any indication of what a 32

23  million jump in revenues would do to the value of the company

24  under your discounted cash flow analysis?

25  A      I'm sorry, it would be discounting back three and a

1  half years into the future.  So, I would actually need to use

2  my computer right now.  I'm sorry I couldn't do it.  There

3  would be an increase.  I can tell you there would be an

4  increase.  I can't tell you what the magnitude would be.

5  Q    Do you think it would be a material increase?

6  A    There would be an increase.  I can't tell you if its

7  material or not.

8  Q    Do you think it would be more than the six million you

9  testified about earlier as it increase?

10 A    I'm really not sure.  I guess I would also say if

11 you're going to have higher revenue you would also have to

12 offset it with an expense related to that higher revenue

13 which are also not in the projections.  So, I couldn't tell

14 you the impact overall what an increase in Pancreaze's

15 revenue would do.  It's not as simple as the additional 30

16 plus million discounted back.

17 Q    I'm sorry, Ms. Stratton, I didn't catch that last

18 statement at all.

19 A    I said it's not --

20 Q    Okay.  I got that.  It's not as simple as what I'm

21 making it out to be is what you are saying?

22 A    Yes.

23 Q    Except that you acknowledge there would be an impact?

24 A    Yes.

25 Q    I would ask the same simple question with respect to

1   VI-0106.  If there was any revenue that was attributable to

2   VI-0106 in the next three years that would impact the

3   discounted cash flow analysis, any revenue that could be

4   projected now.

5   A    That would be correct.

6   Q    I think your answer to this would probably be it would

7   be harder to understand the magnitude of that since you have

8   less data about VI-0106, right?

9   A    I do understand that it is very unlikely there would be

10  any revenue in the next three years.

11  Q    Notwithstanding what the company said in its June 19th,

12  2020 corporate presentation that the revenues could be up to

13  1.2 billion?

14  A    I don't think that they meant in the next three years.

15  I think that they meant at some point in the future upon

16  approval of that drug.

17  Q    Do you have any understanding as to what period of time

18  the company was referring to in that presentation?

19  A    I can tell you that even to get through a phase two

20  they think that would be eighteen to twenty-four months.  So,

21  that is just for a phase two or to get good data within a

22  phase two. So, it could take years before they have -- if

23  they were to get this drug approved it could be years before

24  it's approved and that is not within this projection horizon.

25          MR. DEMMY:  I'm going to ask for Ms. Dougherty's

1  help again.  I appreciate her helping me out.  If you would

2  put the Piper Sandler evaluation that we have been looking at

3  back on the screen, please.

4         THE WITNESS:  Yes.  Sorry to purport, it seems I

5  have lost my screen sharing permissions. I had a brief

6  technical difficulty during your last line of questioning.

7  It seems to have been disabled.

8         MR. DEMMY:  Okay.  We can go by paper.  It's not a

9  problem.

10  BY MR. DEMMY:

11  Q    Ms. Stratton, would you take a look at Exhibit B to

12  your declaration, please.

13  A    Sorry, I got it back.

14  Q    Perfect.  Thank you.

15        So, I want you to go to Paragraph -- I'm sorry, not

16  paragraph, but Page 11 please.

17  A    Okay.

18  Q    Ms. Stratton, the heading says WAC analysis, which I

19  understand is a weighted average cost of capital which is one

20  of the numbers you use in calculating discounted cash flow,

21  correct?

22  A    Correct.

23  Q    All right.  And at its heart a discounted cash flow

24  valuation --

25        (Phone interruption)

1      THE COURT:  Excuse me.  Excuse me.  People, please

2  check to make sure that your phones are muted.  I'm getting

3  conversation.

4      Mr. Demmy?

5      MR. DEMMY:  Yes.  Thank you, Your Honor.

6  BY MR. DEMMY:

7  Q    I know I had a magnificent question that was in

8  midstream so I will try to recreate it.

9      Just to frame the next series of questions we can agree

10 that a discounted cash flow valuation analysis is one in

11 which a value is assigned to a company based on the present

12 value of its anticipated future cash flows, right?

13 A    Yes.

14 Q    Okay.  And to undertake a discounted cash flow

15 valuation a discount rate must be applied against that future

16 cash flow, right?

17 A    Yes.

18 Q    And Piper Sandler's use of a weighted average cost of

19 capital is -- that's the discount rate that Piper Sandler

20 used, right?

21 A    That's correct.

22 Q    Are there other formulations of discount rates that are

23 used in discounted cash-flow valuations?

24 A    This is using the capital asset pricing model.  I think

25 this is the standard for when you look at an enterprise

1  valuation of the company's cash flows.

2  Q     Are there other formulations that are used for discount

3  rates in a discounted cash flow analysis?

4  A     Not that I have seen used on a regular basis.  This is

5  the one that is most used.

6  Q     What other formulations are used, but less regularly in

7  your opinion?

8  A     I mean it's different for different -- let me put it

9  this way.  For an enterprise valuation this is the -- a

10  weighted average cost of capital is the most appropriate to

11  use. I couldn't off the top of my head think of some.  I'm

12  thinking of others for different reasons.  Real estate

13  appraisals use a different rate under the same concept as

14  discounted cash flow, but we're looking at an enterprise

15  valuation.  Weighted average cost of capital is the most

16  appropriate and most normally used.

17  Q     Okay.  I just want to be clear about this, you

18  acknowledged that there are some other formulations that are

19  used less regularly and you don't agree that they are most or

20  more appropriate, but there are some other formulations used.

21  I am just asking you if you can tell me what they are.

22  A     I can't think of any right now.  I am sorry.

23  Q     Okay.

24  A     This is almost always used.

25  Q     Okay.  So, if we look on the left side -- well, before

1  I ask you that can you tell me what the components of a

2  weighted average cost of capital are just as a general

3  matter?

4  A    So, you have to find the cost of equity capital.  You

5  would find the tax adjusted cost of debt capital and apply to

6  a capital structure to get to a weighted average cost of

7  capital.

8  Q    Okay.  And I see on the right-hand side you have the 75

9  percent and 25 percent which shows, I suppose, the ratio of

10 equity to total capital and debt to total capital and to each

11 other, in effect.

12 A    Yes.

13 Q    So, your anticipation is that going forward it will --

14 well, let me ask you that question.  Is that a going forward

15 set of numbers that equity will be 75 percent of the capital

16 and debt will be 25 percent of the capital of this company?

17 A    So, actually in theory you are not supposed to use the

18 company's actual capital structure.  You use a hypothetical

19 which could be it's the -- in this case we used the proxy of

20 the market.  So, if you actually went back to our public

21 comparables page on Page 7 you see there's a column it says

22 debt to total capitalization and you see the median is 25.9

23 percent.  This is using the market information for the

24 theoretical long-term capital structure.

25 Q    Is it improper to use the actual company being valued

1  its debt to equity ratios?

2  A     Yes, unless that is in line with the market then yes.

3  Q     So, in your testimony previously about the use of a

4  median versus the mean would apply here I take it without

5  having to ask you that specific question?

6  A     Yes.  We think its appropriate to use the median.

7  Q     And that's simply an exercise of your discretion in

8  undertaking this project, correct?

9  A     It is widely used.  Yes, it is.

10  Q     And others might disagree and use a different number.

11  They might use an average, right?

12  A     It's possible.

13  Q     And in using an average they might throw out the --

14  like in the Olympics you throw out the high wins and the low

15  wins and you do an average on that basis. Is that ever done

16  in this kind of valuation modeling?

17  A     It is our practice to use the median.

18  Q     Is it ever done though outside of Piper Sandler's

19  practice?

20  A     Yes, it can be.

21  Q     Okay.  Can we go back -- oh, we're back.  So, the risk-

22  free rate of 3 percent, what does that reflect?

23  A     This is the -- in the capital asset pricing model it's

24  a formula -- excuse me for not being able to go through it

25  right now, but one of the components is their risk-free rate.

1  This we typically use from Duff & Phelps.  They're a

2  valuation firm that publishes information for other groups to

3  do valuations to use.

4  Q    Does this number have anything specifically to do with

5  the VIVUS or is it simply an industry number?

6  A    It's an industry number.  Not an industry, it's

7  actually for any industry if you use a risk-free rate on an

8  enterprise valuation.  Many people use the Duff & Phelps risk

9  free rate.

10 Q    So, it's a market number, not an industry number?

11 A    Yes.  Correct.

12 Q    Now what about the market risk premium.  What does that

13 relate to?

14 A    It relates to the risk and the market over time, but

15 represents the equity risk premium in the market over time.

16 You can calculate it or you can obtain it from another

17 source.  We use Bloomberg.  So, it is a market -- the market

18 risk premium is also market.  The theory behind it is a

19 calculated number.

20 Q    Again, this is a market number and not a number that

21 relates specifically to VIVUS, right?

22 A    That's correct.

23 Q    And tell me what the beta is, what it means?

24 A    The beta is if you have a beta of one then when the

25 market moves the company would move the exact same portion of

1  the market. If it's more than one it moves more than the

2  market, if it's less than one it moves less than the market.

3  This is a, again, obtained from Bloomberg for the industry.

4  Q    And what industry is that?

5  A    Yes.  For the pharmaceutical industry.

6  Q    Okay.  But, again, industry specific and not VIVUS

7  specific?

8  A    VIVUS is in the industry.

9  Q    Right, but what I'm saying is that the beta number

10  doesn't relate only to VIVUS.  It relates to all companies in

11  the industry.  It's based on the industry, not on the

12  company?

13  A    Yes.

14  Q    Okay.  So, those three numbers together produce the

15  cost of equity capital that you have there.  Is that right?

16  A    Correct.

17  Q    Oh, I'm sorry, what about the size related equity risk

18  premium.  What does that refer to?

19  A    So, once you get the cost of equity capital using the

20  CAPM model you must make adjustments to the company if

21  there's, you know, control issues.  There's a lot of

22  different things that you cold factor in there.  We chose the

23  size related equity risk premium which, again, is published

24  in a book and applied that to the adjusted cost of equity

25  capital.

1  Q    What is the size that is the concern with respect to

2  size related equity risk premium.  What is being referred to

3  there?

4  A    This is a smaller sized company then others in the

5  industry.

6  Q    Okay.  So, the number goes up the smaller the company

7  is?

8  A    Yes.

9  Q    And it goes down if the company is bigger?

10  A    Yes or there may not be a number if the company is

11  larger.  I'd actually say its -- yeah.

12  Q    And as I understand it none of those numbers in the

13  cost of equity capital or to get to the adjusted cost of

14  equity capital have anything to do with VIVUS on its own.

15  Its either market or industry numbers?

16  A    That's correct.

17  Q    Okay.  So, let's go to cost of debt capital.  What is

18  the cost of debt refer to?

19  A    The cost of debt refers to what the company could

20  obtain for the debt that we have put here as 25 percent.

21  This is the tax adjusted rate they would be paying.

22  Q    Is that based on what the company is actually paying as

23  the cost of debt or some other number?

24  A    No.  We used the market that we obtained in our market

25  test.

1  Q    Why wouldn't the company's actual cost of debt

2  financing be the cost of debt for that item?

3  A    Because you're valuing the company on a date and all of

4  these numbers must relate to the market today.  And the

5  market cost of debt for VIVUS today for first lien debt is 13

6  percent.

7  Q    When you say the market cost of debt for VIVUS today is

8  13 percent what does that mean?

9  A    That means that when Piper Sandler ran its debt process

10 this is the rate that VIVUS could obtain were it to get a

11 first lien debt today?

12 Q    So, does that take into account the rate, perhaps, that

13 VIVUS would be able to obtain after the plan has been

14 confirmed and gone effective?

15 A    Yes, it would.

16 Q    How would it?

17 A    If the -- it is our opinion that from June until after

18 the confirmation date if the company went out to get a first

19 lien debt based on the same projections that are used in the

20 plan is the same projections that were used in our debt

21 process the company would achieve a market rate of 13

22 percent.

23 Q    The company has exit financing, correct or has lined up

24 exit financing as part of confirmation, right?

25 A    Yes.

1   Q     Do you know what the rate of that financing is?

2   A     I believe it is 11 percent.

3   Q     So, why wouldn't that rate be used?  That is the actual

4   rate that the company was able to obtain, right?

5   A     Because that is not necessarily indicative of market.

6   That is the rate that its future shareholder has determined

7   it will charge for the financing.

8   Q     Okay.  Other people looking to do a valuation of the

9   debtor might use that 11 percent.  That would not be

10  inappropriate, right?

11  A     Again, I don't think it's a market rate.  We actually

12  have the benefit of going to the market so we know what the

13  market rate for the cost of debt for this company is.

14  Q     I appreciate that, but that wasn't my question.

15        My question was other people could disagree with you

16  and use 11 percent because that is the actual rate of the

17  financing going forward, right?

18  A     Other parties may see a different market rate. All I

19  can tell you is what we have done.

20  Q     Okay.  So, this is an area where Piper Sandler's

21  discretion comes into play as to the application of a market

22  rate for the cost of debt, right?

23  A     Yes.

24  Q     And that's in contrast to the other items we talked

25  about, the risk-free rate, the market risk premium, the beta

1  and the size related equity risk premium which I understand,

2  unless you tell me otherwise, that Piper Sandler had no

3  discretion.   It just looked at a source and plugged the

4  number in.

5  A     That's correct.

6  Q     So, maybe this is nit-picky, but I'm going to nit-pick.

7  You have the cost of debt at 13 percent, the tax shield of

8  3.3.   Shouldn't it be then 9.7 as the effective cost of debt?

9  A     I'm sorry, it's probably a rounding error.

10 Q     Okay.

11 A     I understand.

12 Q     I had to ask.

13 A     Yes.

14 Q     Generally, speaking --

15 A     Actually, can I just say it's not a rounding error, but

16 this is done in Excel.   So, it just rounds up so you see

17 where it is.

18 Q     I understood that it was a rounding issue.

19 A     Okay.

20 Q     I appreciate the clarification though.

21       Generally speaking, all things being equal, a lower

22 weighted average cost of capital produces a higher value in a

23 discounted cash flow analysis, right?

24 A     That's correct.

25 Q     So, if some other expert valuation witness said, well,

1  we really should use 11 for the cost of debt or some other

2  number, lower number, the weighted average cost of capital

3  would increase under this analysis, right?

4  A    Yes.

5  Q    And the other area in which some discretion is

6  potentially applicable is the debt to equity ratio numbers,

7  right?

8  A    Which is why we used the market rather than a

9  theoretical number that couldn't be supported.

10  Q    Right.  And you used the median number as you testified

11  a little while ago?

12  A    Yes.

13  Q    You talked a little bit earlier about market tests.

14  Would you agree that the best methodology for an actual

15  market test is a sale between a willing buyer and a willing

16  seller?

17  A    That is one market test.  I think that there are

18  different forms of market tests.

19  Q    Do you know if the company's assets were marketed for

20  sale as a going concern prior to bankruptcy?

21  A    They were not.

22  Q    Are you aware of whether there was any discussion about

23  doing that?

24  A    There was not.

25  Q    Your declaration attaches a couple of reports by an

1  entity that you referred to already which is Zacks Investment

2  Research.  Are you familiar with Zacks and what it does?

3  A    Yes.

4  Q    If you can shorthand it for me, what does Zacks do?

5  What services does it provide?

6  A    Zacks is a research analysist firm that provides

7  research to shareholders or to potential investors.

8  Q    About what?

9  A    About the price of a stock.

10  Q    And in some way shape and form the price of the stock

11  has some relationship to the value of that company, correct?

12  A    Yes.

13  Q    Do you know on what Zacks basis its research and its

14  reporting to shareholders?

15  A    I don't know what they base their research on.

16  Q    Do you know whether Zacks had an agreement with the

17  debtors in this case to provide these kind of services?

18  A    I understand that from the exhibits that you provided.

19  Q    You don't have any independent knowledge of that?

20  A    I did not until I read that document.

21  Q    And can you turn to exhibit, what I'll call, Chlavin

22  Exhibit 13 in the documents that were provided to you.  And

23  is this the agreement that you're referring to?  I just want

24  to make sure we're on the same basis?

25  A    Yes.

1  Q      Now attached to your report is the June 9th, 2020 Zacks

2  report.  I think you attached it in the nature of rebutting

3  or responding to Dr. Ahmadi's testimony or his letter.  Do

4  you recall that?

5  A      Yes.

6  Q      Do you agree that that was attached to your report?

7  A      Yes.

8  Q      I'll identify that for the record.  It's Exhibit F to

9  your declaration.  And I think you testified about this a

10  little earlier.

11        If you would turn to Page 4 of, I guess, the first full

12  paragraph, perhaps the second paragraph on Page 4 --

13  actually, I'm sorry, it's numbered Page 3, its Page 4 of the

14  exhibit including the exhibit page.

15  A      Okay.

16  Q      Are you with me?  The paragraph that starts under these

17  assumptions our MPV model?

18  A      Yes.

19  Q      Did you have this information at the time you did your

20  valuation analysis of the company?

21  A      No.  It's not appropriate to look at analyst reports

22  when conducting an independent valuation.

23  Q      Do you know whether or not the information included in

24  this Zacks report is based upon information that the debtors

25  were providing to Zacks?

1  A      I would presume so.  I do not know.

2  Q      Did you include this or look at this report and the

3  information in it about VI-0106 when you did your sum of the

4  parts valuation that you testified about earlier?

5  A      Yes, I did.

6  Q      And I think you said this, you attributed no value to

7  VI-0106 in that sum of the parts valuation, right?

8  A      That's correct.

9  Q      But you are aware that the Zacks report is saying that

10 VI-0106 had a value of in excess of 84 million?

11 A      It says, however, we note that this value is only

12 appropriate after I and declarant in the start of the phase

13 two trial as per our methodology.  I believe this is a

14 contingent value.

15         MR. DEMMY:  I'm sorry, Your Honor.  I'm trying to

16 go back and forth and I'm trying to make sure I'm doing this

17 as efficiently as possible.

18 BY MR. DEMMY:

19 Q      Now with respect to net operating losses, Ms. Stratton,

20 do net operating losses have any independent value apart from

21 whatever impact they may have on, you know, the traditional

22 valuation analysis?

23 A      They can't be sold.  So, no, they can only be used by

24 the company and in certain circumstances.

25 Q      If VIVUS acquired another company could the NOL's be

1  used to shield that other company's positive revenue that,

2  otherwise, would be taxable?

3  A    Under the right circumstances, yes.

4  Q    And you're not a tax expert?

5  A    I am not.

6  Q    So, you're just recognizing that there are tax issues

7  involved in that which I'm not aware of either.  Is that

8  true?

9  A    Yes.

10  Q    Was Piper Sandler involved in the effort to refinance

11  the OW Biopharma debt?

12  A    Yes, we were.

13  Q    And what was the timeframe for that effort?

14  A    Starting we were hired last October of 2019 all the way

15  through in June, when it was apparent, we would not be able

16  to obtain enough debt.  And the other investment bank wasn't

17  able to obtain enough equity to pay-off IEH in full.

18  Q    Was there a moratorium at some point on efforts to

19  refinance the IEH Biopharma debt?

20  A    Yes.

21  Q    What time period was that?

22  A    From about middle of March and then we restarted

23  discussion in April.  We had discussions in the company about

24  it in April.

25  Q    Didn't that moratorium extend until June 1st?

1  A     We had discussions about it with the company.  We were

2  planning on re-launching the effort.  So, I'm not sure what

3  you're getting at.

4  Q     Well, it's a simple question.  Did you understand that

5  the moratorium (indiscernible) refinance the IEH Biopharma

6  debt continued from mid-March to June 1st?

7  A     I think there is actually a process of equity in April

8  that we were not a part of.  So, I don't know how I want to

9  explain that, but, yes, we did not look for additional debt

10 in our profile until June 1st again.

11 Q     Okay.  And coincidentally my next question was going to

12 be about equity offering.  Were you aware that VIVUS's board

13 of directors authorized the company to try to sell

14 approximately 11,000 -- I'm sorry, 11,500,000 shares on or

15 about April 1st of this year?

16 A     Yes.

17 Q     And were you aware that or are you aware that the price

18 proposed for those shares was a dollar sixty a share?

19 A     I didn't know what the price was, but --

20 Q     I'm sorry, your answer was you did not know?

21 A     I was not aware of what the price was proposed to be.

22 Q     Was Piper Sandler -- okay.  That was my next question,

23 was Piper Sandler involved.

24       Apart from involvement of the -- I think we were just

25 talking about -- I'll ask you was Piper Sandler involved in

1  any way in the setting of the price for the shares that were

2  to be offered starting April 1st?

3  A      No.

4  Q      Did Piper Sandler consider that offering at a dollar

5  sixty a share which I will represent to you was the share

6  price in its valuation analysis in any way at all?

7  A      No.

8  Q      Can we go to Page 3 of the presentation that remains on

9  the screen?  I appreciate that.

10         So, my question on this, about Page 3, relates to the

11  subtraction of the cash and cash equivalents.  Do you see

12  that?

13  A      Yes.

14  Q      Does that represent -- well, I will ask it a different

15  way; what does that represent?  What does that negative $31

16  million dollar number represent?

17  A      So, the definition of enterprise value is net debt plus

18  equity value.  So, you would subtract the cash you have on

19  hand from the debt.

20  Q      Okay.  This is showing a negative cash balance.  What

21  does that mean?

22  A      The loan balances are positive.  So, to show that that

23  is subtracted from those loan balances it's a negative

24  number.  So, the company had $31 million dollars of cash and

25  cash equivalents on hand as of 6/29/20.

1  Q      Okay.  So, in reality that's a positive number, but for

2  the purposes of this analysis it shows as a negative number.

3  Is that right?

4  A      That's correct.

5  Q      It doesn't mean that the company had no cash at that

6  time?

7  A      No.  I just mean that to get to net debt we were taking

8  positive numbers and we subtracted out that number to show

9  its negative, to show the sum there.

10  Q      Is it attempting to show that the amount of the debt is

11  more than the assets?

12  A      No.  Net debt, the definition of net debt is the long-

13  term debt left the amount of cash on hand.  The enterprise

14  value is a definition, it is net debt plus equity.

15  Q      Show me on this chart you have the numbers for net debt

16  and for equity?

17  A      So, the debt at this time was 61.4 in the senior

18  secured notes, 4.5 percent convertible notes of 169.2, lease

19  obligations of 1.1.  Those are all positive numbers.  So, if

20  we now subtract the debt of the thirty-one the net debt would

21  be the sum of those numbers.

22  Q      That's what I'm confused about.  How did the 31 million

23  relate, or maybe I just don't get it.  I'm asking you why you

24  subtract that $31 million dollar number from the debt amounts

25  that appear above it?

1  A    Because the actual definition of enterprise value you

2  can look up at any text book, you could probably google this

3  or Wikipedia it and it would say net debt plus equity equals

4  enterprise valuation.  So, it's because some companies may

5  have more cash on hand and have more debt.  It puts those

6  together into a net debt position.

7  Q    Okay.  But the only way that makes sense to me is if

8  you start from the 215.4 million which is multiplied or is a

9  product of the multiplication below of the total enterprise

10 value times 2.9 and then the total enterprise value of 2020

11 estimated, right?

12 A    That's an implied multiple.  We didn't use a multiple

13 here.  This is the actual numbers as of 6/29/20 for the

14 company.  So, the actual market capitalization.  These

15 numbers on the trading value up at the top, the actual market

16 capitalization was 14.7 million.

17 Q    Yes.

18 A    If you add all of those numbers below with that 14.7

19 the sum is 215.4.  We did not use a multiple.  This is the

20 implied multiple.  So, if you took this and the 215.4 and

21 divided it by 73.3 you get 2.9.

22 Q    Where does the $215.4 million dollar number come from?

23 A    So, I will start at the top.  The stock price as of

24 6/29/20 was 82 cents.  You times that by the 17.9 million

25 shares you get 14.7 million is your market capitalization.

1  So, that is the value of your equity.  Then you add the debt

2  of 61.4 million, the debt is 169.2 million, the debt of 1.1

3  million and then you subtract the cash on hand of 31.  That

4  sum is 215.4.

5  Q    Okay.  So, your testimony is that the company had $31

6  million dollars in cash on hand at that time?

7  A    Yes.

8             MR. DEMMY:  I have no other questions, Your Honor.

9             THE COURT:  Okay.  Thank you.

10            We're going to take another five minutes and then

11 I am going to go to other objectors in the order in which I

12 happen to have them which -- I'm looking at the shareholder

13 objections at this point.  So, we will start with, I'm not

14 going to get your name correct again, you are going to have

15 to say it for me.  Mr. Manousiouthakis?

16            MR. MANOUSIOUTHAKIS:  Manousiouthakis.

17            THE COURT:  Say that again for me?

18            MR. MANOUSIOUTHAKIS:  Manousiouthakis.

19            THE COURT:  Manousiouthakis.

20            MR. MANOUSIOUTHAKIS:  Perfect.

21            THE COURT:  You will be first.  Then I will go to

22 Mr. Makosky, and then to Mr. Dijkstra.  And I think those are

23 all the shareholder objectors.

24            So, we're going to take five --

25            MR. MANOUSIOUTHAKIS:  Your Honor?

1          THE COURT:  Yes.

2          MR. MANOUSIOUTHAKIS:  May I ask a question.  The

3    exhibit that I filed is up with the court?

4          THE COURT:  Can you say that again?

5          MR. MANOUSIOUTHAKIS:  An exhibit I filed

6    yesterday, is that with the court?  I mailed it to all of the

7    lawyers.

8          THE COURT:  I do believe I have an exhibit.

9          MR. MANOUSIOUTHAKIS:  Just one page.

10         THE COURT:  Yes.  I do have that one page.

11         MR. MANOUSIOUTHAKIS:  Okay.  Thank you.

12         THE COURT:  Okay.  Thank you.

13         So, we will take five minutes and then we will

14   start up again.

15         Again, Ms. Stratton, do not speak with anyone

16   about your testimony.  Thank you.

17     (Recess taken at 4:29 p.m.)

18     (Proceedings resumed at 4:41 p.m.)

19         THE COURT:  Okay.  Mr. Manousiouthakis, you can

20   begin.

21         MR. MANOUSIOUTHAKIS:  Thank you very much, Your

22   Honor.  I appreciate the opportunity.

23                      CROSS EXAMINATION

24   BY MR. MANOUSIOUTHAKIS:

25   Q    Ms. Stratton, I understand this must be a grueling

1  experience, but I appreciate your time.

2       Start with I'm going to ask you just general questions.

3  Is the valuation analysis (indiscernible) like mathematics?

4       (No verbal response)

5  Q    Can you hear me?

6            THE COURT:  Ms. Stratton, you're still muted.

7            THE WITNESS:  Okay.  I'm sorry.  I couldn't

8  understand his question.

9  BY MR. MANOUSIOUTHAKIS:

10 Q    Okay.  Is valuation analysis a good science like

11 mathematics?

12 A    There is some science and there is some art.

13 Q    Thank you.

14      Now you joined Piper in 2010 and you have officially

15 stated in your document that you're a managing director of

16 Piper Sandler with substantial experience representing

17 companies in connection with their restructuring efforts.  Am

18 I correct?

19 A    Yes.

20 Q    So, the word expert does not appear in that sentence.

21      Now as a Piper Sandler employee have you ever provided

22 valuations for shareholders contesting corporate

23 bankruptcies?

24 A    I have not represented an equity committee.

25 Q    Thank you.

1      So, Piper Sandler is the debtor's investment banker.

2  Should the court consider the valuation you provided as an

3  independent valuation or you showed the buyer of the possible

4  relationship between the debtor and Piper?

5  A    We wouldn't put our professional reputation on the

6  line. All of our work was done as objective as we could be.

7  As you noted, there's some art or there's some subjectivity

8  to the analysis, but we would not put our professional

9  reputation on the line by doing something that didn't make

10  sense to us.

11  Q    But if you were to try to publish this analysis in a

12  scientific journal in the conflict of interest section you

13  would have to report the fact that you are, you know,

14  participating as an investment banker (indiscernible).  That

15  would be in your conflict of interest statement?

16  A    I'm not sure what you would need to do to publish a

17  scientific paper.  I have never done that.  I'm sorry.  I

18  don't know what you need to do.

19  Q    Okay.  Now as you stated in October 19th the debtors

20  engaged you as their investment banker in connection with the

21  valuation of the capital structure and potential strategic

22  alternatives.  You were essentially going to be tasked with

23  finding a way to solve the issues.  The main issues that they

24  were dealing with was this debt that was in 2020.  Everything

25  else was going (indiscernible).  Positive results, positive

1   submissions, increases in sales; everything is

2   (indiscernible) except for the debt in 2020, correct?

3   A    The company was -- I guess you could say that there was

4   positive developments in the company's performance, yes.

5   Q    Okay.  So, I would like to k now what strategic

6   alternatives did you consider since October 2019?  Did you

7   consider asset sales?  Did you consider asset licensing?  A

8   company's (indiscernible).  The creation of a spin-off

9   company.  Issuance of (indiscernible) stock.  Any other

10  alternatives that you considered?

11  A    There are quite a few items that we considered and what

12  was landed on was a refinancing made the most sense.  So, we

13  undertook a refinancing effort.

14  Q    Are you familiar with what the tracking stock is?

15  A    I understand what a tracking stock is.  We did --

16  sometimes at Piper Jaffray; we had our equity capital markets

17  team, our subordinated -- our convertible securities team,

18  our pharmaceutical industry team and our restructuring and

19  special situations team all at one point were involved in

20  this client to look at all potential strategies.

21  Q    So, therefore did you consider tracking stock and you

22  decided against that because VIVUS has assets, several of

23  them already marketed, several are in the pipeline, and no

24  (indiscernible) investors that are typically the investors

25  that are investing in the pharmaceutical business may look at

1 | the company and say this drug is (indiscernible), this drug

2 | is okay, and this drug is the top of the line horse and I

3 | only want to invest on the top of the line horse.  Did you

4 | consider this alternative?

5 |     I had, by the way, I don't know if you are familiar

6 | with it, made this accommodation to Mr. Oki and the board.

7 | Are you familiar with this and did you consider it as a

8 | serious possibility?

9 |         MR. BARR:  Your Honor, its Matt Barr from Weil.  I

10 | want to be very respectful of the pro se shareholders and let

11 | them ask all their questions, but if we could just ask him to

12 | break it down a little so there is no confusion for our

13 | witness and she can answer the questions. I think that would

14 | be very helpful.

15 |         THE COURT:  He can do that.

16 |         Ms. Stratton, I also want you to answer his

17 | question.  The first question he asked was what other courses

18 | of conduct did you consider and you didn't answer that

19 | question.

20 |         THE WITNESS:  Okay.

21 |         THE COURT:  You said we considered a lot, but this

22 | is what we landed on.  His question was what alternatives

23 | were considered.

24 |         THE WITNESS:  It is my understanding, I am not an

25 | equity capital markets expert, that is why we brought them

1   in.  We looked at financing either with debt, convertible

2   securities, we looked at equity offerings.  I do believe at

3   one point we did discuss the potential sale of assets.

4   Within the equity capital markets on what types of things we

5   could do with equity I can't tell you what things that were

6   considered.  I can tell you that our team did look at is

7   there any other possible way to unlock value or provide

8   capital to pay off the IEH debt.

9           So, I couldn't answer if they looked at the

10  tracking stock specifically.

11  BY MR. MANOUSIOUTHAKIS:

12  Q     Okay.  Thank you.

13        Now, VIVUS should have done an acquisition of Pancreaze

14  on June 11, 2018, for $135 million and most recently, it was

15  reported that it was generating a quarterly net product

16  revenue of $5.783 million a quarter.  The numbers are 135

17  million out of the company, 5.783 in the company every

18  quarter.

19        Just a simple multiplication tells me that it would

20  take me six years just to get back my money.  Who does that

21  when they sell a debt due in less than two years.

22  A     So, Doctor, I wasn't involved with the company in 2018

23  when they made that decision.

24  Q     I appreciate that.

25  A     My understanding is that they had a very large G&A

1  structure and the strategy was to bring more revenue to cover

2  that G&A and potentially turn Pancreaze around to grow factor

3  and that that would provide the means to paying off the debt.

4  Q    But at that point in time, Piper was hired, was already

5  the investment banker of VIVUS.

6       Would you have recommended against the Pancreaze

7  purchase?

8  A    I don't have enough facts to tell you whether if I

9  would or not.  I'm sorry, I just --

10 Q    But preferring to pay --

11 A    -- I can't Monday-morning quarterback.

12 Q    -- that capital recovery in six years is an

13 unacceptable metric in this business.

14 A    I do know that it hasn't performed the way that they

15 would like it to perform, but I can't second-guess their

16 decisions at the time.

17 Q    Okay.  Now, in January of 2020, VIVUS made an

18 investment presentation titled, "Innovate, Deliver, and Go."

19 And in this investment presentation, at that time, Piper was

20 their investment banker.

21 A    Yes.

22 Q    In that presentation, they referred to the first five

23 quarters of their turnaround plan having been completed, then

24 they stated that they would address the (indiscernible) debt

25 and made additional statements about VI-0106.  I will read

1  those later.

2      But since you were the investment banker, I presume

3  they're talking to you and you are familiar with what they

4  are presenting out in the investor world, did this plan, so-

5  called 10-quarter plan make any sense when in the middle of

6  it, there's an enormous debt payment due?  Who plans on a 10-

7  quarter set of actions and does not share a clear idea of how

8  in the middle of that 10 quarters, there's going to be an

9  enormous debt coming due, who does that?

10  A    So, I think there's two questions there.  So, one,

11  while we were the company's investment banker, we weren't

12  engaged to assist them with their corporate presentations, so

13  we were not involved in their corporate presentations.

14      And, two, I know that their plan was slower -- their

15  turnaround plan happened slower than they had anticipated, so

16  I would guess when they made those thought plans, they did

17  hope and thought that they might achieve the ability to pay

18  off the debt and they were not able to.

19  Q    Did you know that in that same presentation they stated

20  that they were planning to file an IND for a Phase II(a)

21  study for VI-0116 [sic] in the first half of 2020?

22  A    I had not -- until I read that, no, I was not aware

23  that they were ready to file that that IND and I don't think

24  they were at a point where they were ready.

25  Q    Okay.  If they had done this IND, as they stated in

1  that presentation -- this is not on old presentation, we're

2  talking about January of 2020 -- so, in this presentation

3  they made that statement.  If they had done that submission,

4  would you have valued VI-0106 much higher than zero?

5  A     I think that that is an if, so my understanding from

6  the company is they didn't meet their goals on the

7  formulations to be ready to file an IND and I think they

8  anticipated that our refinance efforts would work and that

9  they would have the ability to fund the Phase II(a) study.

10  Q     I understand that.  It's a hypothetical.

11  I'm asking if they had done it, would the value of VI-0106

12  would have been estimated to be higher by you?

13  A     I couldn't tell you.  I guess it would depend if they

14  had end results from the Phase II as to the efficacy by that

15  point.

16  Q     Well, if they submit an IND, that is inherent in that

17  statement.

18  A     My understanding is you can submit it to start a Phase

19  II, but that doesn't mean that you won't have a failed Phase

20  II study.

21  Q     Well, then the concept (indiscernible), it fails.  They

22  had successful results from Phase I, but with

23  (indiscernible), which included patient treatment known as --

24           THE COURT:  Excuse me.  People, please mute your

25  phones.

1          MR. MANOUSIOUTHAKIS:  Okay.  Am I -- okay.  Thank

2  you, Your Honor.

3  BY MR. MANOUSIOUTHAKIS:

4  Q    Okay.  Let's move on.

5        So, now, as I understand it, the stock offering you

6  were not involved with later, was done later in the year and

7  Wainsworth (ph) was hired.

8        Piper doesn't have expertise about stock offerings?  I

9  mean, what's the reason that there was a (indiscernible)

10 there?

11 A    So, my understanding -- again, I mean not an expert in

12 equity capital markets -- is that on the smaller offerings

13 there, are other investment banks that are better at those

14 than Piper is.

15 Q    Did you know if the stock offering was opened up to

16 repaying investors, like many companies, especially in the

17 pharma business, they go, approach the existing shareholders,

18 they tell them, thank you for supporting us, if you want to

19 increase your participation, would you consider be warrants,

20 would you consider increasing your investments and so on.

21       Was any of that done, do you know?

22 A    I do not know the details of the RDL on April 1st.

23 Q    Okay.  Now, in your DCF analysis there are some

24 possibilities of dramatic expansion of various markets.  We

25 know for a fact that with the Belviq competitor to Qsymia,

1  having been pulled out of the market, there's an opportunity

2  to grab market share that Belviq used to occupy.

3      And there are statements by the drug analysts that the

4  management was being approached by people, you know, entities

5  that would prefer using Belviq to increase their

6  participation.

7      So, have you accounted for the increased Belviq share

8  into your projections for future cash flow?

9  A    But my understanding is they competed with Belviq in

10  the U.S. market and that they have, in fact, gained some

11  market share in the U.S. market that was part of Belviq's,

12  and that is included in the projections and included in their

13  performance.

14  Q    So, the projections that you have shown already

15  anticipate how much of the Belviq market they're grabbing?

16  A    That is correct.

17  Q    What is the number?

18  A    I don't have that specific number, I just know in our

19  discussions with the company's management that the

20  projections were formed and as we made changes to them along

21  the way, there was a discussion, in fact, specifically about

22  Belviq and my understanding is that the are scripts that they

23  projected that are in the projections are based on the ones

24  they thought they could obtain from Belviq.

25  Q    I believe it is very important for the Court and all of

1  us to know what is that projection or how much of the Belviq

2  market has been estimated to be taken over by VIVUS.

3  Okay.  I will move on.

4       Now, you're familiar with the Obesity Act in Congress,

5  correct?

6  A     Yes.

7  Q     Now, if one reads, just the text of the Obesity Act, it

8  will have that the market expansion, if it is approved and

9  becomes law.  So, what is the market for other anti-obesity

10  drugs?

11  I have given an estimate in my letters to the Court of the

12  factor of seven increase in the total market for anti-obesity

13  drugs if the Obesity Act is approved in Congress.

14       Also, it is known now that obesity is an extremely

15  serious adverse factor for impacts -- on health impacts of

16  COVID-19; these people die much more frequently from, you

17  know, COVID-19.  I do not understand why that has not been

18  discussed in the society at large, since we're talking about

19  deaths of many, many, many people.

20       But be that as it may, if the Obesity Act was approved

21  tomorrow, can you tell me how would your cash flow estimates

22  change?

23  A     So, if I just recall -- and I don't have that letter;

24  that was from the equity committee hearing, that letter and

25  your objection -- I do recall that, you know, you have said

1  that seven-times factor was based on your estimate of the

2  price per person and using a 2030 estimate of the number of

3  obese people on Medicare.

4  Q    Yes, I did --

5  A    So, I'm not sure that would be the appropriate

6  addressable market.  I'm not sure I agree with your seven

7  times, however, the company does have a BMI-managed care

8  program in their projections and they believe they're making

9  good strides in that BMI-managed care program because of

10  obesity and because of COVID-19.

11      So, John Amos, the CEO of the company, talks about the

12  comorbidity of obesity and COVID-19 all the time and it's

13  factored into the projections.  I do not believe that they

14  added a lot on the Obesity Act because it's an if, it hasn't

15  been approved.  They won't know to what extent that could

16  change the market for them.  It's something that could be a

17  positive development or a revenue opportunity, but right now

18  there's not enough information.

19  Q    Okay.  All of the numbers about the potential increase

20  inside the text of the law itself, it contains the statement

21  that there's an extra $2,000 that has been spent on obese

22  Medicare recipients versus non-obese Medicare recipients and

23  said that there are tens of millions of Medicare recipients

24  that would be classified as obese and so on.

25      If you want to challenge the factor of seven that I

1 have used, I'm perfectly happy for you to do that, but it is

2 a massive jump to what may happen until the obesity space in

3 short order because of the emergency we all live in.

4       So, I would urge the Court to, you know, take a closer

5 look at this.  This is life-and-death stuff.

6 A     So, is there a question for me or ...

7 Q     No.

8 A     Okay.

9 Q     You answered to the extent.

10 A     Okay.

11 Q     Now, I wanted to go a little bit in your table that you

12 have in your report at page 44 with the comparables.  And I

13 have given kind of an Excel version of this.  I just used

14 your numbers in what I gave to the Board.

15       Now, the enterprise value that you have in your first

16 column, how can one very quickly calculate the fourth column?

17 Is there a sophisticated set of calculations involved or just

18 simple two plus two equals four?

19 A     I just need to get my thing in front of me.

20 Q     It's on page 44 of Document 191.

21 A     So, it should be market cap --

22 Q     Yeah.

23 A     -- plus debt --

24 Q     Yes.

25 A     -- minus cash.

1  Q      Okay.  So, this is very close to Dr. Amati's (phonetic)

2  definition of two plus two equals four.  You know, I mean, I

3  don't want to -- you know, (indiscernible) mine

4  (indiscernible).  That's fine.

5       Now, there is an issue there that one of the numbers

6  that seems to not abide by the formula as you reproduce all

7  of these numbers and, indeed, they are exactly what you just

8  said, except for the one at Knight Therapeutics.  That seems

9  to have some discrepancy.  I don't know if it's just a typo

10  or, you know, what it is, but it should be as it may.

11       What I decided to do afterwards is the cash and the

12  debt things are kind of just facts, like, they are what they

13  are.  No one can change them, you know, at the time of the

14  report.

15       But the market capitalization is a very different

16  animal.  So, in the document I provided to the Court, I made

17  a simple correlation between the enterprise value and the

18  market capitalization, although, we know that the enterprise

19  value, the fourth column is the first column plus the third

20  column, minus the second column.  That's simple math.

21       On top of that there's a very interesting, I would say

22  linear correlation between the enterprise value and the

23  market cap.

24       Do you see that block?  Do you have access to that

25  block?

1  A     Yes.

2  Q     So, would you agree that this is a pretty strong, you

3  know, linear correlation?

4  A     You would expect that because the market capitalization

5  is part of the enterprise value.

6  Q     Okay.  So, yes, but it's actually what -- the point I'm

7  making is that it's the driving force behind the enterprise

8  value, okay.  If it is a single correlation, 1:1 and there is

9  some (indiscernible) that's pretty strong, it's a very strong

10 indicator.

11       Unfortunately for all of us, there's something called

12 stock shorting in the world.  Are you familiar with stock

13 shorting?

14 A     Yes.

15 Q     So, can you give us your own definition and, you know,

16 kind of insight into what stock shorting is.

17 A     There are investors who think the stock will decline in

18 value, so they sell it short.

19 Q     Okay.  Could there be investors out there that want to

20 make this happen?

21 A     I suppose, yes.  I'm not sure I understand that

22 question, but --

23 Q     I mean, we don't know -- we cannot attribute intent to

24 people we don't know.

25 A     No.

1  Q     So, it's a possibility.

2        Now, the question is, can you also give us some insight

3  -- by the way, just to clarify, again, what is stock

4  shorting, stock shorting means you don't own the shares of

5  the stock because you believe that it will appreciate in

6  value; you go borrow shares of the stock and sell them at the

7  high price, hoping that it will drop and you will be able to

8  cover the shares at the lower price.

9        Is that a fair description of what stock shorting is?

10 A     Yes.

11 Q     Are okay.  So, now, are you familiar with something

12 called naked stock shorting?

13 A     I'm sorry, with what?

14 Q     Naked stock shorting.

15 A     I've heard the term before.

16 Q     Okay.  So, basically, there, you know, if I own an

17 account in a brokerage house, if someone wants to borrow my

18 shares, then sometimes they come and ask me, do you want to

19 lend your shares and, here, we're going to give you some

20 interest for that and so on.

21       But, then, it seems that there is some practice that I,

22 you know, that is, you know, (indiscernible) out there who

23 advise this kind of interactions with the owners of the

24 shares is not quite happening.

25       Okay.  So, the important thing that we establish that

1  you agree with is that stock shorting does share some

2  influence on market capitalization.  If some stock is highly

3  shorted, then it's inevitably going to lose market

4  capitalization.

5  A     I don't think I said that.  I think -- I don't think I

6  said that.  I think I said that if you're -- if you want to

7  short the stock, it means you believe the value will go down.

8  Q     Okay.  So, you don't agree it's a causal event, but the

9  correlation of the two, that you agree with?

10 A     I can't tell you that.  I don't -- I'm not an expert in

11 public equities.

12 Q     Okay.  All right.  That's fine.

13       So, you know, this is fine.  Now, getting the

14 comparables that you have used, you have employed the

15 comparables to be companies that are trading between one

16 fifty million and a billion.

17       What made you pick this range?

18 A     It seemed like the appropriate size for a comparable

19 company to VIVUS.

20 Q     Okay.  And how did you decide that?  You looked at the

21 market capital of VIVUS at some time and said, okay, I'm

22 going to go a little below and a little above?

23 A     It's actually a lot more detailed.  We had several

24 discussions on my team about what the appropriate range would

25 be.

1       I relied heavily on my specialty pharmaceutical partner

2  on which companies and size he thought was most relevant to

3  VIVUS and most comparable.

4  Q      Okay.

5  A      Again, you have to find comparable companies.

6  Q      Okay.  One company that is interestingly excluded from

7  your list in page 44 is Arena Pharmaceuticals, which is, in

8  fact, one of the companies that is driving PAH business.

9  Interestingly enough Arena Pharmaceuticals was also a company

10  that was involved in Belviq that we were talking about before

11  and somehow over time it licensed the rights of Belviq away

12  and so on.  It would seem to me that if I am going to create

13  a list of comparables to VIVUS, Arena would be found in that

14  list, as a primary, you know, competitor.

15       Now, you did an upper limit in your choice of companies

16  that this will compare to.  Yes, Arena would not show up

17  because Arena shows a valuation of $3.9 billion.  It's a

18  much-higher evaluated company.

19       Of course, that doesn't contradict with my estimate

20  that I gave before to the Court of $8 billion, but it does

21  contradict with the 1.5 upper -- one-billion upper limit that

22  you shared in your list of comparables.

23       Do you share any comment of that?

24  A      So, again, we were trying to look for companies that

25  are the most comparable and in our opinion, those larger

1  companies have more commercial -- could potentially have more

2  drugs that are developed and commercial.  They have different

3  capital structures.

4       We believe having the right range of size makes it the

5  most comparable.

6  Q    Well --

7  A    So, there may be some companies that are in the same

8  treatment lines that have other treatments or larger

9  companies and we did not want to have to factor in, into our

10 comparable company analysis, the size discount.

11 Q    Well, okay.  Let me give you some facts about Arena,

12 then maybe you will, you know, change your opinion and

13 include it in your list.

14      Arena Pharmaceuticals, according to the 10-Q    form

15 from June 3rd, 2020, they have zero drugs on the market.

16 VIVUS has at least two and we can talk about the rest.  It

17 has three drugs that are in clinical development.  One is the

18 PAH drugs that they've, you know, discussed.  Also, and these

19 are four licensed programs, a billion for joint and clinical

20 development.

21      So, I will repeat the numbers again.  Zero drugs

22 marketed, three drugs in active clinical development --

23 they're doing that on their own and four license agreements.

24 PAH are in phase zero.

25      So, why isn't Arena an exact comparable VIVUS?  We

1  (indiscernible).

2  A     VIVUS actually has three commercial drugs.  They have a

3  sales organization.

4        So, I'm not familiar with Arena, but it falls outside

5  the criteria that we chose to be comparable to the company.

6  Q     And that is what I am saying, that maybe you should

7  change your criteria because you are excluding, effectively,

8  what used to be the main competitor of VIVUS.  Arena -- I am

9  a (indiscernible) investor in VIVUS -- when you talk to VIVUS

10 investors 10 years ago, the only discussion was, what is

11 VIVUS doing?  What is Arena doing?  What is VIVUS doing?

12 What is Arena doing?  And that has been going on for a long

13 time.

14       Now, let me make some other points about your list.

15 You have included in your list a company could Acorda

16 Therapeutics.  This is the lowest-capitalized company.

17       Now, when they're starting to take the medians and

18 things like that of the valuation and so on, it's companies

19 that have low valuation that are included the list, then the

20 median drops, right; is that correct?

21 A     Again, our range was from one fifty to one billion, so,

22 I think we thought we were selecting a pretty large range.

23       And while their market cap is low, because they have

24 debt and a high debt number, their enterprise number meets

25 our criteria.

1  Q     Okay.  That is not --

2  A     We didn't look at just market capitalization.

3  Q     I understand, but that is not the only reason.

4        When one examines the 10-Q form of Acorda Therapeutics

5  June 30, it has only two drugs marketed.  They are for

6  Parkinson's and multiple sclerosis.  These are much smaller

7  markets than the massive markets that VIVUS addresses, which

8  are for obesity, for, you know, pancreatic problems, and for

9  impotence.

10       On top of that, one of the drugs has a 40-percent

11 decline in sale, unlike VIVUS, which having growth in its

12 sales because it has lost legal patent protection fights.

13       So, Acorda Therapeutics should not be on that list.

14 It's a completely illegitimate comparison to VIVUS.

15 Second, Adamas Pharmaceuticals --

16            MR. FRIEDMANN:  Your Honor, this is Jared

17 Friedmann --

18            THE COURT:  Let's -- excuse me -- let's let --

19 have Ms. Stratton respond to why she thinks that that one is

20 appropriately on the list and then you can go on to another

21 one.

22            MR. FRIEDMANN:  Thank you, Your Honor.

23            MR. MANOUSIOUTHAKIS:  Yes.  Thank you very much,

24 Your Honor.  I apologize, I'm not a lawyer, okay.  So, please

25 correct me every time you guys, when you think I'm, you know,

1  not asking the right things or saying the right things and so

2  on.

3        THE WITNESS:  Okay.  Again, in this analysis, we

4  didn't handpick companies.  We came up with a criteria and

5  our criteria was 150 million to roughly 1 billion in

6  enterprise value.  So, and, again, if we went back to our

7  criteria, which was on page 4, it was also they marketed one

8  or more brand of specialty pharmaceutical products, they are

9  a North American-branded specialty pharmaceutical company,

10 and that they had planned targets for 2020 revenue.

11       All of these companies fit that criteria.  We didn't

12 handpick any.  We didn't throw any out.

13 BY MR. MANOUSIOUTHAKIS:

14 Q    I am not suggesting that you handpicked --

15 A    We didn't add any.

16 Q    I am not suggesting that you handpicked out anything.

17 I am not suggesting any intent or anything like that.

18       But what I am suggesting is that it is simply not

19 appropriate to include this company in the comparison list.

20       Okay.  Let move --

21       MR. FRIEDMANN:  Your Honor, this is Jared

22 Friedmann, again, if I may interrupt.

23       You know, we're trying to be very respectful of

24 the stockholder who's asking questions.  We would just ask

25 that they also allow Ms. Stratton to be able to answer the

1  questions.  Every time she tries to answer, she's getting cut

2  off by the next question.

3  So, I understand it's difficult on Zoom.

4  Unfortunately, we're not able to be in the courtroom, but it

5  is important for Ms. Stratton to be able to get the answers

6  out, as well.  Thank you.

7  THE COURT:  Thank you.  Let me ask a question that

8  I think is related to what Mr. Manousiouthakis is asking,

9  which is going back to the company before that was a direct

10  competitor, albeit, I think, at a higher enterprise value,

11  why isn't that an appropriate company to be on the list, a

12  direct competitor of VIVUS, regardless of the enterprise

13  value?

14  THE WITNESS:  They have no commercial products

15  that they currently sell and have the salesforce.  The three

16  commercial products that the company has, they have an

17  internal salesforce to sell them; Arena does not.  They also

18  have drugs under development.

19  And I think that people are mistaking, they're

20  trying to bring in transactions where there's a PAH program.

21  We are not valuing PAH.  It would be inappropriate to take a

22  PAH program comparable, unless it's in this list of companies

23  that have a commercial drug in this range.  I think that the

24  argument that people are trying to make is they're trying to

25  tell me the methodology if we had value to VI-0106, and I

1  maintain I am not valuing VI-0106, so that company is not

2  comparable to the company.

3         THE COURT:  Okay.  So, fair enough.

4         I do have questions around --

5         THE WITNESS:  Okay.

6         THE COURT:  -- but I'm going to let everyone else

7  ask their questions first.

8         But what I understand you to be saying, and this

9  may answer, perhaps, some of the other questions, is that you

10 are not looking -- because you do not place any value,

11 because you place a zero value on VI-0 --

12        THE WITNESS:  0106.

13        THE COURT:  -- VI-0106 -- thank you -- I thought I

14 had that down before today, but I don't -- 0106, because you

15 place no value on VI-0106, both, your public comparables in

16 terms of -- your public comparables, in terms of your

17 precedent acquisitions and your precedent asset purchases is

18 not looking for comparables for VI-0106.

19        Is that right?

20        THE WITNESS:  That's correct.

21        It could be if it was a commercial drug for PAH,

22 which there are drugs that are commercial for PAH treatments,

23 if they landed in this public comparable set, they would be

24 here.  If they had sold as a commercial drug, they would be

25 in our precedent transactions or precedent assets.

1        I can't tell you right now if any of those have a

2   PAH commercial drug, but these are for companies that have

3   commercial, branded, specialty pharmaceutical products.

4        THE COURT:  Okay.  And what's the virtue of not

5   handpicking the company, which you've stressed several times.

6        THE WITNESS:  Because I think if we handpick, then

7   people would say, Well, you handpicked to try to get to a

8   valuation.

9        What we thought was more important was finding a

10  comparable dataset and coming up with the right metrics to

11  meet, and once they meet those metrics, we use all of them.

12  So, we don't say, Gee, this company is too high, let's take

13  it out.  We made our criteria.  Anything that met our

14  criteria was included in our analysis.

15       THE COURT:  Okay.  Thank you I didn't mean to

16  hijack you, Mr. Manousiouthakis, I just wanted to see if,

17  hopefully, my questions were also along the lines of your

18  questions, but please start -- please begin again.

19       MR. MANOUSIOUTHAKIS:  Your Honor, I appreciate

20  your interventions at any and all times.  So, I will

21  continue.

22  BY MR. MANOUSIOUTHAKIS:

23  Q    The second-lowest market capitalization in your list is

24  Adamas Pharmaceuticals and I will tell you, again, what they

25  are involved with.  They are marketing only one drug.  It's

1  for a much-smaller market, Parkinson's and multiple sclerosis

2  again.  And they have another drug partnered, Alzheimer's.

3  This is a class lower than VIVUS in terms of assets.  It

4  shouldn't be on the list.  Would you agree with that, given

5  the information I'm giving you, one drug marketed, one drug

6  partnered.

7  A     So, as I said, our criteria was for North American,

8  commercial-branded, specialty pharmaceutical companies.

9  There are several different brands for different therapies

10 that VIVUS has, and so you have to have a broad enough

11 sector.

12      So, we didn't go through and say, Who markets an

13 obesity drug, which, by the way, is a very difficult market.

14 Who does pancreatic market?

15      We went through and said, Okay, what is a set of public

16 companies that has branded specialty products?

17      And, again, you can't find direct comparables always.

18 This is the valuation methodology as you come up with your

19 dataset.

20      And for our dataset we determined it made sense to

21 start with companies with $150 million up to 1 billion.  And

22 remember, at the time, if you were to look at the company's

23 market cap and its implied market enterprise value, it's on

24 the lower end, and we went all the way up to a billion.

25      So, we didn't say, Let's stop it at 300, let's stop it

1  at 500; we went all the way to a billion to give it the

2  benefit of its potential growth.

3  Q    I appreciate that.

4     I will go now -- you used the expression, we went up to

5  a billion.  I would personally have used an expression, my

6  lower bound was a billion.  Let me explain why.

7  (Indiscernible) Pharmaceuticals is the highest capitalized

8  company in your list.  It is marketing two drugs, just as

9  VIVUS, in fact, it has a common component in one of its drugs

10  with Qsymia; it's topiramate.  And on a much smaller market,

11  it's migraine headache prophylaxis and epilepsy, a much

12  smaller market.  The second one is, again, the same small

13  market, epilepsy, until the second drug called

14  (indiscernible).

15     These drugs are not of the scope of the VIVUS drugs in

16  terms of market size.  They also have three drugs in clinical

17  development, one of which is admittedly ready to be submitted

18  to the FDA and that they do by November 2020.  There are two

19  other Phase I drugs.

20     So, what's (indiscernible) of VIVUS, if you would agree

21  with me, I'm asking, is it should be real and (indiscernible)

22  two marketed and three in active development, two of which

23  are Phase I.

24  A    So, I -- I'm sorry, Doctor, I'm not really sure how to

25  answer your question.

1       Again, we used a criteria.  I will point out it's not -

2  - it doesn't matter for this analysis, but I do remember that

3  even with Qsymia, they do face generic competition in 2024,

4  you know, so, if you are telling me that there are companies

5  that may not have the same addressable market, we may have

6  the same issue with this company in the future.

7  Q    Well, I appreciate that and I will point out to you

8  that the company has been very active in submitting patent

9  applications so that the scope and applicability of Qsymia is

10 extended.  It's a classical strategy by companies to extend

11 the applicability of the patent protection.

12 A    Yes, and that's why in our terminal value and our

13 discounted cash flow, we did believe that the management will

14 be successful in fighting off some of those generic

15 competitors.

16 Q    Okay.  So, I hope we will agree that the company at the

17 top of your one-billion list, Supernus is at one-billion

18 capitalization has two drugs marketed less than VIVUS and

19 three drugs in active clinical development, only one of which

20 is in Phase 3.  It has no licensing arrangements like VIVUS

21 does.

22      Do you agree with these facts?

23 A    I'm sorry, I just -- I can't tell you which companies

24 are directly comparable or not.  I think we are trying to get

25 a broad range --

1   Q     I'm reading facts of the 10-Q    form of Supernus, I

2   apologize.

3   A     I mean, Supernus also has 402 million of LTM revenue

4   and growing if you look at their revenue projections for 2020

5   and 2021.

6   Q     Okay.  So, we'll leave it at that.

7         Now, two other companies that I want to discuss on your

8   list, let me find their names -- HLS Therapeutics and Knight

9   Therapeutics.  Now, when the stock of VIVUS was trading, do

10  you know in which markets it was trading?

11  A     I don't recall right now, I'm sorry.

12  Q     Okay.  It was NASDAQ.  It was trading in --

13  A     I do know that.  I do know that.  I do know that.

14  Q     Okay.  So, NASDAQ is a very healthy marketplace.  It

15  provides liquidity to companies and so on and so forth.

16        Now, in your list, the two companies, (indiscernible)

17  Therapeutics and Knight Therapeutics, are both Canadian

18  companies and they both trade over the counter.  When one

19  looks at the typical information to investigate whether to

20  invest in a company and so on, you look at the information

21  that the brokerage houses provide.

22        There's no information in very large brokerage houses.

23  So, these are Canadian companies trading in the over-the-

24  counter market, which has extremely small liquidity; in fact,

25  I was checking the trading volume yesterday.  It was nothing.

1   There is no trading volume.

2        These companies shouldn't be in the comparison list.

3   VIVUS was trading, you know, millions of shares.  They did

4   nothing --

5   A    I think HLS actually really helps you with an 8.4 times

6   enterprise value to 2020 revenue and, again --

7   Q    I always look at the (indiscernible).  I don't do

8   reverse engineering in my business.  I don't care if it helps

9   me or hurts me.  It shouldn't be there.

10        Now, that is, you know, my comment about that, that the

11   liquidity of these companies and the information so that

12   people can invest in them is nothing, so, therefore, I don't

13   know why they're on your list.

14        The other thing I'm trying to understand better, your

15   statement about the corporation between the Mankind and

16   United but gave so much money to Mankind only after a Phase I

17   trial.  And you made a statement earlier that it would help

18   tremendously, me and I believe the Court.

19        What is your statement, that this is not a comparable

20   because what?

21   A    So, Treprostinil is the drug that Mankind was using

22   this method of delivery for.  Treprostinil has already been

23   approved for the treatment of PAH and United Therapeutics is

24   using that.  Uniting Therapeutics bought this asset, one, to

25   take on a direct competitor for the same drug with a

1 different delivery of -- a different method of delivery, and

2 also so they can obtain that method of delivery not only for

3 their PAH program, but for other drugs that they already have

4 commercialized or are in development.

5      So, they bought the -- they paid off a competitor and

6 they bought a method of delivery that they thought would

7 improve their own product.

8 Q    Okay.  I am sorry, but there a several issues in your

9 statement, so let me clarify.

10      So, this, United has this Treprostinil, a compound, and

11 essentially what it got from Mankind is the right to deliver

12 it in an aerosol form.

13      Well, okay.  So, (indiscernible) is a well-known

14 chemical entity.  It's, you know, it's commonly used by many,

15 many people for many, many things.  VIVUS has acquired the

16 rights to its use for PAH.

17      There's no difference between these two things.  They

18 could easily make a deal United Therapeutics and say, Hey, do

19 you want to use tacrolimus for PAH, you talk to us, and you

20 give us $90 million.

21      So, you understand my point?  What is the difference?

22 A    But tacrolimus has not been approved for the treatment

23 of PAH.

24 Q    None of them are --

25 A    Treprostinil hasn't been approved for the treatment

1  of --

2  Q    -- Mankind's has not been approved.  It has just

3  announced Phase I results.  VIVUS has announced Phase I

4  results.  These are the same --

5          MR. FRIEDMANN:  Your Honor, this is Jared

6  Friedmann again.  The witness continued to be interrupted.

7  She's being asked questions, sometimes several at a time.

8  She's trying -- she's being very patient -- she's trying to

9  answer all of them.

10          This has been going on for an hour and a half now,

11  but she needs to be given an opportunity to answer the

12  questions and they actually obviate the next question that's

13  coming if she can answer the first one that was given.

14          MR. MANOUSIOUTHAKIS:  I apologize.

15          THE COURT:  Okay.  Ms. Stratton, do you want to

16  tell us what the difference is when they both have only been

17  in the Phase I approval?

18          THE WITNESS:  So, Treprostinil, which is the drug

19  that's being used by Mankind with a new method of delivery,

20  which is an aerosol, has been approved for the treatment of

21  PAH.

22          VI-0106, while it's been approved to approve other

23  therapies for other diseases, has never been approved for the

24  treatment of PAH.  There is no efficacy data that VI-0106 --

25  I shouldn't say that -- they have three compassionate-use

1  patients.  They have not completed any Phase II efficacy data

2  to prove that it will be -- to prove that it will work or --

3  and it has never been approved for the treatment of PAH.

4           So, there's many more hurdles for VI-0106 to meet

5  before it can be viable or it meets the inflection point of

6  valuation.  It is not the same.

7  BY MR. MANOUSIOUTHAKIS:

8  Q    Okay.  Well, I will leave that statement to this point.

9  I mean, again, the point is that they both have completed

10 successful, you know, Phase I trials where there has been

11 efficacy demonstrated in a number of patients.  These are not

12 just safety, you know, assessment trials.

13      Now, the other issue that is related to that is this

14 issue about whether or not there was something additional in

15 this license that would involve other drugs in the delivery

16 of other drugs through this aerosol-delivery method.

17      The announcement is very clear.  It says that Mankind

18 will be entitled to receive low double-digit royalties for

19 the up-front payment of 45 million and potential milestone

20 payments of up to 50 million and this deal will be for

21 development and commercialization of a dry powder formulation

22 of Treprostinil, just one drug.

23      Afterwards, it states that Mankind granted United

24 Therapeutics an option to expand the license to include other

25 active agreements for the treatment of pulmonary

1    hypertension.  Each optioned product would be subject to the

2    payment to Mankind of up to 40 million in additional option

3    exercise and development milestone payments, as well as a

4    low-double-digit royalty on net sales of any such product.

5    There's more money coming to Mankind if other products come

6    into play.

7         I hope you would correct your earlier statement to that

8    effect.

9    A    Yes, I understand.  They paid for the options.  They

10   did pay up front.  Some of that would go towards the options.

11   Q    But the option would deliver additional money to

12   Mankind as other drugs --

13   A    I understand that.

14   Q    Yes?

15   A    I understand that.

16   Q    Okay.  I appreciate it.

17        I want to thank you very much for your forthcoming and,

18   you know, clear nature of your statements and I apologize if

19   I was -- seemed to be, you know, intrusive into your answers.

20        Thank you very much.

21             MR. MANOUSIOUTHAKIS:  And thank you, Your Honor,

22   for giving me the opportunity to speak.

23             THE COURT:  Thank you.

24             Ms. Stratton, how you doing?  Do you need a break?

25             THE WITNESS:  I'm good.

1        THE COURT:  Okay.

2        THE WITNESS:  I'm good if you want to keep going.

3        THE COURT:  Okay.  Let's go on to your next

4  shareholder and I think it was Mr. Makosky.

5        MR. MAKOSKY:  Yes, Your Honor.

6        Hello, this is Bruce Makosky.  Thanks for giving

7  me the opportunity to ask Ms. Stratton some questions.

8                    CROSS-EXAMINATION

9  BY MR. MAKOSKY:

10 Q    The first point I wanted to make -- I don't think

11 anybody brought this up yet -- but with regards to the VI-

12 0106, it's actually been shown in, I think it was in the

13 Phase I(b) studies that they used it in 22 patients in a

14 compassionate study that it actually had the effect of

15 reversing the PAH disease process and I think that's

16 significant because I believe there are other competitors in

17 the market, but my understanding is that those other

18 competitors are really just treating the symptoms, so they're

19 palliative, whereas, the VI-0106, tacrolimus compound

20 certainly has the potential and it's been proven to actually

21 reverse the disease.

22      And so, I find it very puzzling why Ms. Stratton

23 wouldn't have any valuation for VI-0106 in her analysis.

24      Ms. Stratton, are you aware of that fact, that in the

25 compassionate studies that VI-0106 has been shown to actually

1  reverse the process of the disease state of PAH in the

2  patients that they study?

3  A     So, my understanding is there were three compassionate-

4  use patients and that was done at Stanford and that the Phase

5  I study was for the safety of the formulation.  So, I don't

6  believe there's any new efficacy data since they purchased

7  the assets, but there's -- that data is from three

8  compassionate-use patients.

9     We don't believe that's a strong sample to have proven

10 that it has -- that it can reverse -- it sounds like there is

11 great promise that it can, but they haven't gotten to the

12 efficacy studies in Phase II to prove that it does.

13 Q    Okay.  Are you aware, also, that part of the -- or the

14 delay for VIVUS filing the IND to actually move it forward in

15 the clinicals was due to some stability testing, that they've

16 actually been claiming for, I believe it's 12 or 18 months --

17 it's a very long period of time -- are you aware of that

18 issue, as well?

19 A    I do understand that issue.

20 Q    Okay.  And that suddenly now that they're just going

21 bankrupt, they suddenly have solved the stability issues and

22 they're able to move forward and file the IND because the

23 last speaker said in the second half of this year.  So, it

24 seems like kind of a coincidence that they had been stuck on

25 this one issue for so long, just long enough for them

1 suddenly now they don't have the funding to move forward.

2 　　　Okay.  So, that's -- I did want to mention that about

3 VI-0106, and then the other thing I'd like to ask you about

4 is this recently came to my attention that there's a number

5 of patents that VIVUS has that they recently, I believe,

6 registered as utility patents and they were filed on Docket

7 24 as Exhibit F.

8 　　　I don't know if it's possible to bring that up; if it's

9 not, I can just -- I just want to give a flavor and ask you -

10 - I'll read a couple of the patents and just ask you.

11 A　　Uh-huh.

12 Q　　Because I don't see it anywhere in your valuation

13 analysis where these patents have any value, I think, in

14 terms of the analysis; although, I do believe they have

15 tremendous value to the company.

16 　　　So, there's actually 13 patents.  I'm looking at

17 Exhibit F for US PTO publication data and if you look at each

18 patent, below it, it shows the date it's filed.  So, the one

19 I'm looking at, which looked very interesting was orally

20 administrable formulations for the controlled release of a

21 pharmacologically active agent.

22 　　　You'll have to bear with me.  It's 4:45 in the morning

23 where I am so and I probably need new glasses, as well, but

24 I'm just reading it.

25 　　　Drug tablets that include an a controlled-release layer

1  of a moisture-sensitive active agent are prepared with

2  lipidic matrix, forming excipient, a water-soluble channel

3  forming excipient and a filler, each being non-hygroscopic,

4  and it was filed on March 18, 2020, and it looks like the

5  utility grant is dated July 9th, 2020.

6       Are you aware of that patent, Ms. Stratton?

7  A    So, I actually went through these patent exhibits that

8  you provided with the management team and my understanding is

9  that many of these relate to their existing commercial

10 products and from my pharmaceutical partner, I understand

11 that it's very common to continue to have patents that

12 support your commercial product and that that value is

13 encased in the cash flows that that company can continue to

14 generate from those commercial drugs.

15      So, our view -- and I did speak with the management

16 team about this specifically -- you know, could you sell any

17 of these patents?  Were you able to get value?

18      And the answer is that you wouldn't want to, because

19 that's how you protect your cash flow that we've projected in

20 the discounted cash flow going forward.

21 Q    Okay.  I understand.

22      And the reason I bring it up is because I think in the

23 previous hearing at one point you mentioned that in your

24 valuation analysis there wasn't much value really given to

25 Qsymia because in just four years, in 2024, generic products

1    are going to be available and so that meant that Qsymia sales

2    would decrease.

3         But would you agree that this looks like a new method

4    of the delivery, so I'm just thinking that the reason behind

5    --

6    A    Actually --

7    Q    Okay.

8    A    Maybe I can answer that for you.

9         So, actually we didn't -- we didn't actually hit Qsymia

10   that much.  In the projections, Qsymia is growing and it's

11   actually the most profitable and held the most -- it's

12   generating the most cash flow for the company even into the

13   projection period and the way that we did the perpetuity

14   growth method -- and, yes, we have to factor in NOLs -- but

15   even if we assume the company was not a taxpayer into

16   perpetuity, it would be more than a seven and a half percent

17   reduction in cash flows from Qsymia.  It would take more than

18   that to have a different result.

19        So, my view is you could lose 20, 30, 40 percent of

20   your market.  You don't know until the generic hits.

21        We held a lot of discussions with the company.  They

22   have a lot of programs that they're putting in place so that

23   they keep that revenue and cash flow going with Qsymia.  So I

24   do think we gave them a lot of credit for those programs;

25   otherwise, we could have used 20 or 30 percent negative

1  perpetuity growth rate because that is their largest revenue,

2  largest cash flow-generating asset and we did not.  So, we

3  gave them the benefit of the doubt and took a smaller

4  negative number on that growth.

5  Q    Okay.  Because I was under the impression that you were

6  valuing Qsymia as not being worth very much and then --

7  A    No.

8  Q    -- I think with these 13 utility patents, some of them

9  very recently awarded, that they can continue to

10  differentiate from the generics and maintain their ASPs and

11  continue to grow the sales.

12      Are you also aware that they're seeking the European

13  Union approval and that they're making progress with that or

14  that it's supposed to be in the, I believe, the second half

15  of this year.

16  A    Yeah.  And those are all in the projections.  And,

17  again, we have, because of these patents -- I wasn't aware

18  exactly because of these patents until you gave us the list -

19  - but in discussions with management, they told us we are

20  going to find different ways so that we can keep our market

21  or a large share of our market as the generics enter their

22  market.

23      So, they do believe that our perpetuity of growth

24  factor was very conservative, not only because we factored in

25  NOLs, but also because, you know, it could be a much worse

1  situation.  But we have factored in that we believe that

2  they're going to be successful in their strategies, which

3  includes these patents, to maintain much of their market

4  share.

5  Q    Okay.  And just staying on this patent issue, I found

6  another patent which is a combination therapy for pulmonary

7  hypertension.  The present invention provides compositions

8  and methods for the treatment of pulmonary hypertension using

9  combination therapy.

10       Are you aware of that patent?

11 A    Yes, I am.

12 Q    And is that valuable in your analysis, that if they

13 come in with a new product as common hypertension therapy,

14 that it would create a unique or a brand new revenue stream

15 for the company?

16 A    I think that that is in connection with the VI-0106.

17       So, they currently don't have a commercial product for

18 which they can use the patent and it's part of the patent --

19 it's part of what would go with VI-0106.

20 Q    Right.  But I guess what I'm trying to point out is

21 since they have these patents, they clearly have a pipeline,

22 I think, just beyond VI-0106, to have this combination

23 therapy.  I think there's other things they're working on.

24       And were any of those other things that they're working

25 on, the pipeline, discussed with management and have you

1  valued them fully in your analysis?

2  A    We believe that we have.

3           THE COURT:  I'm sorry, I didn't hear that, Ms.

4  Stratton.

5           THE WITNESS:  Yes, we believe that we have valued

6  all of their assets appropriately.

7           THE COURT:  Well, I understand that, but his

8  specific question on that particular patent and whether it

9  was --

10          THE WITNESS:  On this particular patent, so even

11  after the fact -- again, I went through each of these patents

12  with company management.  They did not believe that any one

13  patent could be sold to provide value to them today.

14  BY MR. MAKOSKY:

15  Q    Well, I'm not necessarily asking about them selling the

16  patents.  I'm asking about the value the company wants under

17  terms of a pipeline, because it doesn't seem like they're a

18  pipeline and the pipeline, looking at these patents is a lot

19  more extensive than I first even imagined it, but it doesn't

20  seem like you're giving any valuation whatsoever to any of

21  their pipeline.

22          And I just, I don't really see other biopharmaceutical

23  companies being valued that way, where they're only looking

24  at existing sales and not giving any kind of valuation

25  whatsoever to the pipeline, which, as I've said, based on

1  these 13 utility patents that was brought to my attention, it

2  seems like it's quite an extensive pipeline that they've got

3  under development.

4  A    Well, I disagree with you, Mr. Makosky.  I do believe

5  that our discounted cash flow does include the reasonable

6  revenue projections, which are growing, and that our decision

7  not to reduce the cash flows and for the perpetuity by a lot

8  was because the company does have many things they're working

9  on to keep Qsymia relevant.

10 Q    Okay.  So, you're maintaining that, basically, you're

11 taking all this into account with your current valuation,

12 it's all covered.  Because this is new information that I

13 didn't have before when I was trying to value the company and

14 investing in it and thinking that they were going to bring a

15 certain product to market, and now I find out that the actual

16 pipeline is a lot more extensive than I thought.

17       And I was just wondering if you were aware of the

18 patents and then you fully valued them in your analysis, but

19 you are telling me that you have done so, correct?

20 A    Yes.  Yes.

21       And, again, I spoke to my pharmaceutical partner and

22 it's not unusual.  This is part of the process of keeping

23 your commercialized products so that you can come up with new

24 methods of delivery or other ways to use them, so that you

25 can continue the life cycle of those products.

1  Q     Okay.  I think that answers the questions that I had,

2  so thank you very much for your time.

3  A     Thank you, Mr. Makosky.

4            THE COURT:  Thank you.

5            Mr. Dijkstra?

6                         CROSS-EXAMINATION

7  BY MR. DIJKSTRA:

8  Q     Dennis Dijkstra, yes, I have a similar problem as Mr.

9  Makosky, and for me it's also five o'clock in the morning, to

10 please bear with me.

11         Ms. Stratton, good afternoon.  I hope you're fine.

12 I would like to ask you, what influence would you say the May

13 20 notes being convertible had on potential investors?

14 A     I'm sorry, from -- on potential investors?

15         I'm confused by that question.

16 Q     I can clarify for you what I mean.

17         If I'm a potential investor 18 months ago or 10 months

18 ago or even anywhere before November or in November still, I

19 invest in the company.  With that money, it's more successful

20 and then (indiscernible) enterprise comes and says, okay,

21 let's convert now and we own half the company.

22         That would be, for me, as an investor, very

23 unattractive.

24 A     Okay.  I understand.

25         And our, again, our mandate, we, first, were trying to

1  refinance the company and there would no longer be the --

2  that debt.  So, our goal was to replace that debt, so I'm not

3  sure what you're asking me.

4  Q    I just want to know if any of the investors you spoke

5  to -- you spoke to 101, I believe -- said, okay, we might be

6  interested, but the noose around the neck of VIVUS, the sort

7  of (indiscernible) being in this convertible option, that is

8  making us back off.

9       Did you get any information out of the market?

10 Because I remember Mr. Pinkas said that they've been going at

11 it already for 10 months.  I believe Mr. Thomas King even

12 said 18 months.  So, what kind of influence did that have?

13 A    So, I don't believe that had any --

14 Q    Did you -- sorry.

15 A    So, I don't believe that had any influence on our

16 investors, and at one point, you know, we even spoke to some

17 other convertible security providers that might have helped

18 us refinance the debt with another convertible security with

19 a much further out maturity date.  So, I don't think it had

20 any impact on our process.

21 Q    You don't, okay.

22 A    The goal was to pay them off.

23 Q    Okay.  Thank you.

24      And do you know, perhaps, why there was no rights

25 issued to shareholders?  Was that ever considered?

1  A    So, my understanding is that securing a rights offering

2  with as many retail investors as VIVUS has would be very

3  difficult to complete and not typically done.  It's more

4  typically done when you have more institutional investors and

5  there are thousands of --

6  Q    So, what --

7  A    So, that was discussed and it was determined that with

8  the number of retail customers that VIVUS has, it would not

9  be -- you would not be successful in getting that completed.

10 Q    So, it was considered, but the outcome was, no, we're

11 not going to give it?

12 A    I know it was discussed and we didn't do it, so, yes.

13 Q    So, on that -- I think from all the correspondence on

14 the docket, I think (indiscernible) around quite favored of

15 VI-0106.  I would like to get clear for myself how to

16 understand the zero valuation for it.

17      If it were zero, like it were worthless, can it be

18 disposed of?

19 A    So, I think that I've had to amend my valuation there

20 and I would say that it would be up to, worth up to $1

21 million when we did the (indiscernible) analysis.

22 Q    There was a market (indiscernible).

23 A    I did that analysis with my team and I did that

24 analysis before we had an offer for the company.

25 Q    So, it is not worthless; it is worth one million?

1  A      That is what I had stated in my sum-of-the-parts

2  analysis.

3  Q      But it's not for sale?

4  A      I don't know whether it's for sale or not.

5  Q      You don't know, okay.

6         Is it correct to say that it's valued zero because --

7  well, maybe one million -- but in your 45, your

8  (indiscernible) 45, it's still concluded at zero -- but is it

9  correct to say that the value is zero because 5 percent

10 simply cannot see the path forward in regards of getting

11 approval, coming to market, making a risk-adjustment revenue

12 projection, is that why Piper is valuing it at zero?

13 A      So, I can repeat why we think it has zero value.  It

14 was purchased in January of 2017 and, yes, the company has

15 spent quite a bit of time on formulation.  They did conduct a

16 Phase I study, so though do have safety data, and it is,

17 again, a 505(b)(q) because this molecule is, this drug is

18 used for other treatments, so they can piggyback a little bit

19 off of some of that safety, but because they're changing the

20 formulation, they have to do some new safety data, as well.

21        But my understanding is they don't have any new

22 efficacy data since purchasing that asset and when they

23 bought that asset, they already had the data on the three

24 compassionate-use patients, which they said there was some

25 potential reversal of the disease on these three

1  compassionate-use patients.

2      Since then, they have no new data.  I don't see why

3  anyone would be willing to pay more than they did for an

4  asset that hasn't been developed further than it was, other

5  than a formulation.  They don't have efficacy data.

6      And even with the path forward, even if they had

7  funding, which they don't have funding today to go forward, I

8  don't -- like, it's speculative.  It's highly speculative

9  when they will start that process, if their Phase II data

10  will be -- will have good news.  And it is my understanding

11  that in the specialty pharmaceutical, they are not yet at the

12  value inflection point.

13  Q     Okay.

14  A     This is when you have good efficacy data.

15  Q     So, that means whoever acquires VIVUS and assets might

16  reap the benefits from it in the near future?

17  A     Or if they decide to invest in it, they might invest

18  and it will sell.

19      I do also understand that there was a Stanford study,

20  that they did to a Phase II(a), but it was on Class 1 and 2

21  patients and that was considered a failure.

22  Q     Uh-huh.  I thought --

23  A     Now, VIVUS is looking at using it on Class 3 and Class

24  4 patients, which, Your Honor, because I have asked these

25  questions, the phase -- the Class 1 and 2 are people who have

1  the disease, but they can live with it, so it's pretty -- and

2  3 and 4, that means it's progressing further and, 4, you

3  know, will perish from.

4       So, I do know that VIVUS' plan is to come up with a

5  therapy that treats Class 3 and Class 4 patients, so that

6  Phase II(a) study is Stanford did is not relevant to them,

7  because they're looking at 3 and 4, and not 1 and 2; however,

8  that study was considered a failure.  They don't have

9  efficacy data from that study.

10 Q    But I uploaded an exhibit and there's three samples or

11 three reports on (indiscernible) patients and that is pretty

12 positive.  Now, I'm not sure if you read it.  I can bring it

13 up for you, but let me see the number, because I filed quite

14 a lot of them.

15 A    Is this your Exhibit C.

16 Q    C-2, actually, yes.  C-2 from Document 207.

17 A    Yes, and this is the same data that VIVUS had when they

18 purchased the asset in 2017.

19 Q    Okay.  So, do you know or did they tell you from your

20 health care department that some rare-disease drugs already

21 get approval or some form of approval in Phase II if they are

22 life-saving or life-extending?

23 A    My understanding is that there -- this company does

24 intend, if they have good results in their Phase II study,

25 which my understanding means once they start a Phase II

1  study, that's 18 to 24 months into the future from starting

2  that study, but if they do have good results, they could look

3  for fast-track approval or breakthrough therapy.

4      They don't -- you don't automatically get it just

5  because you're working on a therapy for a rare disease.  So,

6  orphan-drug status doesn't automatically give you approval;

7  it gives you tax credits and it gives you -- you know, once

8  it is approved, if it ever gets approved, it would give you

9  exclusivity rights.

10 Q    But there are biotech valuation experts that take all

11 of these things into consideration.  They have -- they take

12 all these parameters and they have a range of going to very

13 conservative to very positive, of course, but you like

14 midpoints, so we can take a midpoint there.

15     I'm a little bit confused by that because I wonder if

16 Piper Sandler has no other customers or clients -- sorry --

17 no other clients that are biotech, clinical-stage

18 development, Part 1 companies, because how did you, at Piper

19 Sandler, value them if you cannot do clinical-stage product

20 valuations.

21     Do you have any of those clients at Piper Sandler?

22 A    So, we do and those are not my clients.  The other --

23 Q    No, I --

24 A    The other pharmaceutical clients that we have are

25 healthy.  They're not stressed or distressed, so they

1   wouldn't be my clients.

2       But my partner, Jeff Ammerman, who has been very, very

3   involved in this company in the valuation, and in the

4   discussions of what we need to consider, I take his opinion

5   very heavily in my decision on the valuation and his view is

6   this asset has not progressed.  There's no efficacy.  And

7   there's no reason for us to believe anyone would pay more

8   than VIVUS paid when there's no new data since they bought

9   it.

10  Q    Did you say --

11  A    And if you want to talk about the three compassionate-

12  use patients, VIVUS knew about the compassionate-use patients

13  when they bought the asset.

14  Q    But did you just say you think you will not find

15  anybody else that will pay what VIVUS paid because they

16  valued it at 40 million; 1 million up front, 39 million

17  milestones, plus royalties.

18       So, did you just say we're not going to find anybody

19  who is willing to pay any more than 40 million?

20  A    So, again, in order to get to any milestones, you have

21  to invest a lot of money.  So, my understanding is it's at

22  least $40 million to get through the Phase II and then

23  potentially another 50 to 60 million for a Phase III.

24       They would hope for a breakthrough therapy, which means

25  they could do the Phase III after it's in the market, but

1  we'd still have to pay that cost, so it is a substantial

2  investment to continue to develop this product.

3       And while, you know, I hope that everyone is right and

4  it can, it's disease-modifying and it can help a lot of

5  people with this disease, because it's a horrible disease,

6  it's very speculative right now on whether it can.

7  Q    So, you say it's costs white a lot of money to get it

8  to market, but in only half of what management projected will

9  come through, we wouldn't be in this court today.

10 A    But in order to get to any revenue for this product, it

11 has to be approved and there's no data today that exists that

12 says that it will be approved.

13 Q    Okay.

14 A    There's no data that says that it --

15 Q    Sorry.

16 A    I'm sorry.

17          THE COURT:  Ms. Stratton, why don't you complete

18 and then we'll go back to Mr. Dijkstra.

19          THE WITNESS:  Okay.  I would just say there is no

20 new efficacy data.  They haven't developed any Phase II

21 efficacy data, which is the inflection point for value for

22 developing pharmaceuticals.

23 BY MR. DIJKSTRA:

24 Q    So, has the compound changed over the last, 2, 3, 4, 5

25 years?  Did they make any chemical change to it?

1  A     So, my understanding is they did make some formulation

2  changes they thought was necessary for stability.  So, they

3  have done some safety tests, but they have not done any

4  efficacy tests.

5  Q     So, if it worked four years ago and chemically nothing

6  has changed because compound FK506 is today still FK506, it's

7  being used in transplantations, it's being used in other

8  fields.  So, if it worked four years ago, why is it not going

9  to work tomorrow or next week or in one year?

10 A     I don't -- I think our view is a sample size of three

11 compassionate-use patients is not a big enough sample to

12 prove that efficacy.

13 Q     And what about the pre-clinical data when they did it

14 on the animal testing?

15 A     So, again --

16 Q     That's also --

17 A     I am not aware of the animal testing.  My understanding

18 of the way the drugs are developed and where they have a

19 value inflection is when you have Phase II efficacy data.

20 Q     But you -- I understand you're not a biotech

21 specialist; me neither -- I'm becoming more and more and more

22 every day because I'm learning -- but the first

23 (indiscernible) tested on, in this case, it was tested on

24 rats.  It was by (indiscernible) and Mrs. Etta Speakerkuther

25 (phonetic) -- she's from Denver.  And, actually, there, the

1   results were so satisfying that they went further into the

2   process and next, at some point, VIVUS bought it.

3        So, I would say if it looks like a duck, it something

4   else like a duck, it's probably a duck.  So, that's why I'm

5   asking you, why would something that worked four years ago,

6   not work tomorrow or in one year?  Why is there no -- I've

7   seen many models.  I think the industry calls it an RNPV,

8   risk-adjusted, net-present value.

9        But it seems like Piper did nothing of that kind.  The

10  preliminary discussion materials, the first time I saw them

11  was on the 18th.  I didn't see them on the petition date.  I

12  didn't see them when we had the equity committee hearing.

13       So, only now, data starts to get clear for us, but

14  still now on one of the most important hearings I think in

15  the whole case, we don't have anything.  You didn't provide

16  anything on paper for us or -- concerning VI-0106.

17  A    And, again, I read through many of the exhibits that

18  you put forth to the Court and I don't think that we would

19  argue that if we had hit the value inflection point, Piper

20  Sandler, my pharmaceutical partner, we know how to determine

21  the market advise, we know how to do an NPV, it is based on

22  (indiscernible) to the discounted cash flow; we know how to

23  do all those exercises.

24       Our view is it's not appropriate to do today.  So, I

25  don't think we would argue with you on methodology, should we

1  thought -- if we thought this had value.  We would have used

2  those methodologies.  We would have done some of the things

3  that all of you have asked.

4      Where we're arguing is we don't believe VI-0106 has

5  that value.  It has not met the efficacy data information

6  that we believe it needs to, to hit a value inflection point.

7  Q    So, I can agree that we are on opposite sides, opposite

8  views.  But if you had 101 investors and nobody was

9  interested, if you had Piper Sandler valuing this company so

10 low, if Mr. (Indiscernible) valuing the liquidation value to

11 almost like nothing, the VI-0106 value is worth nothing, why

12 is IKON Enterprises (phonetic) interested in this company?

13     Why is it going in (indiscernible)?  I still see 34

14 people -- well, only 4 or 5 are -- the judge -- are unfaith

15 [sic] shareholders and the rest is -- well, I don't want to

16 be disrespectful, but that's a small army of specialists,

17 where is all that money coming from, for this low-value,

18 uninteresting company to everybody?  What is all the effort

19 about?  I'm not getting it.

20 A    So, Mr. Dijkstra, I would also say, like, my

21 understanding is that IKON has been a debt holder for five

22 years now, so I don't think they just got involved to try to

23 take this asset away.

24     And I'd also argue that if you look at the implied

25 market value of this company over time, over all that time

1  that Mr. Amos made the comments about how great VI-0106 is,

2  no one increased the value of the stock.

3       When we went to try to do a refinance and the other

4  investment bank looked for equity investors, no one valued

5  this company higher.  Those investors didn't value VI-0106,

6  because if they did, we wouldn't be here today.

7  Q    So, that's actually very thin ice where you're going on

8  and I'll tell you why.

9       VIVUS stock, the past seven years or six years that I

10 have been involved, has been on the (indiscernible) list

11 many, many times.  I had discussions with the company, with

12 Mark Oki (phonetic).  I can show you all the emails.

13      The 201 rules, the SEC 201 rule, was triggered almost

14 every other day and you can see in my exhibit that the -- I

15 would not say it was jumping off a cliff, off the white

16 cliffs of Dover, but it's been going -- since I've been in

17 the stock six years -- from, my average is twenty-six fifty

18 and we are at nine cents today.  So, you have a little bit of

19 understanding where we went.

20      So, I think it's very -- did you research the

21 information of what I'm saying?

22      It was quite public information.  There's a lot of

23 history on short sale.  I mean, we went as high as 60 percent

24 in 2014 to -- I don't know what it is today -- but this stock

25 had been under a constant short sale pressure.

1       So, how can a stock -- how can you say the stock is

2   low, so that's why the market is not (indiscernible)?  I

3   don't see the comparison there.

4   A    So, I think, to me, when there's a lot of sales being

5   sold short, that also means people don't believe in the

6   company.  They don't believe that it's going to meet its

7   projections.  They don't believe that it's going to develop

8   the drug they said they're going to develop, otherwise, there

9   would be many more people.  There wouldn't be short sellers.

10          MR. MANOUSIOUTHAKIS:  Ms. Stratton, I apologize

11   for interrupting, but we agreed that we are not going to

12   assign intent to the shorting activity.  Thank you.

13          THE WITNESS:  Okay.  Sorry, Doctor.

14          I guess I would just say that when we --

15          MR. BARR:  Your Honor, I'm sorry.

16          Can we ask Ms. Stratton if she thinks she needs a

17   break.  We've been going a little bit longer.  I think

18   everybody is getting a little weary, but obviously it's up to

19   her.

20          And I would ask, also, if there are questions,

21   that they're directed to her, as opposed to statements and/or

22   testimony.

23          MR. DIJKSTRA:  Okay.  It's 5:15 for me in the

24   morning --

25          THE COURT:  I'm not sure who was speaking, but I

 1  did ask Ms. Stratton if she wanted a break and she said, no,

 2  she was good to go.

 3           THE WITNESS:  Would you mind if I turn my fan

 4  closer to -- would you mind if I just stepped over here and

 5  turn my fan on me.

 6           THE COURT:  You certainly may.

 7           THE WITNESS:  I have no air-conditioning in my

 8  house and it's very warm.

 9           THE COURT:  And, of course, Ms. Stratton, if at

10  any point you need a break, all you need to do is let me

11  know.

12           THE WITNESS:  Okay.  Thank you very much.

13           I'm fine.  I'm sorry.  I will -- Mr. Dijkstra,

14  what was your question?

15  BY MR. DIJKSTRA:

16  Q    No, let's step about from the thin ice and let go to

17  the next question.

18  A    Okay.

19  Q    That fan is actually very noisy.

20       Can you hear me, because I hear a lot of humming in the

21  audio now?

22           THE COURT:  Please, everyone, make certain your

23  phones are muted.

24           THE WITNESS:  It's a quiet fan so you shouldn't

25  hear it, but I turned it down a little.

1  BY MR. DIJKSTRA:

2  Q     You stated to Mr. Demmy today that there are many ways

3  valuation experts work; is that correct?

4  A     I'm sorry, what was the question?

5  Q     You stated to Mr. Demmy today that there are many ways

6  valuation experts work; is that correct?

7  A     Yes.

8  Q     So, do you think it's possible that other biotech

9  valuation specialists would come with another outcome for VI-

10 0106?

11 A     We don't believe so.

12 Q     You don't believe so.

13 A     No.

14 Q     So, if I would suggest to you that on my comments,

15 another biotech valuation specialist or two others are being

16 invited to value only the VI-0106, because I think at this

17 point, well, you know already I'm convinced that this is

18 where the money is for the future, would that -- is that

19 something that would be possible?

20 A     So, our belief, and my pharmaceutical partner, who is

21 an expert in specialty pharmaceutical, believes that there is

22 no value -- this -- they have not hit a value inflection

23 point and that there should be no value attributed to this

24 PAH program.

25 Q     So, your answer is no, you're not --

1  A      The answer is no.

2         That's what he does for a living.  He sells these

3  assets.  He takes these companies public.  He does follow-on

4  offerings.  We do refinancings.  He does not believe that

5  this asset is at the value inflection point today.

6  Q      Okay.  So, does he also believe that the all other

7  biotech valuation specialists -- there are a few, I think --

8  would come to the same result?

9  A      He believes that any credible biopharma -- this is not

10 biotech; this is specialty pharma or biopharma.  This is not

11 a biotech company.  He said biotech is entirely different

12 than pharma.  He believes that any other credible investment

13 banker would come to the same conclusion.

14 Q      So, how would you like me to call it, a pharmaceutical

15 valuation specialist or biopharma?

16 A      Yes.

17         MR. BARR:  Your Honor, I didn't think that was a

18 question.  Again, I mean just are trying to -- I'm sorry,

19 this is Matt Barr from Weil Gotshal -- bring some -- I know

20 it's late in the morning for them or early in the morning --

21 I apologize for the time difference -- I just want to make

22 sure we're not getting our witness confused.

23         THE COURT:  I think he's being pretty clear.

24         THE WITNESS:  I was just trying to make it

25 clear --

1          THE COURT:  I understand his questions.

2          THE WITNESS:  Your Honor, I was trying to make it

3 clear that biotech is a different sector and we're not

4 discussing a biotech company and I think that a biotech

5 valuation is different than a specialty pharma valuation.

6 BY MR. DIJKSTRA:

7 Q     And then I asked politely how would you like me to call

8 it, is it biopharma?  Is it pharmaceutical?

9 A     So, biopharma includes biotech and specialty pharma.

10       So, this is in the biopharma space, but with respect to

11 the specific assets, I think you have to look at the

12 specialty pharma industry specifically.

13 Q     Specialty pharma, okay.  I'll write that down.

14 A     I just want to make it clear because I do know that

15 biotech has different forms of will valuation that we're not

16 discussing today.

17 Q     So, you declared on (indiscernible) that management had

18 management had informed you that they have no intentions of

19 developing it; is that correct?

20 A     Yes.

21 Q     Did they tell you what they have plans on the combo

22 drug VI-0106 and (indiscernible) that they had filed utility

23 patents for?

24 A     I think that they filed that to give them more options

25 to commercialize different products when they have approval

1  of VI-0106.

2  Q     So, they didn't tell you exactly what they have plans

3  (indiscernible) for it?

4  A     I didn't seem relevant to me at the time.

5  Q     What didn't seem relevant to you at the time, I'm

6  sorry, I'm not getting it.

7  A     I'm sorry.  They're developing patents around a product

8  that is not yet developed.  It's just the same thing as

9  developing product or patents around Qsymia, patents around

10 Pancreaze, to protect and to able to expand or improve your

11 cash flow.

12       They're not at a cash flow point at all with VI-0106,

13 so when it's explained to me that they got a patent that

14 would potentially help them in the future if this drug get

15 approved and if they're in the market, I guess my point is,

16 it is only valuable if they get it approved and if they are

17 in the market.  So, it's not relevant to me today.

18 Q     Did you know about this utility patent before I filed a

19 supplemental to my objection?

20 A     I did not.

21 Q     You did not.

22       Did they tell you, perhaps, what they will do with VI-

23 0106 once they become a wholly-owned IKON Enterprise company?

24 A     To my understanding, there was no funding mechanism as

25 of yet for VI-0106.  It's not included in the exit financing.

1  I do not know the intentions of IKON.

2  Q    Okay.  So, I heard you say today to Mr. Friedmann and

3  to Mr. Manousiouthakis multiple times that even the mechanism

4  of delivery is making a difference.

5  A    No, I think that was in the Mankind transaction.

6  Q    Yes.

7  A    That was in the Mankind transaction, because that is

8  for a drug that has already been approved for the treatment

9  of PAH.  I was explaining the difference between the Mankind

10 transaction and the VI-0106.

11 Q    But United, Mankind, much higher values because of the

12 inhalation technology, right?

13 A    I think the point there was that United Therapeutics

14 wanted a method of delivery for another drug that they

15 already have approved for PAH.  It's the same drug, this

16 gives it a different method of delivery.

17 Q    But the way I read it in your declaration, and I'm sure

18 it was not you who (indiscernible) that pharmaceutical

19 language in (indiscernible).

20 A    I can find it for you, too.

21 Q    So, under C, and I quote, First, the drug has a

22 different mechanism of action and drug (indiscernible)

23 technologies.

24     That's what I'm reading here.

25          THE COURT:  Mr. Dijkstra, where are you reading?

1            MR. DIJKSTRA:  I'm sorry, page 29, C.

2   (Indiscernible) answers.

3            THE COURT:  Thank you.

4   BY MR. DIJKSTRA:

5   Q    It says here, first, the drug has two different

6   mechanisms of actions and drug delivery technologies.

7        Is they are referring to the technology, its delivery,

8   right, the drug?

9   A    Yes.

10  Q    Okay.  Then Mankind's tech was developed to provide a

11  more convenient inhalation device.

12       So, it's the second time they point out to the

13  inhalation, right?

14  A    Yes.

15  Q    Then, relative to United Therapeutics (indiscernible),

16  the (indiscernible) inhaled (indiscernible) PAH patients.

17  That's the third time, right?

18  A    Yes.

19  Q    So, inhalation makes a difference here or at least a

20  part of the difference, right?

21  A    So, United Therapeutics' Tyvaso is already an inhaled

22  product.  I think their view was that this one would have a

23  greater convenience than Tyvaso.  So, they viewed it as a

24  competitor that could work against their existing product in

25  the PAH market.

1  Q      So, if VI-0106 had an inhalation method that would work

2  even better than the difficult (indiscernible) compound

3  orally, would that add value to the asset?

4  A      So, Mr. Dijkstra, I don't know.  At the time if VI-0106

5  were to be approved, I don't know what the competitive

6  landscape would be at that time.  There may be other products

7  that they are competing with, other than this one.  So, it

8  could provide value.  I can't tell you that.

9        You're asking me a lot of contingencies and ifs and I

10 can't answer that for you.  It may or may not, it depends on

11 what the competitive landscape is at the time when they get

12 approval for VI-0106.

13 Q      Let me give you two examples.  In 2016 I have two

14 choices.  I can take the compound orally and go a long

15 process of trying to make a formulation and delaying it and

16 bring the company and shareholders into trouble or I can take

17 it for inhalation and probably get it much quicker approved.

18 Which option would you choose, inhalation or oral?

19 A      I understand what you're asking me, Mr. Dijkstra, but

20 what I'm saying is if VIVUS gets to approval for VI-0106, it

21 may be that their all other competing products at the time

22 are inhalation.  I don't know that.  It could be that -- we

23 don't know that.  That's in the future and I guess what

24 you're saying is that could (indiscernible).  Maybe that's

25 true.  I can't just agree with you.

1      Maybe it's true that the fact that they have a patent
2  means that they could have it work to be inhaled would be
3  better, but we're not to that point where they're at a
4  commercial product.  We're not at the point where VI-0106 has
5  been approved to treat PAH.
6      So, in this case, Treprostinil has been approved to
7  treat PAH and Mankind came up with a better delivery system,
8  a better inhaler.  So, yes, it's going to hurt United
9  Therapeutics.
10      There's a competitive dynamic for this transaction that
11 made this valuable and it's also for a treatment that's
12 already been approved for PAH.  VI-0106 has not been approved
13 for PAH, so --
14 Q    Because we don't --
15 A    -- maybe the fact that they can inhale it is great,
16 but, you know, we're years away from that.
17 Q    So, but the fact that we are -- the fact that we went
18 oral is where we are today.  We have a delay and now you are
19 using it against us, the shareholders, that there is no
20 (indiscernible) and no IND filed and no clinical trials.
21      So, if you, as a company, or you as the decision-maker
22 had the choice in 2016 or 2017 when they purchased it, if you
23 had the choice to go inhalation or oral, which decision would
24 you make?
25 A    I mean I would take the inhalation, but I'm not sure

1  how that's relevant to the value of the VI-0106.

2  Q     Well, I'll make it relevant for you right now.

3  A     Okay.

4  Q     Can you please look at my Exhibit B-1 and B-2, because

5  exactly what you just said in 2016, the technique was already

6  there.

7  A     B-1?

8  Q     B, B-1, and B-2.

9  A     Okay.

10  Q     Rhode Island University did a government-type study

11  with reference to (indiscernible) of delivering through

12  aerosol inhalation (indiscernible) 506 for the treatment of

13  PAH and it worked like a charm.

14        And I don't understand why VIVUS (indiscernible) not

15  acted on that.  So I cannot tell you if they knew it or not

16  knew it, but maybe it's possible that VIVUS' management knew

17  about it and then exactly what they based their projections

18  on in the June 19 presentation.

19        So, the technique is there.  It is tried and tested.

20  You can read it in my -- I'm not making it up.  I was shocked

21  when I found it.

22        Actually, we are opposite sides, but I was so happy

23  that your health care department went into (indiscernible) to

24  find Mr. Amati's claims fundamentally flawed because

25  (indiscernible) I went looking on where do we stand with

1  (indiscernible) 506.

2      Well, we already had it in 2016.  We probably could

3  have already been to market.  So, it's probably Mr. King I

4  have to ask next why they didn't act on it.  I think Mr. King

5  has to answer us why he didn't take his fiduciary duties to

6  shareholders and to make sure maximum value was, as they

7  promised, maximum value was achieved.

8      I'm sorry, I'm getting agitated a little bit, but that

9  is because I'm walking around with this information already

10  for a few days.

11     So, it could have been us making 200, 300 million just

12  for an additional payment or amounts (indiscernible) with

13  United.  It could have been us already.

14     So, does that add value to VI-0106 today?

15 A    I don't believe that it does, but I hear what you're

16 saying.  I think what you're saying, if I can restate it, is

17 that because it's been proven you can use an inhalant for VI-

18 0106, that that provides value today.

19     Again, the only reason in our opinion that that Mankind

20 got value for a Phase I asset was because it was a different

21 delivery method for a drug that was already approved for the

22 treatment of PAH.  VI-0106 has not been approved for the

23 treatment of PAH.

24     So, whether it's an inhalant or not doesn't matter

25 today because you can't use it for the treatment of PAH until

1  you have gone through the approval process and they have not

2  yet gotten efficacy data beyond the three compassionate-use

3  patients, which was the basis for which the company purchased

4  the asset.

5  Q    Can I honestly tell you what feeling I get from the

6  answer you just gave me?

7       The value zero is superglued on VI-0106 and it's just

8  not going to come off.  No matter what I throw, even if I

9  would throw up a kitchen sink at you, it's not going to come

10 off.  It's going to stay at a zero value and that's at this

11 time.

12      So, I thank you very much.  I have further questions.

13           MR. DIJKSTRA:  Thank you, Your Honor.

14           THE COURT:  Thank you, Mr. Dijkstra.

15           Are there any more questions for Ms. Stratton from

16 anyone who has not yet asked questions?

17      (No verbal response)

18           THE COURT:  Okay.  I don't hear any.  Let me ask a

19 few.

20           THE WITNESS:  Okay.

21           THE COURT:  And they're a follow-up, really, on

22 questions everyone has asked, but probably more directly, Mr.

23 Dijkstra.

24           So, as a lawyer, by training, it's intuitive to me

25 that VI-0106 has zero value and I quite, frankly, hear your

1  answer changing today from what I think was in the report, so

2  I want to make sure I understand.  And from my lawyer

3  training, for example, I'm used to using decision trees.  I

4  don't know if you have used decision trees, Ms. Stratton --

5           THE WITNESS:  I understand what decision trees

6  are.

7           THE COURT:  And we look at alternatives and we say

8  if X happens with Y percent of probability, we get this

9  result and if Z happens with A percent of probability, we get

10 another result.  And if Z occurs over a period of time with Q

11 percent of probability we get another result.

12          And so, it's for the intuitive for me that

13 anything is ever zero.  Is there such a methodology for

14 valuing a company, and I'll probably use the wrong term, too,

15 but in the pharma space, that has products in the pipeline,

16 and let's say, start with products in the pipeline and then

17 no commercial products and then we can add on commercial

18 products and we can go from there, but this is what makes no

19 intuitive sense to me.

20          THE WITNESS:  Okay.  So, I'll explain to you, as

21 explained to the process, as explained by my pharmaceutical

22 partner.  So, when a product as efficacy data, you can look,

23 and there are percentages at that point in time, what

24 percentages of those drugs get approved.

25          The further you are along in your Phase II study,

1  the higher percentage chance you may know a better, yes or

2  no, right, if it's going to be approved -- if it's working or

3  not.

4         We're not there.  So, we are at they have some

5  safety data.  They have three patients, which was very

6  promising.

7         And can I walk you through what I've asked myself

8  as I went through the process?  If this really were worth a

9  billion dollars, why wouldn't the company have spent every

10 penny they had developing the product?

11        And the answer is because it's very high-risk;

12 that's what I was told.  Because there are a lot of risks and

13 there are a lot of ifs.

14        THE COURT:  I'm not sure if that meshes with some

15 of the statements that management has made in their public

16 statements, and I'll have to go back and look at that in

17 terms of when they thought they could put the IND in and what

18 they thought the Phase II testing was going to be.  I'm not

19 sure that I saw astronomical numbers, in fact, I think I

20 didn't, but I could be wrong.

21        But I'm not talking -- I'm talking generically

22 now, because I want to understand generically, if a company

23 came to your group that sells or values pharma companies for

24 sale and then you can tell me why it's a different issues for

25 a restructuring, but if they came to your group, would your

1  group say, I'm sorry, we can't help you at all.  Your company

2  is worth zero, nobody is interested in it.  There's not a

3  competitor who you would go to and sell your product to.

4         There's not some company with synergies who would

5  be interested in your product.  It's just zero because you

6  haven't -- you have had no efficacy studies and there's just

7  nothing there anybody wants.

8         THE WITNESS:  So, I will -- we've had hours of

9  discussions.  So, this wasn't taken likely where we just

10  said, You know what?  There's no value to the VI-0106.

11         Our group, my group, and the restructuring special

12  situations team and the group from the specialty pharma team,

13  we had hours of discussions around this issue.  We didn't

14  take this lightly.  We understood that this was a big issue

15  on value.

16         And in those hours of discussions, we talked about

17  the competition, the treatments that are already in the

18  market for PAH, the treatments that are in development and

19  further and higher phases than this company today, and

20  there's more than 12 in development that are at further

21  stages than this company.  And so, based on the totality of

22  everything that we discussed, it was our decision that VI-

23  0106, and I amended it to the million dollars for, you know,

24  what they had paid for it, but we don't think that there

25  would be people who would want to develop this --

 1          THE COURT:  Well, we won't know until --

 2          THE WITNESS:  -- because there's so much

 3   competition today.  And when they bought it in 2017, there

 4   was less competition.

 5          So, there are other competitors out there that

 6   have product that are further along.  There are other ones

 7   that are (indiscernible) modifying that are further along,

 8   and we think that it's going to be very difficult for VIVUS

 9   to get this.  We don't know if it will be approved.  They

10   don't have the efficacy data.

11          And at some point, if they do get it approved,

12   there might already be a really crowded market and their

13   share would be so small, it wouldn't be as valuable as

14   they're discussing today.

15   BY MR. DIJKSTRA:

16   Q    And that's why you would play it out in a decision tree

17   fashion, to figure out --

18          THE WITNESS:  Yes.

19   Q    what the --

20          THE WITNESS:  Yes.

21   Q    -- what that was.  But you're not even --

22          THE WITNESS:  Yes.

23   Q    --  out a limb, right?  There's no limb --

24          THE WITNESS:  No.

25   Q    -- to your tree, is the testimony.

1          THE WITNESS:  Yes.

2   Q    Did the -- when did this thinking occur?  Because my

3   understanding of your expert report, this thinking wasn't in

4   it.  My understanding at least of your expert report is,

5   because VI-0106 has no earnings, you would -- and no cash

6   flow, it wouldn't be included in a cash flow, a discounted

7   cash flow methodology.  So my understanding is it just

8   doesn't get included --

9          THE WITNESS:  So --

10  Q    -- because, in fact, there are no revenues.

11         THE WITNESS:  But that's not accurate.  If this

12  was in a Phase IIA setting with some good results, we would,

13  in fact, likely value this separately.  We -- we would

14  probably do a discounted cash flow separate from our

15  discounted cash flow that would be a much longer projection

16  period, and we would look for precedent transactions that are

17  exactly in this place to view those.  We wouldn't look at

18  one, we wouldn't look at two, as we -- had been suggested;

19  we'd look at all of them.  But it is not -- there's --

20  they're not to that point.

21  Q    Okay.  Well --

22         THE WITNESS:  And so I'm --

23  Q    -- that's interesting --

24         THE WITNESS:  I'm sorry if --

25  Q    -- because that --

1              THE WITNESS:  -- that wasn't in -- if that's not

2  what's stated in there.  But they're not to the point that we

3  believe that there is value.  If it were to the point where

4  we believe there should be value, a lot of these things that

5  have been exhibits for Mr. Dijkstra, we would have done those

6  things.  We would have valued it using a discounted cash flow

7  with a much longer projection period because there -- it

8  wouldn't be in the projection, right?  It wouldn't -- it

9  wouldn't be in this projection period, it wouldn't -- there

10 wouldn't be revenue before 2023, there would only be cost.

11 But --

12             UNIDENTIFIED:  (Indiscernible)

13             THE WITNESS:  -- (indiscernible)

14             THE COURT:  No, nobody else gets to talk right

15 now.

16             THE WITNESS:  So I think the difference here is

17 our view is that it's not at the point where you would give

18 it value.  If it were -- and that's why I said today to some

19 of the *pro se* shareholders I'm not arguing valuation method.

20 If we decided to value it, I think I agree with them, we

21 would have used some of those methodologies.  What I'm

22 arguing is we don't believe it's to that point where you

23 should value it.

24 BY THE COURT:

25 Q    Okay.  I'm not sure I understood that before, I'm not

1  sure that was in your report, although I will go back and

2  take a look at it.  But my understanding of your report was

3  it's not included in a DCF because there are no earnings,

4  it's not included in a comparable because the companies or

5  transactions you chose were for commercial -- were for

6  commercialized drugs and not pipeline drugs, so it's just not

7  included in any of those.

8       Now, because of the parameters that you chose to use,

9  now I'm hearing something different, which is that it wasn't

10  included in those models because, again, you attribute no

11  value to it because it is not developed enough yet to have a

12  value because it hasn't gone through Phase II and an efficacy

13  trial.

14       And is it also your testimony that there's no

15  competitor or no synergies with any company out there who

16  would be willing to pay something for it?

17  A    I guess it's my opinion -- I have been approached by

18  other pharmaceutical companies for the company's other drugs

19  during this bankruptcy; I have not been approached by any

20  other pharmaceutical for VI-0106.  I mean, it's a crowded

21  space.  There's a dozen PH programs in the -- in development

22  today for a -- you know, as we said, a rare disease.  So the

23  addressable market is -- will be small, if all of those are

24  approved or some of those are approved.

25  Q    Well, supposedly, that could have been modeled.  But I

1  understand now, I think, a little differently where you're

2  coming from with respect to this particular product.

3  Obviously, I don't know what that means, where I come down as

4  to what that means.

5      But I also was surprised to see that you would consider

6  some evidence of market value an offer of a million dollars.

7  Why would you consider that some evidence of market value?

8  A    I -- because it was offered.  Mr. Chlavin claims to know

9  everything about VI-0106, he has all of the information that

10  everyone else has, and that is what he chose to offer the

11  company.

12  Q    Maybe he offered it because you valued it at zero, and

13  it has nothing to do with market value.  Is that a

14  possibility?

15  A    It could be.

16  Q    I think more likely possibility.  I was surprised by

17  that.

18      Does the fact that, when VIVUS bought the asset, it

19  agreed to pay $39 million over time as it met certain

20  milestones have no value?  Grant -- I know it hasn't met the

21  milestones; that's not what I'm asking.  Does -- is that not

22  indicative of any value?

23  A    So that's contingent value.  So, again, my understanding

24  is when -- if we were to look at any of those licensing

25  programs, we also look at the purchase price for what you

1  paid -- and then you present value those back with some -- I

2  mean, I don't -- I don't know what the value would be

3  because, at this point, it's speculative.

4  Q    At this point, it's?

5  A    It's speculative.

6       So, when we look at the other products that have been

7  sold, they are typically sold at a later stage in

8  development.  So, when you get information, you can actually

9  do the decision tree you're talking about and see what they

10  actually are paying.

11  Q    But it was speculative then, at the time.  So what's

12  changed?

13  A    Yes.  It's still speculative, so what would change?  Why

14  would someone pay more than a million dollars today, if they

15  paid a million dollars then?

16  Q    Well, they didn't pay just a million dollars.  They paid

17  a million dollars, plus 39 million, if certain milestones are

18  hit.  That was the purchase price, that was the

19  consideration, right?

20  A    So -- yes.

21  Q    So why would that change?

22  A    But that would still potentially only bring a million

23  dollars to the -- to the estate today because the rest would

24  be contingent.

25  Q    So the contingency has no value.

1      Does it have less value than it had when VIVUS

2  purchased it?

3  A    I would say yes.

4  Q    Because?

5  A    Because it's been three and a half years since they've

6  purchased that, they have not gained any new efficacy data,

7  and there are many more competitors today then there were

8  when they purchased that in January of 2017.

9  Q    Okay.

10 A    My headset just died, so let me try a different one.

11      (Pause in proceedings)

12 Q    In your declaration, you said in the footnote that you

13 would add to net debt the $5 million, minium payment that's

14 going to equity holders.  Do you remember that?

15 A    I'm sorry.  I don't know where that -- where that is.

16 Now I've got this all messed up.

17 Q    Let me see if I can tell you.  It's in Footnote 5, on

18 Page 5.

19 A    Yes, I would.

20 Q    What methodology is that based on?

21 A    Because the fact that they're already getting $5

22 million, to me, means, if I'm taking the 270.7 million

23 effective date claims estimate, for them to receive more

24 value than our valuation, we need to be 5 million more than

25 the effective date claims estimate because we are --

1  Q    But that --

2  A    -- giving them $5 million.

3  Q    That was a gift, right?  Would you add a gift to net

4  debt?  What methodology does that?

5  A    It is a gift that has value, it has a five-million-

6  dollar value.

7  Q    It has value to the equity holders.  My question is:

8  Under what theory and what methodology would you add a five-

9  million-dollar gift to net debt to come up with the hurdle

10  number for a total enterprise valuation calculation?  I

11  haven't seen that before.  So I'm asking under what

12  methodology that would happen?

13  A    I -- I don't know that this is a methodology.  But I

14  guess what we're saying is the equity holders wouldn't be

15  entitled to more until we reached the effective date claims

16  estimate, and you know, plus this $5 million that they're

17  receiving as a gift.  I don't believe that, if we were at --

18  our valuation was two seventy -- was at 275.7, that they

19  would get more than the $5 million to which they're getting,

20  I think is the theory behind that.

21  Q    I have to say I'm unclear on adjustments made to

22  management projections, but I will look through the papers

23  for that.

24       That's probably all the questions -- I have other

25  questions, but they're probably not for you, Ms. Stratton.

1  So thank you very much.  Do you need a break before redirect?

2  A    I wouldn't -- I wouldn't mind having a break.

3  Q    Okay.  How long would you like?

4  A    Five minutes is fine.

5          THE COURT:  Okay.  Well, why don't we -- why don't

6  we do this?  Let's take 15, we've been going a while.  Let's

7  take 15.  And then we're going to talk about -- after

8  redirect, we'll talk about how we proceed from here.  Thank

9  you.

10          MR. FRIEDMANN:  Thank you, Your Honor.

11        (Recess taken at 6:52 p.m.)

12        (Proceedings resume at 7:10 p.m.)

13          MR. FRIEDMANN:  This is Jared Friedmann, Your

14  Honor, yes.

15          THE COURT:  Thank you.  And everyone please make

16  sure your phones are muted, except for Mr. Friedmann and Ms.

17  Stratton.  Thank you.

18          Mr. Friedmann.

19          MR. FRIEDMANN:  Thank you, Your Honor.

20                  REDIRECT EXAMINATION

21  BY MR. FRIEDMANN:

22  Q    Ms. Stratton, I'd like to go back through some of the

23  issues that were raised and give you an opportunity to

24  provide some more clarity on some of them.

25        You may remember -- it feels like a while ago, I'm sure

1  -- during Mr. Demmy's cross-examination, he spent a lot of

2  time asking you about your decisions used on the median

3  versus the mean.   In particular, we were looking at the

4  selected public comparables analysis that you did.  Do you

5  recall that discussion?

6  A     Yes.

7  Q     Okay.  Can you explain to us why you made the decision

8  to use the median, rather than the mean?

9  A     So the mean is an average of all of the points of -- the

10  whole universe.  And what that does is allows ones that are

11  very low or very high to influence the number, rather than

12  when you use the median, it is the midpoint of all of those -

13  - those numbers.  So it is -- you're taking a full range and

14  you're saying this is the range, and the mean could be down

15  here, it could be up here.  It's heavily influenced by

16  outliers.  So, in our opinion, taking the median is a little

17  bit more conservative because you're not allowing those

18  outliers to be the numbers, to influence the numbers.

19  Q     In the event that you were to use -- well, first of all

20  -- strike that.

21        What is the basis for that view?  Where are you getting

22  that from?  Is that something that is your personal opinion?

23  Is that something you're getting from somewhere else?  What's

24  the basis for having that view that the median is more

25  appropriate here.

1  Q    It's -- it's part of valuation theory.  I will not argue

2  that other people don't use mean because people do.  Some

3  people might do what makes sense for their different -- it

4  may be that there's not outliers and there's not a difference

5  between median and mean.

6      It is our practice to use median.  When we look at

7  fairness opinions, we typically use the median.  So I -- it's

8  -- it's something that is my practice because I believe it is

9  more accurate than using something influenced by the

10  outliers.

11  Q    How do you deal with that outlier issue for someone who

12  does use the mean; do you know how they would do that?

13  A    Oftentimes, the other thing you can do is take out the

14  outliers, and then a mean might be more appropriate.  In our

15  case, we didn't want to take out the sample size.  We wanted

16  everyone to see what the samples were and who the comparables

17  were.  But I have seen when someone has used a mean, was able

18  to take out the high ones or the low ones.

19  Q    Okay.  And do you know -- when Mr. Demmy represented his

20  math to you, do you know whether or not he was including the

21  outliers or if he had taken them out when he gave you what

22  the mean was?

23  A    I would assume he just did the simple average to get the

24  mean.

25  Q    Okay.  All right.  The next one is going to be a little

1  more complicated because it's a document, so let me see if I

2  can figure out a way to do this efficiently, given the hour.

3       There was some discussion, also, during Mr. Demmy's

4  cross-examination, Ms. Stratton, if you recall, regarding

5  whether or not there was some difference between the -- what

6  was included in the disclosure statement with respect to the

7  financial projections and the financial projections in your

8  discounted cash flow.  Do you recall that discussion?

9  A    Yes.  Yes.

10           MR. FRIEDMANN:  Okay.  And Ms. Dougherty, if we

11  still have the ability to put up Exhibit B, that might make

12  this a little bit easier.  I'm looking to put up Slide 10.

13           MS. DOUGHERTY:  Yes, give me one moment.

14  BY MR. FRIEDMANN:

15  Q    Okay.  And while she's doing that, Ms. Stratton, if you

16  could also, at the same time, take a look at what I believe

17  was marked as Chlavin Exhibit 1, which was Exhibit E from the

18  disclosure statement, which showed the financial projections.

19  And we were looking at the chart on Page 5.

20  A    It doesn't seem to that -- listed that way.  Which one

21  was it, Chlavin Exhibit?

22  Q    Yeah.  So it's -- it was Page 228 out of 235.

23  A    Yeah.  Which exhibit was that?  I'm sorry.  Exhibit?

24  Q    It's Exhibit 1.

25  A    Okay.  I'm sorry.  I have so many binders.  Let me just

1  -- let me just find it in the plan, I have the plan, of

2  course, sitting here.

3          (Witness reviews documents)

4  A    What number, 235?

5  Q    It should be on Page 228 out of 235.

6  A    Okay.

7          (Witness reviews documents)

8  A    Okay.

9  Q    Okay.  So what I'd like to do here is a little bit of

10 comparison, and give you some time here, rather than going

11 quickly, as it was before, which is in -- if I'm looking

12 first at the chart on -- it's Page 5 of the financial

13 projections on Page 228 of 235.  Are you looking at that

14 chart that says "VIVUS' Financial Forecast"?

15 A    Yes.

16 Q    So let's take, for example, the amount you have there

17 for the 2021 EBITDA number.  Do you see that?

18 A    Yes.

19 Q    And what is that number?

20 A    17.3.

21 Q    All right.  And now, if you go over to what's -- what

22 Miss -- Taylor put up on the -- on the screen for everybody,

23 and we look at 2021, and you look at the operating income

24 amount -- and that's 0.6, right?

25 A    Yes.

1  Q    And then you add to it the depreciation and amortization

2  -- which is another 14.8, right?

3  A    Yes.

4  Q    And then you add the stock-based compensation -- which

5  is a number -- which is another 1.9 million, right?

6  A    Yes.

7  Q    What is that total?  And take a moment to figure that

8  out, if you need it.

9  A    So that is 17.3.

10 Q    So is that the same number that was in the financial

11 forecast and disclosure statement?

12 A    Yes, and that would be the -- the math on it, too.  And

13 I'm sorry, that is right, but you don't actually use EBITDA

14 in the discounted cash flow; you start at a different number.

15 So you won't see the same exact 17.3, unless you add up those

16 before the capital expenditures and change in working

17 capital.

18 Q    The point is, though, essentially, that this is showing,

19 if you add those three numbers together, you get the EBITDA

20 numbers, right?  And the same would be true for 2022 and

21 2023?

22 A    Yes.

23 Q    Okay.  So there was no bait and switch here, where there

24 one set of projections that were put into the disclosure

25 statement and then another set of projections that you used

1  for your discounted cash flow, when you did the enterprise

2  valuation, correct?

3  A   No, and I --

4           MR. DEMMY:  Well --

5  A   -- think what --

6           MR. DEMMY:  -- it's --

7  A   -- what I was trying to say --

8           MR. DEMMY:  Excuse me, Your Honor.  And I

9  apologize, but I have to object to that question.  That's --

10 it's an argumentative question, it's leading, the use of the

11 characterization "bait and switch," I never used those words.

12 So I'd object to that question.

13           THE COURT:  Sustained.

14           MR. FRIEDMANN:  I'll rephrase, Your Honor.

15           MR. DEMMY:  Well --

16 BY MR. FRIEDMANN:

17 Q   Ms. Stratton --

18           MR. DEMMY:  -- Your Honor, I object to the

19 rephrasing because he should go on to another topic after a

20 leading objection has been sustained.

21           THE COURT:  I'll let you rephrase this time.

22           MR. FRIEDMANN:  Thank you, Your Honor.

23 BY MR. FRIEDMANN:

24 Q   Ms. Stratton, were the same numbers provided in the

25 disclosure statement, where you set forth the financial

1  forecast that you used in your discounted cash flow analysis

2  that was part of your enterprise valuation?

3  A    Yes, it comes from the same set of projections.

4  Q    Thank you.

5           MR. FRIEDMANN:  While we have this, Taylor, can

6  you please move to -- I think it's Slide 11, the WACC?

7  Perfect.  Thank you.

8  BY MR. FRIEDMANN:

9  Q    Ms. Stratton, do you recall, also, you were asked some

10  questions about the cost of debt that you used as part of

11  your WACC analysis?

12  A    Yes.

13  Q    And can you remind the Court why you chose 13 percent to

14  use there?

15  A    Yes.  We were -- we actually were in the market for

16  first lien debt for this company with the same set of

17  projections.  And the rate that we could achieve for a first

18  lien debt for this company was at 13 percent.  So, when we

19  talk about our market test, this is the rate for our first

20  lien debt.

21  Q    Okay.  And then there was a suggestion, if you recall,

22  by Mr. Demmy that, instead, you should have taken the

23  interest rate from the exit facility, correct?

24  A    Yes.

25  Q    Do you recall that?

1  A     Yes.

2  Q     And I believe you suggested so, instead, you could have

3  used 11 percent, which is the interest rate in the exit

4  facility, correct?

5  A     Yes.

6  Q     Okay.  Are you aware of whether or not there was a

7  commitment fee in the exit facility of 2.5 percent?

8  A     I believe that's -- I have it somewhere, but I believe

9  it's about that.

10  Q     To what extent, if you were going to rely on the exit

11  facility to calculate the cost of debt in connection with the

12  WACC analysis, would you have to include both the interest

13  rate of 11 percent and the commitment fee of 2.5 percent,

14  when determining what to plug in as the cost of debt?

15  A     Well, I would argue, though, that this cost of debt does

16  not include all of the fees that would be associated with

17  this debt, either.  However, our decision not to use the exit

18  facility interest rate was because we didn't believe that was

19  the market rate.  Oftentimes, if you're the shareholder and

20  the lender, you don't come to terms that are necessarily

21  market.  I note you would not want to have something above

22  market, but it's often under market.

23  Q     So, if someone were to use the exit facility to

24  calculate the cost of debt, what would it have to include?

25  You said that you wouldn't just use the interest rate and the

1  commitment fee.  But what else would you include?

2  A    No, we -- that's what we would use.  I'm just saying I

3  note that this 13 percent would be a lot higher if I actually

4  used all the other fees that our market lender was going to

5  approve.

6  Q    Okay.  Are you saying that the 13 percent on the market

7  lender would also be higher, if you included all the fees?

8  A    Yes.

9  Q    Got it.  Okay.  Thank you for that clarification.

10           MR. FRIEDMANN:  Ms. Dougerty, could we go back to

11  page 3, please?

12  BY MR. FRIEDMANN:

13  Q    And Ms. Stratton, you -- I'm sure you can't forget

14  because there were a lot of questions about this regarding

15  why cash was subtracted as part of your pre-petition market

16  valuation.  Do you remember those questions?

17  A    Yes.

18  Q    And can you explain exactly, what is the formula that's

19  generally recognized in the field of valuations for doing a

20  market valuation, starting with the -- starting with the

21  stock price?

22  A    So -- so just the formula for enterprise value is net

23  debt plus equity value.  So --

24  Q    And so what --

25  A    -- if you were doing -- so, in this case, our market --

1  our value of our equity is the market capitalization, which

2  is the stock price on this date, times the shares

3  outstanding.  The net debt would be the sum of the 61.4,

4  169.2, plus 1.1, less the $31 million of cash on hand.

5  Q    Okay.  And it's that last piece, I think, there were a

6  lot of questions about, which is why -- if you actually have

7  cash, why would you be subtracting cash.  Can you explain

8  that?

9  A    Yeah, because different companies may have different

10 reasons for holding different amounts of cash.  And so, to

11 compare enterprise value, you must factor in cash on a net

12 basis.  So you would apply the cash that's on your balance

13 sheet against your debt to get to your net debt number.

14     If you look at some of our public company analysis --

15 public company comps that we have on Page 7, you'll see, even

16 in these cases, there's even companies who have $600 million

17 of cash on their balance sheet.  And just because they have

18 $600 million of cash on their balance sheet, that should

19 total into the total capitalization.

20 Q    To what extent are -- is -- well, strike that.

21     To what extent does the fact -- does it factor in that

22 the cash that a company is holding could be paid off -- could

23 be used to pay off the debtor; does that play a role in this

24 at all?

25 A    Yes.  That -- that's exactly what it is, is, when

1  looking at the enterprise value, it is net debt because you

2  could use that cash to pay down debt.  So it may be an

3  artificially high debt value.  So it is the value of the

4  equity, plus the value of the debt is your enterprise value.

5  Q    Okay.

6      (Pause in proceedings)

7  Q    There were some questions, Ms. Stratton, that were

8  raised by Mr. Manousiouthakis about whether or not the

9  company had looked at alternatives and looked at their

10  ability to access the equity capital market to pay off its

11  debt.  Do you recall those questions?

12  A    Yes.

13  Q    To what extent did the company do that?

14  A    As I said, our equity capital markets had several

15  discussions with the company.  And when it looked like the

16  RDO was what made sense, the company actually went to other -

17  - I know they went to at least two other investment banks

18  that specialize in the smaller offerings and talked to them

19  about alternatives as well.

20      MR. FRIEDMANN:  Can we go back to Page 3 for a

21  second, Ms. Dougherty, please?

22  BY MR. FRIEDMANN:

23  Q    Sorry, I'm jumping between questioners; hopefully it

24  doesn't get confusing, Ms. Stratton.

25      Going back to a question Mr. Denny asked you.  He asked

1  if you, if you recall, whether Piper Sandler had considered

2  the price at which the debtors had offered their shares for

3  sale on a date other than June 29th, 2020.  Do you recall

4  that?

5  A    Yes.

6  Q    And you testified that -- well, strike that.

7       First of all, to what extent would it have been

8  appropriate to use a date other than June 29th, 2020, in your

9  opinion, Ms. Stratton?

10 A    I'm sorry.  Can -- is the question why did we use 6/29?

11 Q    Or why didn't you use another one?  I believe it was

12 suggested that maybe you should have used April 1st, 2020 to

13 conduct your valuation analysis.

14 A    So -- so, again --

15 Q    Why not use that date?

16 A    -- the -- the method of doing a valuation is that you

17 want all the information as of the same day.  So this was the

18 value as of the date that we received the other public

19 company's information, the date that we looked for precedent

20 transactions, the date that we calculated the weighted

21 average cost of capital.  But we -- you know, I have looked

22 at this value going back to March 15th, to see if it made a

23 difference if I picked a different day --

24 Q    And what --

25 A    -- and --

1  Q     -- have you --

2  A     -- I would --

3  Q     -- determined?

4  A     The highest date would have been 3/31/2020, and it --

5  the value, I believe, was somewhere around 239 million.

6  Q     So you're saying that the implied enterprise value, even

7  on the date when the stock price was the highest between

8  March 15th and June 29th, was only 239.1 million?

9  A     I -- I believe that was the number.

10  Q     Okay.  And based off of Mr. Pickering's claim analysis,

11  had you used that date, what would it reflect, in terms of

12  whether or not the company would be solvent or insolvent?

13  A     The company would be insolvent.

14  Q     Okay.  Ms. Stratton, if you wouldn't mind turning, in

15  your own declaration -- Mr. Demmy asked you about a Backs

16  report that's attached as Exhibit F in your declaration.

17  It's -- it begins on Page 108 of 114, but the information he

18  asked you about was on Page 111.

19       (Witness reviews document)

20  Q     This had to deal with the -- okay.  Let me know when

21  you're ready.

22  A     Okay.  Sorry.  Hold on.

23       (Witness reviews document)

24  A     And this was the report as of June 9th?

25  Q     This is the -- this is your -- I'm sorry.  This is June

1  9th, 2020, that's correct.  It's Exhibit F in your --

2  A    Okay.

3  Q    -- in your declaration, it should be Page 111 of 114.

4  Is that where you are?

5  A    Yes.

6  Q    Okay.  And in responding to Mr. Demmy's question about -

7  - well, you know, he asked you about this valuation of VI-

8  0106 in this first full paragraph on -- it's Page 3 of the

9  Zacks report, correct?

10 A    Yes.

11 Q    And I believe, in responding you pointed him to the last

12 sentence of that paragraph, which says:

13            "However, we note that this value is only

14 appropriate after IND clearance and the start of Phase II

15 trial, as per our methodology."

16      Is that -- am I remembering that correctly?

17 A    Yes.

18 Q    Okay.  Ms. Stratton, for the record, to the best of your

19 knowledge, has VI-0106 achieved IND clearance?

20 A    No.

21 Q    And based on your understanding of the debtors'

22 finances, do the debtors currently have the resources to seek

23 IND clearance or a Phase II safety and efficacy trial?

24 A    No, they do not.

25 Q    Ms. Stratton, you were also asked a number of questions

1 about the patents that I guess were initially brought up in

2 Mr. Dijkstra's supplemental objection.

3 A    Uh-huh.

4 Q    Do you recall that?

5 A    Yes, I do.

6 Q    And I believe you had testified during direct about

7 those patents relating to the existing commercial products.

8 Is that correct?

9 A    Yes.

10 Q    So, in those circumstances, to what extent would those

11 patents be able to provide additional new value beyond the

12 current enterprise valuation that you've prepared?

13 A    So, if this patent were able to provide a different

14 market or a different product that's not in our projections,

15 then I think that we would consider it.

16      In this case, these patents all help achieve the

17 existing product lines and their revenue and cash flows.  So

18 our opinion is that they would extend the life or maintain

19 market share in the market that the company is already in,

20 which is factored into the projections.  So, while I didn't

21 know about these patents, the company management did.

22 Q    Okay.

23      (Pause in proceedings)

24 Q    And Ms. Stratton, you know, again, several times during

25 Mr. Demmy's cross-examination, he asked you to hypothesize

1  the existence of another professional who might approach the

2  enterprise valuation of debtors differently.  Do you recall

3  that?

4  A    Yes.

5  Q    And you know, you acknowledge that it was possible that

6  another person might choose to do things differently than

7  Piper Sandler had done, correct?

8  A    Yes.

9  Q    Now you also testified during your direct, at the very

10  beginning of this hearing, that the methods that Piper

11  Sandler employed were well recognized and generally accepted

12  valuation methodologies.  Do I have that correct?

13  A    Yes.

14  Q    What is the basis for that statement that you made, Ms.

15  Stratton, that what Piper Sandler did is what's well

16  recognized and generally accepted?

17  A    Based on my valuation expertise.

18        (Pause in proceedings)

19  Q    Ms. Stratton, sitting here today, do you have any reason

20  to believe that another valuation expert, with all the same

21  education and training and experience as you have in the

22  restructuring world, and who is also an expert in corporate

23  valuation, would arrive at the conclusion that the debtors

24  will, in fact, be solvent at the effective date?

25              MR. DEMMY:  Objection.

1  A    No.

2          MR. DEMMY:  Asking for speculation about somebody

3  else's work and not hers.

4          THE COURT:  Sustained.

5          MR. FRIEDMANN:  Okay.  Nothing further, Your

6  Honor.  Thank you.

7          THE COURT:  Thank you.

8          Okay.  Thank you, Ms. Stratton.

9          THE WITNESS:  Uh-huh.

10          THE COURT:  Okay.  If I'm remembering correctly,

11  Mr. Barr, are -- you have two more --

12          MR. BARR:  We do, Judge.

13          THE COURT:  -- witnesses, Mr. King and Mr.

14  Pickering?

15          MR. BARR:  Yes, that's correct, Judge.

16          THE COURT:  Okay.  And then I understand we may

17  have at least one witness that one of the shareholders is

18  going to call.  Is that correct?

19          MR. DEMMY:  Your Honor --

20          MR. BARR:  Again, this is --

21          MR. DEMMY:  -- this is John Demmy.

22          MR. BARR:  -- Mr. Barr.  Our understanding --

23  sorry, John.  It's our understanding that we may have one,

24  which is -- I'm sorry.  I'm remembering his first name now,

25  but not his last -- oh, Ahmadi, Reza Ahmadi, who was the

1  letter that your -- was submitted to the Court, Judge.  But I

2  do believe Mr. Demmy may have one, as well, so I'll let him

3  now answer the question.

4          MR. DEMMY:  Yes, Your Honor.  It's John Demmy of

5  Saul Ewing for Mr. Chlavin.  We had identified Mr. Chlavin on

6  a very limited issue, and I would candidly say to the Court

7  that it's unlikely that he would actually be a witness, and

8  if he was, I don't think for a very long period of time; it

9  would be immaterial, in terms of timing.

10          THE COURT:  Thank you.

11          Okay.  So Mr. Ahmadi may be -- Ahmadi may be a

12  witness.  And I did see that, I think that was in connection

13  with Mr. Makosky, correct?

14          MR. MAKOSKY:  Bruce Makosky.  Yes, that's correct,

15  Your Honor.

16          THE COURT:  Okay.  Mr. Dijkstra, do you have a

17  witness?

18          MR. DIJKSTRA:  No, Your Honor, I don't.  Thank

19  you.

20          THE COURT:  Thank you.

21          And Mr. Manousiouthakis, do you have a witness?

22          MR. MANOUSIOUTHAKIS:  No, I do not.  But if Your

23  Honor would permit me briefly to ask a couple of clarifying

24  questions to Ms. Stratton, I would appreciate it.

25          THE COURT:  Is that based on either questions that

1  Mr. Friedmann asked or that I asked?

2           MR. MANOUSIOUTHAKIS:  It's related to the median

3  use versus mean, so it's --

4           THE COURT:  Say that again.

5           MR. MANOUSIOUTHAKIS:  -- related to the --

6           THE COURT:  Say that again.

7           MR. MANOUSIOUTHAKIS:  It's related to the use of

8  the median, instead of the mean, as Mr. Demmy was pursuing

9  that line of questioning.

10           THE COURT:  Okay.  And Mr. Friedman did ask on

11  redirect.  Okay.  I will permit questions on mean versus

12  median, but we're not going on that.

13           Sorry, Ms. Stratton.  You're back on, you're still

14  under oath.

15           THE WITNESS:  Okay.

16           THE COURT:  Okay.

17           MR. MANOUSIOUTHAKIS:  (Indiscernible)

18           THE COURT:  Mr. Manousiouthakis.

19                     RECROSS-EXAMINATION

20  BY MR. MANOUSIOUTHAKIS:

21  Q   Okay.  Ms. Stratton, can you tell me if the mean, as a

22  function, is a continuous function of the data?  Like if the

23  data change a little bit, does the mean change a little bit?

24  A   I'm sorry.  I'm not getting your -- I didn't understand

25  your question.

1  Q    So you are using data for companies, you are saying the

2  --

3  A    Yes.

4  Q    -- market capitalization is 1 billion.  If the market

5  capitalization in one of your 16 companies becomes 1.01

6  billion, is the mean going to change?

7  A    Yes.

8  Q    Is the median going to change?

9  A    It may or may not, depending on where that data point

10  is.

11  Q    Exactly.

12      So the median will only change if it is among the two

13  or one company that is right in the middle of the list.  So

14  that means, let's say we added Arena to the list, and Arena

15  has a four-billion-dollar valuation.  Your median calculation

16  would not change one iota.  It's a completely

17  misrepresentative concept that is never used whenever we do

18  fix of data because it is a discontinuous function of the

19  data.  All the --

20  A    So it would actually --

21  Q    Pardon me.  Let me just --

22  A    It would actually --

23  Q    -- (indiscernible) --

24  A    -- change if --

25  Q    -- and I will --

1  A    -- you add another --

2  Q    -- ask you the question.

3  A    Okay.

4  Q    If the value of Supernus changed by a factor of two,

5  would your median calculation change?

6  A    I'd have to look at where it is on the -- so, if you're

7  looking at-- we took the median of --

8  Q    You're --

9  A    -- the enterprise value to revenue, so, yes, it would.

10 Q    I'm talking about --

11 A    (Indiscernible) it would.

12 Q    -- the top company in your list.  Let's say the

13 enterprise value for Supernus is a thousand three, right?

14 A    Yes.  And Doctor, I think what I'm saying is, if you

15 look at the enterprise to revenue 2020 multiple --

16 Q    No, I --

17 A    -- Supernus was --

18 Q    I'm talking about --

19 A    -- 2.3 times.

20 Q    -- (indiscernible) value because this is what determine

21 -- I don't care about revenue.  Your (indiscernible)

22 valuation is done based on the -- only on the four first

23 columns of your spreadsheet in Table 44.  All the other stuff

24 is useless.

25 A    No, that's inaccurate.

1   Q    (Indiscernible) the first method of valuation.  It's

2   just the first column -- four columns, nothing else.

3   A    (Indiscernible)

4   Q    So, if I change the enterprise value of Supernus from a

5   thousand three to 10 billion, would your median calculation

6   change?

7   A    I believe it would because we're actually using the

8   median of the enterprise value to revenue, so that would

9   change that number, and it's not --

10  Q    (Indiscernible)

11  A    -- at the top.

12  Q    I'm asking about the enterprise value.

13  A    But the enterprise value is not what drives the

14  valuation for VIVUS.  What drives the valuation for VIVUS is

15  the enterprise value divided by the 2020 revenue.

16  Q    I am trying to --

17  A    So that --

18  Q    -- point out --

19  A    -- column --

20  Q    I am trying to point out to the Court the flow of the

21  use of the median, as a representative tool for data, because

22  it is a discontinued function of the data.  If enterprise

23  value changes by a factor of 10 for Supernus, nothing

24  changes.  If the enterprise value for Retrophin changes by a

25  factor of 20, nothing changes.  It's just a discontinuous

1   function.

2          THE COURT:  Okay.  Let me --

3          UNIDENTIFIED:  Your Honor.

4          MR. MANOUSIOUTHAKIS:  Thank you.

5          THE COURT:  Thank you.

6          MR. MANOUSIOUTHAKIS:  (Indiscernible)

7          THE COURT:  Let me ask Ms. Stratton to respond to

8   that, so that I understand Ms. Stratton's view.

9          THE WITNESS:  Okay.  If you look at the enterprise

10  to revenue 2020 column, the median of this column is what was

11  used for the valuation against the 2020 projected revenue for

12  VIVUS.  And if you look at Supernus, if it were to increase

13  by a factor of 10, it would possibly be the highest multiple.

14  And so we would move the median -- the median would

15  necessarily move up, given that it's at a 2.3 today.

16         THE COURT:  Okay.  So are you saying that the

17  number -- so, if a -- if the enterprise value of --

18         THE WITNESS:  If the enterprise value --

19         THE COURT:  -- (indiscernible) --

20         THE WITNESS:  -- (indiscernible) --

21         THE COURT:  -- of a billion three -- right.  If

22  the enterprise value of a billion three goes up by a factor

23  of ten, then the enterprise -- the revenue value of 2.3 will

24  change.

25         THE WITNESS:  Yes.

1              THE COURT:  Okay.  And that you're using that

2    number -- so that, depending on how it changes -- and I don't

3    know that -- but depending on how it changes, then that

4    change -- that could change the median of --

5              THE WITNESS:  Correct.

6              THE COURT:  -- 2.8.

7              THE WITNESS:  Correct.

8              THE COURT:  Okay.  I'll let you argue that to me

9    in argument, Mr. Manousiouthakis, about why that's incorrect,

10   but that's Ms. Stratton's explanation.

11             MR. MANOUSIOUTHAKIS:  Well, if the enterprise

12   value of a thousand three changes, the revenue doesn't have

13   to change at all because the (indiscernible) it's different

14   piece of information in a different column, collected from

15   different people, different data.  It has nothing to do with

16   Column 4.

17             THE COURT:  Okay.  I'll have to --

18             MR. MANOUSIOUTHAKIS:  (Indiscernible)

19             THE WITNESS:  I understand -- I understand that.

20   But the enterprise value column is not what drives the

21   valuation formula.

22             THE COURT:  Okay.

23             MR. MANOUSIOUTHAKIS:  But you are (indiscernible)

24   underneath each column.

25             THE COURT:  Thank you.  I'll let -- when we get to

1  argument on this point, if it's a relevant point, Mr.

2  Manousiouthakis, I will let you make the argument then.  But

3  I -- this is Ms. Stratton's factual testimony, in her

4  opinion, on it.  Okay.

5          MR. MANOUSIOUTHAKIS:  Thank you, Your Honor.

6          THE COURT:  Okay.  Thank you.

7          And now, Ms. Stratton, you're done.

8          THE WITNESS:  Thank you.

9      (Witness excused)

10          THE COURT:  Okay.

11          MR. BARR:  So, Your Honor, again, Matt Barr for

12  the record.  We have two witnesses left.  It sounds like Mr.

13  Demmy likely does not, but may have a short presentation --

14          THE COURT:  Uh-huh.

15          MR. BARR:  -- with a witness.  And then we assume

16  that Mr. Makosky wants to put Mr. Ahmadi on.  Obviously, we

17  can ask him that question.  So I guess we'll know if we have

18  three or 3.25 witnesses left.

19          THE COURT:  My understanding from Mr. Makosky is

20  that, yes, he's going to ask questions of Mr. Ahmadi.

21          Okay.  And the two of you are 11 hours ahead or

22  behind, I guess.  Either way, you're 11 hours difference.

23  Okay.

24          MR. DIJKSTRA:  Yeah, we're -- it's just going on 7

25  a.m. here.

1          THE COURT:  Okay.  Somewhere in Asia.  Okay.

2      (Pause in proceedings)

3          THE COURT:  Without considering where every --

4  without considering where everyone was located, I was looking

5  at tomorrow at 11 Eastern.  So what I'd like to do, given the

6  time difference that we have, is to -- even if we're taking

7  witnesses out of order -- is to have Mr. Ahmadi testify at a

8  time that's more convenient for him.  So I don't know what

9  time that would be now.  How long do you think -- we've got

10 to get through all your testimony.  And even if this would

11 work for me, I need to check with the staff, who is staffing

12 this.  How long do we think this testimony is going to be?

13 Mr. Makosky, do you have a sense?

14         MR. MAKOSKY:  From my side, I don't think it will

15 be that long, maybe 10 or -- 10 or 15 minutes, and then there

16 will be some cross-examination, I imagine.  So maybe 30

17 minutes total.

18         THE COURT:  Okay.  I think that's optimistic, but

19 --

20         MR. BARR:  Your Honor, just to -- it's Matt Barr

21 from Weil.  I think we have an hour to an hour and a half, if

22 Your Honor qualifies him as an expert to testify to what he

23 presented to the Court.  We could take voir dire tonight, if

24 you wanted to.  And if you made a decision that you didn't

25 think it was appropriate to hear his testimony, that may save

1  time.  Obviously, if you did believe you would want to hear

2  it or give it the weight it deserves, we probably have an

3  hour to an hour and a half of cross.

4        THE COURT:  Okay.  Well, since I have not given

5  thought to the question of whether Mr. Ahmadi is qualified to

6  give testimony in some fashion that is relevant, it might be

7  quicker just to hear it, and I make up my mind after I hear

8  it as to whether I believe it's relevant, which I know is

9  backwards.  But the -- I'm just looking at my calendar.

10       (Pause in proceedings)

11        THE COURT:  I'm just -- Mr. Ahmadi, to the extent

12  I'm taking your testimony, I want to make sure I understand

13  it, and we've been going a long time.  So, while I want to

14  accommodate you, my concern is that this might not be the

15  best time to start it.

16        So what I think I would like is for the parties to

17  discuss a time that works to bring back Mr. Ahmadi.  We can

18  hear --

19       (Pause in proceedings)

20        THE COURT:  We can hear the other witnesses

21  tomorrow at 11, and the other witnesses being Mr. King --

22  unless -- well, let me ask this.  I'm assuming Mr. Ahmadi

23  doesn't need to hear Mr. King's testimony, if it's going to

24  the release issue.  And Mr. Pickering (indiscernible) --

25        MR. BARR:  It's 1129 and liquidity analysis.

1           Your Honor, I may be saying something that's

2    obvious to you.  Just to remind you, Mr. Ahmadi is in

3    California, not in Asia.  The --

4           THE COURT:  Ah.

5           MR. BARR:  The objecting parties are in Asia.  So

6    I did want to make sure you had that in your mind, as you

7    were thinking through time zones.

8           THE COURT:  Okay.  Thank you.

9        (Pause in proceedings)

10          THE COURT:  Okay.  Then, if we were to reconvene

11   tomorrow at 11 -- and that's 11 ish because I do have a

12   hearing at 10, but it's been truncated, and I feel fairly

13   confident that I will be done in less than an hour -- if we

14   start at 11, that's eight o'clock California time, and that's

15   ten o'clock Asia time --

16          MR. MAKOSKY:  Yes --

17          THE COURT:  -- in the --

18          MR. MAKOSKY:  -- that's (indiscernible)

19          THE COURT:  -- in the evening, right?

20          MR. MAKOSKY:  Yep.

21          THE COURT:  You're ahead --

22          MR. MAKOSKY:  Thank you.

23          THE COURT:  -- in the evening.  I had a son in

24   China for a semester, so I had to get used to that.  My

25   husband never could, he never knew what time it was there.

1        If the -- so I think that's what we're going to

2   do.  Timing is not ideal, my apologies to people in Asia.

3   But Mr. Ahmadi, eight o'clock California time; eleven o'clock

4   Eastern time, ten o'clock at night -- or whatever the

5   equivalent is if I'm wrong -- Asia time, we're going to

6   start.

7        And I have a hard stop at three o'clock Eastern

8   time because I have a joint hearing with Judge Walrath in

9   another case, I cannot -- where we both have counsel, so I

10  cannot be late for that.  I would think I can come back.

11  It's an unusual -- we're doing a different kind of thing

12  here.  But I think that -- my guess is it's an hour, so it's

13  possible we could continue after that.  I'll have a better

14  sense of that tomorrow.  But I do have that hard stop at 3

15  because I'm not going to inconvenience Judge Walrath.  So

16  that's what we're going to do.  Everyone understand where we

17  are?

18           MR. BARR:  Yes.

19           THE COURT:  Okay.

20           MR. BARR:  And thank you, Your Honor.  Thank you

21  for all of us for you spending -- and your chambers -- the

22  time you did tonight, to work so late into the night.  Thank

23  you.

24           THE COURT:  You can -- I will accept for my staff;

25  for me, it's part of the job.  So we will reconvene tomorrow

1   11 ish.  If it turns out that it looks like it's going to be

2   too much after 11, my chambers will let me know, but I really

3   think my ten o'clock will be done by then.  So thank you,

4   everyone.  We are in recess until tomorrow at 11 Eastern.

5   Good night.

6              COUNSEL:  Thank you, Your Honor.  Thank you, Your

7   Honor.

8         (Proceedings adjourned to 8/26/20 at 11 a.m.)

9         (Concluded at 7:57 p.m.)

10

11

12                         CERTIFICATE

13

14      We certify that the foregoing is a correct transcript

15   from the electronic sound recording of the proceedings in the

16   above-entitled matter.

17
    /s/Mary Zajaczkowski            August 26, 2020
18   Mary Zajaczkowski, CET**D-531

19
    /s/William J. Garling           August 26, 2020
20   William J. Garling, CE/T 543

21
    /s/Coleen Rand                  August 26, 2020
22   Coleen Rand, AAERT Cert. No. 341

23

24

25