```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE

                              .    Chapter 11
IN RE:                        .    Case No. 20-11779 (LSS)
                              .    (Jointly Administered)
VIVUS, INC., et al.,          .
                              .    Courtroom 2
                              .    824 Market Street
                              .    Wilmington, Delaware 19801
            Debtors.          .
                              .    Monday, August 31, 2020
. . . . . . . . . . . . . . . .    2:30 p.m.
```

                TRANSCRIPT OF TELEPHONIC/ZOOM HEARING
         BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                 UNITED STATES BANKRUPTCY COURT


TELEPHONIC APPEARANCES:

For the Debtors:            Jared R. Friedmann, Esquire
                            Matthew Barr, Esquire
                            Natasha Hwangpo, Esquire
                            Gabe Morgan, Esquire
                            WEIL, GOTSHAL & MANGES, LLP
                            767 Fifth Avenue
                            New York, New York 10153

                            - and -

                            Mark D. Collins, Esquire
                            Zachary Shapiro, Esquire
                            RICHARDS, LAYTON & FINGER, P.A.
                            920 N. King Street
                            Wilmington, DE 19801

(APPEARANCES CONTINUED)

Electronically
Recorded By:                Ginger Mace

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            Telephone: (302)654-8080
                            Email: gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES (CONTINUED):

For Steven Chlavin:           John D. Demmy, Esquire
                              SAUL EWING ARNSTEIN & LEHR, LLP
                              1201 North Market Street
                              Suite 2300
                              Wilmington, Delaware 19801

For the Trustee:              Linda Casey, Esquire
                              OFFICE OF THE UNITED STATES
                              TRUSTEE
                              J. Caleb Boggs Federal Building
                              844 King Street
                              Wilmington, Delaware 19801

Propria Persona:              Vasilios Manousiouthakis

Propria Persona:              Bruce Makosky

Propria Persona:              Dennis Dijkstra

# I N D E X

#17) Joint Prepackaged Chapter 11 Plan of Reorganization of VIVUS, Inc. and its Affiliated Debtors [Docket No. 13; filed July 7, 2020].

1           (Proceedings commenced at 2:30 p.m.)

2           THE COURT:  Thank you.  Good afternoon.

3           This is Judge Silverstein.  We're here for the

4 continued confirmation hearing in VIVUS, Inc., Case Number

5 20-11779.

6           Ginger, can you remind everybody of the protocol,

7 please.

8           THE COURT RECORDER:  It is extremely important

9 that you put your phones on mute when you are not speaking.

10 When speaking, please do not have your phone on speaker, as

11 it creates feedback and background noise, and it makes it very

12 difficult to hear you clearly.  Also, it is very important that

13 you state your name each and every time you speak for an

14 accurate record.

15           Your cooperation in this matter is greatly

16 appreciated.  Thank you.

17           THE COURT: Thank you.  Let me turn it over to

18 debtors' counsel.  I want to make sure we have, though,

19 everyone we need.  I see Mr. Manousiouthakis, I see Mr. Demmy,

20 I see Mr. Makosky.  I don't see yet Mr. Dijkstra.

21           Now, I do see you.  Okay.  Thank you.

22           That's it.  I'll turn it over to Debtors' counsel.

23           MR. MORGAN:  Thank you, Your Honor.  Good afternoon.

24 For the record, Gabe Morgan of Weil Gotshal on behalf of the

25 Debtors.  I'm joined by my partner Matt Barr and Jared

1 Friedmann, as well as counsel for Delaware Mr. Collins and Mr.

2 Shapiro.

3          Your Honor, I just want to start by thanking you on

4 behalf of the debtors, their board, management, employees, and

5 each of our five witnesses for all of your time, your

6 attention, and your careful thought throughout these cases and,

7 in particular, the last week as we march through evidence and

8 created a pretty impressively expensive record.

9          Your Honor, to assist in the discussion this

10 afternoon, we prepared a presentation which we shared with your

11 chambers as well as the objecting parties, so I'll ask my

12 colleague Jake Schmidt to share his screen on Zoom so that we

13 can see that as we work through it.

14     (Pause)

15          MR. MORGAN:  All set?

16          As you know, Your Honor, we're here today for

17 approval of the disclosure statement, final approval of the

18 solicitation procedures, and confirmation of the debtors' pre-

19 packaged plan.  We filed our memorandum of law at Docket Number

20 185 on August 18, and that covers each of the requirements for

21 approval of a disclosure statement and solicitation procedures,

22 as well as confirmation of the plan.  And it lays out in detail

23 how the debtors satisfy each requirement.

24          Your Honor, one quick housekeeping item.  When we

25 filed our memo with the Court, we also submitted a motion for

1 permission to exceed the 60-page limit on briefing.  As of this

2 morning, I don't believe I saw an order approving that, so

3 unless Your Honor has any questions on that motion, we

4 respectfully ask that you authorize us to exceed the page limit

5 before we proceed.

6          THE COURT:  That's fine.

7          MR. MORGAN:  Thank you, Your Honor.

8          Your Honor, these confirmation hearings come at the

9 end of a long journey for the debtors.  We did not rush into

10 Chapter 11 but arrived here only once it became unmistakably

11 clear that this company needs Chapter 11 to survive.  It's

12 important to dispel any misconception that we jumped to the

13 conclusion of insolvency, as Dr. Ahmadi suggested on Wednesday,

14 or that we failed to exercise due care in considering viable

15 alternatives, as several have suggested throughout.

16          The record in this case makes clear, including

17 extensive testimony by Mr. King, that over the past several

18 years, and quite intensely in the past nine months or so before

19 filing, the company sought various alternatives to address the

20 looming May 2020 maturity of the convertible notes and avoid

21 Chapter 11 all together.  These efforts including without

22 limitation repeated attempts to recapitalize the balance sheet

23 through transactions involving debt, equity, debt and equity

24 were all unsuccessful.  But it started in 2018.

25          And if we jump, Jake, if we could jump to Slide 5 so

26 we can move forward.

27          It started in 2018 with implementing a turnaround

28 plan.  By the fall of 2019, it was clear that plan would not on

1  its own be sufficient to repay the convertible notes, so the

2  company as Your Honor well knows engaged Piper.  Piper and the

3  company evaluated debt, convertible debt, and equity

4  alternatives.  And Piper spoke to over a hundred potential

5  investors.  Unfortunately, those efforts did not lead to

6  successful recapitalization.

7          As Ms. Stratton explained, the company received only

8  two potential viable proposals for a senior/junior structure,

9  and they were in the middle of negotiating terms with those two

10  final parties when the COVID-19 outbreak, causing the junior

11  lender to substantially reduce its proposed commitment due to

12  its own capital called a status fund.

13          As Mr. King noted in his testimony, the company was

14  speaking with IEH Biopharma, LLC, by far the largest holder of

15  convertible notes, throughout this period and periodically

16  before.  And over an extended period of time, the company

17  discussed an array of options with IEH to bridge the financing

18  gap, including an extended payment schedule, full or partial

19  equitization of their debt, and modifications to the equity

20  structure.  Unfortunately, none of these came to pass prior to

21  maturity.  And still looking -- in nearly April, still looking

22  for solutions to the upcoming maturity, the company determined

23  it would seek equity capital and on April 1 announced it had

24  started that effort through a direct offering of the sale of

25  common stock.

26          However, at that point, the company started to have

27  productive conversations with IEH, and the company suspended

28  its equity capital raise effort when it became clear that the

1 transaction with IEH could be a better path for maximizing

2 value for all stakeholders, including notably the debtors'

3 equityholders.

4          I want to take a moment to digress, Your Honor, to

5 discuss the debtors' net operating loss carry forwards.

6 They're an important asset, and preserving that asset is an

7 important feature of the debtors' plan.  But they've taken on a

8 significant, possibly even disproportionately significant role

9 in this course during these cases.  We've noted many times that

10 the NOLs are not separately transferrable apart from the

11 business and are not easily monetized, especially in change of

12 control scenarios like ours.  It can, however, have meaningful

13 value in a reorganization so long as the plan qualifies under

14 382(l)(5) of the Tax Code.

15          Because of the old (indiscernible) restrictions, few

16 debtors are actually able to propose a Chapter 11 plan that

17 qualifies.  We happen to be one of the lucky few.  And the fact

18 that the company could in Chapter 11 preserve NOLs for the

19 benefit of the reorganized company is not lost on us.  It also

20 is not lost on IEH as one of the most likely to be the fulcrum

21 creditor.

22          Our ability to maintain the NOLs for the reorganized

23 company was one of a number of drivers in negotiations between

24 the company and IEH that ultimately led to the grace period at

1  the maturity of the convertible notes.  It also led eventually

2  by extension to the toggle RSA and ultimately the stockholder

3  settlement under the plan, all of which are attempts by the

4  company to fight for the value -- fight for value on behalf of

5  junior stakeholders.

6          THE COURT:  What evidence do I have --

7          MR. MORGAN:  And one additional point --

8          THE COURT:  What evidence do I have on the particular

9  negotiation and the particularities of the NOLs to IEH?

10         MR. MORGAN:  So with respect to negotiations, I can

11 tell you I was involved in some of those --

12         THE COURT:  No, I'm not asking for your involvement.

13         MR. MORGAN:  -- at least between counsel.

14         THE COURT:  I'm not asking for your involvement.  I'm

15 asking for the evidence that I have, the competent evidence

16 that I have of the actual negotiation and how, since you

17 brought it up in this context, the NOLs were thought of by both

18 the debtor and by IEH?

19         MR. MORGAN:  So, Your Honor, I can't speak to the

20 latter.  How IEH viewed the NOLs is not something that anyone

21 that the debtors could call to testify would have knowledge to

22 testify about.  But Mr. King did speak extensively about the

23 role of the NOL in negotiations, as did Mr. Pickering, both of

24 whom --

25         THE COURT:  And neither of them -- neither of them

1 was directly involved in the negotiation by their own

2 testimony.

3          MR. MORGAN:  That's correct, Your Honor.  They were,

4 however, aware of the negotiations, and they also understood

5 the significance of the NOLs for our enterprise, as well as the

6 ability to preserve the NOL in a restructuring in a Chapter 11.

7 And it's something I actually was about to hit on that I think

8 may address some of Your Honor's concern because I was

9 anticipating that.

10          It's a clarification of terminology really, which is

11 you heard, I think, people say that the plan preserves the NOL

12 for the benefit of Icahn, and that's honestly somewhat

13 misleading because the plan preserves the NOL for the benefit

14 of the reorganized company, which will be owned by IEH upon

15 emergence.  So in a way it is indirectly for IEH, but -- and I

16 want to be clear on this point -- the carryback of NOL is

17 limited to the entity that generated the NOLs.

18          So the NOLs would only be carried back within

19 reorganized VIVUS, not IEH or its affiliates.  So the NOL's

20 effectively entity-bound, and if VIVUS were merged or was

21 combined with another entity in some way, which I believe was a

22 suggestion from some folks I forget which day but earlier, only

23 future income could be offset.  Nothing could be carried back.

24          THE COURT:  Okay.

25          MR. MORGAN:  (Indiscernible) has a long history of

1  incurring taxable losses, which means that they also don't have

2  the ability to carry back NOLs today.  So really we're talking

3  about future income, and that the effect of those tax savings

4  on the future income stream have been captured through the

5  discounted cash flow that was prepared by Piper.  And that's in

6  Your Honor's record, as well.

7           So the value -- when you think about the value of

8  this enterprise, the NOL is accurately reflected in the

9  valuation analysis that's before you because Ms. Stratton's

10  testimony was that they not only applied the NOLs through the

11  forecasted period, which may or may not be possible but they

12  did, they also made a significant adjustment in the perpetuity

13  growth assumptions.  It's inverse to negative growth in

14  perpetuity, but they made the negative growth significantly

15  less by virtue of assuming that they would -- the reorganized

16  company would be able to use the NOLs in perpetuity even though

17  these NOLs wouldn't carry forward in perpetuity.  They have a

18  limited shelf life.

19           So the value in the DCF captures what the reorganized

20  company could expect to gain from the benefit of its NOLs.

21           THE COURT:  Ms. Stratton's testimony was clear on

22  that point that she included the NOLs relative to the company

23  in the cash flow analysis.  That was her testimony.  What she

24  didn't consider, and no one considered and it may not be

25  relevant, is whether the NOLs have a special significance to

1  IEH because it is -- will be under the plan the sole

2  shareholder and, therefore, able in theory to take advantage of

3  the NOLs in a way that others could not.

4         Is that something that I should consider in this

5  analysis in the 1129 standard as a corollary to the absolute

6  priority rule that a party is not allowed to be paid more than

7  100 percent or receive more than 100 percent of value?

8         MR. MORGAN:  So I think it is fair to consider that,

9  Your Honor.  And I submit we have considered that, and this is

10 how.  The value of the NOL is the value to the reorganized

11 enterprise to offset its future income.  And that's the point

12 of what I was just saying, which is that it's effectively

13 entity-bound, right.  It's not as though -- I think the phrase

14 I heard people use during evidence was absorbed, that there was

15 this notion that somehow this tax attribute is almost going to

16 be absorbed into a mothership of Icahn and then just applied

17 wherever.  But that's not how NOLs work.

18         It's -- and that's what I was sort of trying to

19 detail just a moment ago which is the NOLs that are at VIVUS

20 which would be preserved under this plan will have to stay at

21 VIVUS.  And if there some subsequent merger or combination, if

22 it's possible and I don't know if it's possible because we

23 don't know the specifics of our counterparty, would still keep

24 it trapped at VIVUS.  And it would only be for future income at

25 VIVUS.  So the future benefit of the tax attribute to IEH is

1 its ability to realize tax savings in the future --

2             THE COURT:  Yes.

3             MR. MORGAN:  -- as the owner of VIVUS.  And that's

4 reflected in their DCF.  So the value --

5             THE COURT:  And you're saying --

6             MR. MORGAN:  I'm sorry, Your Honor.

7             THE COURT:  And you're saying there's nothing more.

8 You're saying there's nothing more in terms of value of the

9 NOLs than what's already been captured by Ms. Stratton, which I

10 understand what she has testified to.  That was clear.  My

11 question is is there no more value specifically to IEH.  And I

12 say that because Mr. King was also very clear on multiple

13 occasions probably surprising me, quite frankly, with his

14 testimony that the importance of the -- and I'm, obviously

15 paraphrasing -- the importance of the NOLs to IEH was something

16 that the debtor considered not only with respect to the plan

17 but when it went out to solicit debt and equity investment.

18 And he said it multiple times I have in my notes, and I'm sure

19 it's reflected in the transcript.

20             MR. MORGAN:  So two responses to that.  The first are

21 two cases, In re Cellular Information Systems, 171 B.R. 926,

22 and the second is In re Myrant.  That's 334 B.R. 800.  And in

23 both of those cases, the Court looks to and addresses

24 specifically the use of how do you properly value an NOL.  Even

25 though it is going to the benefit of the reorganized entity,

1  how is it property captured in value and how does that work

2  with respect to 1129.

3        How it works with respect to 1129 is if the NOL is

4  captured in the future forecast and it shows that there is

5  still insolvency, there is no greater benefit being conferred

6  to any party here because there is no benefit being conferred

7  to the reorganized enterprise.  And so because -- again,

8  because of this sort of entity bound forward future income

9  restriction, it's confined within the enterprise.

10        The other point I wanted to address, Your Honor, was

11  the role of the NOL in a negotiation.  You know, it was

12  obviously a consideration.  I said earlier it wasn't lost on us

13  and it wasn't lost on IEH as the sort of putative fulcrum that

14  as we -- well, in April 1 when they did the direct offering,

15  that offering brought the company up very close to the 50

16  percent change of control and, in so doing, jeopardized the NOL

17  which was -- if you think about it, it has a value to the

18  extent that we reorganize under an (l)(5) plan.  But if we were

19  just recapitalizing, if we were going to effectuate a change of

20  control, we're going to materially significantly impair those

21  assets.

22        So the purpose of being able to try and maintain the

23  optionality of both maintaining the asset to try and negotiate

24  with one party to see what we could obtain for junior

25  stakeholders while also maintaining the ability to go out and

1  if we can do it to cover up the ball lose the NOL but

2  completely recapitalize the balance sheet.  So there was a

3  balance, and that's what I believe Mr. King was attesting.

4          THE COURT:  Okay.  And I have no testimony about the

5  actual negotiation and the mindset of the people who were

6  negotiating for the debtors with respect to that issue, do I?

7          MR. MORGAN:  Well, I think you had Mr. King's

8  testimony.

9          THE COURT:  He was not involved directly in the

10  negotiation.  And he was clear --

11          MR. MORGAN:  He was supervising --

12          THE COURT:  He was clear on what his role was with

13  respect to being a board member versus management.

14          MR. MORGAN:  That's right.  But he also was clear

15  that there were weekly calls between management, the board, and

16  the advisors that were working on the transaction.  There was

17  regular communication and feedback, guidance, and involvement.

18  So there wasn't -- it wasn't as though he was uninvolved or the

19  board was uninvolved.  I don't believe -- I don't know that

20  Your Honor's suggesting that, but his familiarity is there and

21  his knowledge is, I submit, sufficient.

22          THE COURT:  Okay.

23          MR. MORGAN:  I also, Your Honor, sort of ask what is

24  the significance of the frame of mind of the party negotiating.

25  And I think the key here is what is the value to the

1  enterprise, right, because ultimately at the end of the day,

2  1129(b) if there is value in excess of the claims and the

3  company is not insolvent, then we're not fair and equitable if

4  we're not providing the junior stakeholders their attributable

5  share, right.

6          So the point, and I keep coming back to the DCF

7  because the point of the DCF is it showed them an abstract

8  sense.  And they may have thought that it was a really key

9  important part for them, and we may have thought that it was a

10 really good point of leverage for us.  It doesn't really matter

11 at the end of the day.  It comes down to what is the value for

12 the reorganized entity, what does that mean in terms of the

13 present value of the enterprise, and where does that stack up

14 against the claims against the enterprise because we're trying

15 to determine insolvency because we're trying to come back fair

16 and equitable under 1129(b).

17         So the rest of the story here, Your Honor, and that

18 useful digression I think is helpful because it hopefully

19 clears up some misapprehension about the role of the NOL.  The

20 role of the NOL was it's a significant asset to the reorganized

21 entity, and it's something that the company that was going to

22 effectively own the reorganized entity wanted to make sure it

23 didn't lose.  It changes the value proposition.

24         If we had issued more shares in early April and had

25 impaired the NOL, then when Ms. Stratton did her DCF, the

1  number would have been much lower, right, because she wouldn't

2  have had all those NOLs to offset into the future and the

3  assumptions would have changed and the DCF value would have

4  dropped.

5          THE COURT:  It could have been, but they also could

6  have raised perhaps enough money to pay off the debt, so I

7  don't know -- if they weren't constrained by the NOL.  The

8  desire to save the NOL because it was valuable to IEH.

9          MR. MORGAN:  Well, no, Your Honor.  See, that's the

10  beauty of the toggle because what the toggle allowed us to do

11  was to go out and actually blow up the NOL and recapitalize.

12  But in order to do that, we had to satisfy our debt, and that's

13  the key because we weren't able to.  Looking for equity

14  capital, looking for debt capital, we weren't able to raise 200

15  million in order to repay our debt.  And so that's -- and

16  that's why -- and I'm glad you asked that question then because

17  I don't want there to be any belief that the NOL or

18  preservation of the NOL somehow constrained or inhibited

19  management or the board's pursuit of refinancing options.

20  Refinancing was the primary goal.  The NOL would be an

21  afterthought.  It's only in the reorganization context that it

22  had any relevance.

23          THE COURT:  I'll look at the evidence that I have on

24  that.

25          MR. MORGAN:  I mean -- and that's actually sort of

1  carries me through the rest because the rest of the story is

2  then going through the toggle RSA, the key feature of which was

3  allowing the company the ability to go and complete the equity

4  and debt capital processes that it had started and that it was

5  so hopeful would actually carry the day but ultimately did not

6  come to fruition.

7          And, also, Your Honor, I think the -- sort of at

8  least in my mind -- a general thrust behind the narrative is

9  the record is clear that these cases and the plan are the

10  product of extended good-faith efforts by the company.  And

11  that's ultimately, I think, an important place to start.

12          So talking about the plan very quickly, Your Honor,

13  just on a high level, pays all administrative expense and

14  priority claims in full, rolls the secured notes into new debt

15  under the existing facility but that existing facility -- I'm

16  sorry, that existing facility, excuse me, also provides

17  approximately 33 million of new capital, which is going to fund

18  plan distributions and provide the company with net working

19  capital.  There is notably inescapably full equitization of the

20  convertible notes and 200 percent of the reorganized equity.

21          There's also payment in full of all general unsecured

22  creditors in full in cash which gives them a hundred percent

23  recovery at the same time that under our valuation the

24  convertible notes are getting 76 percent recovery.  And then,

25  finally, and I'm sure we will discuss this more later, there is

1  the existing stock settlement, Your Honor, which offers

2  equityholders as of the record date an opportunity to

3  participate in a settlement and receive a recovery even though

4  as a matter of the absolute priority rule under 1129(b) they

5  would not be entitled to a recovery.

6      But, Your Honor, we're here today, as I said, truly

7  in need of reorganization and with a plan that we've

8  demonstrated meets all the requirements for confirmation which

9  gives us a clear line of sight to emergence as a going concern.

10  But before we address how the debtors have met their burden, I

11  just want to take a quick status check on the objections.

12  There have not been any objections filed to the disclosure

13  statement or the solicitation procedures.

14      We did note the August 5 letter of Mr. Roland Hughes,

15  which asserted in large part that the existing stock settlement

16  did not provide sufficient notice which we took as an objection

17  to the settlement itself rather than solicitation.  So I think

18  we'll address that in that context.  There are also the four

19  objections from the stockholders, all of which drive primarily

20  towards this 1129(b) valuation issue.  The objection the U.S.

21  Trustee which relates to, among other things, releases and

22  existing stock settlement.  We made changes to the plan.

23  There's an amended plan on file.  A lot of those are in

24  discussion with the U.S. Trustee.  We've been able to resolve a

25  good number of the issues.  We still have (indiscernible)

1 issues with the U.S. Trustee, so we will have to address those.

2          And then, finally, Your Honor, there were two

3 contract counterparties (indiscernible) included in the

4 confirmation order so those objections are not moving forward

5 at this time.

6          And I don't want to repeat my brief.

7          THE COURT:  Mr. Morgan?

8          MR. MORGAN:  Yes, Your Honor?

9          THE COURT:  Mr. Morgan, you're breaking up some here.

10 Is it just me on my end, but --

11          MR. MORGAN:  Is that better, Your Honor?

12          THE COURT:  No.  It's not better.  You were good

13 until about a minute ago.

14          MR. MORGAN:  (Indiscernible).  Is that better, Your

15 Honor?

16          THE COURT:  Yes.

17          MR. MORGAN:  Okay.  (Indiscernible).

18          THE COURT:  Well, no, I'm lying.  No.

19          MR. MORGAN:  Is that better?  Can you hear me now?

20          THE COURT:  No.

21          Operator, can you check Mr. Morgan's line and see if

22 we're having any interference, please?

23          THE COURT RECORDER:  Your Honor, unfortunately, Mr.

24 Morgan's line is connected and live, obviously, but there isn't

25 really anything beyond that.  It doesn't sound to me -- it

1  sounds to me like a phone issue.  Whether he's on a handset or

2  a cell phone, I don't know.  But it sounds more like a cell

3  phone in a wrong location.

4          MR. MORGAN:  No, I'm on a landline, but I have a

5  headset on.  I don't know if folks can hear me better now.

6          THE COURT RECORDER:  That sounds better.

7          MR. MORGAN:  Is that better?

8          THE COURT:  Yeah, let's try.

9          MR. MORGAN:  Okay.  I apologize, Your Honor.  Where

10  did you lose me?  Was it the part where I was saying I don't

11  want to repeat myself?

12          THE COURT:  I'm not sure, actually, but we got

13  through where the objections are and --

14          MR. MORGAN:  Okay.  And what I was saying, Your

15  Honor, is actually literally I don't want to repeat what's in

16  our brief or uncontested and uncontroversial.  And time is

17  (indiscernible) here, and I want to make sure we focus on what

18  we see is the three major areas of contention today.  First is

19  valuation.  And I know (indiscernible).

20          THE COURT:  Okay.  We're having trouble again.

21          MR. MORGAN:  Let me try that again and I'll go off

22  the headset.  Is that better?

23          THE COURT:  We'll see.

24          MR. MORGAN:  Okay.  And, again, I'm very sorry.

25          THE COURT:  Okay.

1          MR. MORGAN:  Okay.  So valuation, taking those in

2    turn, valuation, existing settlement -- existing stock

3    settlement, and then releases.

4          Your Honor, the plan is built on a fundamental and

5    unfortunate premise.  The debtors are insolvent and that means

6    to us, right, the value of the company as a going concern is

7    less than the sum of all of the claims against it.  And as Your

8    Honor knows, our burden here is to demonstrate that fact by a

9    preponderance of the evidence, which is to show that it's more

10   likely than not the debtors are insolvent.

11         So to meet that burden, we've relied on the valuation

12   analysis prepared by the debtors' investment banker, Piper

13   Sandler, which was prepared in accordance to generally-accepted

14   methodologies and assumptions.  During the evidence portion of

15   this hearing, Your Honor heard many of the testimony, cross-

16   examination, the written declarations of Terry Stratton from

17   Piper Sandler, Ben Pickering from Ernst & Young, and Thomas

18   King, former CEO of VIVUS and a current board member.

19         In light of the evidence, including notably the

20   testimony of Ms. Stratton as an acknowledged expert in

21   corporate valuation, and thanks to the detailed work that she

22   and her team performed in preparing a valuation analysis that

23   is in line with generally-accepted methodologies and based on

24   reasonable professional judgment and assumptions, we believe

25   the record before the Court today demonstrates the debtors are

insolvent.

Ms. Stratton testified that she reached this conclusion not only on the basis of three valuation methodologies that form the bedrock of any credible enterprise valuation, comparable company analysis, discounted cash flow analysis, precedent transaction analysis, but also after considering the outcome of the debtors' recent market testing and the recapitalization effort and the sum of the parts analysis that aggregates market prices for the debtors' assets to derive an enterprise value.

Ms. Stratton testified that Piper Sandler's formal valuation analysis included the comparable company analysis and looked at reported financial data of 16 comparable public companies to determine an appropriate trading mold and estimated that the debtors' enterprise value was between 200 to 200.4 million, discounted cash flow analysis that determined the net present value of the forecasted revenues for the next three years, together with a terminal value that captures the debtors' profits for future earnings and prospective operational performance under which they estimated the debtors' enterprise value to be between 202 and 257 million.

And precedent transaction analysis that looked at 27 precedent transactions to determine their appropriate acquisition multiple and estimated the debtors' enterprise value to be between 220 and 249 million.

1          Ms. Stratton also testified that Piper made an

2    informed judgment concerning the relevant significance of each

3    of these methods and weighted each equally, so a third, a

4    third, a third, to establish an estimated total enterprise

5    value range between 210 million, 243 million, and 225.

6    Although Ms. Stratton also testified that she believed as an

7    expert in this area that the debtors' actual enterprise value

8    was quite likely to be less than that because of the debtors'

9    market test.  And the valuation analysis doesn't formally

10   incorporate the outcome the debtors' recapitalization efforts

11   or the sum of the parts analysis, but they did consider those

12   validated results.

13         And I want to focus there on the market test, in

14   particular, because we talked a lot about the pre-petition

15   efforts and the debtors' attempt to go and raise money to pay

16   back and navigate the maturity, pay back the convertible notes

17   and navigate the maturity.  Those efforts failed.  But one

18   thing they did do was establish a market-informed data point on

19   the debtors' enterprise value.  And here's how they did that.

20         So the debtors were looking to raise a hundred

21   million in debt and a hundred million in equity.  And that

22   hundred million in equity was for 9 percent stake in the pro

23   forma ownership of the company, so I've applied the value to

24   that equity of 110 million, granted I think for 9 percent of a

25   company for 100 million, the company's worth 110 million.  You

1  add those two together, you get 211.  You take 14 of cash out,

2  and you get 197.  And that's the 197 number that we repeat in

3  our papers frequently because that's the enterprise value at

4  which the debtors attempted and failed to raise capital before

5  commencing these cases.

6        And Ms. Stratton testified that in her experience as

7  an investment banker and a valuation expert, the result of a

8  market test and recapitalization effort were frequently

9  determinative.  But let's also not forget that the process

10  failed, which means that the market didn't actually transact

11  for 197.  The true market value was likely somewhere below that

12  because there were willing buyers and sellers at that 197

13  level.

14        And this is really important, Your Honor, and that

15  we've been taking time to stress it, is that you heard a lot of

16  objections to particular judgments, particular metrics,

17  particular mean versus median, the right WAC, you heard a lot

18  of attempts to just (indiscernible) disprove but at least to

19  find some hole to poke in the thoughtful, methodical,

20  consistent work that Piper Sandler prepared.  But what you

21  haven't heard is anything pointing to a different way to

22  interpret the 197.  And the 197 is a very sensible, practical,

23  common-sense balance counterpoint to the more formal valuation

24  work that Piper Sandler prepared.

25        So I think it's key to always sort of have in the

1 back of the mind that there is the valuation work and then

2 there's also the corroboration of the debtors' efforts to go

3 out and raise money.  And all of these, Your Honor, it bears

4 saying all of these are below the 270-million claim threshold,

5 which also hasn't been contested.  That's the threshold as of

6 the effective date -- or the estimated threshold as of the

7 effective date.  And all of these fall well below it.

8         So, Your Honor, I think that that point, you know,

9 sort of walk through the Piper analysis, walk through the

10 market tests.  And, unfortunately, the outcome of both of those

11 is insolvency, but you also heard from other parties that they

12 have a different view, that the company is actually worth more,

13 much more.  So I think we should turn and talk about the

14 specific issues people have raised on that front.

15         And I think that starts us really with VI-0106.  So

16 what is it?  VI-0106 is, as Your Honor heard, proprietary

17 formulation of the drug tacrolimus, the product candidate being

18 studied for the treatment of pulmonary arterial hypertension.

19 Debtors acquired it in 2017 or I should say they acquired the

20 rights to develop it, together with another product

21 (indiscernible), both for an up-front fee of $1 million and a

22 promise to make additional payments up to 9 million in the

23 aggregate on hitting certain development milestones and then up

24 to 30 million in the aggregate on hitting certain sales

25 milestones.

1    But to date, the debtors have not reached any of the

2  development milestones that would trigger a payment.  To date,

3  the debtors have spent whatever time and energy they've spent

4  on VI-0106 working to come up with a stable formulation that

5  would be worth testing.  As far as the phases and studies, even

6  though they had the product for several years, the debtors have

7  only done a Phase I safety study on 19 subjects.  That may or

8  may not be applicable depending on the ultimate formulation.

9    To take a Phase I -- I'm sorry, to take it past Phase

10 I, the debtors will need to submit an IND, an investigational

11 new drug application, with the FDA and the FDA would have to

12 accept it.  The debtors have stated that it's their intent to

13 do that the second half of this year, but as Mr. King

14 testified, there's still significant uncertainty around whether

15 or not to submit that with the current formulation because, as

16 Mr. King explained, it may be scientifically viable but it's

17 not commercially viable.

18   Let's put all this history and current status aside

19 and let's just assume away all of that and say the formulation

20 comes together quickly, debtors file the IND, it's accepted,

21 then what?  Mr. King and Ms. Stratton explained in their

22 testimony that VI-0106 still has a long and very uncertain path

23 to profitability, that if it performs no Phase II clinical

24 trials for VI-0106.  And, most importantly, they have no

25 efficacy data which is the key to advancing a formal product.

1          As Mr. King testified, it's highly unlikely the

2 debtors could obtain such efficacy data any sooner than 24

3 months from next Monday.  And that assumes that they either

4 started really, and there's no reason to assume that based on

5 the facts on the record.  There's no --

6          THE COURT:  What facts on the record do I have?  What

7 facts in the record, competent evidence, do I have on

8 management's plans for what they're doing with this -- with VI-

9 0106?

10          MR. MORGAN:  So Mr. King testified that they have --

11 that they do not have the -- and Ms. Stratton, too -- that they

12 do not have the funds to develop it --

13          THE COURT:  Ms. Stratton --

14          MR. MORGAN:  -- that they do not have --

15          THE COURT:  Ms. Stratton's testimony, how is that

16 competent evidence on what management's going to do with this

17 drug?

18          MR. MORGAN:  I'll take Mr. King then.  Ms. Stratton's

19 testimony would be based on conversations with management,

20 which she's not management.

21          THE COURT:  Which is hearsay.

22          MR. MORGAN:  Right.  She's not management.  But Ms.

23 Stratton's testimony is also relevant because it is taken into

24 account in the valuation, right.  So there --

25          THE COURT:  But that's different.

1          MR. MORGAN:  -- her view which is --

2          THE COURT:  She can rely on that for her valuation.

3    But where's the competent evidence in the record from

4    management about the timeline?  Now I think we do have some

5    evidence in the management presentations about the timelines.

6    But what competent evidence do I have from management as to the

7    timeline and the investment for this drug?

8          MR. MORGAN:  From management?  There wasn't a --

9          THE COURT:  From management.

10         MR. MORGAN:  There wasn't a management witness, but

11   there is testimony from Mr. King and it is baked into the

12   projection.  So there is -- you do have the ability to see

13   those -- that information based on the record.

14         THE COURT:  And what evidence do I have of the

15   projection, management's view of the projection?

16         MR. MORGAN:  So maybe we should jump ahead.  I was

17   intending to talk about the projection.  And maybe, Your Honor,

18   we should jump ahead because I think you're referencing the

19   June 2020 presentation.

20         THE COURT:  There's several things, yes.  There's

21   several things that management has said about this drug and

22   when it intended to do what, a timeline.  And, also, revenues

23   but a timeline.  So I'm trying to see where in the record do I

24   have from management the timeline on this drug.

25         MR. MORGAN:  Well, Your Honor, a couple of things.

1 One, Mr. King's testimony is there is no clear timeline, and

2 part of it is because they don't have a formulation that

3 they're prepared to go forward with.  And I also -- I

4 understand you keep asking about management, but Mr. King is a

5 board member.  The board is supervising the process and running

6 the company, and he's competent and understands both the

7 timeline and the company's current status of development.

8         So I think his competency to speak to this is there,

9 and he did in terms of talking about the sort of anticipated

10 timeline, you know, if he were to assume that everything were

11 to go, you know, like tomorrow, how long would it take, he said

12 24 months earliest.  And even at that, you have no guarantee

13 that that's going to be a productive 24 months, right, that

14 you're actually going to get positive efficacy data at the end

15 of the 24 months.

16         You also have stated from Mr. King about the lack of

17 partnership --

18         THE COURT:  The lack of what?

19         MR. MORGAN:  The lack of being able to find a partner

20 who would take on the drug and then invest the money they need.

21 And then we have on the screen, Your Honor, an excerpt from the

22 transcript which is sort of telling on this point exactly, that

23 we were unable to find a partner at almost any price who would

24 take the drug on and would be willing to investigate the 20

25 million we needed.  So there's an added component of you're

1 saying, you know, how do I know the timeline.

2        Well, Mr. King was I thought clear there is no

3 timeline because we don't know even when the starting gun had

4 fired.  But from when you start the starting gun, it's going to

5 be at least 24 months until we see if we have efficacy data.

6 And then if we have positive efficacy data, it may go to a

7 point that actually this is starting to be something

8 worthwhile.  But there's also no guarantee or even real

9 certainty that you're going to get positive efficacy data

10 because sort of the second part of the two blocks of text that

11 we have on the screen, it's all very much a hypothetical that

12 this would even work.

13        THE COURT:  Well, that's a different question.

14 That's a different issue.  That's a different issue as to

15 whether there's enough certainty to value anything or whether

16 it's all speculative.  I understand that issue, as well.  But

17 I'm sort of starting with the basics.  This management, at

18 least in its presentations, talked about when it was going to

19 file an IND.  It wasn't backing off of this drug because it

20 wasn't abandoning it.  It was moving forward with it.

21        And how does I guess then -- maybe I'm wrong on that

22 and you can tell me where I'm wrong, but how does Mr. King's

23 testimony jive with what management was saying about what they

24 were going to do with the drug?

25        MR. MORGAN:  So, yeah.  So the harmony here is that

1  management -- you have to remember the company is out looking

2  for financing and it believed that there could be some --

3  again, it's a hypothetical.  It's a dream, right.  It's a great

4  dream, but it's just a dream.  But it's also one that they'll

5  never achieve if they don't get money.  So they have to be able

6  to try and find people that will share their dream and the

7  vision with them in order to actually fund it to get into a

8  place where it could even possible have any kind of efficacy

9  data that would indicate that it's anything other than a dream.

10 But we're still at the dream --

11           THE COURT:  Is that in the presentation somewhere?

12 Where is that other than what Mr. King said?  Where is that

13 reflected in the SEC statements or the presentations that

14 management was making?  Where is "we have to find a partner?"

15           MR. MORGAN:  So the -- let me pull up -- the 10-Q,

16 the latest 10-Q that was filed in May, identifies no fewer than

17 12 different risk factors specifically with respect to VI-0106.

18           THE COURT:  Yeah.  There's probably risk factors.

19           MR. MORGAN:  Well, they're identified specifically

20 for the development and, right, the -- and I'm trying to pull

21 it up for Your Honor so I can read from it.

22           THE COURT:  And I guess I should ask is that in the

23 record, because I don't want to look at things that are not in

24 the record.  So that's my mistake if I -- I know we have some

25 things in the record.

1          MR. MORGAN:  Well, I would submit that you could take

2 judicial notice of an SEC filing, Your Honor.

3          THE COURT:  For what, the truth?

4          MR. MORGAN:  Well, you asked statements from

5 management, you know, a statement by the company as to what

6 risks there are out there.

7          THE COURT:  And I should take that for the truth of

8 what's asserted?

9          MR. MORGAN:  No, Your Honor.

10          THE COURT:  Or that it was said?

11          MR. MORGAN:  That it was said.

12          THE COURT:  Okay.  I don't know.  Our record's

13 closed, but okay.

14          MR. MORGAN:  And I'm trying to -- I apologize.  I

15 wish I had this up sooner.  You also do have testimony from the

16 advisors who were embedded with the company, from Mr. Pickering

17 and from Ms. Stratton who had been working with the company to

18 try and raise money -- and this is another point in VI-0106 --

19 trying to raise money and recapitalize the balance sheet based

20 around whatever protected value there may be to this asset,

21 right.  And remember, that process did not result in a value

22 greater than 197.

23          So parties that were being asked to invest equity,

24 and I think equity is important, right, because potentially

25 participating in the upside, we're not willing to transact at

1 that price -- invest in that price is maybe a better term or

2 phrase.

3          (Audio skip from 48:20 to 48:49, music playing)

4          MR. MORGAN:  -- Ms. Stratton also in terms of the

5 cost, you know, puts the cost of development around potentially

6 seven years in terms of getting it out to the market, also puts

7 the cost around 40 to 60 million dollars.

8          THE COURT:  And where do they get those numbers?

9          MR. MORGAN:  From -- so Ms. Stratton got the number

10 from, I believe, her team.  And Mr. Pickering had the number

11 from his experience, although again he was not being offered as

12 an expert in the market.

13          THE COURT:  Right.  And aren't both of those numbers

14 different from what Mr. King said, 20 million?  So --

15          MR. MORGAN:  He did.  And I believe --

16          THE COURT:  -- where did these numbers come from?

17          MR. MORGAN:  So the 20 million, I believe, is a sort

18 of what it would take to get this one study as opposed to what

19 it would take to develop it through the rest of the process.

20          THE COURT:  Okay.  Well, are these facts?  Are these

21 -- they're coming through -- one's coming through an expert,

22 okay.  And I don't know if this is a fact that can come through

23 an expert or not.  Maybe it can.  I haven't thought about that.

24 But Mr. Pickering's not being offered as an expert, and he's

25 not a debtor person.  So is he just -- is his -- what he's

1  reciting just hearsay?

2        MR. MORGAN:  It's based on his knowledge.  It's based

3  on his knowledge as someone who operates in this space.  We did

4  not put him up as an expert.

5        THE COURT:  So he knows from his knowledge that it

6  will take 40 to 60 million dollars to develop VI-0106?  How

7  does he know that?

8        MR. MORGAN:  So I can go back to his declaration and

9  his testimony, but he has extensive experience working in

10  pharma companies.  He's been CRO of pharma companies.  He's

11  been CFO of pharma companies.  He's been involved in this kind

12  of product development.

13        THE COURT:  So is he talking generally or is he

14  talking about this drug and --

15        MR. MORGAN:  It was his view -- if you look at the

16  record, Your Honor, it was his view of this drug.  But I think

17  King is the -- if you're looking for sort of the source of the

18  party that is the closest to it that is not an advisor but is

19  actually a board member of the company, I think Mr. King's

20  testimony is the one that provides Your Honor that clarity.

21        THE COURT:  Yeah, except I have three different

22  numbers now from three different debtor witnesses.  Okay.

23        MR. MORGAN:  So, Your Honor, just to finish the line

24  of thought on the uncertainty because it's building to the

25  other point that you raised which is, you know, how to think

1  about discounting effectively.  Sitting with an unfinished

2  formulation and the Phase I safety data, we've got years at

3  least, we've got significant outlay of cash, we've got no

4  guarantee of efficacy.  We have no even real certainty of

5  efficacy or it's a hypothetical that -- right.

6          And then you take -- let's again say you jump through

7  each hurdle, right, the decision tree, you make it down that

8  branch, then you get to how long until it gets out into the

9  market.  And then once it's out in the market, what do they go

10  through out there as well repeating the same thing.  And

11  there's no certainty around the product's ability to be

12  competitive even if it is ultimately approved.

13          There are -- and this is Ms. Stratton's testimony,

14  there are right now at least a dozen other products for the

15  treatment of pulmonary arterial hypertension in the market and

16  at least a dozen more in various stages of development, and

17  many of those are expected to come to market before VI-0106.

18          THE COURT:  Well, they might, yes.

19          MR. MORGAN:  Right.  Although several of those, Your

20  Honor, actually you have efficacy data unlike us.  So there are

21  drugs out there with actual efficacy data.

22          THE COURT:  Do we know -- okay.  A lot of speculation

23  there.  Do we know if the other companies that own them have

24  money that are developing them?  What do we know, and who is

25  giving us that information?  But that's fine.  There's no

question Ms. Stratton was very clear at least in this time as to why she said she places zero value, maybe a million, zero value on this drug.  She's clear on that, although I think her testimony did somewhat change over time.  But now I understand what her position is.

MR. MORGAN:  Okay.  I was about to go into that.  I may just short-circuit some of that if Your Honor's comfortable with it.  I think what it boils down to is really the difference between an income-based valuation methodology and an asset-based valuation methodology.  An income-based, she's saying, look, there's so much uncertainty.  It hasn't hit an inflection point.  I can't get to a place where I can even give you a discount factor that I think accurately reasonably reflects risk.  And so for that purpose, I'm guessing.  If I give you anything other than zero, I'm guessing and I don't guess.  I'm an expert in valuation.

That's not to say speculative investors won't guess, and that's also not to say that a company may not have a hypothetical and say it's worth some money for me to guess.  There could be a reason for a company to say I'll give you a million dollars, and that's then the corollary, which is the asset-based view of value where in a market, you know, it's not someone will give you some level of cash.

But I think the best data point for that is what the company actually paid.  The company actually paid a million

1  dollars.   It's been three years since they paid a million

2  dollars.   They haven't moved it out of formulation stage.   And,

3  again, there's no efficacy data, so there's no reason to

4  believe that anything has changed between 2017 and 2020 as it

5  relate to this drug.   So the million dollars is kind of the

6  high watermark of where I think that asset value goes.

7         In either event, it's de minimis and ultimately

8  doesn't move the needle to jump from solvent to insolvent.   And

9  that's where there's a case I want to bring Your Honor's

10 attention to, a Seventh Circuit case called Xonics

11 Photochemical, 841 F.2d 198.   But the Seventh Circuit case, it

12 was actually looking at contingent liability, but in arguably

13 dicta, it also addressed the concept of you can't put a

14 contingent liability at full face just like you can't take a

15 contingent asset and say you put it at zero.

16        But what they do say, and I just want to read from

17 the decision: "Occasionally one finds the flat statement that

18 'contingent or inchoate claims of the bankrupt are not included

19 as part of the bankrupt's property.'" -- skipping over the

20 citation -- "This is the equally untenable opposite extreme

21 from valuing them at their face amount. But the quoted language

22 appears to be loose; what these cases actually mean is that if,

23 but for a contingent claim unlikely to yield any cash in the

24 near future, the firm would be deemed insolvent, the existence

25 of a faint hope — cold comfort for creditors waiting to be paid

1  — will not save it from bankruptcy."

2          And that's -- I'm looking for the pen cite.

3     (Pause)

4          MR. MORGAN:  I apologize.  I can't find the pen cite.

5  It looks like 200.

6          THE COURT:  Okay.  And it's 841 F.2d?

7          MR. MORGAN:  That's right.

8          THE COURT:  Okay.

9          MR. MORGAN:  And, again, it's a case looking at

10 contingent liability and sort of the case of trying to

11 understand, you know, how do you account for contingent

12 liability like a guarantee.  And in the case, they would say

13 it's worth 100, and they were saying, well, you can't give that

14 100 just like you can't give an asset zero.  But, also, there

15 are assets that are so faint and so remote that they're

16 effectively zero, which is really, Your Honor, where we come

17 out whether you're under an income approach or you're on an

18 asset approach.  The answer is it's not very much.  It hasn't

19 hit the value inflection point.

20          THE COURT:  And exactly when, remind me, did Ms.

21 Stratton say it would hit the inflection point?  Because

22 management certainly had a track for this as well as their

23 revenue thoughts.  And Ms. Stratton rejected their revenue

24 thoughts.  I don't know if they were in the projections or not

25 because as given by management because she applied her

1 judgment.  But they also had a timeline or somewhat of a

2 timeline on the development of this asset.

3          And I don't know because I haven't been able to line

4 it up whether Ms. Stratton or her group rejected the timeline

5 as well.

6          MR. MORGAN:  So I -- the timeline, I think the issue

7 with the timeline, Your Honor, is that the timeline is itself

8 contingent.  It is --

9          THE COURT:  No.  The timeline's not contingent.  If

10 management has a timeline, the timeline isn't contingent.  It's

11 their timeline for development.

12          MR. MORGAN:  No.  If they're aspirational timeline,

13 Your Honor.  That's the issue, right.  There's no funding to

14 continue this thing into the multi-million dollar cost of

15 development or really on formulation.  They did a very

16 inexpensive safety study.  But --

17          THE COURT:  Well, where do I have that evidence?

18 Where's that evidence other than people saying it?  Ms.

19 Stratton saying it.  Where's that evidence?  Because management

20 --

21          MR. MORGAN:  (Indiscernible).

22          THE COURT:  Because management said in January what

23 it was going to do, and it said in June what it was going to

24 do, notwithstanding the fact that it was facing the maturity of

25 the bond.  But yet, it still said here's what we're doing.  So

1 --

2         MR. MORGAN:  Sure.  And, again, Your Honor, those are

3 operations of a company that can get the funding to continue

4 doing what it would like to do.  But that's part of the

5 shortfall here is there isn't an ability to move forward with

6 something.  There also isn't any -- (indiscernible) into two

7 issues, right.  There's does it work, is there any reason to

8 believe it works.  There's a massive contingency around that,

9 right, the lack of efficacy data.  And that, I believe, is the

10 inflection point for Ms. Stratton.

11         When you get efficacy data, then you see, oh, it

12 works.  It's worth something.  It may come before that if

13 you're starting to get positive indications or if you're sort

14 of on track to get some kind of efficacy data, but from Piper

15 and Stratton's view, efficacy is really the key.

16         On the timeline piece, I think what Your Honor is

17 saying, you know, look, they wanted to drive it forward and

18 that's all good and well, but you can only drive it forward if

19 you have the means to do so.  And you can only drive it forward

20 once you get the formulation in place, which they don't have,

21 and then once you have the funds, means, the funds to do so.

22         THE COURT:  Well, when they de-lever, when the

23 company's de-levered, are you saying they won't have the funds

24 when the company's de-levered?

25         MR. MORGAN:  There is nothing -- there is -- so there

 1  is nothing in the exit facility that marks value for

 2  development of this drug.

 3          THE COURT:  Okay.  I'm not sure why I know that

 4  because I'm not sure I had direct testimony on that.  But let's

 5  assume that's true.  Isn't there something in the record that

 6  says that the company -- I don't know if it said it was cash

 7  flow positive, but that it was positive if it didn't have to

 8  deal with the debt?  I guess --

 9          MR. MORGAN:  It was -- yeah.

10          THE COURT:  Again, I'm looking for the evidence.

11          MR. MORGAN:  Uh-huh.  But maintaining a steady state

12  -- and I believe Your Honor is referencing comments that were

13  made in connection with cash collateral -- maintaining a steady

14  state isn't the same as having a significant amount of capital

15  to invest in development.

16          THE COURT:  Okay.  So they were making statements at

17  a time when they had no money and I should discount those

18  statements, is what you're telling me?

19          MR. MORGAN:  I think you have to take those

20  statements for what they are, and that may be something good

21  to -- a good pivot to talk about, in particular, the June 2020

22  presentation, and what it is and what it's not, right.

23          THE COURT:  Okay.

24          MR. MORGAN:  And so I think what you've gotten, Your

25  Honor, is sort of a hand-picked comment from that presentation,

1  it doesn't represent the whole story because they don't -- one,

2  there's other -- of course, you have to read the presentation

3  as a whole, and two, you have to read it in the context of the

4  comments of the public disclosures.  And so when you look at

5  it, the presentation itself has forward looking statement

6  disclaimers, including specifically with respect to VI-0106 and

7  just reading from it, right.

8          The disclaimer (indiscernible) notes that there are

9  forward looking statements and says there are "subject to

10  risks, uncertainties, and other factors, including risks and

11  uncertainties related to our ability to execute on our business

12  strategy to enhance long-term stockholder value and risks and

13  uncertainties related to our ability to successfully develop or

14  acquire a proprietary formulation of (indiscernible)."  This is

15  from June.  It goes on to say the reader is cautioned not to

16  rely on these forward looking statements.

17          And then when you actually look at the language on

18  VI-0106, what it says in June is we believe the gross revenue

19  potential is up to 750 million or more.  Up to 750 million or

20  more, that means it literally could be any number.  It's

21  clearly sort of a qualified aspirational goal of where this

22  thing could potentially go some day if funded and if the

23  formulation's correct, but it's not where we are and that's

24  really the point, Your Honor, just to sort of bring it back

25  because we're going to go onto 1129(b) context.

1          We're trying to understand what the value of the

2   company today and trying to think about this asset, you know,

3   is there any reason to put anything other than a de minimus

4   amount of value on it given that -- of an asset based and on an

5   income based approach, there's really good testimony from an

6   expert that they don't.  And then you also have -- I'll circle

7   back to it and probably not the last time I'll do that while

8   we're talking -- the market test that parties were asked, do

9   you want to buy 90 percent of this company for $100 million?

10  And by the way, you'll own VI-0106 at the end of that.  And

11  they all said no.

12         So indulge me for a moment while I look through my

13  notes and make sure I hit everything.  I think the other -- I

14  think that's it on VI-0106, Your Honor.

15         The other significant assets, which are not in

16  question -- the other significant asset is the NOL.  We talked

17  about this at the outset.  I don't know that we need to retread

18  the ground.  But again, just to sort of summarize, the

19  valuation reflects the NOL by applying the tax savings over the

20  course of perpetuity not on just the life of the NOL but over

21  the course of perpetuity and therefore, when you look at the

22  valuation method, the DPF valuation method specifically, when

23  you look at the valuation analysis, it gives you the data you

24  need to understand.  What is the NOL worth to the reorganized

25  entity, and that is less than $271 million.  And that really,

1 Your Honor, is the point.  That even with the NOL, the company

2 is still insolvent, which is why (indiscernible) 29(b)

3 standard.

4         Your Honor, Dr. Ahmadi had a couple points on the

5 NOL.  I don't want to necessarily take up too much time talking

6 about them.  I think it suffices to say that we don't think it

7 was properly calculated.  We think the assumptions behind the

8 calculation of the NOL in Dr. Ahmadi's letter were properly

9 calculated, but also, I don't want to revisit that because I

10 know Mr. Friedmann may have an oral motion to strike and you've

11 taken it under advisement so I want to come back to reargue

12 that today.

13         And then, I think that leads us to two more sort of

14 subjects, Your Honor, and one which is (indiscernible) on the

15 projection, and particularly, the presentation.  I think

16 there's been some suggestion that the optimistic statements in

17 the June 2020 presentation were, you know, undermined the

18 projection.  And again, you know, we talked about it in the

19 context of VI-0106, but the same applies for all of the

20 statements.  You have to look at this in context, right.

21         You have to understand there's a forward-looking

22 statement disclaimer.  You have to understand the SEC filings

23 include numerous risk factors for each of these drugs, as well

24 as the company and its operations above all.  You have to

25 understand the SEC filings are also giving parties, you know,

1 an indication of past performance of these products as well.

2 And because our position here is that the full information

3 environment at the time of the presentation would lead a

4 reasonable person to understand these are goals, these are

5 possibilities, this is not necessarily the stuff of financial

6 forecast.

7        THE COURT:  But, again, I guess my question is,

8 where's my testimony from management that says here's why we

9 said what we said in the June presentation or the January time

10 frame or any other time frame, and here's why we rejected our

11 projections down.  Here's why our projections are different

12 than that.

13        MR. MORGAN:  You have the testimony of Ms. Stratton

14 on that front, Your Honor.

15        THE COURT:  She's not -- she is not -- she can rely

16 on those projections, but she can't tell me why they're

17 different from what management said and why management thinks

18 what it said in June was for a different purpose and what -- I

19 had a witness in my just previous valuation case blue sky

20 thinking and whatever.  But where's my management witness who

21 tells me why the projections, which then Ms. Stratton relied

22 upon, are correct and should be adjusted downward and should

23 not include the aspirational thinking or statements that you

24 say are in the June 2020 presentation?

25        How do I get beyond that?  And I'd like to know how

1 do I get beyond that?

2          MR. MORGAN:  Your Honor, you have the testimony of

3 Mr. Pickering who was in bed with the company and understands,

4 performed a liquidation analysis, and understands the products

5 and their potential.  You also have Ms. Stratton and the Piper

6 team who were part of the creation and the formulation and then

7 subsequent revisions to the projection, which is in the record.

8          And so you have both of -- you have Ms. Stratton

9 explaining that she draws the distinction between optimistic

10 outlook and reasonable financial projection based on empirical

11 data and reasonable assumption.  She had a hand in creating the

12 projections and then also a hand in reshaping them over time as

13 the company got more feedback and got new risks, got more

14 information, got feedback from its recapitalization effort.

15 And then you also have Mr. Pickering sort of doing a second

16 look and gut check, I'll call it, where he's actually looked at

17 it and said, you know, he thinks it's aggressive, optimistic,

18 right.  That 75 percent of the revenue growth assumptions in

19 the projections are attributable to new and as yet unproven

20 marketing channels, right.  So that's -- I believe

21 Mr. Pickering's words were, you know, that they're aggressive

22 but it's achievable.

23          THE COURT:  Okay.

24          MR. MORGAN:  And ultimately it does loop back into

25 Ms. Stratton's judgment as to whether or not these were

1  reasonable and reliable, you know, reasonable to rely upon for

2  the purposes of her valuation, right.  And so there is actually

3  a connection back to the valuing -- have the corroboration of

4  the FA, as well, but you have the valuation expert saying that

5  they were part of putting these together, they were part of

6  developing these, they believe they're reasonable, and they

7  believe these are, you know, optimistic but achievable.

8           And then just a few more points on value, Your Honor,

9  and these are sort of in direct response to some criticisms

10  that were made during the course of cross-examination.  There

11  are a number of points, and I need to comment before I, you

12  know, start trying to poke holes at various judgments or

13  determinations that were made by Ms. Stratton and the Piper

14  team.  For example, you know, how do you compute your WAC, I

15  used the last 12 months and why use median versus mean in the

16  comparable transaction or comparable company analysis.  I think

17  the issue here is two-fold.

18          Take median and mean in the second because there were

19  actually cases on this.  But, in general, all of these raise

20  questions.  All of these look to try and sort of point a

21  valuation another way.  But none of these have any supporting

22  evidence or any supporting counter-factual as to why something

23  else would be better from another valuation expert.  And even

24  if they did, Your Honor, that doesn't mean we didn't meet our

25  burden.  And so even if there was another valuation expert,

1  it's not the case that we would have conflicting valuation

2  experts, the debtors can't meet their burden.  But here we

3  don't even have differing conflicting valuation experts.

4        And again, you know, I'll beat the dead horse.  But

5  again, no one has had any response to the market test.  No one

6  has been able to explain why it is that we went out and weren't

7  able to raise capital.

8        THE COURT:  But that's not what Ms. Stratton's

9  testimony is based on.  It is based on the three methodologies,

10  and this company was not marketed for sale nor was VI-0106

11  marketed for sale.  So we have some market testimony to the

12  extent that courts look to that, and that varies across the

13  cases that I read.  But neither the company itself nor the, in

14  particular, VI-0106 was marketed.

15        MR. MORGAN:  But also --

16        THE COURT:   Or am I wrong?

17        MR. MORGAN:  No.  No.  There was Stratton testimony,

18  right, that she did receive some unsolicited offers on various

19  other drugs.  There was no offer on all of the company and the

20  judgment was that piecemeal sale of assets would lead to, there

21  is an enterprise.  There is a benefit to a going concern here.

22  And so recapitalization through financing what its preferable

23  means for preserving value overall.  And while there has been

24  some unsolicited offers for drugs, there have been no

25  unsolicited offers for VI-0106.

1          THE COURT:  Okay.

2          MR. MORGAN:  And then, two points that I want to

3  raise.  They're not really related to value, but I just want to

4  sort of clean up the record a little.

5          One, Mr. Makosky raised on Friday sort of the

6  notion -- there's two things that I just want very quickly to

7  address.  One, the notion that the board is somehow conflicted

8  and has affiliations with Icahn, and the other is that, you

9  know, sort of questioning the judgment or at least trying to

10  get a clean answer on the secured note payment in 2019.  Just

11  to take those two in turn quickly.

12          So FEC disclosures and the testimony from Mr. King,

13  all members of the board are independent other than John Amos

14  and that's because he's the CEO, and that's been confirmed by a

15  third-party assessment agency, Institutional Shareholder

16  Services as recently as May 2019.  They identified -- at that

17  point, they identified two, John and another director not

18  because of a connection to Icahn to be clear, but who stepped

19  down in October 2019.  So as of this entire period that we've

20  been -- well, that we've been talking about, the pre-debt rate,

21  equity rate period, as well, but the ISS reports and the

22  disclosures to the SEC consistently show that there is no

23  conflict.

24          Mr. Makosky sort of suggested, inferred from the fact

25  that there was a proxy fight in 2013 and that some of our

current directors were appointed during that proxy fight, that
therefore, they are conflicted.  Proxy fight didn't include
Icahn.  It was commenced by First Manhattan Company, FMC, and
it was also joined by Sarissa Capital.  Now, Sarissa Capital
was founded by an Icahn alum, but he left Icahn two years
before the proxy fight and was participating as the principal
and founder of Sarissa.  So there's no conflict here.  There's
nothing -- it's all public record.  Everything that I'm
providing Your Honor is also available publicly.  There's just
no there there.

         And then the other, the theory of payment.  What
happened there, and I think this was clear from the testimony
but just to sort of bring it all together, we disclosed in the,
or the company disclosed in the 10-Q from June 30, 2019, the
company was not in compliance with a covenant in its secured
note indenture for the minimum Pancreaze revenue.  Again, you
know, publicly disclosing that we're not hitting minimum
revenue covenants in our secured debt documents is another part
of the information environment for understanding what the
reasonable assumption of redemption, or of possible gross
revenues.

         So the company received a waiver from Ethereum with
respect to the potential of default, the result of that
covenant breach and agreed at that time that it would continue
to negotiate the terms of (indiscernible) venture.  And as part

1 of that, needed to make a payment.  They were going to pay it

2 out as part of the ability to avoid having a default at that

3 point, which if that debt had defaulted then, we would have

4 been in front of Your Honor much sooner.  So the payment was an

5 effort to try and negotiate our way through that default,

6 negotiate an amendment, move forward.

7        Again, all public record with, you know, 10-K, 8-K,

8 so this is all out there and knowable, Your Honor.  And so,

9 with that, unless Your Honor has further questions, I think

10 that that's what we wanted to talk about on the value point.

11        THE COURT:  I think I've hit you with enough

12 questions.

13        MR. MORGAN:  I'm sure you can come up with more, so

14 we could go for a while.

15        So moving on to 1129(b), I think that pivots us

16 actually pretty cleanly into the existing stock settlement.

17 And again, the existing -- the point from which to evaluate the

18 existing stock settlement is the debtors enterprise value,

19 right.  The record before the Court we have argued demonstrates

20 that the debtor's enterprise value is such that they are

21 insolvent and therefore holders of interest are not entitled to

22 receive any recovery under the plan pursuant to the absolute

23 priority rule.

24        The plan recognizes that fact in 4(7)(b) where it

25 specifies the treatment for interest, saying that they'll be

1  cancelled and all holders of interest shall receive no

2  distribution on account of such interest.  But -- and we stress

3  this throughout these cases and this hearing -- the debtor's

4  board and management negotiated and fought hard for a recovery

5  to junior stakeholders, both the general unsecured and the

6  shareholders, and that took a form of the existing stock

7  settlement in the plan, which we think is notable because it

8  provides that opportunity for recovery.  And that's why in

9  4(7)(b), there's also a proviso after saying shares will be

10  cancelled and receive no distribution, it says that holders of

11  existing stock as of the existing stock record date may

12  participate in the existing stock settlement if eligible on the

13  terms and conditions described in 5(3) of the plan.  5(3) in

14  the plan then provides that if the stockholder satisfies

15  certain conditions in facilitating confirmation of a consensual

16  plan and a fresh start, then they will receive their pro rata

17  share of five million in cash and a contingent value right on a

18  first share basis.

19        And the contingent value right if the reorganized

20  debtor meet predetermined EBITDAR milestones in '21 and '22

21  provide a two dollar per share boost.  So, Your Honor, the

22  debtors -- well, actually, let me skip.  Notably, Your Honor,

23  we've engaged in constructive dialogue with the U.S. Trustee

24  since the petition date and we agreed to make various

25  amendments to the plan (indiscernible) and the plan settlement,

in general.

First, we removed all references to settlement throughout the plan if there wasn't some clear agreement between the debtors and the third parties.  Changes intended to address the U.S. Trustee's stated concerns that the debtors attempt to impose the settlement standards of 9019 on all claims in interest.

Second, we removed the condition for participation in the existing stock settlement to avoid excluding those who sought to form or serve on an equity committee and we filed a notice of the change on August 3 which was served on all stockholders well in advance to the plan objection deadline on August 10th and the deadline to opt out of the releases on August 17th.

And then finally, Your Honor, we amended the releases that were, that would be granted by stockholders that participate in the settlement to ensure that they do not release claims for malfeasance or criminal acts.  So in its objection, the U.S. Trustee has taken the position that settlement claims in interest against the debtor under the Chapter 11 plan are not subject to 9019 but instead must meet the fair and equitable standard under 1129(b).  While we respectfully disagree with that issue and believe 9019 is the right standard, we (indiscernible) difference under our plan because the stockholder settlement set aside both standards.

1          By conferring a substantial benefit to participating

2    holders of existing stock in the form of a distribution to

3    which they would not otherwise be entitled, the estate could

4    benefit from a consensual Chapter 11 process and releases as a

5    result of the settlement condition.  And as a result, we think

6    the settlement falls above the lowest point in the range of

7    reasonableness and it's fair and equitable under 1129.  That is

8    it adheres to and actually feeds the absolute priority rule.

9          THE COURT:  Interesting.  I'm not sure if either

10   standard applies, but because you're offering something outside

11   of the priority waterfall, it's an interesting question about

12   whether the stock settlement itself, as opposed to the plan,

13   satisfies 1129(b)(1) as opposed to the treatment.  It's

14   interesting.  I haven't thought about that before.

15         The -- and I don't know about a settlement.

16   Everybody tells me many things are settlements that I don't

17   think are settlements.  But why do you think this is a

18   settlement?  Since I'm going to have to -- if I confirm, I've

19   got to find it meets some standard, why is this a settlement?

20         MR. MORGAN:  The way it's (indiscernible), Your

21   Honor, the existing stock settlement is an exchange between

22   each stockholder and the debtors.  The debtors provide a

23   distribution that sort of defies the absolute priority rule and

24   in exchange for satisfaction of the settlement conditions, we

25   confer the benefit to the estate and the reorganized debtor.

1  That's the -- you know, you have one party providing something

2  and you have one party providing something, and that's the

3  fundamental settlement.

4          The exchange was proposed to all holders of existing

5  stock as of the record date through delivery of the combined

6  hearing notice in the opt out form, as well as (indiscernible)

7  to the plan and disclosure statement, all which detail the

8  description of the settlement conditions and the third-party

9  releases.  We also issued publication notice in the LA Times

10 and USA Today, just to up the world on notice of the

11 settlement.

12         And so having been provided those materials, each

13 stockholder then has the opportunity to decide am I going to

14 accept or am I going to reject the proposal by choosing to

15 satisfy the conditions or not.  And the record -- the voting

16 certification -- the record is that 100 stockholders, more than

17 a hundred stockholders, have rejected the settlement.  They've

18 said they don't wish to -- said that they just want that --

19 they don't want to give what we asked for in exchange for what

20 we were offering, and they said no thank you and they are not

21 participating.

22         But the vast majority of stockholders, by number, 99

23 percent by number (indiscernible), chose to participate in the

24 settlement.  And if the plan's approved, those stockholders

25 will receive the benefit from the debtor's bargaining,

significantly improve recovery and much more than they would

otherwise receive under the Bankruptcy Code.  So the question

then sort of how the conditions would work, you know, each

stockholder is entitled to act on his or her own volition and

they get to make an independent individual decision on whether

or not to participate.  So there was an argument, I believe, in

Mr. Chlavin's papers that there's a class-like death trap, but

that's not the case, right.  And there's also no walk rights,

we don't lose our RSA if a certain amount of shareholders don't

participate.

If a stockholder rejects the settlement, they do it

without consequence to anyone other than themself.  That's

their right to accept or reject the offer.  And finally, and

perhaps most importantly, no stockholder is worse off because

of the settlement.  The worst case scenario for a holder of

existing stock that chose not to satisfy the condition is a

zero recovery under a plan that's complying with the absolute

priority rule.  You know, when you have an insolvent debtor,

that shareholder would get a zero recovery.  So no one is worse

off for participating or not.

And then the sort of one last point I'd like to make,

Your Honor, is that actually the only way the shareholders

could be worse off is the U.S. Trustee prevails in its

objection and the settlement is not approved.  If the

settlement is not approved, then in those circumstances, the

1 stockholders that wish to sell and wanted to receive a recovery

2 are no longer able to do so.  So that's sort of the sum of our

3 thoughts on the settlement.

4          Oh, and Your Honor --

5          THE COURT:  Well --

6          MR. MORGAN:  Sorry.  If you have a question, the

7 other is an aside, so.

8          THE COURT:  Well, the way you're describing it, it

9 sounds more like an offer and an acceptance and a one-on-one

10 settlement of the debtor with each individual stockholder who

11 chooses to accept what's being offered.  I'm not sure what

12 standard I judge that under, but that's how it sounds is it's a

13 one-on-one, every stockholder makes its own decision to accept

14 something that is being offered.  I guess regardless of what I

15 standard I view it under.  But okay.  It's maybe closer to a

16 settlement than many things I've seen that debtors call

17 settlements.

18          Certainly, the stockholders themselves did not

19 negotiate it, so they aren't part of a already agreed-to

20 settlement.  They're given an opportunity in the plan to accept

21 something.  Okay.

22          MR. MORGAN:  That's right, Your Honor.  That's how

23 we've been thinking about it.

24          And then, Your Honor, releases.  (Indiscernible)

25 releases.  According to Section 1123(b)(3)(A), Section 10(7)(a)

of the plan provides for the release of certain of the debtor's

claims and causes of action against the released party and how

the courts apply different standards to debtor releases, we

believe the appropriate standard for approval of debtor relief

is generally speaking the same as approval of Rule 9019

settlements or that the release otherwise satisfies the

business judgment rule, which is, you know, the test under the

Third Circuit PWS decision.

So Your Honor, under this precedent, a release by a

debtor is appropriate if the debtor's business judgment -- if,

sorry, in the debtor's business judgment, any claim of the

estate (indiscernible) are for only marginal liability.  And

here, we submit that the debtor release represents a valid

exercise of the debtor's business judgment and should be

approved for three reasons.

One, the debtor formed at the direction of the board

of directors, a special independent committee composed of one

independent director, that's Jill Frizzley.  And Ms. Frizzley

with the assistance of RLF investigated the viability of

potential claims (indiscernible) debtor release and concluded

that the debtor release would not extinguish any claim with a

significant likelihood of success or (indiscernible) recovery.

I think the debtor release is vital to the debtor's

reorganization and critical to prosecution of these cases and

instrumental in negotiating the plan.

1        Third, Your Honor, no party-in-interest has objected

2   to the reasonableness of the debtor release.  So Your Honor, we

3   submit that the debtor release is justified, fair, reasonable,

4   and in the best interest of the estate creditors and should be

5   approved.

6        That leads us to third-party releases.  Those that

7   are in Section 10(7)(b) to the plan and we believe that the

8   third-party releases should be approved under three premises.

9        First, third-party releases are consensual under

10  well-established principal as employed by this Court and others

11  in the district.  Second, Section 1141(a) of the Bankruptcy

12  Code provides the Court with the authority needed to approve

13  the third-party releases of the type that we have in the plan.

14  And third, even if Your Honor were to determine that the third-

15  party releases are not consensual, we believe they would

16  satisfy the standard articulated in <u>Continental</u>.

17       To be clear, our view is that each third-party

18  release is consensual.  First, as established in the voting

19  certification, the impaired voting classes, Class 3 and

20  Class 4, have unanimously voted to accept the plan and did not

21  opt out of the third-party releases.

22       Second, non-voting classes -- I'm sorry, non-voting

23  holders of claims that are unimpaired under the plan impliedly

24  consented to the releases because they are receiving adequate

25  consideration for the release by being paid in full

1 (indiscernible) plan.  So admin expense claims, priority tax

2 claims, claims in Class 1 of the priority claim, Class 2 of the

3 secured claims, five general secured claims, are receiving

4 adequate consideration for their relief by being paid in full

5 under the plan.

6          And third, the deemed rejecting classes, Class 7 and

7 Class 8, were provided with ample notice and an opportunity to

8 affirmatively opt out of the releases by either objecting to

9 the plan or returning a form to the debtors.  Debtor provided

10 notice of the opt out through Form 8-K filing on June 2nd that

11 disclosed the terms and conditions of the restructuring

12 contemplated by the RSA, including third-party releases 35 days

13 before the petition date; a Form S-1 filed on June 8, 2020,

14 which included the full RSA as an exhibit and included

15 significant detail of third-party releases (indiscernible)

16 third-party releases; publication notice of the relief,

17 exculpation and injunction provisions, which again, as

18 mentioned was in the LA Times and USA Today; a copy of the opt

19 out notice and confirmation notice, which conspicuously

20 described the third-party releases and the process for opting

21 out and informed holders (indiscernible) class that they would

22 deemed -- sorry, that they would be deemed to grant third-party

23 releases if they did not complete and return the opt out

24 notice.

25          Your Honor, the return of a significant number of opt

1  out forms by shareholders demonstrates that the opt out

2  procedures were clear and that the interest holders had

3  sufficient notice to decide whether or not to opt out.

4  Further, Your Honor, courts in this district have approved as

5  consensual similar relief, that even when the effective

6  claimants or interest holders were deemed to reject the plan.

7  In addition, the third-party -- sorry, the third-party releases

8  were a critical negotiated term of the plan, which the

9  supporting note holder would have been unwilling to fund and

10  support the debtor's reorganization.

11        THE COURT:  That one I don't buy, but that's okay.  I

12  do not think that the third-party releases would meet the

13  Continental standards, and certainly not as enunciated in the

14  newest Millennial decision.  You can't just make it a condition

15  to your approval and say it's necessary to the plan.

16        (Indiscernible) going to be consensual or they're not

17  going to be.

18        MR. MORGAN:  I understand and I would differentiate

19  us from Millennial in that we're not telling (indiscernible)

20  that they have to release even though they've been kicking and

21  screaming for years.  So we are consensual as opposed to the

22  fact pattern there, but I don't know that we need to argue the

23  point, Your Honor, but I -- if you would like to, I'm happy to.

24  We'll keep moving.

25        So then I want to address the specific points by the

1  U.S. Trustee because in their objection, they've taken the
2  position that several of the third-party releases are actually
3  non-consensual notwithstanding everything I've just explained
4  and the case law to the contrary.  So specifically, the U.S.
5  Trustee objects to the debtor's use of an opt-out mechanism for
6  holders of interest to opt out of third-party releases.  They
7  rely on Judge Owens' decision -- primarily on Judge Owens'
8  decision in Emerge.  They argue that silence -- this is a
9  quote, "Silence may no longer be construed as acceptance," but
10 Emerge (indiscernible) for several reasons.

11         First, contrary to the U.S. Trustee's unequivocal
12 pronouncement, the court in Emerge did not establish a hard and
13 fast rule against opt-out notices.  In Emerge, deemed to reject
14 equity holders were not receiving any consideration for the
15 third-party releases they were providing.  On the facts -- I'm
16 sorry, on those facts, the court in Emerge concluded that it
17 could not find the third-party releases to be consensual
18 because there was no benefit to the parties to be accepted by
19 equity in exchange for their silence, the contract bids
20 principal.

21         Here, however, because of supporting noteholders'
22 concessions, equity holders would receive a cash payment at a
23 contingent value rate.  Accordingly, equity holders that did
24 not opt out of their releases and complied with other
25 conditions of the settlement but manifested their intent to

1  accept the benefit by remaining silent and not opting out of

2  the releases.  In addition, after _Emerge_, including most

3  recently by Your Honor, in _Pyxus_, there have been several cases

4  in Delaware approving third-party releases as consensual when

5  an opt-out mechanism was used, including in instances where the

6  class granting the third-party release (indiscernible) reject.

7          And finally, as recited in detail in our papers, the

8  court in _Emerge_ relied entirely on non-bankruptcy contractual

9  law concepts without considering the impact of 1141 of the

10  Bankruptcy Code on the issue of consent.  And Your Honor, the

11  courts have held that -- the courts that have held that silence

12  is not consent did so because they relied on state law

13  contractual principals and asked the question, what's the

14  source of the relief and party's duty to speak?

15          Section 1141 makes clear that a Chapter 11 plan is

16  broader and more powerful than a state law contract.  State law

17  contractual principals are not what makes Chapter 11 plan

18  provisions binding on creditors and equity holders.  Chapter 11

19  plan, though it may be negotiated as binding on creditors and

20  equity holders because it's (indiscernible) in the Bankruptcy

21  Code and federal law principals of res judicata, bankruptcy

22  (indiscernible) is so strong, that Chapter 11 plans are binding

23  on creditors and equity holders even if they're not scheduled

24  as a valid claim, have received any distributions, and are not

25  retaining any interest under the plan.

1          So Your Honor, in order for a creditor or equity

2   holder to defeat any provision of the plan, it must file an

3   objection to confirmation of the plan and that's because of

4   1141.  If a creditor does not object, it is bound by the

5   provisions of that plan.  So thus a bankruptcy filing can be

6   deemed as consent and so 1141(a) of the Code creates a duty to

7   speak.  And this court noted that in <u>Melinta</u>, Section 1141 of

8   the Code is more compelling in the contractual arguments

9   (indiscernible).

10          THE COURT:  I did note that.  But you're not really

11   relying on 1141 because you did an opt out.  If you were really

12   relying on 1141, you wouldn't do an opt out, right?

13          MR. MORGAN:  Literally, what I was about to say is

14   that we've actually gone above and beyond 1141 because we

15   provided a mechanic for opting out.

16          THE COURT:  Yeah, I don't know how those two mesh.  I

17   mean, 1141 is sort of this emerging law that I think started

18   with Judge Drain who, of course, we all do look to for his

19   thoughts on multiple issues.  But that interplay is kind of

20   interesting.  Okay.

21          MR. MORGAN:  I'm sorry, and I'll keep moving on.

22          There's a number of objections from the U.S. Trustee

23   on the release so I want to make sure we cover them because I

24   know Ms. Casey will speak to them later.

25          And then, Your Honor, the U.S. Trustee also objects

1  to the existing stock settlement and argues that the existing

2  stock settlement prohibits shareholders from opting out of

3  their releases.  But for all the reasons that I explained

4  before, that's not correct.  The existing stock settlement

5  provides new consideration to eligible stockholders in exchange

6  for their cooperation in confirming the plan and in granting

7  the releases.  Holders of existing stock are free to reject

8  that exchange if they wish.

9       Nothing in the plan compels holders of existing stock

10  to grant releases.  And further evidence of that fact is that

11  more than a hundred did not and opted out.  Four of them are

12  actually even here today prosecuting an objection.

13       So next, Your Honor, the U.S. Trustee objects to

14  several subsections in the definition of releasing parties in

15  the plan, most of which have been resolved by changes in the

16  amended plan.  Specifically, the U.S. Trustee argues that

17  Subsection 1 includes unimpaired claims of interest, but those

18  parties are not provided in the opt out right, which impairs

19  them rendering them no longer unimpaired.  Argument fails for

20  the reasons that I mentioned before, so I don't think I need to

21  go back through it.

22       The U.S. Trustee also argues that Section -- sorry,

23  Subsection 3 requires abstaining creditors to provide releases.

24  We removed this subsection in the amended plan because there

25  are no abstaining creditors, so we just figured it would be

1  easier to take it out rather than argue it.

2         The U.S. Trustee argues that Subsection 4 requires

3  rejecting creditors to provide releases even though they will

4  receive no consideration.  That is addressed throughout the

5  presentation and our paper and there are no rejecting

6  creditors, only holders in interest in subordinated claims that

7  are deemed to reject.

8         So with respect to the holders of interest, those

9  holders are receiving significant consideration through

10 participation in the settlement.  In respect to holders of

11 subordinated claims, we don't think there are any.  No one has

12 asserted them.  We're not aware of any.  But if there are, such

13 holders are most likely to be interest holders and the

14 subordinated claims being (indiscernible).  And -- sorry,

15 510(b)s.  And noteholders, as I noted before, were given clear

16 notice and instructions on how to opt out if they wanted to.

17        Next, the U.S. Trustee objects to Subsection 5, which

18 includes shareholders in the definition of releasing parties

19 (indiscernible) opt out.  As I said earlier, Your Honor, the

20 shareholders have consented to releases through ample notice

21 and (indiscernible) to opt out.  And then, I believe this point

22 has been resolved, but the U.S. Trustee also objected that

23 Subsection 6 included holders of indemnification claims.

24        And finally, Your Honor, the U.S. Trustee asserted

25 that Subsection 11 (indiscernible) releases to a widespread

group of people, none of whom received notice.  Believe we

resolved this objection by amending the plan to modify that

that Subsection is limited solely to the extent that such

person that has a legal right in the Clauses 1 through 10 --

has a legal right to compel the party listed in that Subsection

and 11, to provide such a release.

And then finally, Your Honor, the U.S. Trustee has

objected that the releases provide for -- sorry, that the

releases to be provided by shareholders, to the extent that

they release acts of malfeasance.  We think we've addressed

this by modifying the scope of the release for participating

class holders to remove criminal conduct.  Further, as this

Court has acknowledged, while you must carve out such conduct

from the scope of an exculpation, it is not required to carve

out such conduct from the scope of relief.

And this sort of gets to where I think you may have a

slight difference of opinion on whether or not this is actually

a negotiated term.  Shareholders are receiving a substantial

consideration in exchange for, among other things, a release,

so we wanted the release -- we needed the release and our

counter parties to RSA, the supporting noteholder, wanted the

release to be as broad as possible because they didn't want to

fund an exit facility and fund a plan distribution and a

opinion under the settlement only for those shareholders to

then retain claims and turn around and sue them.  So it was a

1  negotiated significant point that, you know, if they're

2  funding, they wanted to make sure they were funding into

3  something that they were not going to be sued from or by those

4  parties.  And I understand Your Honor's point about Millennium,

5  so I won't belabor my point.  But that is where we think there

6  is some meaningful desire by the parties to actually have

7  third-party releases and to have them be as broad as possible.

8          THE COURT:  Well sure, I understand that.  But as I

9  said, I think they're either consensual or they're not and

10  people want to give broad releases or not.  There could have

11  been a plan here according to the debtors without any

12  shareholder consideration, so very different than Millennium.

13          MR. MORGAN:  Understood.  Understood.

14          All right.  And Your Honor, reading that queue, I'll

15  forego the argument that we comply with the Continental

16  standards.

17          THE COURT:  Yeah, because I'm not going to -- it's

18  not necessary to the reorganization, i.e., without which this

19  company would liquidate.  That is not -- without the

20  shareholder -- existing shareholder, whatever we call it,

21  stockholder settlement.  Very different.

22          MR. MORGAN:  Understood.  Understood.  And Your

23  Honor, my personal belief is these are fully consensual, so I

24  don't want to take up your time arguing an alternate theory.

25          All right.  So moving on.  Your Honor, I don't

1  believe there are any other contested portions of our

2  affirmative case.  Again, I recognize the letter that was filed

3  by Mr. Hughes (phonetic) about notice.  I didn't interpret that

4  and unless Your Honor tells me that you see it differently, I

5  interpreted that as relating to the settlement, not relating to

6  the solicitation.  So I'm happy to walk through the balance of

7  1129 liquidation analysis, feasibility, good faith, the rest of

8  it.  I think it's all been covered in our papers.

9         The liquidation analysis has also been covered at

10  length in the testimony from Mr. Pickering so I'm willing to

11  take Your Honor's guidance on this as to whether or not you'd

12  like to hear it from me.  I surely don't want to take up more

13  time than we need.

14         THE COURT:  If it's been -- excuse me.  If it's been

15  covered in the submissions, that's fine.  And I'm not sure,

16  quite frankly, what is really objected to, so why don't we see

17  if anyone objects to any of these other sections of the Code.

18  I know Mr. Demmy probably has an argument about the -- he does

19  have an argument about the sufficiency of Mr. Pickering's

20  declaration to support certain of these findings, but I'm not

21  sure if there was an objection to those provisions, so we'll

22  deal with that.

23         MR. MORGAN:  I can speak to that, too, Your Honor, if

24  it would be helpful.

25         You asked at the last hearing, you know, sort of

1 what's the purpose behind the 1129 declarations, and to be

2 perfectly frank with you, I also asked myself the same

3 question, particularly when we're doing commenting on them.  In

4 the end, from our perspective, it comes down to completeness.

5          We think it's appropriate and best practices to make

6 sure that there's a legal and a factual showing for each

7 element of 1129, even though in some instances it may not be

8 entirely necessary.  For example, our confirmation briefs

9 routinely state that the plan does not contain any rate change,

10 even though the debtor's not a utility.  (Indiscernible) 112 of

11 our brief.  We always then have a fact witness testify that

12 they consulted with counsel and were advised that the plan does

13 not provide for any rate change, even though it's not a

14 utility, which is Paragraph 40 of Mr. Pickering's declaration.

15          So Your Honor, I think the point that some of these

16 things may not be necessary, we include them for completeness.

17 And as to the competency of a non-management declarant, you

18 know, courts -- Delaware bankruptcy courts have regularly

19 accepted non-CRO financial advisors to serve as an 1129

20 declarant.  A couple examples, for example, Paragon Offshore,

21 Case Number 16-01386; GulfMark Offshore, Case Number 17-11125;

22 Catalina Marketing Corporation, Case Number 18-12794; and

23 Pancakes and Pies, Case Number 19-11743.

24          So I --

25          THE COURT:  Were any of those in a contested

1  situation?  I have to confess --

2          MR. MORGAN:  I don't know off the top of my head,

3  Your Honor.  I don't know off of the top of my head.

4          THE COURT:  I have to confess that I don't think I've

5  ever gotten one from a (indiscernible) advisor basically.  He's

6  an advisor, Mr. Pickering.  Most of the stuff he doesn't know

7  from firsthand knowledge.  Where he's reading the plan, you

8  know, I guess I can read the plan.  Where he's -- what I find

9  in the declarations that, that I suppose I disregard every time

10 is any legal conclusions they reach, which often they do.  You

11 know, this plan is feasible.

12          Well, that's part fact, part law.  This plan was

13 proposed in good faith, part fact, part law.  You can give me

14 the facts that support it, but they're often so conclusory that

15 they're really espousing conclusions that the Court has to

16 reach on its own based on facts.  So I don't know if it's

17 important here or not whether who made the 1129 declaration or

18 whether that is really an issue here, so we'll see what

19 Mr. Demmy says, but I found it odd.  Perhaps obviously not

20 unprecedented.  There are some cases out there.  So obviously,

21 not unprecedented, but I will say not typical.  Okay.

22          MR. MORGAN:  And then one more point, which is just

23 from discussion I think Your Honor raised it at the very outset

24 on Tuesday, and we had talked to the U.S. Trustee about it,

25 which is you had asked Mr. (indiscernible) some questions, and

1  I just wanted to take a second to revisit that, make sure we

2  didn't forget anything here.

3          So as I mentioned before, eligible stockholders

4  received a copy of the debtor's opt out form, which provided a

5  detailed description of the settlement conditions and the

6  third-party releases as well as copies of the combined hearing

7  notice -- I'm sorry, combined hearing notice plan and

8  disclosure statement.  The end of July, after the voting agent

9  had completed its service of materials on eligible

10 stockholders, we learned that these forms did not require the

11 stockholders to provide information that we needed to

12 facilitate the settlement distributions in accordance with the

13 settlement.

14          Specifically, the voting agent advised us that they

15 would need to know a holder's broker nominee in order to

16 exclude a stockholder that elected not to participate in the

17 settlement distribution.  So realizing the importance of the

18 broker nominee information, debtor counsel instructed the

19 voting agent to contact those stockholders that submitted valid

20 opt out forms to confirm that they would maintain their opt out

21 election while informing them that we would need additional

22 information regarding their broker nominee.

23          During that process, the voting agent was unable to

24 reach all of the non-releasing stockholders by phone, either

25 because the holders did not have -- did not provide a phone

1  number in the opt out form, or because they could not be

2  reached when called.  Accordingly, the voting agent sent out a

3  form, emailed all non-releasing stockholders they could not

4  otherwise contact and conclude by saying, Your Honor, these

5  (indiscernible) were made to stockholders who had elected opt

6  out for the clear purpose of acquiring the necessary broker

7  nominee information were made with the best intentions.

8          And as an end result -- or maybe I shouldn't say as

9  an end result, I shouldn't infer causation, but when the opt

10  out deadline expired on August 17th, the voting certificate

11  confirmed that as of August 18, the debtors had received 110

12  opt out forms where the election box had been checked.  That

13  figure excludes 45 stockholders who elected to change their opt

14  out election prior to the deadline.  So doing some simple math,

15  without any changes, the debtor would have received 155 opt

16  outs as of the voting -- I'm sorry, as of the day of the voting

17  certificate.

18          But there were 45 people who changed their mind.  We

19  don't know if those 45 people -- why they changed their mind,

20  but they changed their mind.

21          THE COURT:  So was that before or after they were

22  contacted by Stretto?

23          MR. MORGAN:  I think most of them were after.  I

24  don't know for all of them, but I think most of them were

25  after.

1          THE COURT:  And what are you proposing I do with this

2  or not do with this, which is a little unusual situation where

3  there was contact by the debtor's agent to persons who had

4  submitted a form?

5          MR. MORGAN:  So, Your Honor, two things.  One, I

6  don't think there's anything for you to do with it and we

7  wanted to include it because the U.S. Trustee had raised a

8  concern and we talked to them and we explained to them what was

9  happening.  They understood, but they also wanted to make sure

10  that there was nothing that was sort of known and not

11  disclosed, so it's really a disclosure.  I don't think there is

12  anything that Your Honor needs to do with it.

13          The other thing, two, there's certainly no

14  prohibition on contacting parties, and in fact, there's

15  actually some cases -- I remember the name, but I don't

16  remember the cite, I apologize -- it's Teligent -- where agents

17  do go out and start contacting parties to try and sort of chase

18  people down.  I don't think there's any rule or prohibition

19  against contacting people, but I don't think their contact is

20  problematic.  And, again, it comes down to the decision of the

21  party, you know, did you want to take the consideration of

22  settlement, did you want to opt out of the release.  And so

23  these folks made one decision and changed their mind and made a

24  different decision.

25          THE COURT:  I don't have a problem with anyone

changing their mind.  I think people are entitled to change
their mind.  I think the concern, if there is one, is that the
form that went out was subject to vetting and it was subject to
Court approval, and the concern I would have if I was
contacting parties not to get information about their nominee
but to have a discussion with them about their choice is what
completely accurate information given to them about their
choice so that they know when they changed it that that's what
they wanted to do.  I don't know that there's anything for me
to do about it.

I'm not sure what I would do or could do but that's
my concern, that an unsolicited communication asking not only
for your nominee information but are you sure you wanted to do
this.  There may not be anything inappropriate about it.  I
don't know.  But --

MR. MORGAN:  And Your Honor, the  --

THE COURT:  -- concerned.  Pardon me?

MR. MORGAN:  Sorry.  I didn't mean to talk over you.

MS. CASEY:  Your Honor, this is Linda Casey --

THE COURT:  Yes, Ms. Casey.

MS. CASEY:  -- (indiscernible).

THE COURT:  Yes.

MS. CASEY:  I just wanted to correct something.  The
U.S. Trustee does not agree that it was just a transparency
issue.  We thought that it was a necessary transparency issue,

1  but I do intend to argue, or include in my argument comments

2  regarding this, including a suggestion as to what I think

3  should happen.  So I just wanted to be clear that to the extent

4  there was an indication that we just thought it was a

5  transparency issue, that's not what it was and I -- it wasn't

6  Mr. Morgan that I had spoken to.  We said we would address it

7  in argument.

8            THE COURT:  Okay.  Thank you.

9            Okay.  Then we'll hear what the U.S. Trustee's

10  concerns are and suggestions are and you can address it after I

11  hear that.  Thank you.

12            MR. MORGAN:  Okay.

13            And I apologize, Your Honor.  I understood it was

14  just a disclosure issue, so that's my mistake.

15            Thank you, Ms. Casey, for correcting.

16            All right.  So Your Honor, having asked if anyone had

17  any other objections and having gone through those last two

18  points, I think that's it for me.

19            THE COURT:  Okay.  Thank you.

20            I've got 4:35.  We're going to take five minutes.

21  We've been going for two hours.  We're going to take five

22  minutes and then we're going to start with the shareholders.

23  We'll start with Mr. Demmy when we return.

24            Thank you.

25            MR. MORGAN:  Thank you, Your Honor.

1          THE COURT:  We're in recess.

2                (Recess taken for five minutes)

3          MR. DEMMY:  And as always, I'll do a mic check.  Can

4   the Court hear me?

5          THE COURT:  I can.  I'm glad you got your power back.

6          MR. DEMMY:  Not long after it went out, but enough to

7   cause a little bit of a commotion, obviously.  But thank you,

8   Your Honor.

9          Your Honor, John Demmy of Saul, Ewing, Arnstein and

10  Lehr, and of course, we represent Steven Chlavin, one of the

11  four objecting shareholders that the debtors have identified

12  and then participated throughout this hearing.

13          Your Honor, I'll start a little bit out of order

14  perhaps than what I had intended.  Your Honor asked a lot of

15  the questions of the debtor's counsel, evidentiary-based

16  questions that I had from the evidentiary record.  Debtor's

17  counsel answered them in the manner that he did.  I don't know

18  that I need to belabor that point.  I will not spend as much

19  time on those matters as I had intended to so I just wanted to

20  note that.

21          But then I also wanted to shift because there was

22  discussion about the Pickering declaration, so I figured it's

23  an appropriate time, since we're talking about the evidentiary

24  record, to deal with that or at least give Your Honor my view

25  about that declaration.  And I think --

1          THE COURT:  And Mr. Demmy, I would like your view.  I

2   don't want you to shortcut the evidentiary concerns that you

3   have.  I want to hear them.

4          MR. DEMMY:  I will mention them in my presentation.

5   I'm not going to discard them, but I -- some of them I think

6   have been addressed in a way, but I will take Your Honor's

7   point to heart on that issue.

8          With respect specifically to the Pickering

9   declaration, though, Your Honor, I made this point on Friday.

10  I'll make it again today.  I think a fair reading of the

11  majority of the Pickering declaration starting from

12  Paragraph 26 on, which deal with the Section 1129 requirements,

13  are of no help to the Court, or very little help, if any.  They

14  are mainly argument or legal conclusions.  To the extent that

15  there's an attempt to relate facts, I think that they are based

16  on hearsay conversations or simply a reading of the plan and

17  Mr. Pickering's attempt at an understanding of what the plan --

18  that's not to say that he doesn't have one, but I just don't

19  think that that is helpful for the Court who, Your Honor,

20  you're the expert on Section 1129.  You don't need

21  Mr. Pickering's help to make decisions about whether or not the

22  debtors and the plan proponents have complied with the

23  Bankruptcy Code as required by Section 1129.

24          And if there are facts that are necessary to have

25  been developed in connection with Section 1129 matters, well,

1  they either have or have not been, I would suggest, as far as

2  the evidentiary record apart from the Pickering declaration and

3  I don't believe that the Pickering declaration would add to

4  that effort in terms of a factual basis for satisfaction of

5  Section 1129 standards.  And I want to mention this and go into

6  some detail on this because I think it really highlights the

7  absence of debtor's management.  There are a lot of open

8  questions here that I don't know if they could have been

9  because management wasn't here to testify.  Whether Mr. Amos

10 could fill in some of the gaps, whether Mr. Oki could have

11 filled in some of the gaps in the evidentiary record as I think

12 exists, and I think the Court suspects exists or has concluded

13 possibly exists.

14         So with that, Your Honor, I'm going to now turn to a

15 question that the Court had.  It actually -- there were perhaps

16 two questions or two related inquiries and they ultimately

17 relate to this market test that the debtors are relying upon.

18 And the one question that the Court asked was, what is the

19 relevance of the debtor's frame of mind that -- their

20 negotiator's frame of mind with respect to the value of the net

21 operating losses and whether or not it had value to the debtors

22 or substantial value for IEH Biopharma.  What relevance is

23 that?  And I'll just leave that question hang for a moment

24 because there was also discussion about VI-0106 and Mr. Morgan

25 talked about, well, you know, the answer to that question

1 depends on whether we're doing an asset based valuation or an

2 income based valuation.

3        So I think those two are related and they're related

4 in this way, Your Honor.  The debtors didn't offer the company

5 for sale.  Mr. Morgan talked about unsolicited offers, but

6 unsolicited offers obviously is not a substitute for a

7 marketing process.  It's not a substitute for offering the

8 company for sale.  I think he also talked about, as part of the

9 market test, 90 percent of the company being offered for sale.

10        However, that's -- I interpreted that and I think the

11 record would bear out, that that was for the equity in the

12 debtor, and whoever bought that equity would still have to deal

13 with the debt ahead of it on the balance sheets.  So that's not

14 really the sale that I would be referring to.

15        And Your Honor, one of the things, one of the themes

16 of this confirmation hearing, at least for me, has been the, I

17 want it both ways approach.  You want it this way, but then you

18 want it a completely 180 degree manner on another issue or

19 another point that might serve your interests in a different

20 way.

21        And at the very outset of the hearing debtors'

22 counsel started by saying that the debtors -- I'm going to

23 quote this directly I think, and absolutely accurately -- but

24 the debtors did not leave any stone unturned in their efforts

25 here.

1          Well, they did leave one big one unturned, and that

2    is a sale of the company as a going concern, or of

3    substantially all the assets, not a piecemeal sale, but a sale

4    that we see often in Bankruptcy Court, you know, a going

5    concern or substantially all asset sale.

6          And if the NOLs had no real value to the debtors or

7    de minimis value and it's been subsumed in the discounted cash

8    flow analysis prepared by Ms. Stratton and Piper Sandler, then

9    why not?  Why not offer the company for sale?

10         Find out what the value might be out there, as

11   opposed to attempting to refinance the debt or finding people

12   to buy the equity at a time, I would suggest, in the spring and

13   early summer of this year, might not have been the best time

14   for people to put money into ventures.

15         I don't know if there were people that were going to

16   possibly be interested in buying the company, but we'll never

17   know, because that effort was not taken.  That stone was left

18   turned.

19         THE COURT:  So your point on the market test -- and

20   that was actually one of the questions I had for you, so thank

21   you for addressing it -- but your point on the market test is

22   that the offering of equity and/or debt in the company in the

23   spring isn't a sufficient market test.

24         MR. DEMMY:  That would be my position, absolutely,

25   Your Honor, because I don't -- it's not a sale of the assets or

1  of the going concern.  It's of pieces of the capital structure.

2  And there might be any number of reasons why investors might

3  want to or might not want to buy a piece of a capital structure

4  of a company that's looking like it's going into bankruptcy, or

5  is engaged in this effort in an effort to stave off a

6  bankruptcy case.

7          Yes, Your Honor, that's my position.  I think the

8  true market test is a willing buyer and a willing seller, and

9  what do you get for the assets or what do you get for the

10 company, and that wasn't done here.  With that, Your Honor --

11         THE COURT:  So let me -- so is it --

12         MR. DEMMY:  Yes.

13         THE COURT:  -- of no relevance?  Is it of absolutely

14 no relevance that the debtors attempted to bring some investors

15 in?  I mean, Ms. Stratton testified that that's an appropriate

16 market test of some sort.  Is she wrong on that?

17         MR. DEMMY:  I'm in no position to question Ms.

18 Stratton's judgment on that.  I'm suggesting that there are

19 alternatives to what the debtors attempted to do, and the one

20 alternative that clearly was not done, because I asked -- I

21 think I asked Mr. King, Ms. Stratton --

22         THE COURT:  Yes.

23         MR. DEMMY:  -- and all of them whether a sale of the

24 entire company was discussed, attempted, and the answer was

25 uniformly no.  So I can't say that Ms. Stratton's market test

1  is of no relevance.  I'm saying it's among the things that Your

2  Honor ought to consider, and in my view, the best market test

3  is a willing buyer and a willing seller.

4          THE COURT:  Okay.

5          MR. DEMMY:  And Your Honor, Mr. Chlavin raised

6  several issues in his objection, including whether or not the

7  plan and the plan proponents had complied with the Bankruptcy

8  Code and Title 11 -- the 1129(a)(1), (a)(2), (a)(3)

9  requirements.

10          But clearly, the focus of our objection during the

11  confirmation hearing has been on valuation.  So I'm going to

12  focus now on 1129(b)(2)(C), the fair and equitable standard,

13  because that gets to the heart of the case, it seems to me, the

14  value of the debtors.

15          And 1129(b)(2)(C) says that equity-holders must

16  receive on account of their interest, property of a value as of

17  the effective date of the plan equal to the value of such

18  interest.  So I'll first simply note that the value of the

19  debtors needs to be determined as of the effective date of the

20  plan.

21          And I will note that the Piper Sandler valuation, the

22  valuation analysis by Piper Sandler was as of June 29, 2020,

23  which is two months ago, and that was prior to the commencement

24  of the bankruptcy cases.  Ms. Stratton did testify that I think

25  it was on August 11 -- I think that appears at page 48 of the

1 August 25 transcript; I want to make sure I got that correctly

2 -- that Ms. Stratton testified on August 11 she and her team

3 updated the Pipe Sandler valuation analysis.  It increased the

4 debtors' value by $6 million.

5         However, no written analysis of that updating was

6 provided.  There was -- as I understand it, we don't know

7 exactly what the information was that went into that.  There's

8 no documentation of that increase in the valuation analysis.

9 But again, that's on August 11, a little in time to the

10 effective date.

11         So I'm not going to stress, overly stress that point,

12 but I note that the valuation must be as of the effective date,

13 not June 29 of 2020, and the meat of the evidence in the

14 valuation analysis that's been provided here by Piper Sandler

15 was as of June 29th, and that's not exactly the effective date

16 of the plan.  And in other cases --

17         THE COURT:  Well, it isn't.

18         MR. DEMMY:  -- Your Honor --

19         THE COURT:  Yes.  Okay.

20         MR. DEMMY:  I'm sorry.

21         THE COURT:  In other cases what?  Tell me.

22         MR. DEMMY:  Well, in other cases that have a longer

23 runway and more activity in the cases where the debtors

24 actually file monthly operating reports and do financial

25 statements throughout the case there might be an opportunity

1  for the valuation analysts to provide a -- a valuation analysis

2  closer in time to the effective date, because there might be

3  more information available.

4         We heard testimony that there was some other

5  additional information, some financial statements that were

6  prepared by the debtors.  Mr. Pickering testified that he

7  updated his analysis based on updated financial statements, and

8  I believe some financial statements that related to the post-

9  bankruptcy period of time.

10        But those financial statements were not produced.

11 They weren't filed with the Court.  They weren't, you know, a

12 subject of conversation at this confirmation hearing.  So it

13 was possible to update it, I think.  And in other cases you

14 might have more time and a longer runway in order to update

15 your financial information, but there's some other issues with

16 the timing that I'll get into a little bit later in my

17 argument, Your Honor.  I don't -- you might have had a question

18 and I don't want to go off there without --

19        THE COURT:  Well, you know, it just struck me that

20 you don't necessarily know what the effective date is going to

21 be of your plan.

22        MR. DEMMY:  No.

23        THE COURT:  When you file it.  This was a pre-pack.

24 I actually pushed the confirmation date off, I forget now, a

25 week or so.  So that's hard to know, and it's also future

1  looking.  So I actually don't know that a banker would push it

2  out into the future and say, well, as of this date that hasn't

3  occurred yet here's my valuation analysis.

4          MR. DEMMY:  No, I'm not suggesting that, Your Honor.

5  What I'm suggesting is that there's discretion involved in

6  valuation analysis, and that is a piece of it.  And there's

7  other pieces, as well, and I'll get into those.

8          THE COURT:  Okay.

9          MR. DEMMY:  But that could have been done.  It could

10 have been -- there could have been a more fulsome update done,

11 but it wasn't.  We had the testimony about the 6 million, and

12 I'm not trying to gloss over that.  It's just that it wasn't as

13 fulsome, obviously, as the June 29 valuation that was appended

14 to Ms. Stratton's declaration.

15          And I note that if they did the updated work on

16 August 11 there could have been some things attached to her

17 declaration, which was filed I think August 19 or something

18 like that.  I don't want to mis-state the date.  My friend is

19 helping me out, as well.

20     (Laughter)

21          MR. DEMMY:  So Your Honor, I referenced the having it

22 both ways phenomenon, what I perceive is part of what's going

23 on here.  And I'm going to start with VI-0106.  We've had a lot

24 of discussion about VI-0106, so let's just get into it.  And

25 the company -- the company's witnesses I should say, because I

1  think there's a distinction between the company's witnesses and

2  the company, perhaps, on some of these issues that Your Honor

3  has recognized.

4        But the company's witnesses uniformly say it's

5  valueless or it's of de minimis value, that the company doesn't

6  have the money to develop VI-0106, that it's a drain on the

7  company's resources, and so forth and so on.  And that's

8  despite the corporate presentation of June 19, 2020, which

9  painted a much rosier picture of VI-0106.

10        And it wasn't simply a, boy, we think it's -- it

11  could be a little bit better than zero.  It was significantly

12  better than zero as a projection, and I know the word

13  "aspirational" was used a lot, but it -- the statements in the

14  June 19, 2020, corporate presentation presented a potential

15  revenue stream for VI-0106 of 10 times the company's projected

16  2021 revenue of $119 million.

17        And that's some pretty rosy projections when the

18  testimony at this confirmation hearing has been very doom and

19  gloom.  It's speculative.  It's that we don't have the efficacy

20  studies done; it's going to cost a lot of money.  We don't have

21  the money, and it sounds like the debtors almost are of the

22  view of abandoning VI-0106, because of all the negatives and

23  all the drawbacks to it.

24        However, company doesn't want to sell it.  My client

25  made an offer based on what the debtors were saying, which is,

1 | this thing is valueless.  So we made an offer, which was
2 | responded to basically with a stiff arm, and that was set forth
3 | in the confirmation brief that the debtors filed.

4 | So if it is truly valueless and if it is really a
5 | drain on the company's resources and if the company really
6 | doesn't have the money to spend, whether it's 20 million or 70
7 | million over two years or over seven years, why not sell it or
8 | at least set up a process to sell it, and extract some value
9 | from an asset that otherwise seems like I'm wondering why it's
10 | still part of the debtors' asset list, if it has such little
11 | value.

12 | THE COURT:  Well, does the debtor have to do that in
13 | the context of this type of plan that is -- if it's validly and
14 | appropriately valued, VI-0106, then why can't it just flow
15 | through as an asset of the company?

16 | MR. DEMMY:  Your Honor, I don't think there's
17 | anything in the Bankruptcy Code that compels them to sell that
18 | asset.  But what I'm suggesting is that the debtors are saying
19 | to the Court that this plan's proposed in good faith, that it
20 | meets all the requirements of the Code, and one of which is
21 | that the plan is in good faith and the proponents have acted in
22 | good faith.

23 | And if this asset is truly valueless and it's going
24 | to be a drain on the company and cost tens of millions of
25 | dollars why wouldn't the debtors properly exercise their

1 fiduciary obligations to all stakeholders in the case by trying

2 to extract whatever value they can from it.

3          So no, directly in response to Your Honor's question,

4 they wouldn't be compelled to do it, but it seems to me that in

5 the fair discharge of fiduciary duties in this case, it's

6 something that they should have considered along with the sale

7 of all the assets of the company or the company as a going

8 concern.

9          It's the same problem, that this asset, the debtors

10 want to retain it, and in the context of the debtors'

11 management -- who didn't testify -- but the debtors' management

12 saying, this is going to be a big winner.  And I'm going to

13 suggest, Your Honor, that shareholders, you know, despite the

14 existing shareholders' settlement, are not going to participate

15 in any of that upside.

16          They're not going to participate in the upside of

17 VI-0106, because it's not included among the assets that are

18 part of the existing shareholder settlement.  There are EBITDAR

19 milestones under that settlement, and if the company reaches it

20 then the shareholders get the $2 per share.

21          However, VI-0106 is not included among those assets

22 for which the EBITDAR calculation will be made.  And in

23 fairness, the R part, the R&D costs for VI-0106 are not

24 included, as well.  It's earnings before that -- that number.

25 But here's the interesting part.

1        The EBITDAR milestone in the existing stock order,

2   again, it was $98.5 million.  The EBITDA number in the

3   company's financial projections that are attached to the

4   disclosure statement, Exhibit E, are $76 million, and if this

5   is for the same measurement period, 2021 and 2022, that surely

6   suggests to me that the R part of EBITDAR is going to be 22.5

7   million.

8        And that sounds suspiciously like what Mr. King

9   thought the debtors were going to spend over the next couple of

10  years with respect to VI-0106.  So we have this worthless asset

11  the company doesn't have the money to develop and it's simply a

12  drain on the company's resources, and it's speculative and we

13  don't have the right information about it, but we're going to

14  spend $22 million over the next couple years trying to develop

15  it, which suggests to me that if they don't spend that money,

16  if you take the company's witnesses at their word, that this is

17  just a big negative, a big, worthless, black hole that we

18  shouldn't go into, maybe the company's EBITDA for 2020 and '21

19  could really, actually be 98.5 million, because you don't then

20  spent the R part.

21       You don't spend the research and development on

22  VI-0106.  And maybe then you'd have a lot more EBITDA, $22½

23  million -- and I know that EBITDA and free cash flow, which is

24  what Piper Sandler used in their discounted cash flow analysis

25  of not the same numbers -- however, I think they're cousins of

1  each other, and it stands to reason that if EBITDA is $22½

2  million more, the pre-cash flow number is going to be more,

3  maybe not 22½ million because of -- you know -- the way you do

4  that, that math is somewhat beyond me.

5        But if you had a much higher EBITDA or free cash flow

6  for 2021 and 2022, the valuation's going to go up, and Ms.

7  Stratton was very clear in testifying that.  If that free cash

8  flow number increases, the value's going to go up.  Now, I

9  can't tell you how much, Your Honor.

10        That's not my expertise.  I can do some simple math

11  and we'll do that a little bit later, but I can't do that kind

12  of math.  But it's another one of these, it's worthless but

13  we're going to spend money on it, and if we do spend money on

14  it, it actually, directly impacts the financial projection and

15  the valuation that's done based on those financial projections;

16  and I think that's inconsistent.

17        THE COURT:  Well, where's -- so you're just -- you're

18  implying the spend of $22½ because of the difference between

19  the EBITDAR and the contingent value right document, which

20  quite frankly, is interesting that it excludes VI-0106.  That

21  is not something I had picked up on before the hearing.

22        But you're comparing the EBITDAR number in that to

23  the EBITDA numbers in the financial projection disclosed in the

24  disclosure statement and the appendix.

25        MR. DEMMY:  Yes, that's correct.

1          THE COURT:  And coming to some conclusion about what

2  that difference is?

3          MR. DEMMY:  Well, we know what the difference is.

4  It's R, EBITDAR versus EBITDA.  The R is research and

5  development.

6          THE COURT:  Well, I --

7          MR. DEMMY:  And maybe not all of it.  And what I'm

8  saying is that Mr. King testified, and I think Mr. Morgan

9  referenced it, that the company would be spending $20 million

10 over some period of time of the -- on this worthless asset.

11 Sounds like the R part of the EBITDAR, which is being excluded

12 -- and remember, it's only the R for VI-0106, I believe.  Maybe

13 I misstated that.

14         THE COURT:  Yes.

15         MR. DEMMY:  But that's where I'm getting that from.

16         THE COURT:  So you're --

17         MR. DEMMY:  Yes.

18         THE COURT:  -- so you're comparing two benchmarks

19 that the debtors have given us and saying the only difference

20 is the R.  So that must be the difference.

21         MR. DEMMY:  Yes, that's exactly right.

22         THE COURT:  Okay.

23         MR. DEMMY:  So a word that I've been thinking about

24 during this hearing is discretion, but I also think of the word

25 artistry, and I don't mean that -- I mean it the most

complimentary and respectful way, that I think Ms. Stratton and
the Piper Sandler team are good artists.

They're good at what they do.  They exercise their
discretion in a way that, you know, is what they think is
appropriate, but it might not be appropriate for all
situations.  And I'll take up on what Dr. Ahmadi said, and I
don't think it matters whether he's an expert witness or not.

Mister -- or Dr. Ahmadi, I'm sorry, said during his
testimony that the math in the valuation analysis is relatively
simply.  Once you have the inputs, the selection, you know, the
criteria for and the selection of the representative public
companies and the criteria for and the selection of the
precedential transactions, the financial information that goes
into the projections, you know, future revenues and the
discount rate to be applied for a DCF analysis, once you have
those inputs and you have those charts that we saw that were
attached to Ms. Stratton's declaration, and part of her
valuation analysis, from there, then, the math is pretty
simple, and I would tend to agree with that.

It's the first part that the discretion is applied or
the artistry comes in, and I think Ms. Stratton candidly
testified that there were some areas where she exercised
discretion that others could exercise discretion in a different
way.

So and this might seem like a trivial thing, but I'm

1  going to start with the median versus mean.  And is it trivial?

2  To talk about it maybe, but it has a big affect here.  If you

3  look -- and Your Honor, I want to refer to some of the charts

4  that are in Ms. Stratton's declaration.  So I would ask you to

5  turn to that, please.

6          THE COURT:  Okay.  Give me a second to find my copy.

7  Okay.

8          MR. DEMMY:  So I want to start with the selected

9  public companies chart, which is page 7.  And by the way, for

10  the record, this -- what I'm looking at is the preliminary

11  discussion materials from Piper Sandler, mister Pat --

12          THE COURT:  I'm sorry.  Mr. Demmy, can you give me

13  one moment?  I'm sorry.

14          MR. DEMMY:  Sure.

15          THE COURT:  And I'm just going to mute you guys for a

16  moment.  I'll be right back.

17      (Off the record)

18          THE COURT:  My apologies.  I'm sorry, Mr. Demmy.

19          MR. DEMMY:  Thank you, Your Honor.

20          THE COURT:  Mean and median.

21          MR. DEMMY:  Yes.  And I was just identifying for the

22  record the document we're looking at, which is Exhibit B to

23  Ms. Stratton's declaration.  Okay.  So we're on page 7, and in

24  the selected public company or public comparable valuation

25  analysis, Piper Sandler used as a multiplier the 2.8 number

1  that appears at the -- near the bottom of the far right-hand

2  side.

3          There's the EV revenue, LTM 2020/2021, and under 2020

4  there's the 2.8 number.  And that's the multiplier that Piper

5  Sandler used, and Piper Sandler used that 2.8 because it's the

6  median, the number in the middle of all the numbers in that

7  column under 2020.

8          Actually, it's not quite true.  Piper Sandler took

9  2.8 and then for some reason wanted to produce a range so it

10 backed the 2.8 down by a tenth of a point underneath and a

11 tenth -- and it added of a point on the other side to get a

12 range of 2.7 to 2.9, although I'm not sure how those numbers

13 relate to the numbers in the column.

14         But in any event, to produce a range for its public

15 company valuation, Piper Sandler used 2.7 and 2.9, but the

16 median is the 2.8 figure.  And again, Your Honor, this is where

17 the simple math comes into play.  If you simply add the numbers

18 in that 2020 column, you get 58.4.

19         There are 16 numbers in the column.  You do the

20 division, and I'll simply represent that that number is 2.65.

21 That's the mean.  That's the average.  If you take 3.65 for

22 2020 and multiply it against the estimated 2020 revenue of the

23 debtors of $77.2 million, that produces a number just under

24 $282 -- I'm sorry -- $282 million.  At $282 million, Your

25 Honor, the debtors are solvent.

1          THE COURT:  Okay.  I want to make sure I'm -- I've

2    got this.  So you're taking on page 7 of Ms. Stratton's

3    declaration the last 12 months of 2020 EV revenue.

4          MR. DEMMY:  No.  It's the number that Ms. Stratton --

5    that Piper Sandler used was the 2.8, which is in the next to

6    last column under EV/revenue and under the year 2/20.

7          THE COURT:  Yes.

8          MR. DEMMY:  2020.  Sorry.  Those are the numbers I'm

9    referring to.

10          THE COURT:  And you say, if you take the mean, the

11    average, and not the median, that number is -- the mean is

12    3.65?

13          MR. DEMMY:  Correct.  And now, if you use that as the

14    multiplier, and multiply 3.65 by the 2020 revenue of 77.2

15    million, it produces a number just under $282 million.  Now, if

16    we really wanted to apply some additional discretion here we

17    can do that in a couple of ways with regard to the revenue

18    number.

19          And first, Your Honor, and let's get back to what

20    management said on June 19, 2020, and what it said was that the

21    revenue projection for Pancreaze was up to $100 million.  And

22    in the exercise of discretion in the valuation process that

23    number was back down to $68 million.

24          So if we use a higher number for Pancreaze -- again,

25    that's -- I'm not going to do this math for you, but it just

1  stands to reason, if you use the 100 million or some number

2  above 68 million for Pancreaze, you're going to get a higher

3  valuation, presumably, because the revenue number for 2020 that

4  you just multiplied the 3.65 multiplier against would be

5  higher, results in a higher number.

6        Second application of discretion regarding revenues,

7  Your Honor -- and I asked this question of Ms. Stratton and she

8  pushed back on it -- but what if the more realistic revenue

9  projections are the 2021 numbers, which begins a mere four

10 months form now.

11       The 2021 revenue projection is $119.4 million, which

12 represents a 55 percent jump in revenues from 2020.  And

13 wouldn't that actually be more representative of the effective

14 date value, since 2021 is only four months away and 2020 might

15 be considered an irregular year for a lot of reasons?

16       The debtors were involved for a long period of time

17 in refinance efforts, spent time in bankruptcy pre-planning,

18 spent two months in bankruptcy.  I just did the math, Your

19 Honor.  It's just a data point here.  If you use the 3.65

20 multiplier against 2021 revenue the valuation number would jump

21 to $435 million.  And people would say, you know, that's crazy.

22 You're using apples and oranges.  Well --

23       THE COURT:  Yes.

24       MR. DEMMY:  -- if you use Piper Sandler's 2.8 against

25 the 2021 revenue results that's 334 million.  If you use the

1  2021 mean, not the median, but the 2021 mean, and those numbers

2  are provided, and the mean in the 2021 column would be 2.54.

3  Again, that's very simple math.

4         Just add up the numbers and divide, and you multiply

5  the 2.54 against 2021 revenue to provide an apples to apples

6  comparison, the valuation number would be $303 million.  And

7  again, clearly solvent.

8         THE COURT:  But didn't Ms. -- well, I got a lot of

9  questions on this, but didn't Ms. Stratton push back, as you

10 said, by saying that you would have to add -- you'd have to

11 consider expenses.  You'd have to consider something.  She had

12 something that you were supposed to have to consider if you

13 were going to use 2021, which she says you would not use, and

14 it's not appropriate to use in the methodology.  But if you

15 were you would have to include something else.

16        MR. DEMMY:  So Your Honor, I think what she was

17 referring to was the discounted cash flow analysis, because the

18 public comparables and the selected precedential transactions

19 simply rely on the revenues.  They don't take into account

20 expenses.

21        THE COURT:  True.

22        MR. DEMMY:  If you go to page 5 to illustrate that

23 point, under the first column is public trading comparables,

24 and you'll see at the very bottom in the lighter blue shaded

25 rectangle it has that median range that I talked about, 2.7 and

1 2.9, multiplied by 2020 estimated revenues of 77.2 million.

2          So expenses aren't a factor there.  And the same for

3 the precedent transactions, the next column over, and there

4 you're using LTM, which means last 12 months, as of 3/31/2020

5 revenue.  Again, the expenses are not part of that calculation.

6 It's -- and I acknowledge she did push back on the discounted

7 cash flow piece of this that --

8          THE COURT:  Okay.

9          MR. DEMMY:  -- an increase in revenues doesn't

10 necessarily all flow to the bottom line of whether it's free

11 cash flow or EBITDA.  That is correct.

12          THE COURT:  Okay.  But so financial advisors who are

13 doing their valuations or bankers that are doing their

14 valuations do make judgment calls.  We all know that.

15          MR. DEMMY:  Yes.

16          THE COURT:  That a valuation is part art, part

17 science.  You may say more art than science, but it's both.

18 And it's -- it is striking that the change of one judgment call

19 from mean to median in the DCF analysis -- I think I've got it

20 right, or maybe I'm wrong -- if --

21          MR. DEMMY:  We were looking at the public

22 comparables, yes.

23          THE COURT:  And the public comparables -- yes, sorry

24 -- and the public comparables analysis makes such a big change.

25 But nonetheless, that is a judgment call.

1          MR. DEMMY:  Yes.

2          THE COURT:  And am I correct that she said that her

3   firm -- that that's the default position of her firm.  So she

4   didn't look at the mean and look at the median and then make a

5   decision here on which to use.  She said, this was the default

6   position of her firm on how they -- on what they do.

7          And if that's the case, which I believe it is because

8   that's what she testified to, then why should I disregard her

9   choice in the face of not having another expert to tell me why,

10  in fact, that's wrong here.

11         MR. DEMMY:  Well, Your Honor, I think you have the

12  power to disregard her choice, and it's based on the totality

13  of the circumstances here.  There are many data points that

14  would lead or could lead a third party, an objective third

15  party, to conclude that this debtor is solvent, the debtors'

16  companies are solvent, because there are different metrics that

17  can be applied.

18         You have differences -- and it's not just the one

19  discretionary issue.  It's that when it's the revenues that are

20  used.  It's the involvement of Piper Sandler in connection with

21  the financial projections and the discounting of revenues, for

22  example, the Pancreaze and the discounting of the VI-0106, and

23  we've heard a lot about those things.

24         There are different methodologies, and Ms. Stratton

25  testified to this, that it wasn't wrong, it wouldn't be wrong

1  in her view to use the mean.  It's just that she doesn't use

2  the mean.  And one of the reasons why she said that in her view

3  the mean was not the proper metric to use is because of the so-

4  called outlier issue.

5        So I'd like -- if Your Honor is not wanting to ask a

6  different question, I'd like to talk about the outlier, because

7  I think it is responsive to what Your Honor is getting at here.

8  She justified the use of the median and not the means by

9  saying, well, there's outliers with mean and you have to, you

10 know, deal with that.

11       What I would say about that is I don't really

12 understand that, because Piper Sandler was the one that picked

13 the criterion.  It picked all the characteristics of the public

14 comparable companies and all the precedential transactions that

15 went into its analysis.

16       And you heard Ms. Stratton testify that they spent

17 countless hours and did a really -- made a big effort to come

18 up with a criteria and spent a lot of time doing it, and I

19 don't doubt that at all.  If they did that then why are there

20 any outliers?

21       Why wouldn't the outliers have been dealt with in the

22 selection process, in the criteria?  If you're looking at a

23 list of companies -- and Ms. Stratton testified that there was,

24 you know, there was a minimum revenue level, a maximum revenue

25 level and various other criteria, and I don't know that I can

1  recite them all here -- but once you've done that, why is there

2  an outlier for which the mean would not be applicable or that

3  the mean would not credibly take care of or not be an issue in

4  respect of a mean calculation.

5          And Dr. Ahmadi -- again, I don't think this is

6  anything that relies on his status as an expert or not, but he

7  testified just as a matter of common sense, when it comes to

8  statistics like this sometimes, you know, the result can be

9  determinative or can be something that you're pushing towards.

10         I'm not saying that Ms. Stratton did that.  I'm

11 saying that that possibility exists.  And statistics can be

12 used in many ways to get to the desired result.  And the use of

13 a mean or a median is not a particularly complex decision to

14 make once you have the data set.

15         The data set is fixed.  So you're not using one or

16 the other to necessarily manipulate the data if the data is

17 there.  It's simply a way of expressing what that data means.

18 And what I'm saying to Your Honor is that there are expressions

19 of the data set that Piper Sandler used which this company is

20 clearly solvent.

21         MR. DEMMY:  Your Honor, I would like to go to the

22 selective -- I keep saying this wrong.  I keep wanting to say

23 selective presidential [sic] -- maybe I'm too caught up in the

24 election, but it's selective precedent asset purchases, and

25 they appear on pages 8 and 9.

1          And here, Your Honor, you have to look at both charts

2  together, because Piper Sandler used the medians on page 8 and

3  9, and those are reflected in the last column of each of those

4  charts, and for the chart on page 8, the number, the median

5  number is 3.3, and on page 9 it's 3.1.

6          And I'm not sure why Piper Sandler did this, but in

7  then applying those numbers to the LTM revenue, last 12 months

8  revenue number, which produces the collective precedent asset

9  valuation number, they didn't use 2.1 and 2.3.  They used 3.0

10  and 3.4, and I'm unclear as to why it did that.

11          But clearly, that is another application of

12  discretion, it seems to me.  And when you apply the 3.0 and 3.4

13  -- and I'm going to go back to page 5 really quickly -- but

14  when you apply the 3.0 and 3.4 to the LTM revenue you get that

15  range of 220 to $249 million.

16          So here's the problem, again, and the one is the one

17  I've been talking about.  If you look at the mean for those two

18  data sets, the mean numbers are 3.3 and 3.7.  I'm sorry.  Yeah.

19  That is correct, the 3.3 and 3.7.  You don't get as good of a

20  result when you use those numbers against the last 12 month

21  revenue of 73.3.

22          That range is only based on those increased

23  multipliers.  It's only 242 to $271 million.  But here's the

24  issue with that, Your Honor.  And again, we're supposed to use

25  -- we're supposed to value this company as of the effective

1  date, and the LTM revenue number that was used was that of

2  March 31 of 2020.

3        That was the revenue number for the last 12 months

4  that Piper Sandler used.  That is five months ago.  And we know

5  that the debtors have updated information.  It seems to me that

6  this is the number that could have been updated, but wasn't.  I

7  don't know what the result of that would be.

8        But here's another application of discretion, and

9  perhaps another hole in the evidentiary record, what were

10 revenues for April, May, June, all pre-bankruptcy months.  So I

11 wanted to point that out, that again, there's application of

12 discretion here, because you have the median numbers of 3.1 and

13 3.3.

14       Piper Sandler didn't actually use those numbers.

15 They used a different set of numbers, and it stopped its last

16 12 months analysis on -- as of March 31, and it did so as of

17 June 29.  Again, April, May, June, almost three months had

18 passed as of June 29 when Piper Sandler did its selective

19 precedent acquisition analysis.

20       And it seems to me that that's -- that is a hole in

21 the factual record that might be interesting to find out about,

22 but maybe we won't.  And I want to turn to the discounted cash

23 flow, discounted cash flow valuation analysis for just a

24 moment.

25       And again, I'm going to nitpick.  Mr. Morgan's right,

1  we're nitpicking it in a way, but it's a lot of information

2  that if you put it all together there could definitely be a

3  different conclusion about the value of this company.  And as

4  Your Honor recognized at the equity committee hearing, you

5  know, it seems like, well, maybe it's so close that it could be

6  tipped over, and it's so close that reasonable minds would

7  differ, and it's so close in certain respects, but then in

8  other respects, not very close if you use different end points,

9  if you exercise your discretion in a little bit different way.

10         So let's talk about discounted cash flow for the

11  moment and the weighted average cost of capital.  One of the

12  things that apparently was an exercise in discretion by Piper

13  Sandler was that it used an assumed market rate of 13 percent

14  for the cost of debt.

15         And just so we can follow along, Your Honor, the

16  weighted average cost of capital analysis is on page 11 of the

17  exhibit we were just looking at.  So we have the cost of debt

18  number of 13 percent, and we know that the exit financing that

19  the debtors have lined up in 11 percent.

20         Piper Sandler used 13 because that was its estimate

21  of what the market rate would be.  Seems to me we know what the

22  market rate is for this debtor, because we have the exit

23  financing and it's at 11 percent cost of money.  Another area

24  where I believe Piper Sandler used its discretion was in the

25  ratio of equity to debt capital.

1          Again, Piper Sandler said, we looked at the market

2  and used 75 percent equity and 25 percent debt in the long-term

3  capital structure estimates.  That's at the top right-hand

4  column of page 11.  And you see when you multiply the equity in

5  the debt, you multiply them in the material below it.  You

6  multiply the equity -- I'm sorry -- the 75 percent portion of

7  equity by the cost of equity of 21.2 percent and you age 15.9.

8          You then multiply the portion of the debt, which is

9  25 percent, by the cost of the debt, which is 9.8 percent, and

10 you get 2.4.  You add those two numbers, you get the weighted

11 average cost of capital that Piper Sandler used.  My

12 contention, Your Honor, why would the debtors' actual equity to

13 debt ratio not be used?

14         We know what it is as of the effective date.  And

15 let's just take the Piper Sandler valuation now, since it's

16 $231 million with a $90 million exit facility.  That's more

17 like a 60/40 split, not a 75/25 split.  And the weighted

18 average cost of capital comes down if you use 50 percent of

19 equity times 21.2, as opposed to 75 percent.

20         I'm not going to do that math for Your Honor, because

21 it's a little harder to do and I don't think it's valuable,

22 other than to note that it's not just one item.  It's a number

23 of items that go into this valuation analysis that are

24 concerning, and that on -- in balance, the totality of which I

25 believe gives Your Honor the discretion, as the finder of fact

1 and law here, to find that this valuation analysis does not

2 meet the debtors' burden.

3          THE COURT:  And I can do that --

4          MR. DEMMY:  And what I want to reference, one of the

5 things I --

6          THE COURT:  -- and I can do that even though I don't

7 have a competing analysis that shows me some qualified expert

8 who comes up with a -- who uses his or her discretion

9 differently, and suggests --

10          MR. DEMMY:  I think you can, Your Honor --

11          THE COURT:  -- and suggests that Ms. Stratton is

12 mistaken because of x, y, z reasons.

13          MR. DEMMY:  Yeah, I think you can do that, Your

14 Honor, because for a large part I have taken what Piper Sandler

15 and just applied a little bit different input.  And Your Honor

16 can make the decision whether or not you think the mean is more

17 representative or the median is more representative, or whether

18 the last 12 months of revenue as of March 31 really gets us to

19 an effective date valuation.

20          There's any number of issues that Your Honor I

21 believe can consider, and even in the absence of a qualified

22 expert say, I don't find this valuation to be reasonable under

23 the circumstances, that it raises more questions than it

24 answers, perhaps, and I can't find that the debtors met their

25 burden.

1      It's not a shareholders' burden at this point to

2 disprove the Piper Sandler valuation.  It's the debtors' burden

3 to prove that the valuation is correct.

4      THE COURT:  And what would I base my judgment on?

5 What would I base my judgment on that says that I question Ms.

6 Stratton's use of the median instead of the -- or the mean

7 instead of the median?  Would I go to a treatise and say, ah,

8 well, so and so, you know, says the default provision should be

9 the median unless there' are circumstances that say otherwise?

10 What would I base my judgment on?

11      MR. DEMMY:  Well, on a couple of things, Your Honor.

12 One, this is not your first valuation and your experience

13 always is brought to bear on questions like this.  Second, the

14 concept of mean versus median is not, to me, the subject,

15 necessarily, of expert testimony.

16      It is something that people that have taken a

17 statistics course can understand, and how one or the other may

18 more accurately reflect the data set.  So I think you have

19 plenty of authority in those ways to do that, Your Honor.

20      THE COURT:  I don't remember what my grade in

21 statistics was.

22    (Laughter)

23      MR. DEMMY:  I remember mine --

24      THE COURT:  Okay.

25      MR. DEMMY:  -- but I'm not going to say it.  No.  I

1  will say it, because somebody will say that Demmy didn't know

2  what he was doing and got a D.  I got an A in statistics, but

3  that was a long time ago.

4           THE COURT:  Right.

5           MR. DEMMY:  Enough said.

6           THE COURT:  Well, mine was probably longer.  Okay.

7  Go ahead.

8           MR. DEMMY:  So Your Honor, another thing that I think

9  that the Court has to consider here is the overall timing of

10  the way this transaction has come about and the component

11  parts.  And I'll just get this very quickly, Your Honor.  In or

12  about May, early June at the latest, and by early June, I think

13  June 1, but at some point in that time frame the goal became

14  clear that VIVUS was to end up as a private company, solely

15  owned by IEH Biopharma, holding over $600 million in NOLs.

16           That was when the deal between the debtors and IEH

17  was struck, and those NOLs, by the way, I think it's clear,

18  they can be used going forward if there's some future merger or

19  acquisition by VIVUS.  And we've also heard a lot of discussion

20  about the substantial value of those NOLs, not necessarily to

21  the debtor, but to -- potentially IEH Biopharma.

22           But to get there equity has to be wiped out and there

23  needs to be a valuation analysis that shows that the debtor is

24  solvent -- or insolvent, rather.  That analysis wasn't done

25  until June 29.  Now, I'm not casting any aspersions or trying

1  to do anything along those lines.

2          I have the utmost respect for the professionals

3  involved here, but the timing has to be taken into account, but

4  -- and then the exercise of the discretion, an insolvent

5  company was part and parcel of the agreement that was reached.

6          THE COURT:  Let me ask you a question, since you

7  commented.  In this context, in the 1129 context, is the value

8  to IEH of the NOLs, as distinct from some other party,

9  relevant?

10          MR. DEMMY:  I think it's relevant, Your Honor, from

11  this perspective, that the plan and the plan proponents must

12  have proposed the plan in good faith and it must otherwise

13  comply with the requirements of the Bankruptcy Code.  So if

14  this plan is more about preserving the NOLs for IEH Biopharma,

15  rather than preserving value and achieving value for all

16  stakeholders -- and now, I'll go back to my refrain about the

17  sale process not having occurred -- if that sale process might

18  have provided more value then I think the debtors were duty-

19  bound to pursue that path.

20          Excuse me, Your Honor.  And if the debtors did not

21  pursue that path because it had a deal with IEH Biopharma,

22  because the NOLs were extremely valuable to IEH Biopharma and

23  that was the nature of the agreement that was negotiated, I

24  think it is relevant in that context.

25          We don't know a lot about those negotiations, because

1  the negotiators aren't here.  They didn't testify.  So that's a

2  problem that I guess everybody has to grapple with.  Your

3  Honor, unless you have other questions, I have concluded my

4  remarks and I'll sit down.

5      THE COURT:  Let me ask you a -- back to the Pickering

6  declaration.  If I were to find that it's either all hearsay or

7  a legal conclusion and doesn't support the debtors'

8  confirmation, what absence do you think the debtors have in

9  their proof?  What absence is there?  What -- which 1129(a)

10  standard haven't they met?

11      MR. DEMMY:  It's a good question, Your Honor.  I

12  think that -- and I'm being as candid as I can -- I think that

13  many, if not most, of the 1129(a) standards are observable from

14  the plan, the disclosure statement, the solicitation, the

15  voting results or the docket generally.

16      So I don't know, frankly, if there's an 1129(a)

17  requirement that's not satisfied if the Pickering declaration

18  is not given any weight at all in those regard.  I believe it

19  shouldn't be because in the context of a contested confirmation

20  I don't think it was appropriate.

21      And I think it highlighted the fact that I still

22  don't understand why the advisers testified and management

23  didn't, but I've beat that dead horse, but I have not gone

24  through it, because we -- our objections were fairly narrowly

25  focused on the issues that I've raised.

1          So we did not go through all the 1129(a)

2   requirements, and Mr. Pickering's declaration with a view of

3   contesting them.  So Your Honor, I don't know the answer to

4   your question directly, but I wanted to give you an explanation

5   of where we were coming from with regard to the Pickering

6   declaration.

7          THE COURT:  Okay.  Thank you.

8          MR. DEMMY:  Thank you, Your Honor.

9          THE COURT:  Before I go to -- I will go next to Mr.

10  Manousiouthakis, before, though, I need to make a quick call on

11  another matter.  But I'm talking like five to 10 minutes.  So

12  we'll take a 10-minute break, and then Mr. Manousiouthakis, you

13  would be up.  Thank you.

14      (Recess at 2:59 p.m., until 3:09 p.m.)

15          THE COURT:  Okay.  We're back on the record.  Mr.

16  Manousiouthakis.

17          MR. MANOUSIOUTHAKIS:  Thank you, Your Honor.  I'd

18  like to take a few minutes, given the prior discussion with Mr.

19  Demmy, to kind of clarify that no special prerequisite

20  knowledge is really needed for this median concept to become

21  very clear.  It is very simply.

22          So I want to go to Ms. Stratton's (indiscernible)

23  valuation on the threat to public comparables, the list that

24  she gives you on page 44.  Do you have that?

25          THE COURT:  Yes, her selected public comparables.

1      MR. MANOUSIOUTHAKIS:  So just to show you how simple

2  this is, if you look at the very first entry, Accorda

3  (phonetic) Therapeutics, there's a number of 36 in the market

4  cap column.  So if you add 36 with the number in the third

5  column, total debt, 242, you get 278.

6       Then you subtract the top number in the second

7  column, 123, and you get the number in the fourth column, 152.

8  That's it.  So now, what is the concept of the median?  It

9  takes each column, like you see at the bottom it says, the

10 median needs let's say 426 in the fourth column, okay.

11      So then what one needs to do is, you take all the

12 numbers in that column, the 16 numbers in the first column --

13 the fourth column, and you just rank them, which one is the

14 highest, 1,003.  Which one is second highest, 665, and so on

15 and so forth.

16      But then after you rank them you says, I have 16

17 numbers, the only importance of these numbers was when you did

18 the ranking, because you picked the highest, the second

19 highest, the third highest.  After that point their role in the

20 median computation is zero.

21      The only thing that matters are two numbers, the 431

22 for Biodelivery Sciences, and the 421 for Therapeutics MD.  And

23 these, their average, if you see the numbers 426, it's the

24 average of these two numbers.  So what that means is that this

25 is a completely insensitive metric.

1      If all these other numbers -- you get the 1,003 --

2 the only (indiscernible), 64 and so on.  If all of these

3 numbers were 1,000 it would not matter at all in the

4 computation.  It's a completely insensitive metric, and what

5 becomes super important in that table is the statement on the

6 note that these are companies with valuations that are between

7 -- Enterprise valued between 150 and 1 billion.  Who picked

8 that?  Why?  Why this?

9      Essentially, what that determined effectively in a

10 backward manner is which are the two magic companies that would

11 make the median.  So it's -- you know -- so that's all I wanted

12 to say about that, and I think I -- I hope I have conveyed the

13 simplicity of what we're talking about.

14      THE COURT:  Well, let me ask you a question since

15 you've explained that so nicely.  In what circumstance would

16 someone use a median, given that it's insensitive to certain

17 analyses?

18      MR. MANOUSIOUTHAKIS:  I would never use it.  Now --

19      THE COURT:  Not in anything that you've ever done as

20 a professor.  You would never use it?

21      MR. MANOUSIOUTHAKIS:  Never use it because it's not

22 representative of the data.  The data can vary tremendously and

23 the median stays the same, identical.  It's an incredibly --

24 you know -- it's what I called before, the sensitivity of it is

25 a discontinued response (indiscernible)

1          THE COURT:  Yes.

2          THE CLERK:  Excuse me, Your Honor.

3          THE COURT:  Yes.

4          THE CLERK:  This is Ginger.  Is there any way we can

5    get him to speak up a little bit?  I'm barely getting him.

6          MR. MANOUSIOUTHAKIS:  Okay.  Thank you.  Is that

7    better?  Okay.

8          THE CLERK:  A little bit.

9          MR. MANOUSIOUTHAKIS:  I can keep the -- let's move it

10   closer.  Okay.  Have I answered your question, Your Honor?

11         THE COURT:  Yes.

12         MR. MANOUSIOUTHAKIS:  So it's a very insensitive

13   measure, and it's not reflective of the data.  The only

14   influence it gives on the data is when you do the resale

15   ranking.  After that, it's (indiscernible) influence.  The

16   other thing is it gets tremendously affected by why do we get

17   16 companies.

18         Why not 20?  Why not 24?  Why not 30?  Why 150

19   million or billion?  Maybe it's still 3 billion as another

20   number, and so on.

21         THE COURT:  Okay.

22         MR. MANOUSIOUTHAKIS:  And this is why I made --

23         THE COURT:  But there does have to be a choice.

24   There has -- there does have to be some judgment that's

25   exercised to come up with public comparables.

1          MR. MANOUSIOUTHAKIS:  That's correct.

2          THE COURT:  And Ms. Stratton testified that they

3 established a standard and then they used every company within

4 that standard.

5          MR. MANOUSIOUTHAKIS:  I am not saying that they are

6 manipulating in any way things.  It's just a matter of what is

7 the 150 million or what is the 1 billion.  Where are they

8 coming from?  They are crucial.  And if you remember, I

9 established earlier during Ms. Stratton's questioning, that the

10 two lowest companies, Accorda and Adamas (phonetic), said zero

11 pipeline drugs, only one or two drugs, no license drugs and so

12 on.

13          They were really not comparable to legals.  Why are

14 they not on the list?  Well, what they're doing is they're

15 lowering the median just because of their selection.  So I will

16 leave it at that.  I -- you know -- we don't have too much time

17 and I don't want to impose on your time, and I appreciate that

18 you have given me and the other shareholders the opportunity to

19 speak.  So do you have any questions for me on this topic?

20          THE COURT:  No.

21          MR. MANOUSIOUTHAKIS:  Thank you very much.  So I want

22 to kind of make a summary statement, if you will.  I have gone

23 through a document that was prepared by Mr. Kevin Lewis, the

24 legislative attorney of the Congressional Research Service,

25 called "Bankruptcy Basics, a Primer."

1          It's dated March 22, 2018, and it (indiscernible) for

2   me.  I'm kind of learning about all of this in this process.

3   "The U.S. bankruptcy law has two central aims, to relieve

4   debtors of debt obligations and give them a fresh start, and

5   preserve the interests of creditors and other stakeholders."

6          That is an important statement included in this

7   document.  And it then says that, "Ideally, a Chapter 11 plan

8   is a product of negotiation between the debtor and its key

9   stakeholders that are judged with rights and obligations among

10  the debtor and his debt and equity holders so as to render the

11  reorganized debtor a viable economic entity."

12         In this bankruptcy there was no negotiation with

13  equity holders that took place before the proposed plan was put

14  forward.  The second point I want to make is that in this

15  bankruptcy the company shareholders did not vote on the plan

16  before the bankruptcy filing, before the filing.

17         Now, I want to make some general statements, because

18  unfortunately, I am personally being affected by all of this,

19  but also, I think there are many, many, many other people in

20  the country.  Of this society, we're explaining things, this

21  pandemic of COVID-19, but we're also experiencing the pandemic

22  of public company bankruptcies that are unnecessary.

23         They are bankruptcies by choice and we essentially

24  have very large financial organizations with access to

25  extensive legal resources and access to restructuring

1 bankruptcy so-called professionals that are overwhelmingly

2 hired, as we have established, most of the time by debtors and

3 creditors.

4          And what is happening as a result is we're

5 experiencing now a very perverse consummation of what was

6 expected to be an adversarial relation between the debtors and

7 the creditors into an effectively collaborative relation.

8          They are well-armed with legal representation, and

9 they seem to just come and goes.  And this come and goes seem

10 to be to shortchange the interest of the other stakeholders,

11 and mostly retail equity shareholders that typically cannot

12 afford any legal representation.  I may want to give as a

13 simple piece of evidence how many members of the legal team

14 represent the shareholders versus the debtors and the creditors

15 in these proceeding.

16          I believe that throughout our argument, the

17 shareholders, we have established that VIVUS is not insolvent.

18 It has three drugs that are approved, marketed, and licensed in

19 multiple territories, in the U.S., in the E.U., and so on.

20          It has a promising drug in the research pipeline, and

21 a telemedicine platform that at least in terms of a metric that

22 is called number of physicians involved, it seems to at least

23 be premised to be close to the metric used by Teledoc of 31

24 hundred physicians, and Teledoc has a 17 billion dollar

25 capitalization in the marketplace.

1           Now we still have not heard -- if you remember, Mr.

2    King said that he doesn't remember how many that they have

3    involved in their model (indiscernible) that would be something

4    --

5           THE COURT:  Excuse me.

6           DR. MANOUSIOUTHAKIS:  Yes.

7           THE COURT:  Please, everyone, mute your phones.  I'm

8    hearing other conversations.

9           DR. MANOUSIOUTHAKIS:  Okay?

10          THE COURT:  Dr. Manousiouthakis, yes?

11          DR. MANOUSIOUTHAKIS:  So I would still like the Court

12   to receive that information from Mr. King.  How many physicians

13   are involved in the VIVUS telemedicine platform?  That is an

14   important consideration because even the telemedicine platform

15   could show value that we haven't really talked much about.

16          THE COURT:  It could --

17          DR. MANOUSIOUTHAKIS:  Now --

18          THE COURT:  It could, but the clear testimony on

19   that, Mr. Manousiouthakis, was -- or, Doctor, I'm sorry, is

20   that -- is that VIVUS's telemedicine platform is not the broad-

21   ranging platform that other companies may have, but was -- is

22   done as a way to increase prescriptions for Qsymia.

23          DR. MANOUSIOUTHAKIS:  Well, I would agree with the

24   concept that it is a very specialty oriented telemedicine

25   platform, and I would like to put forward the point that this

1  is actually a tremendous advantage.  I would make this simple

2  analogy:  When you go to your doctor, you first go to a

3  generalist, but then if you have a special problem, you go to a

4  specialist.

5       Well, the VIVUS platform is the specialist.  The

6  Teledoc would be the generalist, that is my point.

7            THE COURT:  Thank you.

8            DR. MANOUSIOUTHAKIS:  Now the issue regarding the

9  NOLs, so Piper Sandler applied the debtors' NOLs to forecasted

10 revenues, that means we're going forward.  If you remember, I

11 had made the point that NOLs can be also applied backwards, and

12 can lead to tax refunds.

13           Now if we go to Mr. Pickering's testimony, he says

14 there's no tax law that allows you to sell them into the

15 market, so NOLs simply have no value.  Now that seems somewhat

16 inconsistent, but I will not focus too much on that.  With his

17 subsequent statement, where he says "NOLs can only be utilized

18 by the reorganized company."

19           And then goes on, and he's using the expression, NPP.

20 The NOLs would stay within the NPP.  The use would be

21 available, but only within the NPP, and so on.  He's very

22 careful in his wording, so I point that out.

23           These NOLs would only be useful in the NPP itself.

24 What is that NPP?  Which NPP is this?  Is it VIVUS or is it IEH

25 because VIVUS would be a subsidiary of IEH if this plan is

1  confirmed.

2         So I would go then to some recent -- some statements

3  that can be found in the CPA Journal, Certified Public

4  Accountant Journal, the rules of the profession, article

5  Consolidation Group Tax Allocation Agreements, How to Handle

6  Tax Attribute Carryovers.  "A consolidated group's parent

7  corporation acts as the group's agent in all federal income tax

8  matters, Treasury Regulations Section 1.1502-77(a).  In this

9  role, the parent corporation pays the group's tax liability,

10 receives its tax refunds, and interacts with the IRS on the

11 group's behalf."  That seems pretty clear to me that NOLs maybe

12 worth hundreds of millions of dollars in this situation.

13        The IRS has released guidance recently in the context

14 of the CARES Act, we're talking 2020, with expedited procedures

15 for claiming refunds for five year net operating loss

16 carrybacks.  This is the IRS talking.  So I think there's a lot

17 of value in the NOLs, and both for VIVUS and IEH have -- having

18 VIVUS as a subsidiary.

19        I will go on to the VIVUS valuation.  I believe we

20 have established that the VIVUS is in the several billion

21 dollars category.  I have given detailed numbers.  I have not

22 heard any counter arguments about the Obesity Act impact that

23 is at the door.  If one looks at the number of co-sponsors, we

24 are at the threshold, just below the curve, number of, you

25 know, sponsors as a function of time.  We are almost there.

1          Now I have been a very long-term shareholder of

2  VIVUS, pre-hostile takeover, pre-approvals of the, you know,

3  Qsymia, STENDRA, and so on.

4          We have suffered a hostile takeover by First

5  Manhattan.  The argument was, well, we are destroy -- you know,

6  the current management is destroying is shareholder value.

7  Well, it was 285 at the time, and now we're at twenty.  If that

8  is not destruction of shareholder value, I don't know what is.

9          This was, over time, a company with extremely high

10 levels of (indiscernible) throughout the same period.  Then we

11 have the sale of STENDRA.  We also have the continued set of

12 management changes.  We have a company that has changed CEOs

13 over a seven-, eight-year period like several times, four or

14 five.  I cannot even count anymore.

15         How can you give stability and so on if this is

16 happening?  There's something going on.

17         So we have the sale of STENDRA happening for 30

18 million in future consideration, supposedly to start increasing

19 sales of STENDRA to Auxilium.  Well, Auxilium is a small

20 company itself, how's it going to sell STENDRA?  If -- I

21 understand if you sell it to Merck or to Pfizer and so on, they

22 get these enormous sales forces, that's understandable.   If

23 you sell it to Auxilium, a tiny little company, and guess what

24 happens after you got your 30 million and your future

25 consideration?  One year later, Auxilium is sold for 2.6

1 billion dollars.

2         And if you look at the sale, you know, papers, it

3 features STENDRA as one of its two prize assets, XIAFLEX and

4 STENDRA.

5         Then we have the 135 million dollar purchase of

6 PANCREAZE.  We have established that it -- at the rate it

7 generates revenue, it would recover just its acquisition cost

8 in like seven years or six years or something like that.

9         But more importantly, what it did is it took 135

10 million dollars out of the cash reserves of VIVUS.  Would we be

11 talking about the VIVUS bankruptcy here now if we have 135

12 million in cash in the bank at VIVUS?  No, we wouldn't be.

13         So we are having this situation essentially come up

14 because of all of these decisions.

15         Now I believe that the Court should reject the

16 proposed Chapter 11 plan proposed by the debtors and the

17 creditors, and should consider other plans that are put forward

18 by the shareholders, and there can be many.  There are many,

19 many ways to go forward where everybody can win, not just one

20 subset of the parties involved.

21         One such plan that I want to put forward is that the

22 bankruptcy application is rejected, the stock of VIVUS is

23 refloated into the NASDAQ, there's some replacement of some

24 members of the VIVUS board with members representing

25 shareholders.

1          And then, considered strategic alternatives that

2   somehow Piper didn't come up with, or never told us that it

3   could come up with it.  We know they were working since 2019

4   with VIVUS supposedly on strategic alternatives.  One

5   recommendation I have made was a possible company splitting, or

6   a creation of a subsidiary and a spinoff that would, you know,

7   be possibly attracting a much higher capitalization value, or

8   the issuance of a tracking stock.  A tracking stock is a

9   company that says I have multiple businesses -- VIVUS does, it

10  has drugs, it has Qsymia, it has STENDRA, and it has PANCREAZE.

11  It could say who wants to only participate in Qsymia?  Here's a

12  tracking stock for Qsymia only.  Who wants to participate only

13  in STENDRA?  Here's the tracking stock for STENDRA.  It's a

14  natural.

15         And then because the debt stays with the parent

16  company, these things could develop their own much higher

17  capitalization.  It's -- it's something that, you know, IEH

18  should be familiar with because Dell and Vmware have exactly

19  done that, and Vmware now is a tracking stock for Dell, and it

20  is a much, much higher capitalization.

21         So these strategic alternatives will dramatically

22  increase the market capitalization of VIVUS.  And it will

23  enable easier IEH debt financing.

24         Now what needs to be done for that is you can have

25  essentially the Court, you know, in order to create value for

1  all the stakeholders, put forward and obtain the consent of IEH

2  to extend the time period that they provided to VIVUS for

3  paying off its debt on June 2.  That time period they had

4  provided was one month only.

5          The Court could put forward the notion to IEH that

6  you should extend this period to 13 months because that will

7  allow mainly to finish on July 1, 2021.

8          What that will allow is a much easier access to the

9  financial markets, not under the Damoclean Sword of you have to

10 do a deal in one month.  You have 13 months to make a deal,

11 finance and so on.  The markets -- you know, the associated

12 (indiscernible) of the markets will be much less in terms of

13 access to capital.

14         And also, most importantly, it will give the ability

15 to VIVUS to complete the so-called 10-quarter turnaround time

16 that they have been saying for months -- for months in quarters

17 to the investors that we have a 10-quarter turnaround plan to

18 make VIVUS profitable and to deal with our debt, and so on.

19 Why not make that happen?  Let them complete the 10-quarter

20 turnaround plan.  What is -- you know, I'm not saying that they

21 should not have some interest in some financial, you know,

22 accommodation for extending this.  But we're not talking about

23 years, we're talking about one year.  Why isn't that possible?

24 That's my recommendation, so that everybody can win in this

25 situation.

1          Thank you.

2          THE COURT:  Thank you.

3          Mr. Makosky?

4          MR. MAKOSKY:  Yes, this is Bruce Makosky here, Judge

5  Silverstein, how are you today?

6          THE COURT:  Well.

7          MR. MAKOSKY:  Can the --

8          THE COURT:  Thank you.

9          MR. MAKOSKY:  Can -- oh, good.  Okay.  Can -- can the

10 Court hear me all right?

11          THE COURT:  I can.

12          MR. MAKOSKY:  Okay, very good.

13          I should mention that there have been a number of

14 thunderstorms going through this area, and my power went off

15 briefly about an hour ago.  So if I disappear all of a sudden,

16 that will be the reason.

17          Thank you, Your Honor.  There's been a lot of

18 discussion and a lot of testimony certainly over the last three

19 sessions of this combined hearing from last week.

20          What I'd like to do is briefly summarize what I

21 perceive to be some of the key takeaway points from the last

22 few days.  And I'd like to start with the Dr. Ahmadi testimony.

23          On Wednesday, I called Dr. Reza Ahmadi to the stand

24 to provide an alternative valuation for VIVUS, and I just would

25 like to remind briefly the main points that he made were, first

1  of all, that the Piper Sandler analysis is not independent.  It

2  does not provide adequate and specific quantitative support for

3  the assessment of the VIVUS assets.

4          And secondly, that the analysis does not assign any

5  value of the VI-0106 drug for which successful Phase 1.  Trial

6  results have been announced for over a year, and they're in

7  Phase 2.

8          And the third point here was that the analysis does

9  not assign any value to the VIVUS net operating losses, which

10  are over 900 million dollars.

11          And the comments I wanted to make were that while the

12  witness may not have had every single detail 100 percent

13  correct, the main gist of his testimony should be considered to

14  be valid due to the following:

15          He felt strongly enough to come forward and have his

16  letter submitted to the Court.  He did so without any sort of

17  financial remuneration whatsoever.  And he made himself

18  available not only for the Court appearance itself, but also

19  for a two-hour deposition prior to the Court appearance, as

20  requested by the opposing counsel.

21          And as a professor at the UCLA Anderson School of

22  Management who teaches MBA students, he ought to have enough

23  real world knowledge to be able to provide an independent

24  alternative opinion on the valuation.

25          In terms of the valuation analyses officer by Ms.

1   Stratton and Mr. Pickering, there is substantial doubt that the

2   assets of VIVUS have been valued correctly.  Most notably, no

3   value whatsoever is given to the pipeline drug VI-0106,

4   contrary to how biopharm investments are normally valued, which

5   does take the pipeline into account.

6           The only market task provided by Ms. Stratton was

7   when Mr. Slabin -- Chlavin, I'm sorry, offered one million

8   dollars to purchase this asset, VI-0106, the debtor and debtor

9   in possession continued to claim that it has no value, but yet

10  it was not part of their gift to shareholders in the existing

11  stockholder settlement plan, implying that their actual belief

12  could be that it must have more value.

13          We also heard from Mr. King the other day that

14  PANCREAZE was an excellent acquisition for VIVUS when it was

15  purchased from Janssen Pharmaceutical for 135 million dollars

16  years ago.  But now for some reason, it is being valued at

17  anywhere from only just 15 million dollars maximum all the way

18  down to zero in the valuation provided by Mr. Pickering even

19  though the annual run rate of sales is greater than 20 million

20  dollars.

21          By purchasing this asset, VIVUS used a substantial

22  amount of cash which it had held on the balance sheet, cash

23  that could have been used to pay down the convertible debt owed

24  to IEH Biopharma in May of this year.

25          They also took out senior secured debt due in 2024 at

1  a much higher interest rate.

2          In November, 2018, John Amos, the CEO, announced they
3  would be paying off roughly 49 million dollars of that senior
4  secured debt because they had too much cash on the balance
5  sheet.  Their collateral situation had improved substantially,
6  and it would also be saving 10 million dollars over the next
7  four years in interest payments.  Investors were led to
8  believe, therefore, that the company turnaround was progressing
9  so much so, in fact, that they had enough confidence to pay
10 down the 2024 debt early.  And so they certainly must have had
11 a plan for addressing the 170 million dollars coming due to IEH
12 Biopharma in just the next six months.

13         However, we heard Mr. King say twice, once at the
14 equity committee motion hearing, and also again on Thursday
15 last week, that the real reason this debt was paid down early
16 was because PANCREAZE sales were below target, and they were,
17 as a result, in breach of a debt covenant with Imperial
18 Capital, and thus were obligated to pay this debt down early.

19         Mr. King said that this huge disparity in the reasons
20 given is due to CEO John Amos optimism or embellishment.  But,
21 in fact, the explanations are as different as night is from day
22 when compared with the reason given to the shareholders.

23         How exactly does a company's collateral situation
24 improve while, at the same time, they are in breach of covenant
25 due to missing the sales target?  The company has a fiduciary

1 duty to accurately convey all material events which occur to
2 the stockholders.

3        Mr. Cheng -- oh, sorry.  Mr. King claimed to be
4 executing his fiduciary duty, but was actually not even
5 directly involved in the bankruptcy negotiations.  Nor was he
6 involved apparently with the June 19, 2020 presentation in
7 which management stated that VIVUS could generate up to 180
8 billion dollars per annum for each of the next three years.
9 That presentation was released just 18 days prior to the
10 Chapter 11 filing.

11        Mr. King also says that he was brought in by the
12 original founders of VIVUS to reignite the company in 2017, but
13 does not personally own any shares of the VIVUS stock.

14        We later heard that he was brought in by CFO Mark Oki
15 based on their relationship at Alexa Pharmaceuticals, another
16 company, by the way, in which shareholders had their original
17 investment transformed into a contingency value right.

18        The one person who could shed some real light on what
19 was going on, CEO John Amos, was not made available to testify
20 at this hearing.

21        Lastly, regarding the NOLs, even after all of the
22 proceeding testimony, it is still unclear to me exactly with
23 precision how much they are really worth.  But given the
24 different federal and state tax rates, most likely somewhere
25 between 100 million and 200 million dollars.  In laymen's terms

1 for me, that might be best described as a lot of money.

2          In Ms. Stratton's testimony, however, this value may

3 only be accounted for in the discounted cash flow analysis, and

4 is certainly minimized in terms of dollar amount usefulness and

5 importance.

6          In Mr. King's testimony, on the other hand, the NOLs

7 are described as having a lot of value to the icon group, and

8 was a major reason behind the successful negotiation of the

9 restructuring support agreement.

10          Also, they are given as a reason why the company

11 never raised equity previously, because they did not want to,

12 quote/unquote, "blow up" the value of the NOLs to IEH Biopharma

13 where, during all of this consideration for IEH Biopharma was

14 the fiduciary duty to protect shareholders?

15          That concludes my argument, and I would, if

16 permitted, like to make a closing statement at the end.

17          Thank you very much.

18          THE COURT:  Mr. Makosky, you can make that statement

19 now.  This is argument, so you can make whatever closing

20 statements you have now.  I'm not sure I'm going to get back to

21 you.

22          MR. MAKOSKY:  Okay.  Yeah, I wasn't sure if we went

23 another round or not, so that's -- that's why I brought it up.

24 Okay, then --

25          THE COURT:  I appreciate it.

1          MR. MAKOSKY:  Okay, terrific.

2          Then in that case, Judge Silverstein and the Court, I

3   want to thank the Court for the opportunity to argue my case

4   here today, and also to bring forward the witness last

5   Wednesday.  I believe it has been shown at this hearing, not

6   only that the assets are undervalued, but also that there is

7   substantial doubt regarding a potential conflict of interest

8   and possible breach of fiduciary duty associated with this

9   bankruptcy.

10          I am just a small shareholder, but I feel this case

11  has wider implications for the markets as a whole.  If it's

12  some kind of a new paradigm that private equity or hedge funds

13  or whatnot are able to take companies under using only debt,

14  then I believe that's going to put a huge chill on the equity

15  markets.

16          Now please don't get me wrong, as a shareholder, I

17  have no problem accepting responsibility for my investments.

18  If a company I invest in is acquired at a discount to what I

19  may feel it is actually worth, I might not be happy about it,

20  but it would still be fair in my mind.

21          Likewise, if a company fails because they have poor

22  products or cannot execute their business plan, then I have to

23  accept the risk I took and move on.

24          But, however, if the company is somehow set up to

25  fail, or the assets are all rolled up somehow while

1 shareholders are simultaneously wiped out, then that is

2 absolutely unacceptable because it means that anyone who bought

3 shares in VIVUS after the FMC takeover in 2013 would have had

4 zero chance of any other outcome than losing all of their

5 investment in the company.

6      Now how is that a level playing field and how is that

7 fair?  My father always taught me that I should invest my money

8 in the United States for two main reasons:

9      First of all, the U.S. is governed by the rule of

10 law;

11      And secondly, the markets are transparent and fair.

12      I'm afraid I've seen a lot of changes happening in

13 the States in recent years, many not for the better.  While I'm

14 not here today to make a political statement, I do believe it

15 is important to stand up for what is right; I do not see how

16 confirmation of this bankruptcy can be right.

17      Nevertheless, I still do believe in justice in

18 America.  I humbly request, Judge Silverstein, that you reflect

19 on the facts presented in this case, and agree that

20 confirmation of this VIVUS bankruptcy plan currently before the

21 Court should be denied.

22      I, therefore, ask you to sustain my objection and the

23 objections of the other objecting party to confirmation of the

24 plan.

25      Now let me close by saying that I sincerely

1  appreciate the opportunity to present my case before the Court,

2  and for the latitude shown by all parties to myself as pro se

3  in this case.

4          Thank you very much.

5          THE COURT:  Thank you, Mr. Makosky.

6          Mr. Dijkstra?

7          MR. DIJKSTRA:  Good afternoon, Your Honor.  Good

8  morning to me, it's 5:35 in the morning, so I hope I'm going to

9  make it.  It's just a short statement, it's not really an

10 argument.

11         So, nevertheless, if you have any questions, then I'd

12 gladly hear them.

13         Smothered with the COVID-19 hot sauce, the

14 prepackaged pan was presented to us as a Happy Meal takeout,

15 and please do not forget to leave your rights at the door.

16 When it turned out not to be the expected walk in the park,

17 suddenly it became the fault of the four objecting

18 shareholders, keeping the noteholder, debtor, its employees,

19 and all the other shareholders hostage.

20         Now I'm not sure if it is common practice in this

21 line of work, but all that was given to us until August 18 were

22 low points, mid points and high points, plus the conclusion

23 that the company was clearly insolvent based on the art of

24 valuation.

25         But even when the calculations finally came, I

personally just could not get away from the feeling that it was made to match the numbers in the disclosure and not the other way around.

The thing that surprised me the most is that we were only given the opportunity to speak to an (indiscernible) lawyers and specialists was just member of the VIVUS board. Why was the management so often subject of discussion and definitely cause of a few contradictions not available to us? (indiscernible) value from an insolvent company and to seemingly unimportant studies at a university out of sight. Now does that not sound just like everyday life?  But what happens to when you marry the two together?  That, Your Honor, only God and King seemed to know.

I do not wish to be in Your Honor's shoes today having to distinguish between what is fact, fiction, or confidential.  But in line of my Docket 206 proposal, perhaps the shareholders can be of great help.  Through this case, I learned that the basic principle of the bankruptcy laws is to give companies a fresh start.

I am convinced that such results, as presented in the plan, can never be achieved.  Debtor, with the same management and challenge products, will just be forced on a continued path of indebting itself.  Debtor insists that just for the deeply trouble VI-0106 (indiscernible) formulation and stability arise, at least 40 million is needed for further clinical

1  development, and that's against a highly speculative outcome.

2        When I add that to the five million pro rata placed

3  as debt by Piper Sandler, and the 35 million paid out under the

4  CVR, the total sum comes to 80 million dollars.

5        Now if the shareholders are given the opportunity to

6  relieve the debtor from the burden of carrying forward some of

7  their worthless assets in exchange, the total sum of 80 million

8  dollars will be contributed to the positive side of debtors'

9  balance sheet.

10       This means that over time, debtor only needed a net

11 exit facility of just 10 million dollars.

12       Now going from 270 million dollars in debt on the

13 petition date, to just 10 million in time, that, I believe,

14 Your Honor, is a real fresh start.

15       Dear Judge Silverstein, I sincerely thank you for

16 both giving me and the other shareholders the almost unlimited

17 opportunity to present our case and its evidence.  Your Honor,

18 we are forever in your convertible debt.

19       Thank you.

20       THE COURT:  Thank you, Mr. Dijkstra.

21       Okay.  Mr. Morgan, I will give you the opportunity to

22 have the last word since this is your confirmation hearing to

23 respond to anything that has been raised by any of the

24 objectors.

25       MR. MORGAN:  Your Honor --

1          MS. CASEY:  Excuse me, Your Honor.

2          MR. MORGAN:  Your Honor --

3          THE COURT:  Oops.

4          MS. CASEY:  This is Linda Casey from the United

5    States Trustee, did you want to hear --

6          THE COURT:  Oh, my -- my sincere apologies, Ms.

7    Casey; yes.

8          MS. CASEY:  That's okay.  I don't show up on your

9    screen, and I do thank you, again, for allowing me to appear

10   without showing up on your screen, so thank you.

11         For the record, this is Linda Casey on behalf of the

12   United States Trustee.

13         Your Honor, we have a handful of objections that are

14   all connected in some way.  So we do object to the condition of

15   the existing stock element that shareholders are prevented from

16   bringing objections regarding the cash collateral, the plan,

17   the RSA or the exit facility to Your Honor's attention.

18         We object to the third party releases being granted

19   by unimpaired creditors.

20         We object to the third party releases being granted

21   by existing stockholders.

22         We object to existing stockholders having to release

23   claims based on intentional fraud, gross negligence,

24   recklessness, and willful misconduct.

25         And we also object to the third party releases being

1  granted in favor of the debtors' officers and directors,

2  employees, and professionals.

3        And finally, we have some concerns related to the

4  code solicitation communications by Stretto.

5        As I indicated, these are all connected in some way,

6  and they're connected by the consistencies that you have heard

7  the U.S. Trustee raise several times that third party releases

8  cannot be based on alleged deemed consent where silence is the

9  overt act of acceptance.

10        In this case, we have some unique facts in the record

11  and in the case that really highlights the issues that the U.S.

12  Trustee has with these releases.

13        So first we have some of the facts on some of

14  Stretto's representatives testimony that we don't usually have

15  in these cases.  And while I had discussed with debtors'

16  counsel prior to the hearing the statement that Mr. Morgan read

17  in, Stretto's representative actually testified to more than

18  what I would -- that my understanding of the facts were.

19        And what he testified to was that Stretto had

20  received calls from shareholders confused as to what they were

21  supposed to do, how they were supposed to opt out, or how they

22  were supposed to remain opted in.

23        We also heard testimony that if a creditor actually

24  sent back the opt out form, and signed it, and filled it out,

25  but failed to check the box that they had opted out, there was

1  an assumption that they were asserting that they actually

2  wanted to opt in, and that they were confused, and had to send

3  back this form in order to do so.  And that unlike those who

4  opted out, those who sent back the forms and signed them, but

5  did not check the opt in/opt out box, Stretto did not call to

6  confirm that that's actually what they meant to do.

7        And, quite frankly, that's consistent with the order,

8  and that's consistent with the process, is that if the box

9  isn't checked, sending back the form is insufficient, and we

10 don't know how many people just simply mistakened to check that

11 box.

12       We actually heard -- and I believe it was Mr.

13 Dijkstra -- in his questioning that his mother had intended to

14 opt out, and failed to check that box, and was originally put

15 in as having checked in.

16       We also, of course, heard of communications with the

17 parties who have opted out, and Stretto, I will discuss at the

18 end, what I believe should happen to that if Your Honor

19 otherwise confirms the plan.  Just as a little aside, I want to

20 say that I'm not casting any aspersions on Stretto or the

21 debtors' other professionals, and I do understand there was a

22 legitimate need to reach out to get the nominee information,

23 and I believe that the contacts were made in good faith,

24 despite the fact that I do think that they were potentially

25 confusing and need to be addressed.

1    So I think Your Honor has said, and I think the

2 parties understand, and I agree, that even if the plan is

3 otherwise confirmable, these releases are not necessary to the

4 reorganization.  And they would not pass muster a non-

5 consensual release basis.  If a plan is confirmable, the

6 debtors necessarily have to prove that equity was out of money,

7 and that they could have crammed down a plan with no payment to

8 equity at all.

9    So what are these third party releases?  Well,

10 they're basically an offer of a settlement to existing

11 stockholders, and were extending the silence can be deemed

12 consent from third party releases to actual complicated

13 settlement offers that have terms beyond just the third party

14 releases.  Here the stockholders are being told we'll give you

15 this payment in exchange for not just giving the third party

16 release, but also agreeing to all of the existing stock

17 settlement conditions, which includes not objecting to the

18 plan, which includes -- let me switch to that screen real quick

19 -- which includes not opting out of the releases, not asserting

20 a subordinated claim against the debtors, or the officers, or

21 directors, not selling, or transferring, or otherwise disposing

22 of their claim after the petition date, and not paying back any

23 recovery or payments received on account of their interest,

24 other than as set forth in the plan.

25    So it's not just a release, as we see in other cases.

1  It's an actual offer of the settlement that we are assuming is

2  being accepted simply by silence.

3         So to go back to the issue of the deemed silence for

4  releases.  That extends to both the releases by the unimpaired

5  creditors and the existing stockholders.  And the debtors have

6  taken the position that basically because it's in a plan, it's

7  within the jurisdiction of the Court and, therefore, silence --

8  there is a duty to speak up, and silence can be considered

9  acceptance.  Well, we've seen how difficult it is for the

10 existing stockholders in this case to understand what this is,

11 and that's one of the reasons the U.S. Trustee has always

12 objected to that.

13        But here, we see that both as to the existing

14 stockholders and the unimpaired creditors, what is being

15 granted is a claim held by a third party against a third party.

16 It is not property of the estate, it is not something that this

17 Court has jurisdiction over.

18        As to the unimpaired creditors, the proposition is

19 that they have received consideration for those releases

20 because they're being paid in full.  Well, of course, they're

21 being paid in full because under the Absolute Priority Rule,

22 they need to be paid in full to confirm this plan, and they're

23 being paid by the debtors.

24        The releases, however, are broader than just the

25 claim that the unimpaired creditors can assert against the

1 debtors.  The releases are to any claims related to the

2 debtors.  And importantly, any claims related to the

3 relationship between the debtors and the released party, not

4 the releasing party.  And there are several examples of where

5 this could come in, and it could be a claim that they have not

6 been paid on, and they have not received consideration directly

7 from the released party.

8       Two of the ones that we have thought of at the U.S.

9 Trustee's Office, the first one would be if a employee of the

10 debtors were to go to a mediation at the lender's or at the

11 shareholders', whomever is the released party, and got injured,

12 even though they got paid in full on their worker's comp

13 against the debtors, worker's comp is limited, and they may

14 have a claim for additional damages that they could not assert

15 against the debtors against those third parties.  And because

16 this release is so broad in any way related to the debtors, in

17 any way related to the relationship between the debtors and the

18 released parties, that would extend to them.  And that goes to

19 the silence is being deemed consent, and the understanding of

20 what's happening here.  Unimpaired creditors hear that they're

21 going to get paid in full, and we're putting a duty on them to

22 read these complicated legal documents that can be hundreds of

23 pages long, that they are not bankruptcy professionals, to

24 understand these fine points as to whether this is a broader

25 release, and that they are actually giving up something other

1 than what they're getting paid for.

2          The other example, I don't think it's relevant here,

3 although I haven't looked at that carefully as to what's being

4 rejected, is an unimpaired creditor received payment in full on

5 its rejection damage claim as limited by the Bankruptcy Code

6 for a nonresidential lease, but has a guarantee by one of the

7 released parties, although they've been paid in full under the

8 plan, they've been paid a limited amount of their claim, and

9 they would be releasing these third parties for additional

10 amounts simply by being silent, and not understanding that they

11 needed to object.

12          The third party releases is for the existing

13 stockholders, perhaps in this case I would say is even more

14 problematic because they -- this is all of their claims, and

15 they are -- we have testimony in the record that stockholders

16 were confused as to how to go about opting out or opting in.

17 We have evidence in the record that some people attempted to

18 opt out, and didn't do it appropriately.

19          And that just goes to the theme that the U.S. Trustee

20 has.  We have -- I mean theoretically if the ability to force a

21 release or deem or consent because they have not objected or

22 sent in an opt out notice is appropriate, that would even

23 extend to people who have only received constructive notice.

24 And it's hard to imagine how the party who is an unknown

25 creditor or a known creditor who the debtors cannot locate has

1 affirmatively indicated that they consent to the releases if

2 they're only getting publication notice that the may or may not

3 have read, and they certainly haven't been served with all of

4 the papers.

5          So those are -- you know, they're the consistencies.

6 I know Your Honor has heard the U.S. Trustee's arguments on

7 third party releases in the past.  We just think that this case

8 shows those reasons why we are concerned about that in this

9 case.

10          As to the objections, the limitation on being able to

11 object, Your Honor, it's both improper, per se, but it's also

12 overbroad.  You know, such that a shareholder would be

13 ineligible to receive the treatment under the plan or under the

14 existing stock settlement, I guess is more appropriate, even if

15 they brought an objection to Your Honor's attention that was

16 not a -- you know, perhaps a objection to the cash collateral,

17 that they have a lien, that that was being primed or objection

18 to the plan that the notice was unclear and that they objected

19 to the disclosure statement because they didn't understand how

20 to opt in or opt out is, you know, to -- while we understand

21 the debtors' position is this is just a settlement, and a

22 settlement offer, and they could reject it, and then they could

23 object.

24          The U.S. Trustee's position is there should be some

25 guardrails on what the settlement offer can provide.  And is it

1 appropriate to silence stockholders, and not let them bring to

2 Your Honor's attention issues with -- you know, any issue at

3 all with any of these major pleadings in the case.

4         We also do object to the relief given by the

5 shareholders to have to include intentional fraud, gross

6 negligence, recklessness, and willful misconduct.  And it is

7 somewhat tied to the fact that this is not truly consensual.

8 If this were a negotiated agreement where the parties were in

9 the room, and there was back and forth, and they hammered it

10 out, you know, the U.S. Trustee doesn't usually typically

11 object to the terms between two parties that are sophisticated

12 and have come to an agreement unless it affects some other

13 rights.

14         But that's not what happened here, this is a take it

15 or leave it offer.  And we don't typically see that broad of a

16 release imposed upon third parties, especially third parties

17 who are stuck in a position where they have to decide, well, I

18 really am fine with the treatment, but I really don't want to

19 give up intentional fraud, gross negligence, recklessness, or

20 willful misconduct, but I don't have a choice.

21         And finally as to the releases.  The case law is

22 clear that the third party releases are not to be granted to

23 officers and directors, employees and professionals.  They have

24 not provided any contribution to the releasing parties.  And

25 the case law is clear that performing their jobs and their

1 duties is not sufficient.  Officers and directors and

2 professionals are entitled to exculpation, not to releases.

3         Now I know the debtors are going to say that this is

4 the best possible result, and that if Your Honor is to deny

5 confirmation, or at least deny the existing stock settlement

6 and the third party releases, that the shareholders are going

7 to get nothing.  Well, that may be the end result, I don't

8 believe that Your Honor can excise the existing stock

9 settlement from this plan and confirm it, especially given the

10 fact that the shareholders who opted in did not object on that

11 basis.

12         So it would need to be at least re-noticed with the

13 existing stock settlement taken out, if not renegotiated in

14 full.  And additional parties could come forward with

15 additional objections and, you know, we'll see what happens.

16         But the third party releases are just not appropriate

17 in this case and are very problematic.

18         Now if Your Honor were to approve the plan and the

19 releases, we do have some concerns with the post solicitation

20 communications by Stretto.

21         Again, not to cast aspersions, I understand why they

22 did it.  But if you look at the -- you know, we obviously

23 don't know what was said in the phone call, but we do have the

24 email.  And when we look at the email that was sent, it was

25 very briefly said if you opt back in, you're giving your

1  releases under Section 10.7, but there was no real notice --

2  statement as to what that meant.  And in the bold type, it

3  said, "and if you keep your opt in, you're giving the $2.58

4  distribution."  And there was a discussion, again, of what that

5  was and the fact that the -- I forget what the numbers is -- is

6  going to be paid immediately, and then there is a contingency

7  on the two dollars, and it's not going to be paid for two

8  weeks.

9         And I just think that as Your Honor noted, the notice

10 was heavily vetted and negotiated, and specifically there was a

11 box with very detailed information that a layperson could

12 understand, explaining what the releases were, who the releases

13 were being granted by, who the releases were going to, what

14 your -- payment you were going to get in exchange for what the

15 contingency's for, was the two dollars.  And having read all of

16 that, the 45 or so executive stockholders chose to opt in, and

17 then getting either a phone call or an email where the only

18 emphasis is on what you're going to get paid, and not a

19 explanation of what you're going to lose if you take that

20 offer; we had 45 come back in.

21        The email also was a little confusing.  I think I

22 understand how it came about, but the email that went out to

23 the parties who they could not reach on the phone said confirm

24 that you want to revoke, or fill out this paperwork.  And I

25 think that came about because if they talked to somebody on the

1  phone, they got the oral indication they wanted to revoke, and

2  then they sent an email that said confirm our conversation

3  where you want to revoke.  But the email that went out to the

4  parties who weren't on the phone to say confirm that you want

5  to revoke is a little confusing.  And, quite frankly, I don't

6  have confidence if somebody didn't write back and say, "I

7  confirm."  Meaning I confirm that I want to opt out, but --

8  because it's unusual to say I want to confirm that I want to

9  revoke.

10         So I do -- we do think that there should probably be

11  -- if Your Honor were to confirm the plan otherwise -- a

12  process to re-notice, maybe simply send something similar to

13  the boxed language that we had before, but it should be vetted,

14  the parties should discuss it, and there should be another

15  round to make sure everybody was clear on this.  We do have

16  testimony that creditors who may or may not have opted in or

17  opted out called Stretto and said they were confused.  We have

18  this confusing process of trying to find out if people really

19  wanted to opt in or if they wanted to revoke their opt in --

20  excuse me -- opt out -- see, I'm even being confused.  And I

21  think that it should be cleaned up through a process that is

22  vetted and approved, and a notification going out and giving

23  everybody a second bite at the apple.

24         And unless Your Honor has any further questions,

25  that's the U.S. Trustee's position.

1            THE COURT:  Thank you.

2            Is there anyone else who's objected that I have

3  overlooked?

4            MR. PINKAS:  Your Honor, Oscar Pinkas here for IEH.

5  No objection you overlooked, but we also would like to be

6  heard.

7            THE COURT:  Okay, Mr. Pinkas.

8            MR. PINKAS:  Thank you, Your Honor.

9            We appreciate the Court taking the time for this

10 hearing with a busy schedule.  As Your Honor might imagine, we

11 join in the debtors' legal arguments, and rely heavily on

12 argument in their papers in support of everything that's before

13 the Court.  We believe they addressed the vast majority of the

14 points at issue.

15           We also join in the arguments regarding credibility

16 and admissibility and motions to strike regarding evidence.

17           Regarding the last point, Your Honor, just to take in

18 reverse order for a moment, the U.S. Trustee's concern about

19 opt outs.  If there's any concern that opt outs coming back in

20 had any confusion, we're perfectly fine letting them choose

21 whether to opt out again post effective date.

22           As Your Honor recalls from the Equity Committee

23 hearing, I gave you the example of a class action settlement

24 where you return the card.  We're not trying to take anything

25 away from people, so if they want a second bite at the apple of

1  opting in, we have no problem with that.

2        There are two primary issues before the Court, Your

3  Honor:  valuation and third party releases.  Before addressing

4  them in detail, I wanted to note what's not evident from the

5  record.

6        The debtors have thousands of creditors, three of

7  them objected to what were contractual assumption issues; all

8  three have been resolved.  So as we stand here today, there's

9  not a single creditor that takes issue with the plan.

10        In addition, as you saw in the Stretto declaration,

11  the debtors have over 10,000 shareholders.  We have four before

12  the Court and 106 total that opted out.  So the debtors have

13  over 10,000 shareholders, about 99 percent of their -- point

14  nine actually of their equity interest that take no issue with

15  confirmation.

16        Turning to the issues, regarding the releases, they

17  meet all the applicable legal standards as I'll describe later.

18        On valuation, it is the debtors' burden to prove

19  insolvency by preponderance of the credible evidence, that's

20  the Emerge Energy Services decision by Judge Owens, 2019

21  Westlaw 7634308 at Page 6.

22        The only credible evidence, Your Honor, before the

23  Court on valuation is Ms. Stratton's expert testimony.  And

24  that analysis was both reasonable and used the three methods

25  that are generally accepted by the courts in this District.

1 That's the <u>Nelson Neutraceutical</u> decision, 2007 Westlaw 201134

2 at Page 20, it's a Judge Sontchi decision.

3        Ms. Stratton testified multiple times, Your Honor,

4 that VI-0106 and NOLs were both included in her valuation.  And

5 her method of inclusion comports with valuation theory and with

6 the law.  Again, the <u>Nelson Neutraceutical</u> decision on

7 methodology and the <u>Spansion</u> and <u>Ampex</u> decisions that we cited

8 in our brief on value a speculative asset at zero dollars.

9        The major dispute then that -- what we have, Your

10 Honor, is whether or not the debtors are insolvent.  Again, the

11 credible evidence in the record belongs to the debtors.

12        But perhaps most importantly, Your Honor, no matter

13 what type of analysis you use, the answer is the same.  The

14 debtors have  undisputed claims of 271 million dollars.  The

15 valuation on June 20th, valuation on August 11th, a market

16 test, enterprise value as -- was calculated in part of Piper

17 Sandler's valuation, they all come in between 197 and 230.  So

18 they're all about 20 percent or more -- and we would say or

19 more -- less than valuation.  And that includes, Your Honor, as

20 you speculated, whether we could assign some value to 0106

21 based upon a risk adjusted analysis.

22        The debtors paid one million plus 39 of contingent

23 payments.  We heard testimony that 0106 has not changed since

24 2017.  So at most, we can value that 39 million of deferred

25 payments.

1          If you look at the 13 risk factors that were clearly
2   delineated in the debtors' SEC filing, at most, you could give
3   them a generous chance of overcoming each of the 13.  But even
4   if you say 15 percent, that's still only 16 million dollars --
5   excuse me -- 6 million dollars.  So the value impact of 0106
6   under any standard is immaterial.

7          THE COURT:  But what do I do -- and I'll give you a
8   chance to answer it because, quite frankly, this is the
9   elephant in the room.

10         MR. PINKAS:  Um-hum.

11         THE COURT:  Ms. Stratton's valuation is as good as
12  her assumptions and as the projections on which they are based.

13         MR. PINKAS:  Um-hum.

14         THE COURT:  And I had no testimony from management
15  with respect to contemporaneous, in essence statements they
16  made, that don't line up with the projections.

17         MR. PINKAS:  I'm glad you asked that, Your Honor,
18  because I -- as you might imagine, that was part of what I was
19  intending to discuss with you.

20         THE COURT:  Well, it's 7 o'clock and I'm trying to
21  move us to the important -- what I think are the -- I'm telling
22  you, this is where I have issues with the -- I don't know if
23  they're issues yet, but this is what I see as a deficiency or
24  possible deficiency in the evidence that was presented to me by
25  the debtors.

1          MR. PINKAS:  Understood.

2          Your Honor, the presentation is part of an S-1

3  filing.  S-1 filings are for stock issuances.  They relate

4  solely to forward-looking statements.

5          THE COURT:  So why isn't the management in front of

6  me telling me all of this?

7          MR. PINKAS:  Your Honor, I don't know why the debtors

8  did not put a management representative on the stand, but my --

9  my -- what I would like to articulate is the fact that I don't

10  think it's material.

11          The law is that any statements on going forward that

12  are not projections, in fact -- the presentation specifically

13  says it's not making projections of a business.  The law says

14  those statements are immaterial and cannot be relied upon --

15          THE COURT:  So at the same time --

16          MR. PINKAS:  -- and that is --

17          THE COURT:  So at the same time that the debtor is

18  contemplating wiping out equity, it could make statements that

19  suggest that one of the assets that it values at zero is, in

20  fact, worth a lot more than that.  That's acceptable?

21          MR. PINKAS:  Your Honor, I'm not here to judge

22  whether it's acceptable or not, that's Your Honor's position.

23          But what I know is that the law says that that is

24  permitted, and that is --

25          THE COURT:  Well, I don't understand that.  So the

1 law says that I'm not allowed to consider in a confirmation

2 hearing contemporaneous, in essence, statements of management

3 with respect to the timeline on which they're going to develop

4 a drug and the value -- and I'll use that in a very loose term

5 -- that they place on it?

6        MR. PINKAS:  No, Your Honor, I'm saying just the

7 opposite.  I'm saying that Your Honor is absolutely permitted

8 to consider it, but that the law says it has very little to no

9 weight, and that is the bespeaks caution doctrine, which says

10 that those statements are immaterial as a matter of law, that's

11 the Cross Media Marketing Corp. Securities Litigation decision,

12 314 F. Supp. 2d 256 at 266.

13        THE COURT:  Give me that again.  314 --

14        MR. PINKAS:  Excuse me, Your Honor; let me repeat it.

15 314 F. Supp. 2d 256, Pages 266 to 268.  It says that the market

16 participants investing cannot rely upon it, and also that

17 preexisting shareholders cannot rely upon it because doing so

18 would be unreasonable.

19        THE COURT:  Well, okay, they can't rely upon it, but

20 does that mean that the statements can't be true?  What does

21 that mean?  They can't rely on it.  I'm not relying on it, I'm

22 just saying this is a statement management made.

23        MR. PINKAS:  Understood, Your Honor.  And I'm not --

24 and I'm not suggesting that they can't be true because

25 obviously the SEC has material misrepresentation provisions in

1 its regulations.

2        But what you see in the statements is that they can

3 project up to a certain amount of revenue.  And so anywhere

4 between one dollar and 750 million, that's not a material

5 misrepresentation.

6        And lastly, Your Honor, the law also says -- and this

7 is the <u>Chelsea Therapeutics International Limited Stockholders</u>

8 <u>Litigation</u>, that's 2016 Westlaw 3044721 at Page 5 and 6, this

9 is the Delaware Chancery Court, 2016.  It says that any

10 existing shareholder can't rely upon it, again, because to do

11 so would be immaterial, number one.  So it's immaterial to

12 anyone, and it's unreasonable.

13        And there, the court dismissed the complaint where

14 the company in which shareholders invested was undervalued --

15 allegedly undervalued in a transaction where buyer's own

16 projections of a drug that the company owned was not yet

17 approved for use by the FDA to treat the specific condition

18 alleged, and the court found no reliance could be put thereon.

19 Because, number one, the information is immaterial congruent

20 with the other decisions.  And in addition, the statements were

21 clear puffery.

22        So from that perspective, Your Honor, I'm not

23 suggesting you can't consider it.

24        What I'm suggesting is when you look at the

25 confluence of factors around it, which is what the case law

1  says, including all of the debtors' SEC filings, it was 100

2  percent clear that it was a sales pitch for an equity offering.

3  No more, no less.

4        And, Your Honor, the equity investors didn't believe

5  it.  Had they -- had it been true, had it been -- had it been

6  actionable in the current -- you know, couple future years,

7  potential investors would have invested in this business, we

8  would have been paid our 235 million dollars, and we wouldn't

9  be talking here today.

10       So I'm not suggesting management can make a

11 misrepresentation, I'm suggesting they didn't.  They tried to

12 sell the product that they could not develop for three years

13 and nobody put value in their assertion, that's what I'm saying

14 to Your Honor, including the last sale, which was 40 million.

15 If you bought something for 40 million and you haven't changed

16 it in three years, why is it going to do better when you

17 haven't even come up with a proprietary formulation or any

18 proof that it's safe whatsoever, right.

19       And Your Honor speaks of elephants in the room, so

20 let me address them for you because I agree with you there are

21 elephants in the room and one of the things that we should

22 address is what are they.

23       The debtors did try to finance or partner in the

24 development of 106.  If you have no possibility of developing

25 something and nobody is willing to fund the development with

1 you, by definition it has no value.  Okay.

2        The debtors did all they could to avoid bankruptcy.
3 They spent three and a half years as you heard from two
4 witnesses trying to find a way to repay their debt and IEH
5 tried to help them for eight months.  Unfortunately for
6 everyone they were unable to do so, especially for us because
7 as you heard at every pass for three years we just wanted to be
8 repaid.

9        But the debtors didn't stop there, Your Honor.  They,
10 despite an inevitable bankruptcy, negotiated well, they used
11 the levers they had, there's the possibility of business
12 interruption caused by a non-consensual bankruptcy, okay.  As
13 Your Honor may be aware, commercialized pharma companies age
14 poorly in bankruptcy.

15        The debtors used this lever to try and pull us into a
16 plan.  So, what did we do?  We set out with them to formulate a
17 contingency plan per their request, on a balance sheet
18 restructuring to give them value presented, which is above
19 their valuation, and avoid a non-consensual fight and
20 deterioration of the business.

21        So here's where I'm going to demystify it for you,
22 Your Honor.  We're being accused of trying to steal VI-O106 or
23 getting some enormous value from the debtors NOLs.  I'm going
24 to make it very plain and very clear.  We agreed to support the
25 plan above the debtors' value to minimize business interruption

1 and to close out the debtors' history on what we hoped would be

2 a consensual basis.

3         Clearly, that was not going to be the case.  But

4 sitting here today, we are the only party entitled to recovery

5 that's not being paid in full.  We have secured debt that's

6 being reinstated and we have convertible debt that is being

7 equitized, and -- at what we believe is a high valuation.  So

8 the debtors are now paying 235 million of debt and we're being

9 asked to take a $41 million haircut.

10         So, Your Honor, when presented with that, what do we

11 do?  As you might expect, we focused on how to preserve what

12 the debtors have, their assets and how to close the chapter,

13 releases.  It's very simple, Your Honor.  We would not pay

14 people (indiscernible) rule would permit, only to have them

15 make claims against a reorganized business, which is our only

16 source of recovery, and this is not because the NOLs or 0106

17 have some great value.  This is because we're not being repaid,

18 and so we're forced to look at the debtors' assets to be

19 repaid.

20         Had we been paid in full -- had we been paid in full,

21 none of the debtors' assets would have any importance to us

22 because we would have our capital back and we would go on about

23 our way.  But that doesn't mean that NOLs and 0106 -- some have

24 some -- have some magical value.  It just means that these are

25 assets to which I am forced to get a recovery.

1          So, Your Honor, more evidence.  Why could I not be
2    stealing 0106?  We've held the note since 2015.  10106 was
3    bought in 2017.  We clearly did not invest to own it.

4          On top of that, Your Honor, we are a lender.  We
5    don't run this business, we don't know how it operates, we
6    didn't make any of the decisions and we don't have anymore
7    information about these assets then Your Honor does having
8    heard testimony.

9          So you can imagine 0106, we're not very optimistic
10   about its value given what we've heard, especially if the
11   debtors could not develop proprietary formulation or find a way
12   to partner or fund its development for three years.

13         The same is true for the NOLS, Your Honor.  The
14   shareholders' fundamental premiss is totally incorrect.  The
15   debtors had no ability to issue any material equity without
16   compromising their NOLs.  So what did they do?  They went to do
17   a financing that would either pay off the debt in full, which
18   means who cares whether the NOLs are impaired because you have
19   a recapitalized business.  They tried to do that and they
20   failed.

21         So what other measures could the debtors have done?
22   Issuing stock less then $235 million was not an option.  Your
23   Honor heard uncontroverted testimony that the debtors are three
24   and a half percentage points away from a change of control.
25   Issuing a hundred million of equity as Ms. Stratton testified,

1 is 90 percent of the company.  So that would have changed --

2 that would have caused a change of control, it would have

3 reduced the ability to use the NOLs, the debt still would not

4 be repaid and the debtors -- and the shareholders would be

5 arguing that they were diluted.

6        So, Your Honor, we were not somehow preferred in

7 preserving the debtors' assets, especially the NOLs.  The

8 record is actually to the contrary, right.  You try to sell 90

9 percent and when you can't, you preserve the asset you have so

10 as not to impair current stakeholders, which is your fiduciary

11 duty as a debtor, director and board member and officer.

12        So, from that perspective, again, Your Honor, we are

13 a lender.  We are looking at the same projections as the Court

14 is from the outside.  We are told that the reorganized debtors

15 may have some profitability in the future years.  We're relying

16 on their projections and Ms. Stratton's valuation just are you.

17        So the NOL value is to offset that probability --

18 profitability, excuse me, which Ms. Stratton has included in

19 her valuation.  So then you ask me what is the relevance of the

20 NOLs to IEH, it's very simple.  We have not ascribed any

21 valuation to the NOLs.  Especially one more then in Ms.

22 Stratton's analysis, right.

23        THE COURT:  Well I don't have any evidence of that.

24        MR. PINKAS:  (indiscernible) --

25        THE COURT:  I don't have any evidence of how -- and

1  I'm not criticizing because I don't think this is IEH's

2  responsibility to tell me how they value this company, but Mr.

3  King on any number of occasions made statements that suggested

4  that it was important to IEH to maintain the NOLs and that it

5  did influence, to some degree, and I'll have to go back and

6  look at the testimony, how they marketed.

7          You're suggesting that it only -- that the NOLs only

8  matter to the company or that it was logical the way they

9  progressed in their -- in the company's thinking on how to

10  solve it's impending debt issue.

11          But I'm not -- I don't know that that was Mr. King's

12  testimony.  And --

13          MR. PINKAS:  Your Honor -- excuse me.  Sorry.  I

14  thought you were done.

15          THE COURT:  And again, I'm not criticizing IEH.  It's

16  not your responsibility to come in and to provide testimony,

17  but you can't give the evidence through what you're trying to

18  say here because I don't have that.

19          MR. PINKAS:  Your Honor, I'm not suggesting Your

20  Honor has that necessarily directly in one sound bite but I

21  think Your Honor does have that through Mr. King.  He said that

22  the NOLs were important in the negotiations as we were getting

23  to consensus on a restructuring above the debtors' value, which

24  means that what IEH told him is exactly what I told you, if

25  we're going to support a plan above the debtors' value, we need

1 to be sure that the chapter is closed and that you're keeping

2 all of your assets.

3       So I think Your Honor does have it, maybe not in one

4 sound bite, but it is in Mr. King's testimony.

5       THE COURT:  Okay, I'll look for that.

6       MR. PINKAS:  Okay.  Your Honor, just one point of

7 clarification of the record, we were not involved in the proxy

8 fight.  I hope that's clear, but that proxy fight as you look

9 in the SEC filings, was between FMC and First Manhattan,

10 neither of them are IEH affiliates.  The Mr. Demmy that was

11 referred to had left an icon affiliated company 18 months

12 before.  We were not involved in the proxy fight.

13       Your Honor, I believe you should -- before getting

14 into some of these points in detail, I think Your Honor should

15 take judicial notice of the SEC filings.  All the parties have

16 referenced them or cited them somehow and they've not been

17 moved into evidence.  So if we're going to consider any public

18 filings for the benefit of any party, they should be all

19 considered for the benefit of all.

20       The law on what weight, which we submit is none, as I

21 cited on the June 20th presentation, requires consideration

22 actually, if you look at that -- those two cases I gave you, it

23 says you have to look at the SEC filings that surrounded the

24 statements so as to understand the disclosure that was at hand

25 and here, the SEC filings, the 10-K specifically, said there

1  were 13 risk factors before 106 would generate a single dollar

2  of revenue.

3          Your Honor, before addressing some further points

4  where there was some questions in the record, let me address

5  three points made by Mr. Demmy.  The 1129 factors, Your Honor,

6  Mr. Demmy could point to now 1129(a) factor that the debtors

7  have not presented evidence on through testimony or an

8  unobjected to portion of a declaration.  We agree.

9          Mr. Demmy insinuates that the exclusion of the 106

10 product in the CVR, EBITDAR milestone is somehow to the

11 shareholders' detriment.  That's the first time I've heard that

12 argument so I just wanted to point out to Your Honor that it's

13 actually incorrect.

14         As you heard, there's a big difference between EBITDA

15 and EBITDAR, that latter not accounting for research and

16 development costs, which are high in this industry.  The R&D

17 cost difference between the CVR and the plan is actually not

18 VI-0106.  You heard Mr. King testify that the FDA has required

19 a blood pressure study of Qsymia and that that is costing 16

20 and a half million dollars of research and development.  So Mr.

21 Demmy tried to insinuate that that 22 or so million dollar

22 difference between the EBITDAR in the CVR and the EBITDA in the

23 projections was the R&D for 106, the testimony is directly to

24 the contrary.

25         Also --

1          THE COURT:  I don't understand that so I want to

2    understand that point because the EBITDAR in the contingent

3    value rights agreement references specifically research and

4    development expenses related to VI-0106.  Presumably, research

5    and development expenses related to other things are included

6    in the EBITDA number.

7          MR. PINKAS:  They are included in the EBITDAR number,

8    not in the EBITDA, which is why the EBITDAR number is higher,

9    right, because it's earnings before R&D so you're earnings are

10   higher because R&D is not counted in EBITDAR.

11          And so, Your Honor, if you look at the two, there's

12   about a 22 and a half million dollar difference, Mr. Demmy's

13   point was that's all 106.  It's not.  You have testimony

14   uncontroverted in the record that 16 and a half million dollars

15   of that is actually Qsymia.  So clearly that's not the

16   difference maker here.  V-106 (sic) --

17          THE COURT:  Okay.

18          MR. PINKAS:  I just want to clarify that.

19          THE COURT:  I'll have to check.  I'm not sure if I

20   have any clear evidence in the record on that difference.

21          MR. PINKAS:  Understood, Your Honor.  But also on the

22   point about EBITDA versus EBITDAR, they both project earnings

23   but in different way.

24          We use EBITDAR in the CVR at the company's request.

25   The company requested that we tie to the existing products that

generate revenue, which by definition excludes VI-0106 because
as you've heard testimony on, it has no chance of generating
revenue in three years.  So if you think about the way the CVR
actually works, if you included 106, you would get no revenue
benefitting an upswing but you would get, if we tried to
develop it, costs, which would bring it down, which means that
if I put 106 into CVR I'm actually making it harder for the
company to hit the threshold.

        But, as Your Honor might surmise, I'm not here to
create problems, I'm here to solve them.  We have no objection
to including 0106 in the products that go in the EBITDAR
threshold in the CVR so long as the cost is also included, so
--

        THE COURT:  I'm not negotiating.  This isn't a
negotiation section.  It says what it says.

        MR. PINKAS:  I'm not making a settlement offer, Your
Honor.  If Your Honor wants to order it, that's fine.  I'm just
letting you know there's not some hidden agenda.

        As for Mr. Chlavin's offer on VI-0106, the debtors'
brief is replete with this.  Their business judgment was that
the work they would do for net proceeds from a million dollar
sale was not worth derailing a 275 million implied value plan.

        Your Honor, going to valuation, Mr. Demmy argues that
Ms. Stratton's information was stale.  She actually testifies
in her declaration that she updated the analysis on August 11th

after the end of Q2 results and used those figures as well as she scoured for additional precidential transactions for the other types of analysis' and found none.

She came up with a $231 million midpoint due solely -- the change being due solely to external factors.  So from that perspective, there's no mystery as to how she calculated. We have her methodology, we've discussed it at length.  There is no stale information here.

Mr. -- Ms. Stratton also testified she used a set of criteria that no one disputed in order to get to a data set that was objective.  And that's very critical, Your Honor. Objective.  The goal of her analysis was, as she testified, to create a pool of data and analyze them objectively while minimizing discretion in her analysis.

That way, she did not put her thumb on the scale of value, as Mr. Demmy insinuated.  And where she did exercise her discretion, she did so to the benefit of the debtors.  Your Honor heard that the negative growth rate of Qsymia could have been ten times higher, two and a half up to 30 times.  That clearly would have had a huge detrimental impact on valuation because Qsymia is the debtors biggest revenue driver.  It accounts for over 65 percent of their revenue per Page 84 of their 10-K.

The FDA has ordered the debtors to perform a CBOT analysis, which they have refused to do for years, that would

1  cost them between 180 and $220 million and they're trying to

2  get a bye from doing it.  But as Mr. King testified, the FDA

3  may very well require it to be performed.

4        In addition, Ms. Stratton gave the debtors the

5  benefit that they could guard away generics from taking away

6  Qsymia's market share in the next couple of years.  On both of

7  these points, Your Honor, another valuation expert could come

8  to a very different result with a much lower valuation.

9        So, Your Honor, where there is discretion, it

10  actually helps and if we're going to include the contingent

11  value of speculative assets, we also need to include the

12  contingent liabilities that were not in the valuation as Ms.

13  Stratton testified and that's Mr. Morgan's Xonics Photochemical

14  in case, 841 F.2nd 198 at 200.  It's a Seventh Circuit

15  decision.

16        Now Your Honor may say to me what else do I have?

17  What else is there?  We heard that -- the testimony from Mr.

18  Pickering that the debtors' financials are achievable but

19  optimistic.  They're actually ten percent off for this year

20  alone and as Mr. Demmy said, we're two thirds of the way

21  through the year.  So, Ms. Stratton's valuation may actually be

22  high.

23        Also, Piper Sandler and H.C. Wainwright went to the

24  market to raise capital in what Piper Sandler testified were

25  open capital markets for pharmaceutical companies.  Clearly

1  they did not raise the capital necessary to pay the debt.

2  So Your Honor says, okay, well, is that a sale?  Is

3  that a market test?  Yes, it is.  A full equity in debt raise

4  is a proxy for a sale of substantially all assets.  Why?

5  Because the stock issuance was offering the equity investor 90

6  percent of the company, i.e., a change of control, and the

7  money was being used to pay down the debt.  It was a balance

8  sheet restructuring proposal.  So, i.e., there's either no debt

9  or there's less debt.  And specific to 106, Ms. Stratton

10  testified that no investor put a value on it.  Thirty-nine

11  signed NDAs, not one put a value on it.

12  Mr. King testified that they couldn't develop it or

13  finance it.  So Mr. Demmy asks why did you not do a sale of

14  assets?  Well, simple.  The debtors determined their plan

15  exceeds the value of any asset sale.

16  And by definition, based on what they saw in the

17  market, they knew asset sales were going to come in at a lower

18  price.  And that decision was not made in a vacuum.  Ms.

19  Stratton received offers for assets as part of their strategic

20  alternative efforts.  There was not an offer made for 106 and

21  the sum of the bids for assets that were offered was well below

22  197 million of the financing.

23  So the financing was actually the best alternative.

24  And it's still a hundred million below the plan.

25  Finally, Your Honor, Ms. Stratton does a precedent

1  asset transaction analysis to multiply a multiplier by the

2  debtors' asset value, okay.  3.1 is the median in her analysis.

3  If you apply that, as she did in her precedent transaction

4  analysis, you still come in below the claims.  Again, asset

5  sales will not make the debtors solvent.  They marketed for

6  months and months and they used their business judgment was

7  there -- that the plan was their best option.  That's the

8  market test.

9          Your Honor, there was also --

10          THE COURT:  What the virtue -- what's the virtue --

11  excuse me for a second -- what's the virtue of using the

12  median?

13          MR. PINKAS:  I'm glad you asked me that, Your Honor.

14          The virtue of using a median, Your Honor, is for a

15  pure data set.  So, this Court has ruled that the use of a

16  median in valuation at confirmation is appropriate, that's the

17  Nellson Nutraceutical decision I cited, now at Page 31.

18  There's nothing credible in the record to say that's not

19  reasonable or incorrect, but now let's look at how the median

20  works versus the means, because Ms. Stratton said, right, the

21  purpose of the median analysis is to create objective data set

22  with all available data.  You're not excluding any outliers.

23  So you're looking at what all the data will tell you and you're

24  coming to an all data objective conclusion.

25          So let's look to Mr. Manousiouthakis' examples of

1  Supernus Pharmaceuticals.  He says let's change the enterprise

2  valuation by ten times.  By definition that will change the

3  outcome because Ms. Stratton's formula is not the enterprise

4  value.  It is enterprise value divided by revenue.  If you

5  change only the numerator, the multiplier will change.  As

6  such, the multiplier for the company would be 25, not two and a

7  half.

8          So Supernus was actually below the median before and

9  now it's going to jump well above, so in the median range, the

10 median has just gone up and in the mean range, the mean has

11 skyrocketed.

12         Ms. Stratton testified the use of the median is

13 appropriate as the optimal value in that valuation analysis

14 because it looks at the data objectively.  So she crafted an

15 objective analysis with all data.  I'm not a valuation expert,

16 Your Honor, but if you look at everything, it seems to me like

17 that's a good practice, and I don't hear a challenge to it.

18         She also testified that in using the mean, one has to

19 exclude outliers, so now you've introduced discretion, right.

20 Mr. Ahmadi (sic) actually agreed.  If you heard him say -- as

21 Your Honor heard him say, if the football coach was a professor

22 at UCLA, you would have had to exclude him from the analysis

23 because he's too high paid.

24         Again, Your Honor, Ms. Stratton was trying to get a

25 data set that did not skew the analysis in which she did not

1 have to exercise discretion to the debtors' detriment, which

2 the use of the median solves for.  And you can see that --

3          THE COURT:  There are going to be I assume, I mean,

4 Nellson Nutraceutical -- haven't read that one in awhile but it

5 was very specific and as I recall, Judge Sontchi just like did

6 his own evaluation, but -- and came up with his own valuation.

7 And maybe because he didn't buy management's projections, I'm

8 trying to remember, but there are going to be experts who use

9 the mean.  I mean, if I look back at the valuation hearing I

10 had last week, they might have used the mean.  So it's a call.

11 And I'm not saying it's the wrong call, I don't know that, but

12 if that one call changes the number as dramatically as it does,

13 doesn't that suggest that there could be another valuation?  A

14 higher valuation?  That to me is somewhat incredible if the

15 change of that one number -- or that one factor, and maybe this

16 is totally the wrong way to look at it, but if that change of

17 that one factor makes a dramatic difference, then even if the

18 rest of the methodology would be the same, which I think it

19 would be, what do I do with that?  I do nothing with that?

20          MR. PINKAS:  No, Your Honor.  Actually, I agree with

21 you that some other expert could come up with a different

22 valuation and a different valuation methodology.  But in your

23 example, what we're talking about I believe is an outlier.  So

24 when we look again to the other example that Mr.

25 Manousiouthakis gave us, he said what if I look at HLS

1  Therapeutics and Knight Therapeutics and I pull them out,

2  right.  Well, okay, HLS Therapeutics has an 8.4 times multiple.

3  Three times higher then the weighted median.  Okay.  So this

4  gets right to your point, Your Honor, that Piper Sandler used.

5  As such, excluding it as an outlier in a mean data set, means

6  the valuation actually goes down because you just took a high

7  number and you took it out of the population of data, right.

8          Also, if both of those companies were excluded, as

9  Mr. Manousiouthakis argued, the mean actually goes down because

10 HLS has a 8.4 times multiple about three times higher then the

11 median that Piper Sandler but Knight has a 2.2 times multiple,

12 only slightly lower.  So if you exclude both, the weighted

13 analysis based on a mean is going to drop considerably, right.

14 So, Your Honor, I think the short answer is, can people

15 disagree, absolutely.  We've been disagreeing for four days,

16 right.  So people can disagree.  And Your Honor may not agree

17 with Ms. Stratton.  My only point to you, Your Honor, is it

18 doesn't matter.  The debtors are 20 percent or more, I would

19 say more, away from equity value, right, and you have no

20 credible evidence to contravene the valuation analysis that Ms.

21 Stratton has done.  By definition, the debtors have met their

22 preponderance of the evidence on valuation.

23         THE COURT:  So let me ask you this question then.  Is

24 the fact that they're -- well, assume for the moment -- let's

25 put Dr. Ahmadi on the side, but are you saying that the fact

1  that there no other valuation in front of me means that there's

2  no -- means that the debtor has met their burden?  What are you

3  saying by what you've just said there?

4          MR. PINKAS:  So what I -- it's not a question of

5  whether evidence is one-sided.  It's a question of what is the

6  credible evidence by a preponderance.  And if you look to Judge

7  Owens' decision the Emerge Energy, that's the analysis she

8  uses.  And she says debtors are credible, other side not so

9  credible.  Debtors win the day.

10          There was contravening evidence --

11          THE COURT:  Yes, it was -- she has an interesting

12  sentence in her opinion which I don't have in front of me but

13  when I re-read it I thought how do I juxtapose her sentence

14  which sort of says like I don't have any reason to disbelieve

15  with the burden of proof.  It's an interesting -- because I

16  think it's a really well-written, well-reasoned decision and

17  then I get to this one sentence and I thought the burden of

18  proof issue was really important and I didn't understand the

19  one sentence.  I wish I had it in front of me because as I

20  said, I think it's a really well done decision.  So I'm trying

21  to make sure I understand the arguments on the burden of proof

22  which I'm not sure Judge Owens struggled in her Emerge

23  decision.

24          MR. PINKAS:  Your Honor, I don't recall that sentence

25  from the decision either.

1          THE COURT:  Yes.

2          MR. PINKAS:  I can't either agree or disagree with

3  you but, you know, I will say your last point was it wasn't

4  clear that that was contested.  We've had arguments from four

5  different objectors here as to Ms. Stratton's methodology and

6  her conclusions, and I would suggest to Your Honor about 90

7  percent of the arguments are not located in briefs, they have

8  evolved over time and so every objection feasible that could

9  have been raised to Ms. Stratton's analysis has come out.  I

10  don't think there's anything missing.  I don't think there's a

11  stone unturned, which I would then say to Your Honor would

12  distinguish us from that last sentence.

13          THE COURT:  Yes.  My apologies because I don't --

14  I've got many opinions on the bench, I don't have that one.

15          UNIDENTIFIED SPEAKER:  Your Honor, can I say

16  something?

17          THE COURT:  Not yet.

18          MR. PINKAS:  Your Honor, can I turn to 106

19  specifically just to answer a couple of other questions you

20  had?

21          THE COURT:  Yes.

22          MR. PINKAS:  Your Honor, the cost of the 106 analysis

23  and development is -- the testimony is totally congruent.  Mr.

24  King said $20 million for a Phase II trial.  He didn't say full

25  development.

1            Ms. Stratton said $40 million for Phases II and III,

2   and another $50 million to commercialize thereafter.  Mr.

3   Pickering, I can't remember his number, but he cited a high

4   cost, as well.  All three of them totally congruent, and Ms.

5   Stratton and Mr. Pickering have personal knowledge because they

6   both studied 106 to do their respective valuation analyses

7   pursuant to the plan.

8            Your Honor also asked where is the inflection point?

9   Ms. Stratton actually answered that in her testimony, as well.

10  She said it's after the completion of Phase II trials where you

11  have safety and efficacy data.  We don't have Phase II trials

12  or safety and efficacy data.  Your Honor --

13           THE COURT:  But I think she also said -- I could be

14  wrong.  I think she also said if that was going to happen

15  within her projection period she would value it.

16           MR. PINKAS:  If it was going to happen within her

17  projection period I believe she would have to value it.  But

18  you also had testimony that said it was never going to happen

19  within the projection period from Mr. King.  And in fact the

20  SEC filings say just that.  They say that this is years away.

21  Page 37 of the 10-K.  This is years away, and that's before

22  delays.  And I'll get to that happily, Your Honor.

23           On the debtors' lack of funding you asked what

24  evidence is there?  The cash collateral budget shows that upon

25  consummation of a plan the debtors don't even have funding to

1 pay their claims when all of their debt is either reinstated or

2 converted.  Clearly they can't pay for their own restructuring,

3 and Mr. Pickering's testimony was the debtors need financing

4 without it.

5          As to a future lack of funding you heard Mr.

6 Pickering testify that he looked at the exit facility and he

7 analyzed the funding to determine the feasibility of the plan.

8 As part of that he said there's funding for working capital,

9 not the VI-0106.  Nothing is being hidden.

10          Your Honor also asked what is management's view?

11 Okay.  Management's view, SEC filings are certified by

12 management.  If Your Honor takes judicial notice of the SEC

13 filings, they go into the record, that is management's view, I

14 would submit.  And they're cited to in everybody's briefing and

15 in everybody's argument, making it proper to do so.

16          Now, you don't need to take those views for the

17 truth.  They're not hearsay.  Right?  You can take them for the

18 value of what management believed at the time without

19 implicating hearsay because what Your Honor was trying to

20 understand was management's view.  And management's view said

21 in the 10-K, quote, "We may not be able, as in never, be able

22 to effectively develop and profitably launch and commercialize

23 Tacrolimus, or any other potential future development programs

24 which we may undertake, and that may include our inability --

25 or, excuse me, our ability to conduct Phase II and Phase III

1  trials, which could be delayed by patient enrollment, long

2  treatment time due to five things, effectiveness, disruption,

3  adverse medical events and side effects, failure to take the

4  placebo, and insufficient data.

5       Then we look to the projections, Your Honor.  You've

6  go the 13 risk factors that have to be met, Page 37 of the 10-

7  K, to generate a single dollar of revenue.  And --

8       THE COURT:  Which 10-K are you looking at, Mr.

9  Pinkas?

10      MR. PINKAS:  I'm sorry, Your Honor.  I missed that

11 last part.

12      THE COURT:  Which 10-K are you looking at?

13      MR. PINKAS:  It's the 10-K that was filed in March.

14      THE COURT:  March.

15      MR. PINKAS:  It is the 2019 10-K.  And it says, and I

16 quote, "The last risk factor, we may never achieve market

17 acceptance by patience, the medical community, and third-party

18 payors and generate product sales."  Moving down into that

19 quote, "If we are unable to successfully develop, produce,

20 launch or commercialize Tacrolimus, our ability to generate

21 product sales will be severely limited, which will have a

22 material adverse impact on our business, financial condition,

23 and result of operations."

24      So sitting here today, Your Honor, what do we have?

25 We have what I would submit are very cautionary statements in a

1  13-tree decision analysis.  We have 106 that's not approved to

2  treat PAH.  So the -- you heard a lot about the method of

3  delivery.  The method of delivery is irrelevant if the drug

4  can't be used to treat the disease that shareholders are

5  relying on to ascribe value.

6         But more importantly, Mr. King testified inhalation

7  doesn't work.  So what do we have?  We have a -- Mr. King

8  called it a dream.  I'll call it something a little bit more

9  commonplace.  I'll say it's a drug that the debtors have been

10 unable to develop for three years, and they're highly unlikely

11 to ever be able to develop again.  They tried to find a

12 partner.  They tried to find a lender.  They failed.  They made

13 clear that 106 is years away, and they would have to develop,

14 launch, and commercialize it.  Thirteen reasons why they could

15 not do that, all on the 10-K, so I won't read it back to Your

16 Honor.

17        The law treats speculative and contingent assets as

18 having zero value, and that's important not because the assets

19 are hard to value.  It's because they are so contingent that

20 they have no present value.  That's the _Spansion_ and _Ampex_

21 decisions.  Ms. Stratton's testimony was just that.  106 is so

22 speculative and contingent that it has no present value.  And

23 if you look at it on an asset basis no more than one million.

24 There is no evidence that says that calculation is incredible.

25 But it doesn't matter because we don't have to look to Ms.

1 Stratton.  If you look to Your Honor's contingent risk analysis

2 I'd say 15 percent is generous as to 106 getting through the 13

3 traps to be commercialized and generate revenue.  Multiply that

4 by 40 million, that's $6 million.  No matter how you look at it

5 the debtors are insolvent.

6       Mr. Demmy argued we should look at 2021 revenue in

7 evaluation.  That's apples and orange, Your Honor.  Ms.

8 Stratton says you have to value when you do the analysis as of

9 revenue in that year, clearly.

10       But more importantly, Mr. Demmy himself recognized

11 1129 valuation is done as of the effective date.  That's -- the

12 effective date is not in 2021, Your Honor.  It's around Labor

13 Day if Your Honor confirms the plan.  That makes sense because

14 as Your Honor heard there's a lot that would have to change to

15 get to 2021, including not on the asset side but also on the

16 claim side of the debtor's balance sheet.

17       We went through median and mean, Your Honor, so I

18 won't do that again.  Discount rate and working average cost --

19 excuse me, weighted average cost of capital, Mr. Demmy argues

20 you look to the exit facility.  Okay.  Ms. Stratton says he's

21 wrong, but okay.  Even if we look at the exit facility the

22 interest rate is 11 percent.  The commitment fee is two-and-a-

23 half.  That's 13-and-a-half percent cost of capital.  Ms.

24 Stratton testified not only is it improper to use that, but in

25 any event she said 13 percent is correct.  Okay.  The exit

1 facility is spot on.  So the exit facility provides no basis to

2 address the cost of capital.

3       Mr. Ahmadi testified, which Mr. Demmy then

4 incorporated in his argument, that the discount rate should be

5 ten percent.  I would argue to Your Honor that that simply

6 can't be the case.  The debtor's current cost of secured debt,

7 the secured notes, which were not issued to us, as you know,

8 exceeds that number.  Their cost of debt in the secured notes'

9 indenture, their only secured debt, is 14 percent.  That's the

10 definition of interest rate in Section 2.3(d), and that

11 indenture is available at the June 8th, 2018 8-K.  And of

12 course, Your Honor, that 14 percent is before I impute the time

13 value of money, so the discount rate is necessarily higher.

14       Your Honor, just a couple very quick points on the

15 June 20 presentation.  I gave you the law.  The presentation

16 was for a very different purpose than what we're doing today.

17 I am not suggesting that Your Honor can't look at it.  I'm not

18 suggesting that it doesn't exist.  All I'm saying is, number

19 one, it was for a very different purpose, number two, the law

20 says it's immaterial and to be given no to little weight per

21 the cases I cited.

22       Your Honor, let's now talk about the practical as I

23 try to round this out.  The shareholders make multiple

24 restructuring proposal, none of which account for the debtors'

25 reality.  The shareholders asked the Court for a long-term

1  forbearance, or that certain assets be hived off for their

2  benefit.  None of that comports with the absolute priority

3  rule.  None of that is feasible.

4          The debtors don't have a liquidity issue.  Their debt

5  is matured.  They need a balance sheet restructuring.  It's a

6  very, very different scenario than what the shareholders

7  proposals hypothesized.  And as the debtors testified and their

8  independent auditor found, which going concern qualification is

9  again in that March 10-K, the independent auditor found that

10 debtors cannot continue as a going concern without a balance

11 sheet restructuring.

12         So I want to correct the record on one point, Your

13 Honor.  One of the shareholders argued that IEH tried to help

14 the debtors for 30 days.  No, Your Honor.  In November 2019,

15 eight months before the petition date, we went to the debtors

16 and we said we have heard in your earnings call that you said

17 it would be crazy to refinance the convertible notes at this

18 time because, number one, they're not callable, and number two,

19 since they're not callable you would have to carry two pieces

20 of debt until the maturity date, and therefore pay double

21 interest.  We said to the debtors we will consent to letting

22 you call, and we will eliminate your double interest.  We will

23 give you that consent any time you have the money.  So we

24 eliminated any roadblock to them doing the refinancing, which

25 is critical, because here was have shareholders saying the

debtors didn't do enough for eight months.  Under the terms of
their debt documents they could actually do nothing for eight
months.  The only option they had was to give us $170 million
on May 1st.  They couldn't call us, they couldn't redeem us,
they couldn't convert us, so we actually gave them the option
to do this refinancing, none of which we were required to do.
So clearly, Your Honor, we were trying to help these debtors
much farther ahead of time, and all of this is in the public
SEC filings, the convertible indenture is a public document.

Finally, Your Honor, absent confirmation the debtors
are back to the drawing board and the claims amounts only grow.
All of that would result in a worse outcome for the company and
shareholders.

Lastly, Your Honor, I want to just touch on the
releases, and this supposed behavior that has been attributed
to IEH as being unfair.  On the releases we are the only
creditor not being paid in full.  We are agreeing to roll our
secured debt into the exit facility.  We are agreeing to
convert 170 million of unsecured debt claims at what the
debtors say is a 76 percent recovery.

What are doing in exchange?  We are giving people $45
million.  Unsecured creditors are getting payment in full to
which they otherwise wouldn't be entitled.  That's $5 million
out of 76 percent recovery.  And shareholder recovery is $5
million on the effective date and up to $35 million in a CVR.

1  So, Your Honor, we go back to the very simple premise upon

2  which shareholder arguments start.  The debtors and IEH do not,

3  quote, eagerly desire releases because of a hidden agenda, as

4  Mr. Dijkstra implied.  They have a plain purpose, and it makes

5  perfect sense.  Releases are integral to this plan because the

6  valuation implied in the plan of $275 million plus the CVR is

7  in excess of the debtor's value.  And that was done to minimize

8  the disruption in the debtor's business and to close this

9  chapter.

10        I think it's self-evident for Your Honor, but I'll

11 say it, absent the releases we would not support a plan above

12 the debtors' valuation because we would be asked to pay people

13 up front and hope that they would not make a claim that would

14 disrupt the business that we have to be repaid out of.  Nobody

15 in their right mind would do that, much less a lender.

16        Looking to the case law in this district, Your Honor,

17 Pages 8 to 12 of our reply cite 12 cases that have approved

18 releases either identical to or very similar to this one.

19 Also, Your Honor, you'll hear the argument again from Mr.

20 Morgan, but 1141 puts all parties in interest to the onus to

21 object to a plan because it is a super contract binding them.

22 As such, for the cases we cited in the reply the opt out

23 structure is appropriate.

24        More importantly, Your Honor, the opt out structure

25 worked.  106 shareholders chose it, and over 10,000

1  shareholders said I would prefer to get the settlement and did

2  not object.  So I would submit to Your Honor there is actually

3  overwhelming settlement that this plan be confirmed.

4        I will touch on the existing stock settlement very

5  simply, Your Honor.  It's either a conditional gift or it's a

6  settlement.  Either one is appropriate and valid.

7        As to our behavior, Your Honor, and I'll round out

8  here and finish, the debtor's restructuring is not the result

9  of a zealous note holder.  It was borne of necessity.  The

10  debtors had a maturity that was public since 2013.  They have

11  not had cash since 2013 to pay their debt.  IEH waited five

12  years to be repaid.  We tried to eliminate roadblocks, as I

13  said, for eight months.  We permitted other noteholders to be

14  paid so that we could give the debtors forbearance for an

15  additional 60 days so that they could again try to refinance

16  twice, all while we negotiated in the background the balance

17  sheet restructuring as a contingency that the debtors asked us

18  for.

19        We're the only party entitled to a distribution that

20  is impaired, and we're proposing to give shareholders a

21  recovery despite that impairment.

22        Finally, Your Honor, we spent over $60 million of our

23  money to buy the secured note claims to enable a prepackaged

24  restructuring to minimize the impact on the debtor's business

25  so that we could then support a plan in excess of the debtors'

1  value.

2          Your Honor, I have not seen this in other cases, so I

3  am not going to tell you that this is mainstream or common, but

4  I would say to Your Honor IEH's actions are not only laudable

5  compared to many fact patterns that Your Honor sees, but they

6  are the only reason creditors will be paid in full and

7  shareholders will get any recovery.

8          Finally, Your Honor, last point, the debtors

9  conducted an independent investigation to support the debtor

10 release in the plan.  That investigation, as you see in Ms.

11 Frizzley's declaration, included Ethereum and IEH, Ethereum

12 being the prior secured noteholder.  The investigation, per Ms.

13 Frizzley, found no colorable causes of action, and her

14 testimony is uncontroverted.

15         So, Your Honor, there's nothing being hidden here.

16 We are trying to do the right thing.  We are trying to give the

17 shareholders value that they're not entitled to.  We're trying

18 to give creditors an additional $5 million they're not entitled

19 to.  And we're just trying to move on so that in hopes when we

20 own this business we could actually hope to get repaid from it.

21 It's that simple.  I don't want to say there's a hidden agenda.

22 There certainly isn't one.  It's all as plain as the tip on my

23 nose.  And I would say, Your Honor, with that confirmation

24 should be approved.  Thank you.

25         THE COURT:  Thank you.  I'm not suggesting there's a

1  hidden agenda, but I assume that IEH has taken actions that it

2  believes are in its best interests to take, as I would expect

3  them to do.  Okay.

4         MR. MANOUSIOUTHAKIS:  Your Honor, sorry about that.

5  Can I speak?

6         THE COURT:  You can have five minutes.

7         MR. MANOUSIOUTHAKIS:  Okay.  Thank you.  Just in

8  order to clarify the issue about the median, because things

9  stand exactly the way I said they stand.  Whatever the IEH

10 counsel said about the median does not affect anything that I

11 said.  The median concept, once you apply it to one of the

12 columns, pick any column you want, you rank the entries of the

13 column.  It's only the two -- the two entries in the middle

14 that matter.  For example, if we want to talk about

15 (indiscernible) to revenue as we start and discussed, what is

16 the smallest number that I see in that column?  .9X.  That will

17 be at the bottom of the column.  It will be irrelevant.  What's

18 the highest number?  7.3X.  It will be at the top of the

19 column.  It will be irrelevant.  Its only relevance is is it

20 above the two middle entries?  The concept is identical.  I

21 just -- you know, create confusion just to create confusion.

22 This is what we are observing.  That's item number one.

23         The number two items means the IEH counsel talks

24 about how the VI-0106 may take years to develop and so on.  It

25 says all (indiscernible) designation.  The minute that it

1  completes the Level II it will have fast tracking.  It does not

2  have only fast track designation in the U.S. It also has it in

3  the E.U.  It's a whole different market.  How many people have

4  been approached in the E.U. to license it at Phase I?

5  (indiscernible) managed to license for 90 million its Phase I

6  drug.  So that's one issue there.

7            And then the issue about the Ethereum payment, one

8  could attribute some possible fraud to the IEH that if Ethereum

9  debt holders are still in play, then they may have to be an

10 integral part of the negotiations between the debtors and the

11 creditors.  And they may not be agreeable to we will becoming a

12 subsidiary of IEH.  Could that be a possible rational that may

13 enter into these considerations?  I don't know.

14            So these are the three points I wanted to make.

15 Thank you.

16            THE COURT:  Thank you.

17            MR. DEMMY:  Your Honor?

18            THE COURT:  Mr. Demmy?

19            MR. DEMMY:  Yes.  I just want two minutes, both on

20 evidentiary issues.  First, we did not cite SEC documents in

21 our papers.  We didn't rely upon them.  The record is closed.

22 The debtors had an opportunity to offer SEC exhibits.  I object

23 to the Court taking judicial notice of SEC filings.

24            Two -- point two, we just went through about an hour-

25 and-a-half, as I counted it, of the sixth witness for the

debtor, Mr. Pinkas.  He made some argument, but he did a lot of

testifying, Your Honor, and I'm sure you understand that, and

I'm sure you can decipher amongst his statements which was

testimony about what IEH Biopharma did or didn't do, or what it

thought, or what the debtors did or didn't do and thought.  I

just wanted to note those two for the record.  So I did not

want to interrupt Mr. Pinkas while he was testifying as the

sixth witness for the debtor after the record is closed, but

it's there, and I couldn't let the record close without me

making that observation.  Thank you, Your Honor.

THE COURT:  Thank you.  Mr. Morgan?

MR. MORGAN:  Thank you, Your Honor.  So, Your Honor,

as I was listening to Mr. Pinkas I was steadily crossing my

arguments off.  At this point I think I would put it back to

you given the hour and given the length of the arguments, the

testimony, the record in front of you, the papers, everything

you have in front of you, I think you have what you need to

find the debtors have met their burden by a preponderance of

the evidence.

That said, I am happy to address any questions you

have.  I'm happy -- I love the spotlight, so -- I hate to give

it up, but I think you have what you need, Your Honor.

THE COURT:  Okay.  Thank you.  I do not have any

additional questions for anyone.  And if there's anything that

you think has not been covered I will hear that.  But otherwise

1  I think the way this turned out with Mr. Pinkas speaking last,

2  as you pointed out, you were crossing things off your list, I

3  think he summarized, whether through argument or perhaps

4  through testimony, as Mr. Demmy would say, the debtors'

5  position, and those in support.  So I have no remaining

6  questions.

7        MR. MORGAN:  I think, Your Honor, the one other --

8  thinking back to the U.S. Trustee's concern --

9        THE COURT:  Yes.

10       MR. MORGAN:  -- Mr. Pinkas had mentioned that he

11 would be happy to re-notice.  I actually caution against that.

12 We have many thousands of shareholders.  I don't think it's

13 appropriate to re-notice all of the shareholders.  I think, and

14 submit, and we've argued that it was clear as written.  These

15 people -- these shareholders received the notice.  There's no

16 shareholders that didn't receive the notice.  And almost by

17 definition those -- by definition those that responded to the

18 opt out form received the forms that Ms. Casey pointed out were

19 so clear and so carefully worded.  So they already had the

20 disclosure.  They already had the material.  Sending more

21 material I don't think is going to make it better.  And in

22 terms of Ms. Casey, you know, sort of hitting on we have

23 testimony of confusion, we have testimony of confusion, that's

24 not what we have testimony of.  We have testimony that a few

25 people reached out to (indiscernible).  Also, if you look at

1  the opt out form there's an e-mail and a phone that suggests

2  that they reach out, if they have any questions.  The reason we

3  put that in every opt out notice is that people have questions

4  sometimes they'd want to ask and understand.  There's no

5  testimony that there's some great -- you know, great massive

6  confusion.

7        So I think the rest of the arguments go to what we've

8  already addressed in our papers, and I don't know that we need

9  to get into arguing the finer points of the relief, but I did

10 want to address that because it had to do with the

11 communications.

12        Also, the -- my third -- my third also, that e-mail

13 that went out, you know, two things to note about it.  One, if

14 you didn't respond nothing happened.  Two -- but it starts off

15 by saying you have opted out.  You have opted out.  There --

16 this is -- if you did not respond, you could do nothing, you'd

17 stay opted out.  The revocation was trying to confirm that

18 people wanted to make sure that they were doing what they

19 thought they were doing, and then if they were we needed

20 information.  But information is the key.  That's what we were

21 trying to ask for.

22        THE COURT:  I think I'll address that.  If I confirm

23 the plan we'll come back and have a discussion about what needs

24 to happen with respect to either the entire shareholder

25 constituency, or those who had some subsequent communications

1  with Stretto.  So I'll address that and may have some further

2  questions with respect to that because it is a little bit

3  unusual situation, or at least I haven't encountered this

4  specific type of situation before, so I would need to give some

5  thought as to what I think would be appropriate in this

6  circumstance.  I hear Mr. Pinkas being flexible is what I hear

7  on that issue.  But we'll have that discussion, if need be,

8  once I rule.

9          MR. MORGAN:  Understood, Your Honor.

10          THE COURT:  So I want to thank everybody for their

11 arguments, and quite frankly for the way the entire hearing has

12 been handled.  I know it's very difficult for those who are

13 unrepresented.  I think you acquitted yourselves well under the

14 circumstances.  And I will take this matter under advisement.

15          My goal had been to rule promptly.  I am not going to

16 write.  It's going to be from the bench.  But I will tell you

17 when it won't be.  It won't be tomorrow because I have a full

18 day trial tomorrow on something else.  It won't be probably the

19 next day.  And I got a new case, so I have first days.  So I

20 will get to this as soon as I can, and my goal is to consider

21 what has been said carefully, and to rule as promptly as I can.

22 And my chambers will reach out to parties to let them know when

23 that is going to happen.  And given that I probably have more

24 control over when that can happen then I have in terms of

25 scheduling this, I'll try to make it at a time that is more

1  palatable for everybody on the call, no matter where you're

2  located.

3           So that will be the goal, given that the ruling will

4  be -- while it could be lengthy, it's something I control more

5  than the -- than how a hearing needs to proceed.  So thank you

6  again.  My chambers, as I said, will reach out and let you

7  know, and I will get to this as soon as I can.  I want to give

8  the consideration that it clearly deserves.  So thank you --

9           UNIDENTIFIED ATTORNEY:  Thank you, Your Honor, for

10 your time.

11          THE COURT:  -- and we're adjourned.

12          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

13          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

14          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

15                         *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

# **C E R T I F I C A T I O N**

We, DIPTI PATEL, KAREN WATSON, BETH GRIGSBY, KAREN HARTMANN, CINDY POST and TAMMY DeRISI, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter to the best of our abilities.


/s/ Dipti Patel                        /s/ Karen Watson

DIPTI PATEL                            KAREN WATSON


/s/ Beth Grigsby                       /s/ Karen Hartmann

BETH GRIGSBY                           KAREN HARTMANN


/s/ Cindy Post                         /s/ Tammy DeRisi

CINDY POST                             TAMMY DERISI

RELIABLE                        Date:  September 2, 2020