<pre>
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE

IN RE:                          .  Chapter 11
                                .  Case No. 20-11779 (LSS)
VIVUS, INC., et al.,            .  (Jointly Administered)
                                .
                                .  Courtroom 2
                                .  824 Market Street
            Debtors.            .  Wilmington, Delaware 19801
                                .
                                .  Thursday, December 3, 2020
. . . . . . . . . . . . . . .   10:05 a.m.


              TRANSCRIPT OF TELEPHONIC/ZOOM HEARING
       BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Debtors:            Jared R. Friedmann, Esquire
                            Matthew S. Barr, Esquire
                            Gabriel A. Morgan, Esquire
                            WEIL, GOTSHAL & MANGES, LLP
                            767 Fifth Avenue
                            New York, New York 10153
                            -and-

                            Zachary I. Shapiro, Esquire
                            RICHARDS, LAYTON & FINGER, P.A.
                            920 North King Street
                            Wilmington, Delaware 19801


(APPEARANCES CONTINUED)

Electronically
Recorded By:                Felicia Morton, ECRO

Transcription Service:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            Telephone: (302) 654-8080
                            E-Mail:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording:
transcript produced by transcription service.
</pre>

1  APPEARANCES CONTINUED:

2  For Steven Chlavin:        Lucian B. Murley, Esquire
                             SAUL EWING ARSNSTEIN & LEHR, LLP
3                             1201 North Market Street
                             Suite 2300
4                             Wilmington, Delaware 19899

5
   For the Official
6  Committee of Equity
   Security Holders:          Joseph C. Barsalona, II, Esquire
7                             MORRIS NICHOLS ARSHT & TUNNELL, LLP
                             1201 North Market Street
8                             Suite 1600
                             Wilmington, Delaware 19801
9
                             -and-
10
                             Joseph O. Larkin, Esquire
11                            SKADDEN, ARPS, SLATE, MEAGHER &
                               FLOM, LLP
12                            One Rodney Square
                             920 North King Street
13                            Wilmington, Delaware 19899

14
                             Mark A. McDermott, Esquire
15                            One Manhattan West
                             New York, New York 10001
16

17
   For IEH Biopharma:         Oscar N. Pinkas, Esquire
18                            DENTONS US LLP
                             1221 Avenue of the Americas
19                            New York, New York 10020

20

21  ALSO APPEARING:

22  For Interested Party:    Dennis Dijkstra, Pro per

23

24

25

INDEX

MOTIONS:                                                          PAGE

Agenda
Item 4:   Second Amended Joint Prepackaged Chapter 11       5
          Plan of Reorganization of VIVUS, Inc. and its
          Affiliated Debtors
          [Docket No. 339; filed November 10, 2020]

Court's Ruling:                                                  105


                            WITNESSES

WITNESSES CALLED
BY THE DEBTORS:                                                  PAGE


        MARK OKI

              CROSS-EXAMINATION BY MR. DIJKSTRA             31


WITNESSES CALLED
BY THE EQUITY COMMITTEE:                                         PAGE


        CHARLES BOGUSLASKI

              CROSS-EXAMINATION BY MR. DIJKSTRA             50

        DAVID CLARK DEES

              CROSS-EXAMINATION BY MR. DIJKSTRA             54


                            EXHIBITS

NUMBER:                                                          PAGE

1) Declaration of Mark Oki                                      31

2) Declaration of Charles Boguslaski                            50

3) Declaration of Clark Dees                                    54

TRANSCRIPTIONIST'S CERTIFICATE                                 128

1      (Proceedings commence at 10:05 a.m.)

2           THE COURT:  Thank you.

3           Good morning.  This is Judge Silverstein.  We're

4   here in the VIVUS, Inc. bankruptcy case, Case Number 20-

5   11779.  We're getting a lot of feedback.

6           Ginger [sic], can you remind us for the protocol

7   for the hearing, please?

8           THE ECRO:  It is extremely important that you put

9   your phones on mute when you are not speaking.  When

10  speaking, please do not have your phone on speaker as it

11  creates feedback and background noise, it makes it very

12  difficult to hear you clearly.

13          Also, it is very important that you state your

14  name each and every time you speak for an accurate record.

15  Your cooperation in this matter is appreciated.  Thank you.

16          THE COURT:  All right.  Thank you.

17          Mr. Shapiro?

18          MR. SHAPIRO:  Good morning, Your Honor.  For the

19  record, Zach Shapiro.  I actually will turn the podium over

20  to Mr. Barr.  He has some opening remarks I think he wants to

21  make.

22          THE COURT:  Thank you.

23          Mr. Barr?

24          MR. BARR:  Thank you, Your Honor.  And Your Honor,

25  just so -- for purposes of making sure that we do what we

1 would like to do with your agenda, there were two open agenda

2 items on the calendar before the confirmation hearing, which

3 we're all obviously prepared and here for.  Those are the

4 retention applications of the law firms for the equity

5 committee.  Would you like us to go to the confirmation

6 hearing and you'll take those up separately, or would you

7 like to deal with those first?

8          THE COURT:  Let's go ahead and deal with those.  I

9 just have a question with respect to the form of order.

10          So, for both the -- I've reviewed both the Skadden

11 retention and the Morris Nichols retention papers, and I

12 notice that the form of order of both contains a provision --

13 it's a little unusual, let me find it.  It's the last

14 paragraph, probably in both.  And it says that,

15 notwithstanding the retention, the rights of everybody are

16 preserved to object to the allowance and payment of fees and

17 expenses on the basis of a conflict of interest, or that the

18 firm has an interest materially adverse to the interest of

19 any class of creditors for any reason.

20          So, as I said, that's an unusual paragraph.  We

21 get conflicts decided up front.  So what's the reason we're

22 reserving something here?  What's the concern?

23          MR. MCDERMOTT:  Your Honor, if I may, this is Mark

24 McDermott on behalf of Skadden Arps.

25          So there has been no objection to our retention

1   that I'm aware of, certainly not on grounds of any kind of

2   conflict.  The only evidence we have is my declaration.  My

3   firm has never represented VIVUS, does not represent Icahn

4   Enterprises or any of its affiliates, and to my knowledge,

5   never has.  There are some parties-in-interest in the case

6   that we represent on unrelated matters to this case.

7           The genesis of this language of this case was IEH,

8   and it was accommodated by my firm, no real issues with it.

9   But I do agree with you that it is a little bit unusual.  And

10  it's not motivated, that I am aware of, by any belief by IEH

11  that there's any kind of conflict here.

12          What actually drove it in our case was that there

13  were two financial institutions that I would prefer to leave

14  nameless that are clients of ours on unrelated matters.  One

15  I believe is an indenture trustee, and one I also believe is

16  a former lender.  I can represent that they were never the

17  focus of anything we did here in this case, for what it is

18  worth.  There was never a thought in anybody's mind that

19  there was anything there, even looking at it.  But I repeat,

20  even with respect to those institutions, we've never

21  represented them on anything involving this case.

22          This language was important to IEH.  Again, I'll

23  admit, like you said, that it is a little unusual.  I wasn't

24  necessary wild about it, either, but I was also interested in

25  minimizing friction and maintaining peace in the valley.  So

1  I was fine putting it in there, but I can certainly

2  understand why it drew your attention and why you have the

3  questions that you do.

4        THE COURT:  Okay.  Let me hear from IEH on why I

5  need this language because I don't want to start a practice

6  of having this language in retention orders.  I just dealt

7  with several retentions in cases, and I have ruled in each

8  instance, based on the context and the evidence that I have

9  in front of me on conflict issues, and have done it prior to

10  approving retentions, so that we're not in a situation that,

11  after the fact, I have an issue, either with fees or with

12  even something broader than that, that comes back to haunt

13  the case.  So I need to understand why I should have this

14  language in this order.

15        MR. PINKAS:  Understood, Your Honor.  This is Mr.

16  Pinkas from Dentons.  I'm on the phone, my Zoom isn't

17  working, it's telling me someone will connect me soon, so

18  that's the reason you can't see me.

19        THE COURT:  Ah, we need to --

20        MR. PINKAS:  So I can -- I --

21        THE COURT:  -- get you connected.  Okay.

22        MR. PINKAS:  Yeah.  I'm coming in, I'm coming in

23  now.  Can you -- let me just strike the video --

24      (Participants confer)

25        THE COURT:  Okay.  Let me ask whether --

1          MR. PINKAS:  Can you see me, Your Honor?

2          THE COURT:  I do.  You're sideways, but I see you.

3          The -- let me ask whoever is hosting this to

4    please check to make sure that we have everyone who's

5    supposed to be in the Zoomcast on the Zoomcast.

6          Mr. Pinkas.

7          MR. PINKAS:  Yes, Your Honor.  Thank you very

8    much.  Can you see me now?

9          MR. PINKAS:  Okay.  Great.  Your Honor, I fully

10   appreciate that this is a odd provision.  And frankly, we

11   discussed this provision at length with both MNAT and

12   Skadden, one, before we agreed to it; and, two, before the

13   hearing.

14         The genesis of the provision, as Mr. McDermott

15   said, in each order is not that we believe something has

16   actually happened.  But we're in the odd case here where the

17   equity committee was appointed recently, has not filed any

18   fee application, and we're not aware of what work they did

19   because we're here consensually, right?  And so it's the odd

20   case because we don't have information, number one.  And

21   number two, the classes of creditors that are impaired in the

22   plan constitute just three creditors total:  Two trustees and

23   IEH.  The financial institutions Mr. McDermott is referring

24   to is -- are the financial institutions that are the

25   trustees, and MNAT also represents those entities on

1  unrelated matters.  And in addition, MNAT represents IEH

2  affiliates on unrelated matters.

3         And so the purpose of this language is not to hold

4  up retention.  I just want to be very clear about that.  What

5  we're trying to do is to simply reserve rights as to fees and

6  expenses, if it turns out that what is being represented to

7  the Court turns out to be incorrect.

8         And I will tell Your Honor we did discuss with

9  both MNAT and Skadden, prior to this hearing, that Your Honor

10 might not be comfortable with the language in the orders.

11 And if that is the case, my understanding is that Skadden and

12 MNAT would make representations on the record, and we would

13 just agree to reserve rights based on those representations.

14 I'm happy to proceed in that way.  And I think, you know, if

15 we just have that confirmation, we could then just delete the

16 language out of the orders.

17        THE COURT:  I guess I'm still not sure what's

18 being reserved, and that's the whole point.  I don't think

19 we're in any different position than we are with retentions

20 in the beginning of the case.  Debtors' counsel files

21 retention in the beginnings of the cases for all of their

22 professionals; they are approved prior to any fee

23 applications being submitted.  And if there is a conflict, I

24 expect someone to come forward and tell me there is a

25 conflict.

1          And I've recently had that in several cases, and

2    I've made those decisions.  And in one instance, I limited

3    what debtor's counsel could do with respect to a certain

4    creditor.  And in one instance, I found there was no actual

5    conflict.  And I've had those decisions.

6          But it seems to me a fundamental principle, a

7    first principle of retention that I determine if there's any

8    conflicts or not.  And if people are -- if firms are

9    representing, as if often the case, creditors in unrelated

10   matters, I don't consider that to be a conflict or an actual

11   conflict, and I assume that professionals have appropriate

12   waivers if they're going to take a position adverse to

13   someone, and they're, in fact, not going to breach their

14   professional ethical obligations with respect to their

15   clients.

16         So is that what your concern is about?  And is

17   your concern for the world, or is your concern just for IEH?

18         MR. PINKAS:  That -- you're right, Your Honor.

19   That is the concern, and that concern is focused on IEH, as

20   the debt holder in the two classes.  But I will note the

21   trustees are -- you know, could be argued to be the claim

22   holders, which is why the trustees get looped into this.

23         And so I understand that Mr. McDermott is saying

24   there is no conflict of interest or material adverse

25   interest, and that that was represented.  I understand that

1  that's what Mr. Barsalona would say for Morris Nichols.  If

2  that's, in fact, the case, then that's what's represented to

3  the Court; and if that is true, then they should absolutely

4  be retained.  And if Your Honor is comfortable with that,

5  that's fine.

6            But you know, I just want to be clear that, if

7  something comes up after the fact, you know, it's -- we're

8  just early on here.  And so I -- you know, I defer to Your

9  Honor how you want to deal with this.  But I understand

10 Mr. Barsalona will make the same representation, and we would

11 just simply reserve our rights, with the full expectation, by

12 the way, Your Honor -- I will make this very clear.  These

13 are sophisticated counsel.  I expect their representations to

14 be true and accurate.  I don't, in any way, bespeak them or

15 disbelieve them.  It's simply a lack of information.

16           And so, with that, Your Honor, if Mr. Barsalona

17 will make his representation, I'm comfortable removing the

18 paragraphs from the order and, you know, dealing with this

19 later, if that turns out to be untrue.

20           THE COURT:  Okay.  Well, I'll let Mr. Barsalona

21 make a representation because you all have had these

22 discussions.  But I make the information -- I make the

23 decision on retention based on the information that is

24 presented.  And of course, I assume that it is correct, and

25 that the professionals are giving me accurate information.

1  And I'm not going to start a practice where we have

2  reservations in orders, and I don't see this as any different

3  than any other case that I have with respect to retention

4  applications.

5          So, Mr. Barsalona, I'm happy for you to make

6  whatever representation you want to make, in addition to what

7  I've read in the two declarations that I think were filed by

8  Mr. Dehney.

9          MR. BARSALONA:  Good morning, Your Honor.  For the

10 record, Joe Barsalona from Morris, Nichols, Arsht & Tunnell.

11 And thank you for your time this morning on this issue.  Hate

12 to be before you on a retention issue, but we are where we

13 are.

14         So, as Your Honor just stated, there are two

15 declarations on file by Mr. Dehney, and he's here to testify,

16 if necessary.  We have advanced waivers with all of the

17 affiliates with respect to the two trustees, as well as the

18 IEH.  And these -- on top of that, the Icahn Enterprises

19 matter is closed as of right now, so we don't have a present

20 matter, which is very important under 1103(b), which is what

21 we're here on today.

22         That being said, Your Honor, we also can make the

23 representation that there is continuing no conflict of

24 interest, as we stand here today, that will show up in our

25 time records.  And all rights are reserved by IEH, as well as

1   MNAT, to defend that when the time comes.

2           THE COURT:  Okay.  Okay.  So the representations

3   have been made, whether they were necessary or not.  I'm

4   going to approve the retentions based on the papers as filed

5   and the declarations as filed.

6           I did particularly look to see if either firm had

7   represented any Icahn entities.  I did note the supplemental

8   declaration of Mr. Dehney, I did note the waivers and the

9   possibility that this would be closed.  It is now closed.  I

10  do not hear Icahn objecting to retention or IEH objecting to

11  retention on that basis of the known information that we

12  have, so I'm approving these retentions.

13          And if you want to submit clean orders, that's

14  fine.  Otherwise, I'll just strike out the last paragraph.

15      (Participants speak simultaneously)

16          THE COURT:  Okay.  We'll strike the --

17          UNIDENTIFIED:  Sorry, Your Honor.

18          THE COURT:  We'll strike the applicable paragraph,

19  and I'll approve them.

20          MR. BARSALONA:  Thank you, Your Honor.

21          MR. PINKAS:  Understood, Your Honor.  Thank you.

22  This is Mr. Pinkas.  That's what we were trying to

23  accomplish.

24          THE COURT:  Okay.

25          MR. PINKAS:  I appreciate the Court's indulgence.

1          THE COURT:  Very well.  Okay, we can move on.

2          MR. BARR:  Thank you, Your Honor.  Again, for the

3   record, Matt Barr of Weil Gotshal on behalf of VIVUS and its

4   affiliated debtor entities.

5          Your Honor, on behalf of VIVUS, its board, its

6   management, its employees, and the stakeholders, we thank you

7   very much for making the time today to be back in front of

8   you on our combined disclosure statement, confirmation, and

9   solicitation procedures motions.  As we previewed back at the

10  conference on November 5th, this is the continuation of that

11  hearing and, importantly, the amendments of the -- to the

12  Chapter 11 plan that are before the Court today incorporate a

13  settlement negotiated following the court-authorized

14  mediation with Chief Judge Sontchi with the full support of

15  the equity committee appointed by the United States Trustee

16  after Your Honor's September ruling, the supporting note

17  holder, and VIVUS.

18         As mentioned, we did file a second amended plan at

19  Docket No. 339 with a redline at 340.  WE did last night file

20  a slightly revised second amended plan at Docket 407 with a

21  redline as well.

22         We also filed in connection with the settlement,

23  which we'll talk about in a little bit, and the plan an

24  amended and restated plan supplement at Docket 367; and

25  subsequent amendments to the final royalty agreement at

1  Docket No. 376; and the trust agreement at Docket 377, Your

2  Honor.

3         We also filed last night a revised opt-out notice

4  at 408.  And if Your Honor is inclined to approve the

5  disclosure statement, solicitation, and confirmation at the

6  end of the hearing, we will go through the changes in each of

7  those, which are changes made at the request of either the

8  U.S. Trustee, the Office of the United States, the DOJ, or

9  other stakeholders to resolve some of the issues and concerns

10 that they had with the notice and/or the order.

11        Your Honor, on Tuesday, December 1st, we filed our

12 supplemental memorandum of law and reply at Docket 389, which

13 supplements our original memorandum of law.  We didn't feel

14 that you wanted us to go through each and every element again

15 since the record remained open and this was a continuation.

16        We also incorporated the declarations and

17 testimony that was already in the record that you reopened in

18 support of confirmation, including the testimony of Ms. Jill

19 Frizzley; a declaration of an independent director at

20 Docket 188; Mr. Thomas King, an independent director, at

21 Docket 189; Mr. Brian Karpuk of Stretto, the claims and

22 noticing agent, at Docket 187; Mr. Van Pickering of Ernst &

23 Young, the debtors' financial adviser, at Docket 190; and

24 Ms. Teri Stratton at Piper Sandler, the debtors' investment

25 banker, at Docket No. 191.

1        Your Honor, importantly, we also filed a new

2   declaration with supplemental evidence following the

3   September hearing, and the declaration of Mr. Mark Oki, the

4   debtors' chief financial officer and chief accounting

5   officer, at Docket 391.

6        Your Honor, I did not introduce all the parties

7   that are here.  I see many, many faces or blocks.  We have

8   either with us or available each of those witnesses, should

9   Your Honor have any questions, but of course Mr. Oki, who is

10  the new declarant, which we will be moving into evidence

11  shortly, is here and available for cross-examination.

12       As Your Honor knows, following your September

13  ruling, the United States Trustee solicited interest in and

14  formed the equity committee on September 22nd.  The committee

15  has three members, including two of the four equity holders

16  that previously objected to the initial plan -- they are on

17  the equity committee -- and they hired very sophisticated and

18  experienced advisers in Skadden Arps; Morris, Nichols,

19  Arsht & Tunnell; and Teneo as their financial adviser, which

20  Your Honor has now approved each of their retentions.

21       The equity committee fully supports the settlement

22  and confirmation of the plan as stated in their pleadings and

23  has themselves filed two declarations in support of

24  confirmation of the plan, Mr. Charles Boguslaski of Teneo and

25  Mr. Clark Dees of Teneo, investment bankers for the equity

1  committee.  And those are at Docket Nos. 393 and 394

2  respectively.

3           Together, Your Honor, we believe the debtors'

4  briefing and combined testimony of the eight declarants now

5  in support of confirmation provide Your Honor with more than

6  sufficient evidence to satisfy each and every requirement for

7  approval of the disclosure statement, solicitation

8  procedures, and confirmation of the second amended plan.  We

9  will go through each of those, Your Honor, in turn.

10          In addition to the support by the equity committee

11 and the supporting note holder, who Your Honor I believe

12 recalls holds 100 percent of the debtors' secured and

13 unsecured notes, which is all of the debtors' funded debt,

14 all prior objections to the plan have been withdrawn.

15          The informal comments that we received from

16 various parties, including the United States Trustee and the

17 United States Attorney's Office, have been resolved through

18 the inclusion of language in the revised proposed

19 confirmation order and/or through certain revisions that were

20 made through the plan.  If Your Honor is inclined to approve

21 the motion, we will walk you through each of those.  We don't

22 want to be presumptuous and do it now, Mr. Shapiro will do it

23 later on in the hearing.

24          With respect to the Securities and Exchange

25 Commission, as you will hear from Mr. Shapiro, we have had

1  discussions with them with respect to the confirmation order.

2  The debtors and IEH are still working through some language,

3  but we are confident that that language will be resolved in

4  the form of some changes necessary to the confirmation order.

5  We do not have them standing -- or, sorry, sitting here

6  virtually -- I usually would be standing -- today, but we do

7  believe shortly, either during the hearing or immediately

8  after the hearing, we will have language consented to by all

9  of the parties.

10        As noted on the amended agenda filed last night at

11  Docket No. 409, however, we do have one outstanding

12  objection.

13        Mr. Dijkstra, as Your Honor knows, a shareholder,

14  has submitted an objection to confirmation of the second

15  amended plan.  To be clear, as I think the record is, he

16  withdrew his objection to the first plan, but has now filed

17  an objection to the second amended plan.

18        So, with Your Honor's permission, what we would

19  propose to do today is I will continue with a few more

20  remarks regarding the cases and how they have progressed

21  since September, and a brief description of the terms of the

22  settlement agreement itself.  Then if any other party would

23  like to make any other opening statement, if Your Honor is

24  inclined, they can.  And then we would go to the evidence

25  portion, where both the debtors and the equity committee have

1 witnesses that they would present.

2          We understand from Mr. Dijkstra that he withdrew

3 the evidence that he provided with respect to Mr. Ehrhardt

4 and he will not be calling him at the hearing today.  So the

5 debtors and the equity committee would move forward with

6 their evidence.

7          And then finally, Your Honor, after evidence, the

8 debtors and the other parties would make their arguments and

9 of course answer any other questions -- or any questions that

10 Your Honor may have.

11          So with that, Your Honor, as noted, the U.S.

12 Trustee appointed the equity committee, and the equity

13 committee retained sophisticated and very experienced

14 advisers at the end of September of this year.  VIVUS

15 immediately started a dialogue with the equity committee and

16 its advisers to respond to diligence and discovery requests

17 necessary to advance the mandate of the equity committee.  At

18 the same time, VIVUS had to carefully consider, however, its

19 situation and appropriate next steps to carry out its goal,

20 to make sure that we keep a going concern, save the jobs of

21 our employees, and engage -- or emerge under a fair plan to

22 all of our stakeholders.  In that regard, VIVUS determined it

23 was facing a liquidity constraint and that even if it was

24 able to obtain certain concessions from our supporting note

25 holder with respect to the minimum cash covenant under our

1  cash collateral order, it would need debtor in possession

2  financing in early December 2020.

3          The parties quickly realized that it was not in

4  the best interest of the stakeholders to incur substantial

5  additional financing, additional administrative expenses, and

6  the associated risks to the business of a long and protracted

7  Chapter 11, and immediately good-faith settlement discussions

8  began in mid-October amongst VIVUS, the equity committee, and

9  the supporting note holder and their respective advisers.

10  These settlement discussions were hard-fought and, I'm sure

11  Your Honor can imagine, at many times extremely adversarial,

12  but were always conducted cordially and in good faith.

13          While discussions were progressing, VIVUS, in the

14  exercise of its fiduciary duties to maximize and protect the

15  value of these estates, needed to consider alternatives in

16  the case that the parties were unable to come to some type of

17  settlement resolution.

18          In that regard, after careful consideration, Your

19  Honor may recall we filed among other things a motion to

20  approve bidding procedures at Docket 286 to facilitate an

21  alternative plan in which the debtors would conduct a court-

22  authorized market test to determine value and stakeholder

23  recoveries on a waterfall plan basis.  VIVUS could not,

24  however, risk not having a baseline restructuring, so it

25  modified the IEH-sponsored plan to provide for this market

1 || test, and basically had the IEH plan act as our stalking

2 || horse subject to higher or better bids.

3 || Fortunately, this alternative path proved to be

4 || unnecessary.  After exchanging several term sheets, VIVUS,

5 || the equity committee, and the supporting note holder

6 || determined that the assistance of a mediator would be the

7 || most productive and efficient way to further ongoing

8 || settlement discussions.  At the end of October, Your Honor

9 || ordered the parties to mediate before Chief Judge Sontchi.

10 || The mediation took place on November 1st and we

11 || are thrilled to say that it was a success.  The mediation

12 || resulted in an agreement in principle among the parties with

13 || respect to the terms of certain amendments and modifications

14 || to the initial plan, in particular the existing stock

15 || settlement, that would earn the full support for confirmation

16 || from both the equity committee and the supporting note

17 || holder.

18 || As an aside, Your Honor, I want to thank you, and

19 || I know I say it on behalf of all of the parties involved, for

20 || you convincing Judge Sontchi to be our mediator.  Not

21 || surprisingly, he was fantastic.  He conducted a well-thought-

22 || out and efficient mediation that saved these estates

23 || significant resources and provided VIVUS and its employees

24 || the guidance and certainty needed to protect the company's

25 || future, and we thank you very much for doing that.

1         The mediated agreement in principle was

2    subsequently memorialized in a support term sheet filed on

3    November 5th at Docket No. 329, and then followed up with the

4    amendments, as I mentioned, the second amended plan, the

5    notice of continued combined hearing for the second amended

6    plan, any letter to shareholders from the equity committee at

7    Docket No. 346.

8         The equity committee also filed a statement in

9    support of confirmation on December 1st at Docket 392, and

10   IEH filed a statement in support at Docket No. 390.

11        The equity committee, as the official statutory

12   body appointed as fiduciaries for all of the equity holders,

13   stated that they believe "the current settlement is the best

14   recovery reasonably achievable under all the circumstances,"

15   and that's at the equity committee's statement of support at

16   paragraph 14.

17        The operative docs for the settlement, the royalty

18   and trust agreement, were also filed as amended recently, as

19   mentioned at the beginning of the hearing.

20        Generally, the settlement provides, but we will

21   discuss it in more detail a little bit later, that the terms

22   of the existing stock settlements are an increase in the

23   total amount of cash consideration from five million to $6

24   million in cash.  A substitution of the contingent value

25   rights that Your Honor heard about at the initial hearing

1  that was laid out in the initial plan with a new royalty

2  construct, which provides holders of existing stock who

3  participate in the settlement with a pro rata share of three

4  percent of the net sales of VI-0106 after reorganized VIVUS

5  recoups development costs in concordance with the terms of

6  the royalty agreement.

7          Your Honor, I'm saying lots of things I know you

8  are very familiar with, so I'm just going to use the terms

9  that we used at the last hearing.  Of course, if there's

10  anything you need us to go into more detail, I'm sure you

11  will stop me.

12          The equity committee states that the addition of

13  the approximate $1 million in cash, together with the

14  potential upside from the perpetual royalty payments provided

15  under the existing stock settlement to the shareholders, is a

16  material improvement over the consideration of the initial

17  plan.

18          Your Honor, as we noted in our pleadings, the

19  existing stock settlement conditions contained in the plan

20  are the same as the original plan.  So the settlement

21  continues to be an exchange with shareholders of the record

22  date, which, Your Honor, we have changed to November 13th as

23  the proposed record date.

24          Your Honor, as Mr. Morgan and others will walk

25  through after the additional evidence is presented, the

1  existing stock settlement agreement as contemplated in the

2  plan should be approved.  Mr. Dijkstra, the only objector,

3  objects to the second amended plan primarily on the basis of

4  the debtors' estimated enterprise value, and that he believes

5  it's incorrect and improper because it underestimates or

6  undervalues VI-0106 and the debtors' NOLs.

7         Your Honor, there are a number of other assertions

8  in his papers, including the attack on the legitimacy of the

9  bankruptcy process itself, but we think it's best not to go

10  into those, but we're happy to answer any questions Your

11  Honor may have, and rely on our papers for those types of

12  arguments and really focus on the VI-0106 and the NOL

13  arguments at this point.

14         With respect to valuation, Mr. Dijkstra offers no

15  evidence that the debtors' enterprise value is incorrect.

16  The debtors submit there is no other evidence in the record,

17  let alone any expert rebuttal, with respect to the issues of

18  the debtors' valuation and/or insolvency.  Mr. Bruce Makosky

19  originally offered the testimony of Dr. Rezra Amadhi to rebut

20  Ms. Stratton's expert testimony concerning the debtors'

21  enterprise value.  The debtors moved to strike Mr. Amadhi's

22  testimony on various grounds, which I won't go through again

23  here, but we believe he was not qualified to provide such

24  testimony.  However, Mr. Makosky, as mentioned before, has

25  withdrawn his objection to confirmation and the initial plan

1  at Docket No. 372 before the Court ruled on the motion to

2  strike.  Your Honor, we believe that his opinions should be

3  now removed from the record given the withdrawal of the

4  objection, and we've provided some law with respect to that

5  in our briefing and Mr. Morgan is prepared to deal with that,

6  if necessary.

7          As mentioned, Your Honor, there is no other

8  evidence presented by any of the objectors.  However, VIVUS

9  and the equity committee offer additional evidence today that

10  Your Honor will hear, including the testimony of Mr. Mark

11  Oki, VIVUS' CFO, and we submit that the evidentiary record

12  that you have as supplemented by today's record, Your Honor,

13  is uncontroverted and will provide Your Honor the necessary

14  elements needed to make a determination and to approve the

15  debtors' enterprise value and insolvency assumptions under

16  the plan.

17          As Mr. Morgan will explain in argument, there is

18  more than sufficient evidence in the record with respect to

19  the valuation analysis as being reliable, contrary --

20  irrespective of Mr. Dijkstra's contrary assertions.  In fact,

21  the equity committee, which retained its own financial

22  adviser, evaluated the debtors' valuation analysis before and

23  after the mediation and has agreed, as I said before, that

24  the current settlement is the best recovery reasonable

25  achievable under all the circumstances for equity holders,

1 and that the committee shareholders participate in the

2 settlement and that they not opt out of it.

3          The equity committee ultimately states that "it is

4 determined that the proposed settlement is fair and

5 reasonable, in the best interest of shareholders, and the

6 committee, therefore, recommends that the plan be confirmed."

7 And, Your Honor, I'm citing the equity committee's statement

8 in support of confirmation at paragraphs 14 and 24, but they

9 are here and obviously will speak for themselves.

10          Any alternative plan to the second amended plan

11 almost certainly would lead to costly litigation, prolonging

12 VIVUS' stay in Chapter 11, diminishing VIVUS' limited

13 liquidity, forcing VIVUS to incur debtor-in-possession

14 financing, and threatening the proposed recoveries to our

15 stakeholders.  The existing stock settlement avoids such

16 outcomes and the intended destruction of value to the

17 estates, and, therefore, is a sound exercise of VIVUS'

18 business judgment to agree to and move forward with this

19 plan.

20          As a result, the debtors will provide, and you

21 will hear evidence today that the existing stock settlement

22 agreement falls well above the lowest point in the range of

23 reasonableness and the second amended plan provides the best

24 recovery possible for our stakeholders.

25          In conclusion, Your Honor, VIVUS listened

1  carefully, as did all the other stakeholders, to your ruling

2  in September, and we are here today with wide support across

3  all stakeholder classes with one objector, and we believe

4  that the undisputed evidence in the record at the end of the

5  hearing will grant Your Honor the ability to confirm the

6  Chapter 11 plan, as it will satisfy our burden of proof by a

7  preponderance of the evidence that we have met each and every

8  requirement necessary under the Bankruptcy Code.

9           The plan gives VIVUS and its stakeholders a clear

10  line of sight to emerge from Chapter 11 and continue in the

11  market as a going concern and to save jobs, which, Your

12  Honor, we would submit is the ultimate objective in any

13  Chapter 11 case.

14          Your Honor, I'm happy to answer any questions you

15  may have at this stage.  As mentioned, Mr. Friedmann will go

16  through the evidentiary portion, after anybody else would

17  like to make any statements, and then Mr. Morgan will be

18  making arguments on behalf of VIVUS.

19          THE COURT:  Okay.  Thank you.

20          I will permit others to make any opening statement

21  they want to make at this time.  Let me ask first, anyone in

22  support?  Either the equity committee or IEH, you may make a

23  statement; you don't need to, you can wait for the

24  conclusion.

25          MR. MCDERMOTT:  Good morning, Your Honor.  Mark

1  McDermott, again, on behalf of the equity committee.  I would

2  like to make a few brief remarks, so that we can get straight

3  to evidence, and I will reserve as necessary to speak in more

4  detail after evidence.

5          All three committee members are participating in

6  the hearing today -- or I should say on the phone --

7  Mr. Steve Chlavin; Mr. Andrew Sole, who heads the Esopus

8  Creek Advisors value fund; and also Mr. Bruce Makosky.

9  Mr. Makosky also volunteered to serve on the oversight board

10 of the trust that will be created under the plan, if Your

11 Honor confirms it.  The actual trustee will be CSC, a very

12 well-known and respected bankruptcy and claims administrator.

13          I don't think the shareholders could have asked

14 for a better set of representatives throughout this process.

15 I have done this for 30 years and I saw nothing but the

16 highest standards of dedication and devotion to a, at times,

17 difficult process.  Mr. Chlavin and Mr. Makosky in particular

18 have never been through Chapter 11.  There was never a call

19 missed, there were never any good questions unasked, there

20 were never any great observations that were not made.

21 Mr. Makosky in particular is 12 hours either ahead or behind

22 of us, I'm not sure which, but he was on every phone call

23 whether it was 2:00, 3:00 or 4:00 or 5:00 in the morning

24 every single step of the way.

25          This negotiation at times was analogous to hand-

1  to-hand combat, frankly.  I apologize, Your Honor, I just

2  realized I did not have my video on while I've been speaking.

3  There were few material phrases of these documents that

4  weren't renegotiated half a dozen times.  There were a few

5  considerations in support of this settlement, including its

6  risks, that weren't talked about at length with Teneo

7  multiple times.

8         In closing my initial remarks, Your Honor, I will

9  emphasize and repeat:  this settlement is a significant

10 improvement, in the committee's view, over the initial offer

11 that was on the table; it is fair and reasonable under the

12 circumstances; and it is in fact the best compromise under

13 the circumstances, considering all the various risks

14 attendant upon not settling, including future litigation.

15        Thank you, Your Honor.

16        THE COURT:  Thank you.

17        Okay.  Anything from IEH before I ask Mr. Dijkstra

18 if he would like to make any opening statement?

19        MR. PINKAS:  No, Your Honor.  So as not to

20 belabor, I'll just make my statement at the end.

21        THE COURT:  That's fine.

22        Mr. Dijkstra, do you have anything you want to say

23 by way of opening?

24        MR. DIJKSTRA:  Good morning, Your Honor.  I do not

25 really have an opening statement, but I would like to make an

1   apology for the confusion yesterday.  I completely missed the

2   standby part in the agenda and as a matter of fact, I

3   honestly never read further into the agenda as the first page

4   where the date and the Zoom link are presented.  So in

5   reading the many new documents, I completely missed that, and

6   I made the wrong assumption.  So, for that reason, I thought

7   it was better to save the Court the three hours it would have

8   cost for the testimony and the cross-examination of my

9   witness, and therefore I thought it was better to take that

10  off.

11          So my sincere apologies to both the Court and of

12  course Mr. Shapiro.  I'm sorry.  Thank you.

13          THE COURT:  All right.  Thank you.

14          Okay, we're ready for evidence then.

15          MR. FRIEDMANN:  Thank you, Your Honor.  Good

16  morning.  This is Jared Friedmann from Weil Gotshal & Manges

17  on behalf of the debtors.

18          With the Court's permission, the debtors' witness

19  this morning is Mr. Mark Oki.  As Mr. Barr mentioned before,

20  he is the chief financial officer and chief accounting

21  officer of VIVUS.  Mr. Oki submitted a declaration earlier

22  this week, which is on the docket at number 391.  Mr. Oki is

23  on the phone and is present in the virtual courtroom today,

24  though I'll ask him to make sure his camera is on his

25  computer.

1            And, Your Honor, we would respectfully move to

2    enter Mr. Oki's declaration into evidence as his direct

3    testimony, subject of course to cross-examination, as well as

4    any questions that Your Honor may have for Mr. Oki.

5            THE COURT:  Thank you.

6            Is there any objection to the entry into evidence

7    of Mr. Oki's declaration as his direct testimony?

8            I hear none.  It's admitted.

9         (Oki Declaration received in evidence)

10           Mr. Friedmann, do you have any supplemental

11   direct, or are you tendering him for cross at this point?

12           MR. FRIEDMANN:  Thank you, Your Honor.  We have no

13   supplemental direct right now.  We would tender him for

14   cross-examination, should there be any.

15           THE COURT:  Thank you.

16           Mr. Dijkstra, do you wish to cross-examine Mr.

17   Oki?

18           MR. DIJKSTRA:  I actually would, Your Honor.  I'm

19   sorry.  I was just away from the computer for a second.

20           Would you like me to start now?

21           THE COURT:  Yes.

22           MR. DIJKSTRA:  Okay.

23                       CROSS-EXAMINATION

24   BY MR. DIJKSTRA:

25   Q    Good morning, Mr. Oki.  I know it's very early for you

1  there.  We are about 15 hours apart, I think -- or, excuse

2  me, you are in California?  So we're --

3          THE COURT:  Oh, Mr. Dijkstra, before -- I'm sorry,

4  before you begin, I should swear in Mr. Oki.

5          Mr. Oki, can you raise your right hand, please?

6          MARK OKI, WITNESS FOR THE DEBTORS, AFFIRMED

7          THE COURT:  Please state your full name and spell

8  your last name for the record.

9          THE WITNESS:  Mark Oki, the last name is spelled

10 O-K-I.

11         THE COURT:  And, Mr. Oki, do you affirm the

12 statements that you have made in your declaration?

13         THE WITNESS:  Yes.

14         THE COURT:  Okay, thank you.  Now, Mr. Dijkstra.

15 My apologies.

16         MR. DIJKSTRA:  Thank you, Your Honor.

17 BY MR. DIJKSTRA:

18 Q    So, again, good morning.  Let's start off with the

19 first question.  How many VIVUS shares did you own on the

20 July 7th petition date?

21 A    I believe 12,100.

22 Q    Twelve thousand, one hundred.  Thank you.  Will you be

23 further employed by VIVUS after this Chapter 11 case?

24 A    I do not know that.  We have not discussed that --

25 Q    All right.

1  A      -- I don't know.

2  Q      Okay.  Can you please tell me the name of the Malta-

3  based company that is through a subsidiary distributor of

4  Qsymia in South Korea?

5  A      Alvogen.

6  Q      Can you spell that for me, please?

7  A      A-L-O-Z-G-E-N.

8  Q      A-L-O or A-L-V-O-G --

9  A      A-L-V -- sorry -- A-L-V-O-G-E-N.  Alvogen.

10 Q      Okay, thank you.  Do you have any knowledge about the

11 Tax Code Section 382-15?

12 A      I have limited knowledge.

13 Q      Can you share with me what your understanding is of

14 that specific section?

15 A      I understand that to be (indiscernible) an old and cold

16 creditor can (indiscernible) net operating losses on a

17 federal basis.

18 Q      Would that be it?

19 A      I mean, we can go through various things, but that's

20 the general high-level view of it.

21 Q      Thank you.  Were you attending the negotiations with

22 Icahn Enterprises which eventually resulted in the RSA?

23 A      We were included in the negotiations.

24 Q      Okay.  Could you explain to me if and how the net

25 operating losses of VIVUS were discussed?

1  A     I was not in the actual room when the discussions were

2  happening.  We were just a part of the process

3  (indiscernible) so I don't know what specific discussions

4  they had, if any.

5  Q     As we know from previous testimonies from Mr. King, he

6  wasn't present.  So, if you were not present, do you know who

7  was -- who was actually in the negotiations?

8  A     I'm sorry, let me clarify.  Are you talking about the

9  recent negotiations between IEH and the equity committee?

10  Q    Oh, I'm sorry, I'm not.  I'm talking about the RSA, the

11  reorganized agreement, so all the way back in May.

12  A    We had had discussions -- I'm sorry, I apologize for my

13  answer -- we had had discussions about the NOL, that the

14  Icahn Enterprises valued them, I don't know to what extent,

15  but they did discuss that they were -- they would like to get

16  the NOL.

17  Q    Did you just say they were not discussed to any extent?

18  A    Again --

19  Q    To the extent --

20  A    -- to the extent that -- the only extent that we

21  discussed was that they wanted the NOLs as part of the

22  package.  We didn't put a value to them or anything, but just

23  that it was important that we maintain the NOL, which is kind

24  of evidenced through the first day motions, the NOL

25  preservation motion.

1   Q      Okay.  So it was clear in those negotiations that the

2   NOLs were important, but you don't know to what extent the

3   value of the NOLs was important?

4   A      That is correct, we did not put a number to it.

5   Q      Okay.  Thank you.  Were you made aware in those

6   negotiations that Icahn Enterprises is a controlled group?

7   And I mean a controlled group (indiscernible) --

8   A      I'm aware that they hold many companies and that they

9   are (indiscernible) --

10  Q      But were you made specifically aware in those

11  negotiations that's for tax laws they were considered a

12  controlled group?

13  A      We did not have those discussions, nor did we find that

14  relevant.

15  Q      Okay.  Was this section that we just spoke about where

16  you have limited knowledge about, was the Section 382-15

17  discussed during those negotiations?

18  A      Again, the IEH stressed that they wanted to maintain

19  the NOL and, again, we made efforts to do what we could to

20  preserve those NOLs.

21  Q      So were the specific -- were the implications of Icahn

22  Enterprises being a controlled group and acquiring VIVUS

23  through Chapter 11, were those points discussed during the

24  negotiations?

25  A      I'm unaware of any discussions regarding how Icahn

1  would use those NOLs.

2  Q    So it was also not discussed what the proceeds of the

3  federal NOLs would be in the -- as an amount of deferred

4  taxes -- tax assets for the benefit of Icahn Enterprises?  I

5  think you just stated that that was not discussed, right?

6  A    Correct.

7  Q    So a range in benefit also was not discussed?  They

8  didn't say, oh, it's going to bring us maybe up to X million

9  to X million considering the tax rate, et cetera, et cetera,

10 nothing of that sort?

11 A    That is correct.

12 Q    Thank you.  As a result of those negotiations with

13 Icahn Enterprises, VIVUS had to pay off 11.5 million in May

14 2020 that was not owned by Icahn Enterprises, is that

15 correct?

16 A    That is correct.

17 Q    So is it correct that you decided to issue close to

18 eight million shares, which consequently diluted the existing

19 shareholders with about 80 percent to pay off that portion of

20 the debt not owned by Icahn Enterprises with the proceeds of

21 that sale through H.C. Wainwright?

22 A    No, the funding that -- or the equity (indiscernible)

23 that we did in April of 2020 was a potential financing, it

24 was (indiscernible) step to and a potential financing to

25 fully pay back the debt.  It did not come to fruition

1  through -- as negotiations with Icahn progressed, but it was

2  a step to potentially refinance the entire debt, it was not

3  for the specific purpose of paying back those few

4  shareholders -- sorry, the $11.5 million in notes.

5  Q    Okay.  But the consequence of that sale was that you

6  edged so close to ownership, which would make Mr. Morgan

7  (indiscernible) worry about it in that NOL motion hearing

8  that you said.  So, because of those eight million shares

9  issued through H.C. Wainwright, that was the transaction

10  where you edged close to the ownership changed control,

11  right?

12  A    It was one of the transactions that contributed to

13  getting close, yes.

14  Q    So maybe, because I'm not sure if I understood, can you

15  tell me again why did you issue specifically on the 1st of

16  April that press release where you said we sold close to

17  eight million shares at 1.60, what were the proceeds exactly

18  used for?

19  A    So, again, this is going to be one step in a multi-step

20  process to potentially pay off the debt and move on from

21  this.  This first step was to raise money; the second step

22  would be to do another small funding.  We have baby shelf

23  limitation restrictions on how much we could raise on our

24  self-registration statement.  We believed or it was possible

25  that through the second -- another round of financing we

1  could get out of the baby shelf limitation and then go out

2  and raise additional capital without the baby shelf

3  limitations to -- with the hope for the end result of raising

4  sufficient capital to pay off the debt.  We -- at that point

5  we engaged -- we engaged with Icahn on discussions and

6  because of the -- how well the discussions were going with

7  IEH, we slowed that process down.

8  Q     Okay.  Do you remember what happened exactly one day

9  earlier when you issued the press release on April 1st, that

10 would be the 31st of March, do you remember what happened

11 that date?

12 A     What do you mean specifically?

13 Q     You issued a press release about the telehealth

14 software and that had some consequences for the stock price.

15       Do you remember that?

16 A     Yes, we saw an increase in our stock price.

17 Q     Do you know by any chance what the surge, the highest

18 price reached that day was?

19 A     I don't remember the peak price.  I think we closed at

20 around four dollars and -- I can't remember specifically,

21 but --

22 Q     Yeah, you're very close, the peak was exactly 4.55,

23 4.55 U.S. dollars per share.  And that was also very

24 interesting to me, 50 million shares were sold that day,

25 whereas that day VIVUS only had just about ten million shares

1   issued.  If you had everything prepared to sell shares

2   because it was part of a bigger plan, was it not possible to

3   sell shares a day earlier?

4   A    We had our self-registration in place, it's possible.

5   Q    April 1st, about eight million shares sold through H.C.

6   Wainwright transaction about 1.60 -- or exactly at 1.60 a

7   share.  That resulted in a few shareholders, I saw a 13G from

8   Savvy Management, and there later turned out to be a few

9   more, the Armistice (ph) and then maybe one or two more, I'm

10  not sure.  Between then and now, have any of these

11  shareholders contacted you regarding what happened with VIVUS

12  in this run-up to the bankruptcy or during the Chapter 11?

13  A    Can you clarify?  Are you asking me if any shareholders

14  called and asked what was going on or are you just referring

15  to the people who purchased shares in --

16  Q    The H.C. Wainwright sale, so only those 8.9 private

17  placement shares, did any of these shareholders contact you

18  between April 2nd and now to say, hey, I bought shares

19  through H.C. Wainwright did that day and now, within three

20  months later, you guys are going bankrupt, can you please

21  explain what's going on?  Did any of those shareholders from

22  the private sale through -- or the private placement, sorry,

23  through H.C. Wainwright contacted you and tried to get some

24  information about the Chapter 11 or bankruptcy case?

25  A    None of the participants in the registered direct

1  offerings have contacted us.

2  Q    Okay, thank you.  Then I would like to go to your

3  statement on page 9, item number 22.  So --

4  A    Yes.

5  Q    I'm sorry, here I go, yes.  So what I tried to do there

6  is I tried to determine what the valuation was for three

7  commercial products of VIVUS and what I thought Ms. Stratton

8  did was take the last 12 months' turnover for each and every

9  product and multiplied that by 3.1 to get (indiscernible)

10  valuation, but reading your statement, I made some mistakes

11  there, right?  Can you please explain what mistake you think

12  I made?

13  A    Are you referring to the $82 million in current assets?

14  Q    Yes.  So I put --

15  A    So we --

16  Q    -- down there --

17  A    Oh, go ahead.

18  Q    I put down there the 219, because I thought the 82

19  million current assets would be considered the cash

20  collateral, right?  Is that correct?

21  A    I don't believe so.  I'm not sure what you mean, but

22  the $82 million is just current assets, so it comprised of

23  cash, receivables, inventory, and other current assets.

24  Q    So those 82 million -- and I'm taking that from

25  Mr. Pickering's balance sheet, I'm sure it was a little

1  bit -- I think there was a little bit more cash on petition

2  date, but just to have a number.  So the 82 million current

3  assets on his balance sheet, is that considered as cash

4  collateral?  It would be inventory, cash, prepaid, and

5  other -- accounts receivable, prepaid, and other assets.  Is

6  that the cash collateral there was talk about in the first

7  day hearing?

8  A    I'm not sure, quite honestly, but it's the assets that

9  we had on our books as of, I believe, May 31st.  Are they

10 collateral for the debt holders?  I assume they're collateral

11 for the senior secured notes.  I'm not sure I understand your

12 question, I'm sorry.

13 Q    Well, the thing is VIVUS filed the petition on July 7

14 and was aiming to get the plan confirmed about 43 days later

15 on August 19th, is that correct?

16 A    Yes.

17 Q    So in that time window, I'm trying to determine what

18 the specific parts in VIVUS' worth were, so -- and because

19 you -- I tried to do that in my objection and that's why --

20 and you are referring to that, so that's why I was hoping we

21 could figure out where I made the mistake.  So the sum of the

22 parts is 219 and I thought if that 82 million of current

23 assets would be considered the cash collateral, do I then

24 have to assume that 219 is the complete enterprise value as

25 you tried to describe here?

1  A     Yes, the 219 is --

2  Q     Okay.

3  A     -- Ms. Stratton's estimate of the -- I believe it was

4  Ms. Stratton's sum-of-the-parts analysis and that the

5  $82 million is included in there based on -- you know,

6  basically, the 82 million is part of the working capital.

7       What you did not include in here is also the current

8  liabilities of that office (indiscernible) assets and they

9  are assets that were built into the working capital needs of

10 her discounted cash flow analysis.  And they're also related

11 to -- for example, the receivables, they're related to sales

12 that had previously occurred.  So I believe they are in her

13 analysis, so I -- you know, I agree -- I concur that they

14 should not be included in the sum-of-the-parts analysis.

15 Q     Not -- I'm sorry, now I'm confused.  You're saying not

16 included in the sum-of-the-parts analysis?

17 A     So they are a part of the sum-of-the-parts analysis,

18 but I don't think you should add it back in as they've

19 already been included in there.  I'm sorry I didn't make that

20 clear.

21 Q     Okay, okay.  But to say 219 is the enterprise value and

22 then to take off the current assets, which would leave me 137

23 million, can I apply that as a value to the pre-marketed part

24 of Qsymia, PANCREAZE (indiscernible) and Stendra?

25 A     No, the 219 is the value that Ms. Stratton has applied

1  to the products.

2  Q     So the 219 is the value she -- and can I compare that

3  to as you would value real estate?  For example, you have

4  real estate and to determine asset value you do it the rent

5  multiple times ten, for example, and then you have an asset

6  value, right?

7  A     Assuming it's a rental property.

8  Q     Okay.  So I'm trying -- I'm still trying to determine

9  what Qsymia, PANCREAZE, Stendra and (indiscernible) were

10 worth, but I cannot figure it out with this calculation.  So

11 you say the 219 should be the asset valuation, a combined of

12 the last 12 months' turnover times the 3.1 multiple

13 Ms. Stratton used?

14 A     I'm saying Ms. Stratton has determined that

15 $219.2 million, I believe that's the correct number, is the

16 amount that she derived, and I'm not making any comments on

17 what I think, I'm saying that's what she has determined.

18 Q     But the current assets do -- are a part of it, but not

19 in full.  So the 82 million is not in full in the

20 219 million?

21 A     It is.  They are a part of the analysis that

22 Ms. Stratton did.  She doesn't specifically add them in or

23 take them out, but they're part of the analysis that she

24 performed.

25 Q     Okay.  In the enterprise valuation, it seems very

1  important what -- and cash equivalents are -- in the current

2  assets are used, so that amount -- or an amount of cash and

3  cash equivalents would make quite a lot of difference in an

4  enterprise valuation, right?

5  A    Yes, but that is a different type of calculation.

6  You're comparing apples and oranges.

7  Q    Yes, yes, I understand that, but if we go to the

8  midpoint later on in the enterprise valuation with the other

9  methods, she still comes only to the 225.  So I don't see the

10  219 being far away from the 225, so that's why I'm asking it.

11        So in the other method -- in one of the other methods

12  the cash and the cash equivalents in the current assets would

13  be making a huge difference, right, that was what we can

14  agree on?

15            MR. FRIEDMANN:  Your Honor, I'm going to object to

16  this line of questioning at this point.  You know, I've

17  obviously given Mr. Dijkstra a lot of leeway.  And Mr. Oki in

18  his declaration did point out a very small point, which was

19  just that in addition to taking the sum-of-the-parts

20  analysis, he added in another $82 million, and Mr. Oki

21  explained why that is not right.  Mr. Dijkstra is now asking

22  him to comment on, you know, numerous other analyses done by

23  Ms. Stratton who was, as we all recall, subject to

24  significant cross-examination that lasted much of the day,

25  including by Mr. Dijkstra.  And I just think at this point

1  this is an improper line of questioning for Mr. Oki and well

2  beyond the scope of the direct exam.

3            THE COURT:  I'm going to sustain that objection.

4  I think that his testimony in paragraph 22 deals with the

5  sum-of-the-parts analysis and he has explained his response

6  to that, but he doesn't get into the other enterprise value

7  analysis.  So that's sustained.

8            MR. DIJKSTRA:  Okay.

9            MR. FRIEDMANN:  Thank you, Your Honor.

10            MR. DIJKSTRA:  I thought that Ms. Stratton and

11  Mr. Oki had testified that they worked together on getting

12  this enterprise valuation, so therefore -- okay.

13  BY MR. DIJKSTRA:

14  Q    Mr. Oki, do you have any knowledge of the language of

15  the covenant with Ethereum that obligated you to pay off

16  close to $50 million in October 2019?

17  A    Yes.

18  Q    And Mr. Amos is not here today, but do you perhaps know

19  why he never mentioned that obligation as per the covenant,

20  but made the statement that it was because VIVUS was sitting

21  on too much unused cash and it would result in interest

22  savings over time?

23  A    Both were factors.  Again, we were looking to save

24  cash, cash meaning all future payouts as well.  So it was not

25  an inaccurate statement for Mr. Amos to say that we were

1  doing it to preserve cash.

2  Q     Is it fair to say, if that payment was not made in

3  October 2019, we would not be in the Bankruptcy Court today?

4  A     I do not believe that's a true statement.

5  Q     I only have one last question on the balance sheet that

6  Mr. Pickering provided.  There is an item there that's called

7  "other non-current assets."  Those can be depreciated or

8  written off or amortized, I think you -- I believe you call

9  it.  So what happens with the amount that is written off of

10  this specific item?  Where does the money go?  Is that

11  considered a loss?

12  A     So the largest item in our non-current asset is the

13  intangible asset related to the PANCREAZE acquisition that we

14  did in 2018.  So what is your specific question?

15  Q     I want to know if you do -- because in the normal

16  procedures in every quarterly financial result I always saw

17  this item go down, so there's a write-off or amortization or

18  a depreciation, and I want to know where does that money go.

19  It is considered as a loss, right?  Would it make the NOLs

20  higher?

21  A     Yes.  So just to clarify, it's not money going away,

22  it's just amortizing --

23  Q     Oh, no, I know --

24  A     -- an intangible asset.  So --

25  Q     -- it's paper.

1  A     -- there is a line item -- there's a line item in the

2  profit-and-loss statement, it says "Amortization."  We break

3  out cost of goods sold between what we would consider cash

4  expense and non-cash items.  So there's a specific line item

5  that is the amortization of the intangible asset, so you can

6  see it on the profit-and-loss statement as a stand-alone

7  number.

8  Q     Okay, thank you.  So this -- if you don't add to it

9  anymore, this 114 million will in some point of time -- and

10 I'm not arguing how long it is, but in some point of time

11 this 114 million will -- if you're not adding anything to it,

12 it will go down to zero, right?

13 A     Eventually, yes.

14 Q     So that means the NOLs would also be increased by 114

15 million over time?

16 A     I -- possibly.  I would have to look at the specific

17 tax code, I can't -- I'm not a tax expert.

18 Q     Mr. Oki, do you know what a NOL shell is?

19 A     Not specifically, no.

20 Q     No?  Okay.  So then I -- if you don't know what a NOL

21 shell is, I don't have any further questions.  Thank you very

22 much for your time.

23 A     Thank you.

24         THE COURT:  Thank you.  Redirect?

25         MR. FRIEDMANN:  None, Your Honor.  Thank you very

1  much.

2          THE COURT:  Okay.  Mr. Oki, your testimony is

3  concluded.

4          THE WITNESS:  Thank you.

5      (Witness excused)

6          MR. FRIEDMANN:  Your Honor, Jared Friedmann again

7  from Weil Gotshal on behalf of the debtors.  We have no other

8  witnesses this morning, so we would turn the virtual platform

9  over to counsel for the equity committee, who I believe have

10 two witnesses.

11         THE COURT:  Okay.  Thank you.

12         MR. LARKIN:  Good morning, Your Honor, this is Joe

13 Larkin from Skadden Arps on behalf of the equity committee.

14         As my partner Mr. McDermott said at the outset,

15 the equity committee has submitted a statement in support of

16 confirmation of the second amended joint prepackaged

17 Chapter 11 plan of reorganization, and we have submitted

18 declarations from two senior managing directors of Teneo, who

19 served as the equity committee's financial adviser, in

20 support of our statement.  They are at Docket No. 393, that

21 is the declaration of Mr. Charles Boguslaski, and at Docket

22 No. 394 is the declaration of Mr. Clark Dees, also a senior

23 managing director, who along with Mr. Boguslaski, led the

24 engagement for Teneo on behalf of the equity committee.

25         Your Honor, we don't have any supplemental

1  testimony, any direct supplemental testimony to offer this

2  morning, and we would offer the declarations of

3  Mr. Boguslaski and Mr. Dees in support of confirmation.

4          THE COURT:  Okay.  Thank you.  I'm going to take

5  them one at a time.  Is there any objection to the

6  declaration of Mr. Boguslaski coming in as his direct

7  testimony?

8          I hear no one.  Does anyone wish to cross-examine

9  Mr. Boguslaski?

10         MR. DIJKSTRA:  I would, if possible, Your Honor.

11  Thank you.  Dennis Dijkstra.

12         THE COURT:  Okay, Mr. Boguslaski.

13         MR. DIJKSTRA:  Good morning.  I hope I'm going to

14  say this right the first time, but --

15         THE COURT:  Mr. Dijkstra?  Mr. Dijkstra?  I need

16  to swear in Mr. Boguslaski before we start.

17         Can you raise your right hand, please?

18    CHARLES BOGUSLASKI, WITNESS FOR THE EQUITY COMMITTEE,

19                         AFFIRMED

20         THE COURT:  And will you state your full name and

21  spell your last name for the record?

22         THE WITNESS:  Charles Robert Boguslaski, B-O-G-U-

23  S-L-A-S-K-I.

24         THE COURT:  Mr. Boguslaski, do you affirm the

25  statements made in your declaration that's been admitted into

1  evidence?

2          THE WITNESS:  I do.

3      (Boguslaski Declaration received in evidence)

4          THE COURT:  Okay, thank you.  I'll turn it over to

5  Mr. Dijkstra.

6          I'm hearing somebody is typing, so please check to

7  make sure that you're muted.

8          Mr. Dijkstra.

9          MR. DIJKSTRA:  Thank you, Your Honor.

10                      CROSS-EXAMINATION

11  BY MR. DIJKSTRA:

12  Q    Good morning, Mr. Boguslaski.  I hope I said that

13  right.  I just have a few questions.  You are senior manager

14  at -- director at Teneo Capital.  So Teneo is owned by -- if

15  I understood correctly, Teneo is owned directly by CVR

16  Capital and Temasek Holdings, right?  Is that correct?

17  A    Well, I believe we're owned by CVC Capital --

18  Q    CVC, I'm sorry.

19  A    -- partially owned by CVC Capital.

20  Q    And CVC owns -- this is my Siri, I apologize -- CVC

21  owns a large part of Alphagan, is that correct?

22  A    I do not know.

23  Q    Because that is in the declaration, that's why I'm

24  asking.

25          Mr. Boguslaski, do you know what a NOL shell is?

1  A      No, I'm not familiar with that specific term.

2  Q      The royalty agreement happens to be a perpetual royalty

3  agreement.  Now, I know a lot about perpetual license

4  agreements, but those usually are -- not always contain any

5  value, but this royalty agreement for VI-0106 is a perpetual

6  agreement.  Can you please explain to me again what a

7  perpetual agreement is and especially this one?

8  A      So my understanding in the terms of this royalty

9  agreement is that the holders will receive the royalty as a

10 percentage of sales of drugs from VI-0106 as long as it

11 continues to be sold.

12 Q      Okay.  I see that you have quite a lot of

13 pharmaceutical experience.  Have you ever -- you yourself, in

14 your profession, have you ever come across other drugs under

15 a perpetual royalty agreement?

16 A      I can't say I have.

17 Q      Because I didn't know that also, I was made aware in

18 the phone call I had with that company I talked about the

19 inhalation method of delivery for, and a perpetual royalty

20 agreement in this pharmaceutical or biopharmaceutical

21 industry is actually very unusual and that has primarily to

22 do because the -- at some point in time the existence of

23 generics.  So if my information is correct -- and actually I

24 went -- I don't know, have you had a chance to look at the

25 Selten -- Selten patent agreement that VIVUS made with Selten

1  when they acquired the patents for Tacrolimus?

2  A    On that I would defer to my colleague Mr. Dees, who

3  reviewed that from his project (indiscernible) --

4  Q    So then perhaps it's also better I ask him the

5  question.  So you say he is more knowledgeable on that part

6  of the royalty agreement, right?

7  A    I won't speak for him, I'll defer to his answer on the

8  royalty agreement.

9  Q    So then I'm going to ask you the question anyway.  You

10  have not seen the Selten agreement that VIVUS and Selten made

11  when they acquired the Tacrolimus agreements, you have not

12  seen that agreement, is that correct?

13  A    I'm aware of its existence, I have not reviewed it in

14  detail.

15  Q    Okay.  Can I read the 3.4.2 section for you?  "Such

16  royalties shall be payable on a country-by-country and

17  product-by-product basis beginning on the first commercial

18  sale of a VIVUS product in a particular country and ending on

19  the later of X amount of years after the first commercial

20  sale in such country, or the date of expiration of the last-

21  to-expire patents right having an issued claim covering the

22  VIVUS product in such country."

23        So, as I was made aware, that is actually standard.  So

24  how much money will this royalty agreement bring the other

25  shareholders that are opting in and didn't object, didn't ask

1  anything, how much money will they bring these shareholders

2  when a generic will come to market, and probably the sales

3  under this royalty agreement will be way off, it will be much

4  less, am I assuming that correct?

5  A     I'm sorry, I don't follow your question and I don't

6  know the answer.

7         MR. DIJKSTRA:  Okay.  I will ask Mr. Dees about

8  the royalty agreement, the perpetual royalty agreement, Your

9  Honor.  I think I'm finished with Mr. Boguslaski.

10        THE COURT:  Okay, thank you.

11        Any redirect?

12        MR. LARKIN:  This is Joe Larkin, Your Honor.  No

13  redirect.

14        THE COURT:  Okay, thank you.

15     (Witness excused)

16        THE COURT:  And now we'll turn to Mr. Dees.  Does

17  anyone object to the entry into evidence of the declaration

18  of David William Clark Dees?

19        I hear no objection.  It's admitted.

20        Is it Mr. Clark Dees or Mr. Dees?

21        MR. DEES:  Mr. Dees, Your Honor.

22        THE COURT:  Mr. Dees, can you please raise your

23  right hand?

24   DAVID WILLIAM CLARK DEES, WITNESS FOR THE EQUITY COMMITTEE,

25                       AFFIRMED

1     THE COURT:  Please state your full name and spell

2   your last name for the record.

3     THE WITNESS:  David William Clark Dees, D-E-E-S,

4   of Teneo Capital.

5     THE COURT:  Thank you.  And, Mr. Dees, do you

6   affirm the statements that you made in your declaration

7   that's been admitted into evidence?

8     THE WITNESS:  I do, Your Honor.

9        (Dees Declaration received in evidence)

10     THE COURT:  And, Mr. Dijkstra, cross-examination.

11                     CROSS-EXAMINATION

12   BY MR. DIJKSTRA:

13   Q     Good morning, Mr. Dees.  Much easier last name, so

14   that's good.

15        I'll ask the same question:  do you know what a NOL

16   shell is?

17   A     I do not.

18   Q     Okay, thank you.  Then going straight to the other

19   question that I just tried to work out with Mr. Boguslaski.

20        So the royalty agreement made for VI-0106 is a

21   perpetual royalty agreement, but have you ever come across

22   other drugs that had a perpetual royalty agreement?

23   A     I can't recall if I have or not.  I agree with you that

24   it's standard for a royalty agreement to have some term.

25   Q     Thank you.  And that you say is -- you agree with me

1  that it's standard to have some term and that would either be

2  X years after first commercial sale or patent expiration

3  date, or perhaps even X years after patent expiration date?

4  So somewhere in (indiscernible) right, that would be

5  standard, not perpetual?

6  A     Some formulation like that.  It varies tremendously,

7  these agreements are highly customized, but, yes, some

8  formulation or mix of those formulations is typical.

9  Q     Okay, thank you.  Have you seen the covenant for the

10  $50 million they paid off in October 2019?  So there is

11  supposed to be an Ethereum covenant and in there it's

12  supposed to state that under circumstances they have to more

13  quickly pay off debt, and I was wondering if you have with

14  your own eyes seen that covenant?

15  A     I have not.

16  Q     Okay.

17         MR. DIJKSTRA:  Your Honor, Mr. Dees, I have no

18  further questions.  So, thank you very much.

19         THE COURT:  Thank you.

20         Any redirect?

21         MR. LARKIN:  This is Joe Larkin, Your Honor.  No

22  redirect.  Thank you very much.

23         THE COURT:  Thank you.

24     (Witness excused)

25         THE COURT:  Mr. Larkin, do you have any other

1  evidence that the equity committee is putting forward with

2  respect to confirmation?

3        MR. LARKIN:  We do not, Your Honor.  We ask the --

4  the Court has entered the declarations of Mr. Boguslaski and

5  Mr. Dees, and that's the evidence we're submitting today.

6        THE COURT:  Okay, thank you.  Let me ask --

7        MR. DIJKSTRA:  Your Honor?  I'm not sure if I'm

8  jumping the gun or if it was already possible, is it possible

9  for me to ask only that same question about the covenant to

10  any representative from the equity committee, is that

11  possible, or is now not the wrong time?

12        THE COURT:  Well, those are the two witnesses for

13  the equity committee.

14        MR. DIJKSTRA:  Okay, so that I already addressed

15  it today.  Okay, thank you.

16        THE COURT:  Yes.  Thank you.

17        Okay.  Does any other party -- and I guess that

18  would be IEH -- does any other party in support of

19  confirmation have any other evidence to present?

20        MR. PINKAS:  Your Honor, Oscar Pinkas of Dentons

21  for IEH, we don't have any evidence to present.

22        THE COURT:  Okay.  Thank you.

23        Then Mr. Dijkstra?

24        MR. DIJKSTRA:  Yes, Your Honor.

25        THE COURT:  Do you have -- I understand that you

1  are no longer going to present Mr. -- I think it was

2  Ehrhardt -- as a witness?

3          MR. DIJKSTRA:  No, I already explained the

4  confusion, I apologize for that.  And as I said, I thought

5  yesterday after the wrong assumption it would be better to

6  save the Court the three hours.  So I think at this point in

7  time it's okay, I will leave it at that.

8          THE COURT:  Okay.  I'm not sure I understand what

9  the misunderstanding was.

10          MR. DIJKSTRA:  The misunderstanding yesterday was

11 that I saw new declarations and was not aware that all their

12 witnesses -- yeah, witnesses like Mr. King were also

13 available as standby, I didn't see that in the agenda.  So as

14 I had the report made based on Mr. King's statement and I

15 thought it was good when it would be discussed here, and

16 Mr. Ehrhardt could do his presentation.  But, yeah, for me,

17 the proof in the pudding of that report is already the very

18 enthusiastic reaction of the company I spoke to.  So, for

19 now, it doesn't -- it doesn't -- the testimony itself perhaps

20 doesn't make -- or doesn't put any extra weight in it.

21          Mr. Ehrhardt is attending, but he's not

22 testifying.  But if the Court insists, he could still do so,

23 but then I will probably trigger a whole lot of legal issues

24 again.  So that's why I say it's okay, I'll leave it at that.

25          THE COURT:  Okay.  Well, no, I'm not insisting

1  that he testify, so that's fine.

2          Okay, then our evidentiary record is closed.

3          MR. BARR:  Thank you, Your Honor.  This is Matt

4  Barr from Weil on behalf of VIVUS.  So as mentioned, Your

5  Honor, unless you have any other thoughts as to how to

6  proceed, we can start with argument with Mr. Morgan.

7          THE COURT:  I would like to take five minutes and

8  then we can start with arguments.

9          MR. BARR:  Thank you, Your Honor.

10         THE COURT:  So we're in recess for five minutes.

11      (Recess taken at 11:32 a.m.)

12      (Proceedings resumed at 11:37 a.m.)

13         THE COURT:  There we go.

14         Mr. Morgan?

15         MR. MORGAN:  Thank you.  Good morning, Your Honor.

16  For the record, Gabe Morgan of Weil, on behalf of the

17  debtors, and I'll be presenting the debtors' argument this

18  morning.

19         As you know, Your Honor, we're here today asking

20  for three forms of relief:  approval of the disclosure

21  statement, final approval of the solicitation procedures that

22  were conditionally approved earlier in the case, and

23  confirmation of the debtors' second amended plan.

24         As Mr. Barr noted at the outset, confirmation of

25  the second amended plan today gives the debtors a clear line

1   of sight to emerge as reorganized, going-concerns for the

2   benefit of the debtors' employees, customers, creditors, and

3   stockholders.

4           To achieve that goal for them, it's the debtors'

5   burden to demonstrate that the disclosure statement, the

6   solicitation procedures, and the second amended plan satisfy

7   or comply with each of the requirements under the Bankruptcy

8   Code, including this absolute priority rule in

9   Section 1129(b).  Our burden here is subject to preponderance

10  of the evidence standard; that is, whether it is more likely

11  than not the debtor has satisfied and complied with the

12  requirements.

13          In September, Your Honor concluded that the

14  debtors had not yet met their burden for confirmation.  So,

15  the question, I believe, is:  What's different today?

16          First, the plan is different.  As we announced at

17  the status conference with Your Honor in early November, the

18  mediation before Judge Sontchi was successful.  After hard-

19  fought, arm's-length, and good faith negotiations, the

20  debtors, the equity committee, and the subordinating

21  noteholder have reached agreement on a global settlement that

22  resolves the parties' disputes, with respect to confirmation,

23  the debtors' enterprise value and insolvency, and recoveries

24  available for stockholders.

25          That settlement is reflected in the revised

1  existing stock settlement under the seconded amended plan,

2  and I'll spend on the settlement later on, but I want to note

3  here that the equity committee's statement in a letter of

4  support that was served on shareholders where they concluded

5  that the settlement provides shareholders with a material

6  improvement over the terms of the initial plan and that the

7  second amended plan provides the best recovery reasonably

8  achievable for holders of existing stock.

9          The second thing that's different, Your Honor, is

10  the level of support.  I mentioned the equity committee,

11  which is the fiduciary representing the interest of all

12  shareholders, and there's more than 20,000 shareholders, as

13  of the record date.

14          The subordinating noteholder also fully supports

15  the plan and they're the holder of 100 percent of the

16  debtors' secured and unsecured notes, all of it funded debt;

17  in addition, each shareholder that filed an objection to

18  confirmation of the initial plan, withdrew their objection,

19  although, as Your Honor is aware, one of them did

20  subsequently file an objection to the second amended plan, so

21  we'll talk about that, as well.

22          Also, informal comments that were received from

23  various parties, including the U.S. Trustee and the U.S.

24  Attorney's Office, have been resolved in an inclusion of

25  language in the revised proposed confirmation order and/or

1  through certain revisions that we made to the plan.  And

2  while there are some ongoing discussions with the SEC that

3  Mr. Shapiro will address, we are largely agreed there.

4         In short, while I cannot tell you confirmation is

5  uncontested, I am very pleased to report that we're here

6  today for confirmation of the second amended plan with

7  widespread support and the debtors are currently in a very

8  different place with their stakeholders than they were in

9  August and September.

10         And the third party thing that is different is the

11  record.  To start, we heard, Your Honor, during our earlier

12  confirmation hearing, and we presented today, a member of the

13  debtors' management team, Mr. Mark Oki, the debtors' CFO and

14  chief accounting officer, who both, submitted his declaration

15  and was cross-examined by Mr. Dijkstra just moments ago.

16         As I'll elaborate in a few minutes, Mr. Oki's

17  testimony addresses certain issues raised by Your Honor

18  during the previous hearings, including, with respect to the

19  process by which the debtors' management team prepared and

20  updated financial projections, and with respect to certain

21  statements made in the corporate presentation from June 2020,

22  including forward-looking statements regarding the market

23  potential for the product VI-0106.

24         I apologize, Your Honor, my -- there we go -- in

25  addition, we also know how the declarations and testimony, or

1  I guess in cross-examination of Mr. Clark Dees and

2  Mr. Charles Boguslaski, both of Teneo Capital, the equity

3  committee's investment banker.  Mr. Dees and Mr. Boguslaski

4  provide evidentiary support to the equity committee's

5  decision to settle with the debtors and fully support the

6  second amended plan today.

7          And that sort of brings me to the greatest point

8  on the record, Your Honor, which is there is no evidence in

9  the record, let alone any expert rebuttal, that's contrary to

10 the debtors' testimony before Your Honor with respect to

11 satisfaction or compliance with each of the requirements

12 under the Bankruptcy Code.

13         And Mr. Barr addressed it before, I'm happy to

14 expand on it if Your Honor would like, but the letter that

15 was submitted by Dr. Ahmadi or I guess submitted by

16 Mr. Makosky, in support of his objection, that objection has

17 been withdrawn and, consequently, that letter and the

18 testimony is no longer part of the record.

19         And so, Your Honor, we are in quite a different

20 place than we were when you ruled in September.  And because

21 the evidentiary record remains open, although Your Honor just

22 closed it, and given the current state and the significance

23 to the relief we're seeking, I'd like to start by summarizing

24 the additional evidence provided in connection with today's

25 hearing, how that fits into evidence that we previously

1   presented to this Court regarding the debtors' insolvency,

2   and by extension, compliance with the absolute priority rule,

3   then I'd like to address the revised, existing stock

4   settlement and why it's fair and equitable and should be

5   approved, and then address Mr. Dijkstra's objection and why

6   it should be overruled.

7           Over the course of the earlier confirmation

8   hearings, Your Honor heard a lot of argument around two

9   particular assets, VI-0106 and net operating loss

10  carryforwards, or NOLs, so I'll start there.

11          And I do note, Your Honor, that we lay this out in

12  our supplemental brief, so while I plan to cover highlights

13  here, we have been more thorough in our brief.  Starting with

14  VI-0106, through his declaration and testimony, Mr. Oki

15  provided additional detail on the inherent risks and the

16  uncertainty around successful development of VI-0106 and he

17  carried his conclusion that VI-0106 has a *de minimis* present

18  value; more, specifically, Mr. Oki stated in his declaration

19  that:

20          "There are significant hurdles in VI-0106's

21  development, all of which were set forth in detail on VIVUS'

22  Form 10-K for the year ending December 31, 2019."

23          He also stated:

24          "The timeline for research, development, and

25  marketing VI-0106 largely depends on how well VI-0106

1  performs during Phase II clinical trials and whether the FDA

2  grants VI-0106's accelerated approval after the Phase II

3  trials are completed."

4          Continuing, if the Phase II clinical trials are

5  highly successful and the FDA grants accelerated approval,

6  Mr. Oki stated he anticipates that it will take:

7          "Two to three years to complete the clinical

8  trials and FDA-approval process and that the total cost

9  developing VI-0106 will be approximately $52 million."

10          Contrary, Mr. Oki stated:

11          "If the Phase II clinical trials are not as

12  successful, as VI-0106 does not receive accelerated approval,

13  it will likely take approximately six to seven years to

14  complete the clinical trials and FDA-approval process and the

15  total cost of developing VI-0106 is likely to exceed $100

16  million, including milestones."

17          In addition, Your Honor, Mr. Oki noted that the

18  debtors are aware of at least one competitor with a similar

19  product that's already in development and may come to market

20  sooner, which is a risk to the ultimate commercialization,

21  and on balance, Mr. Oki concluded that, and this is to quote:

22          "Due to the limited progress that we had made with

23  respect to advancing the drug and remaining regulatory and

24  developmental hurdles, as well as the significant outstanding

25  financial investment necessary to bring the drug to market, I

1  expect that a potential buyer today would not be willing to

2  pay substantially more than what we acquired for the drug in

3  2017."

4            And that is the hundred-million, up-front cash

5  payment with the $39 million in milestone payments based on

6  development and sales (audio interference).

7            Mr. Oki's testimony also addresses the context for

8  certain statements made in the corporate presentation from

9  June of 2020, in particular, the statement that the company

10 believed:

11           "The gross revenue potential for VI-0106 is up to

12 750 million or more annually in the U.S."

13           He testified that the statements from the June

14 2020 presentation were not financial projections and were not

15 based on financial projections; rather, to quote him:

16           The purpose of this corporate presentation was to

17 attract potential investors by highlighting management's

18 views of the potential market -- market potential -- sorry --

19 views of the market potential for our products and the

20 revenue we believe that VIVUS' products could potentially

21 generate in the company was able to maximize sales.

22           VI-0106 was approved by the FDA as expeditiously

23 and smoothly and possible and VI-0106 was able to achieve 100

24 percent market penetration; in other words, such statements

25 reflected our optimistic vision of market potential under the

1  best and most ideal outcomes as possible.

2          That's from his declaration.

3          And, Your Honor, because there are and were

4  significant uncertainties about whether these outcomes could

5  be achieved, the company did include disclaimers in their

6  June 2020 presentation and we talked about those before, so I

7  won't repeat them here.

8          Your Honor, we also -- on VI-0106, we also heard

9  from Mr. Dees in his declaration and for his part for the

10  equity committee's part, he acknowledged that there is risk

11  and uncertainty around the successful development of VI-0106.

12  More specifically, in (audio interference) drug development,

13  including expenditure of significant costs before

14  determination of efficacy, development-stage pharmaceutical

15  transactions typically include significant contingent

16  considerations.

17          So, that's what's new on VI-0106.  Going back to

18  August, as Your Honor probably recalls, Ms. Stratton

19  testified that she ascribed no value for VI-0106 in valuation

20  analysis, but when pressed, she testified that she believed

21  if VI-0106 were bought and sold today, the debtors would

22  likely receive no more than $1 million, which is what they

23  paid to acquire the rights to develop and commercialize it

24  back in 2017.

25          Ms. Stratton's view is based on her expert opinion

1   that any value associated with the product is highly

2   speculative.  She noted that as of yet, the product is

3   associated with no positive Phase II safety or efficacy data,

4   which she referred to as an inflection point for value when

5   developing pharmaceuticals.

6          She also noted that to reach such a point, the

7   debtors would have to invest tens of millions of dollars in

8   the drug's clinical development.  Mr. Oki's testimony

9   supplemented that to give a better target of whether it's 50

10  or over 100.  In addition, she noted it would be several

11  years before VI-0106 completed clinical trials.  The product

12  is not guaranteed for fast-track designation or accelerated

13  approval; again, Mr. Oki supplemented that to make clear what

14  the timeline would be if accelerated or not accelerated.

15         And finally, Your Honor, as Ms. Stratton said and

16  we've repeated, there is no guarantee what the outcome of

17  those trials would be and there's no guarantee that the FDA

18  would subsequently approve the drug for sale to consumers or

19  that once the FDA did approve, that the drug would be

20  competitive.  These risks and the resulting conclusions as to

21  the *de minimis* value of VI-0106 were supported by the

22  testimony of Mr. King as well as Mr. Pickering.

23         In light of the foregoing testimony, we believe

24  that the record is thorough and clear that although VI-0106

25  may have significant potential, the many risks and

1  uncertainties associated with its successful development, as

2  well as the significant costs and time is necessary for any

3  development, support a conclusion that the value of VI-0106

4  is highly speculative, making the present value of VI-0106 *de*

5  *minimis* and in any event, insufficient to alter the

6  conclusion in the valuation analysis that the debtors are

7  insolvent.

8          Moving on to the NOL.  Through his declaration,

9  Mr. Oki explained that the CARES Act provides no benefit to

10 the debtors because they have paid no federal income taxes

11 since 2013, which is the earliest taxable year to which an

12 NOL could be potentially carried back under the CARES Act.

13         Mr. Oki also noted that when these Chapter 11

14 cases commenced, the debtors were close to the 50 percent

15 threshold that would constitute an ownership change, within

16 the meaning of Section 382 of the Tax Code and, therefore, if

17 a single new shareholder observed 5 percent or more of the

18 company, that could trigger an ownership change and result in

19 a loss of the debtors' NOLs.

20         Mr. Boguslaski of Teneo stated in his declaration

21 that the equity committee considered the value of the NOLs in

22 conclusion -- that in reaching this conclusion, that the

23 existing stock settlement was the best deal for equity

24 committee; more specifically, he stated:

25         "The equity committee considered avenues for

1  extracting additionally settlement considerations for

2  shareholders on account of the debtors' NOLs.  The equity

3  committee attempted to obtain some settlement consideration

4  for stockholders on account of NOLs as part of maximizing the

5  overall consideration in any settlement package."

6         And similarly, though not evident in his statement

7  of support, the equity committee explained that the debtors,

8  without the benefit of any earnings on account of VI-0106 in

9  the near term, would have taken a significant number of years

10  to realize any benefit of tax savings from the NOLs, even

11  with the improved future performance of the current

12  commercial products they projected; moreover, almost any

13  feasible alternative strategic transaction would have

14  resulted in a change of control that would, in turn, have

15  destroyed or materially compromised the NOLs' values.  The

16  committee considered these factors in formulating an

17  acceptable package settlement consideration for shareholders,

18  and that's Paragraph 13 of their statement.

19         Then going back to August; again, Your Honor, the

20  evidence in the record from before shows that Piper Sandler

21  properly and fully included the value of the debtors' NOLs in

22  their valuation analysis in a manner that is consistent with

23  accepted valuation principles.  Ms. Stratton explained that

24  when preparing the DCF analysis, the discounted cash flow

25  analysis, Piper Sandler, one, applied the debtors' NOLs to

1  offset any projected taxable income through the projection

2  period and, two, reflected anticipated NOL-related tax

3  savings beyond the projection period by increasing the

4  perpetuity growth-rate assumptions for the terminal value.

5          More specifically, on the terminal value, she

6  testified that Piper Sandler employed a negative 2 and a half

7  percent perpetuity growth rate in its DCF analysis and had it

8  not been for the NOLs, they would have employed a

9  significantly more negative perpetuity growth rate.

10         In her testimony, Ms. Stratton also explained that

11  NOLs are not assets that can be readily transferred or

12  otherwise monetized for direct benefit of stakeholders;

13  rather, an NOL's value both, as a general matter and

14  specifically for VIVUS, is dependent upon the inability to

15  generate future net (indiscernible) income, taxable income,

16  the timing of such income and the effective tax rates at the

17  time it occurred.

18         She further explained that for the reorganized

19  debtors, the maximum value of the NOLs -- and that's the tax

20  savings to be realized -- would be 21 percent of the current

21  effective tax rate of 648 million, which is the total amount

22  of the NOLs.  But -- and this is, I think, key to this --

23  that would be realizable by the debtors if and only -- by the

24  reorganized debtors -- if and only if the NOLs were fully

25  utilized in the first year, that is, this year.

1            Ms. Stratton, and more recently, Mr. Oki, both

2   testified that will not happen and, in fact, they do not

3   believe the reorganized debtors will have taxable income and,

4   therefore, cannot realize any tax savings for some time.

5            In light of the foregoing testimony, we believe

6   that the record is thorough and clear that, one, the CARES

7   Act provides no tax benefits to debtors; two, if a single new

8   shareholder obtains 5 percent or more of the debtors' current

9   equity, that could trigger an ownership change and

10  significantly impair the NOL; three, the equity committee

11  considered the potential for value of the debtors' NOLs and

12  negotiated additional settlement considerations for

13  stockholders on account of the NOLs; four, Piper Sandler

14  properly and fully included the value of the debtors' NOLs in

15  its valuation analysis in a manner that is consistent with

16  accepted valuation principles; five, the debtors do not

17  anticipate taxable income for several years, making any near-

18  term benefit to the NOL unlikely; and six, the value of the

19  NOL is insufficient to alter the conclusion in the valuation

20  analysis that the debtors are insolvent.

21           Now moving on to the projections.  In his

22  declaration, Mr. Oki testified that he was directly involved

23  in the preparation of the debtors' financial projections for

24  fiscal years 2020 through 2023.  The testimony of Mr. Oki

25  showed that the financial projections were developed by the

1  debtors' management team with support from Piper Sandler

2  using a methodological iterative process that took into

3  account collective industry experience and relevant industry

4  information, historical operating and production performance

5  and operating costs, and that such process was consistent

6  with general industry practice.

7        Mr. Oki also testified that the debtors

8  historically prepared financial projections for no more than

9  a three-year period because, to quote, "Market competition

10 and technology in the pharmaceutical industry change so

11 quickly."

12       Mr. Oki further testified that the financial

13 projections were not prepared specifically for purposes of

14 the debtors' Chapter 11 filing; rather, they were initially

15 developed in November of 2018 in connection with the debtors'

16 efforts to raise additional capital from third-party

17 investors and they were also used for ordinary course

18 activities, for example, serving as the debtors' 2020 budget.

19       Mr. Oki explained that the projections were

20 updated in April 2020 and then, again, in June 2020, in

21 connection with the debtors' recapitalization efforts and

22 they took into account changes in the debtors' actual

23 financial performance today.

24       Finally, Mr. Oki testified that the debtors have

25 missed their financial projections, even as adjusted in the

1  June 2020 projections, by approximately 7 to 10 percent.  He

2  attributed that shortfall, in part, to the continued COVID-19

3  pandemic, which has slowed sales of Pancreaze and Qsymia, but

4  also in part because of the continuation of these Chapter 11

5  cases.

6       And finally, Your Honor, bringing it altogether

7  was enterprise value.  We don't have any new enterprise value

8  conclusions today, so it goes back to the conclusions of

9  Piper Sandler and Ms. Stratton, and as Your Honor no doubt

10 recalls, Ms. Stratton was recognized as an expert on the

11 subject of valuation, testified extensively on her opinion

12 that the debtors are, in fact, insolvent.

13       Ms. Stratton and her team performed a

14 comprehensive analysis of the debtors' estimated enterprise

15 value, which is described in Section B of the disclosure

16 statement and as Ms. Stratton stated in her declaration and

17 during the earlier hearings, Piper Sandler's valuation

18 analysis reflected the results of three industry-standard

19 valuation methodologies equally weighted, discounted cash

20 flow, comparable company, and precedent transaction analysis.

21 And it established a range for the debtors' total estimated

22 enterprise between 210 million, 243 million, with a midpoint

23 of 225 million.  Because the total amount of outstanding

24 claims against the debtors is approximately 271 million,

25 Stratton concluded that the debtors are insolvent.

1    Your Honor, Ms. Stratton also, in addition to the

2  three methodologies, also looked to the, we called it a

3  "market test" but also looked to the implied value of the

4  debtors' pre-petition recapitalization efforts and she

5  performed a "sum of the parts" analysis, which looked at the

6  aggregate market prices for the companies' assets and

7  resulted in an estimated total enterprise value of 219

8  million.

9    It is worth noting that Ms. Stratton testified

10 such a method, the "sum of the parts" method, was not a

11 common or a customary method for valuing biopharma companies

12 like VIVUS.  These two additional techniques corroborated the

13 methods or the earlier first three methods and while all five

14 valuations approached the concept of value differently, they

15 all have one thing in common; they result in an estimated

16 enterprise value that is below the estimated claims

17 threshold, and that is that they show the debtors are

18 insolvent.

19    Your Honor, I believe that recaps our record as it

20 stands and with that, I'd turn to the existing stock

21 settlement.  As a starting point here, I want to emphasize,

22 but not belabor the point that the revised, existing stock

23 settlement is the product of an arm's-length and good faith

24 negotiations among the debtors, the equity committee, and the

25 supporting noteholder.

1          And Mr. Oki and Mr. Boguslaski both say in their

2     declarations, the settlement, and by extension, the second

3     amended plan, is ultimately the result of the court-approved

4     mediation in which Judge Sontchi served as mediator.

5          According to testimony provided by both, the

6     debtors and the equity committee, those negotiations were

7     complex, rigorous, connected in good faith, and at arm's-

8     length.  In their papers, independently, both the debtors and

9     the equity committee refer to them as "hard-fought."

10         That adversarial process, though it was difficult

11    alternative times, as Mr. Barr mentioned at the outset,

12    served as a pressure test on all sides to ensure that the

13    terms of the second amended plan are, in fact, in the best

14    interests of all the debtors' stakeholders and that's where

15    we ended up, Your Honor.

16         As I noted at the beginning of my argument,

17    Mr. Boguslaski stated in his declaration:

18         "The equity committee views the settlement and the

19    second amended plan as a material improvement over the

20    proposed settlement of the original plan, and the best

21    recovery reasonably achievable under all the circumstances,

22    including in light of the costs and risks of litigation."

23         And the debtors share a similar sentiment.

24    Mr. Oki stated in his declaration that he believes the

25    existing stock settlement constitutes a sound and reasonable

1  exercise of the debtors' business judgment and is in the best

2  interests of the debtors, their estates, creditors, and other

3  parties in interest.

4           So, what are the terms and how do they meet the

5  applicable standards?

6           In our supplemental brief, we provided a side-by-

7  side comparison of the settlement terms in the initial plan

8  versus the second amended plan and we hope that summary was

9  helpful for Your Honor, and that in a nutshell, the existing

10 stock settlement in the second amended plan involves an

11 increase in the total amount of total cash consideration from

12 5 million to 6 million.  Substitution of the contingent value

13 rights in the initial plan, which as Your Honor may recall,

14 turned on performance of the debtors' current commercial

15 products and excluded VI-0106, with a new royalty construct

16 that allows holders of existing stock, who participate in the

17 existing stock settlement so receive a *pro rata* share of a

18 perpetual royalty of 3 percent of net sales of VI-0106 after

19 the reorganized debtors recoup development costs under the

20 terms of the royalty agreement.

21          The shift from CVR to royalty allows the

22 stockholders to participate in any upside of VI-0106 if it

23 ultimately is developed and commercialized successfully into

24 the blockbuster drug that some have argued it will be.

25          And I stress the word "perpetual" above, as

1  Mr. Dijkstra did in his cross-examination, because we think

2  the ongoing nature of the royalties is an important feature

3  in the terms of assessing the consideration that was offered

4  to stockholders, also, a significant feature of the equity

5  committee in their support for the royalty construct.

6        I also note that the royalty payments only start

7  after the reorganized debtors recoup development costs; more

8  specifically, to use the precise terms, once the reorganized

9  debtors generate aggregate EBITDA as a result of net sales of

10 royalty products in an amount that exceeds pre-royalty

11 development costs.  This is also an important feature of the

12 construct because it goes to the cost and risk allocation

13 between the two sides.

14        The reorganized debtors bear the up-front costs

15 and risks associated with any development of VI-0106.  So, if

16 the reorganized debtors pursue development, spend the money,

17 and it turns out that any number of the contingencies we've

18 discussed in the product ultimately is not approved or is not

19 marketable, none of that cost is passed on to the royalty

20 holders.

21        So balance that risk, under the royalty construct,

22 shareholders only participate in the fruits of the

23 reorganized debtors' labor once the cost of development has

24 been recouped, and that was a sort of key part to the

25 negotiations and a balance of the construct.

1          Turning back to the terms of the existing stock

2    settlement -- that was the new record date, Your Honor, which

3    is November 13, 2020 -- and as part of the negotiated terms

4    of the settlement, we otherwise kept the terms of the

5    original settlement intact, including the conditions for

6    participation and the terms of the releases, although, we did

7    adjust the releases to include the equity committee, the

8    liquidating trustee, and NewCo, and NewCo is the -- will be

9    the subsidiary to be formed in connection with the royalty

10   construct.

11         And all of this we did on notice, as we detailed

12   in our brief in new Paragraphs 15 and 58, we provided parties

13   in interest with notice at each step of the way, including

14   service of the second amended plan, notice of the continued

15   confirmation hearing, and notice of the record date, as well

16   as the press release (indiscernible) and publication notice

17   in *The Wall Street Journal*.

18         The settlement should be approved.  And as we

19   noted in our briefing, the Court is guided here by well-

20   established case law on approval of settlements in a plan.

21   The standard is clear under 1123 and Rule 9019, the

22   settlement must be fair and equitable and fall above the

23   lowest point in the range of reasonableness.

24         In this Circuit, when evaluating whether a

25   settlement meets that standard, courts are guided by the four

1  Martin factors:  probability of success in litigation, likely

2  difficulties in collection, complexity of the litigation

3  involved and the expense and convenience and delay

4  necessarily attending it, and the paramount interest of

5  creditors.  The debtors submit that the record before this

6  Court today shows the existing stock settlement meets this

7  standard and should be approved.

8         First, the debtors stand by their positions on

9  enterprise value, and as I outlined at the start, the current

10  evidentiary record contains no evidence, let alone any expert

11  rebuttal to the contrary.

12         The reservations of rights in the support

13  noteholder -- I'm sorry -- in the supporting statements from

14  the equity committee and the supporting noteholder suggest

15  that the current state of the debtors' record is likely due

16  to the fact that the parties achieved a settlement embodied

17  in the second amended plan and that that settlement resolves

18  their disputes with respect to confirmation, the debtors'

19  enterprise value and insolvency, and recoveries available for

20  stockholders.  You can only speculate what other parties'

21  respective litigation positions would be on these issues

22  without a settlement.

23         Regardless, the record is very clear that these

24  issues are complex and if there were to be litigation around

25  them, the result would be a significant delay in progressing

1  these cases to emergence, a significant expenses and

2  increased risk around potential outcomes and continued

3  viability of the enterprise, all of which would be to the

4  detriment of the debtors, their estates, and all

5  stakeholders; accordingly, Your Honor, we believe the first

6  and third Martin factors, the probability of success and the

7  complexity and expense and delay of litigation are satisfied.

8        And the logic of the settlement is pretty simple

9  from the debtors' perspective.  The revised existing stock

10 settlement was negotiated as part of the overarching plan

11 construct, that was recoveries were maximized for equity

12 holders.  While the plan provides for payment in full to

13 general unsecured claims and sufficient exit financing to

14 support the debtors' business upon emergence, all of which

15 benefits all stakeholders, including shareholders, as they

16 would participate in the royalty construct going forward.

17       At the same time, as we (indiscernible) the Court

18 at the status conference in early November, the debtors are

19 running low on liquidity and these cases are at a critical

20 juncture.  The alternative to a settlement is not in any

21 parties' best interests.

22       Mr. Boguslaski put it succinctly in his

23 declaration, quote:

24       "Absent such a settlement, I understand that these

25 cases, these Chapter 11 cases were likely to veer into

1  protracted and costly litigation, with respect to, at the

2  very least, the debtors' proposed sale motion and a fully

3  contested confirmation process."

4          And Mr. Oki noted in his declaration that the

5  debtors' extended stay in Chapter 11 has already had a

6  negative impact on their performance and contributed to the

7  debtors' missing projections.  He also noted that further

8  delay will require a significant debtor-in-possession

9  financing because the debtors' cash flow projections show

10 only enough working capital for the debtors to continue to

11 operate through the beginning of December without additional

12 cash.

13         Accordingly, we believe the existing stock

14 settlement meets the fourth Martin factor and that is the

15 paramount interest of creditors; here, the paramount of all

16 stakeholders.  As the record makes clear, those interests are

17 best served by expeditious confirmation of this plan.

18         In sum, Your Honor, we believe the record is

19 clear.  It supports your approval of the existing stock

20 settlement, as embodied in the second amended plan as fair

21 and equitable and above the lowest point in the range of

22 reasonableness.

23         In addition, Your Honor, and for good form, to the

24 extent that the fair and equitable requirement of

25 Section 1129(b) applies to the settlement, which was

1   suggested at the last round of confirmation hearings, we also

2   believe the existing stock settle satisfies that standard

3   because the evidentiary record today supports a finding that

4   the debtors are insolvent and (indiscernible) the existing

5   stock settlement necessarily improves the position of

6   shareholders by offering each eligible holder an opportunity

7   to recover value greater than they would receive under a

8   strict application of the absolute priority waterfall.

9          And that, Your Honor, brings us to the objection

10  that was filed by Mr. Dijkstra, a shareholder.  As a

11  preliminarily matter, Your Honor, we believe Mr. Dijkstra's

12  objection should be viewed in context.  First, there is an

13  official equity committee of equity security holders pointed

14  at Your Honor's direction.  The committee represents, as a

15  fiduciary, the interests of all shareholders, including

16  Mr. Dijkstra.

17         The committee engaged capable, experienced legal

18  financial advisors.  With the assistance of those advisors,

19  it engaged in an adversarial process and negotiation with the

20  debtors and the supporting noteholder.  Those negotiations

21  led to mediation.  That mediation resulted in a settlement,

22  and that settlement is reflected in the second amended plan,

23  which the equity fully supports.

24         Again, as I mentioned, in connection with the

25  settlement, the debtors are at a (indiscernible) point with

1  respect to restructuring.  The record is clear that

2  additional delay, expense, and risks associated with the

3  continuing valuation litigation and pursuing an alternative

4  claims construct in which the debtors market their assets is

5  an inferior option to confirmation of the second amended plan

6  today, which is part of the reason that the debtors, the

7  equity committee, and the supporting noteholder have all

8  agreed to avoid that outcome by supporting the plan.

9           In his objection, Mr. Dijkstra re-raises many of

10  arguments that he made during the prior confirmation hearing.

11  To the extent that the arguments have been made, briefed, and

12  rebriefed, I do not want to spend Your Honor's time treading

13  old ground, but I am happy to answer any questions you have.

14           I would also like to address the two main topics

15  from his objection; the VI-0106 and the NOLs.  In short, as

16  we read Mr. Dijkstra's objection, he argued that the second

17  amended plan should not be confirmed because the debtors are,

18  in fact, solvent and he reaches that conclusion because of

19  his argument that the debtors' valuation analysis incorrectly

20  valued VI-0106 and the NOLs.

21           Important here to stress that these are arguments.

22  The evidentiary record before Your Honor today has extensive

23  testimony on both, VI-0106 and the NOLs, but Mr. Dijkstra has

24  provided no evidence, let alone, an expert rebuttal to

25  support his arguments with respect to the debtors' enterprise

1  valuation.

2        And, Your Honor, taking those in turn, VI-0106 and

3  the NOLs, I started my argument by laying out the record with

4  VI-0106 and the NOLs, so no need to repeat, clearly, but I'd

5  note again that in addition to the prior declarations and

6  testimony of Ms. Stratton, Mr. King, and Mr. Pickering, we

7  now have the declaration of Mr. Oki, a member of the debtors'

8  management team.

9        The record supports the conclusion drawn by Ms.

10  Stratton, Mr. Pickering, Mr. King, and Mr. Oki, that VI-0106

11  may have the potential to one day be a revenue-producing

12  assets, but the timeline for developing the product is

13  lengthy, the cost is significant, and the outcomes for many

14  developmental and commercial hurdles are uncertain.  As a

15  result, the present value for VI-0106 is *de minimis* and in

16  any event, insufficient to alter the conclusion that the

17  debtors are insolvent.

18        Mr. Dijkstra's objection has no substantive

19  response to these well-demonstrated points that the

20  development process is highly -- the development process and

21  the attendant risks, costs, and uncertainty make value highly

22  speculative.  He flatly states that the value for VI-0106,

23  quote, "was and is definitely not zero," and he questions and

24  criticizes the zero-value conclusion, but he offers mostly

25  his own disbelief and some argument around the possibility

1 that VI-0106 may be administered through inhalation for

2 treatment of PAH.

3          Mr. Dijkstra's argument on inhalation appears to

4 be focused on attempting to prove that one of the debtors'

5 witnesses, Mr. King, was wrong when he testified at some

6 length that inhalation therapy did not work for VI-0106.

7          Presumably, the reason for Mr. Dijkstra's focus on

8 inhalation is an attempt to draw a comparison between VI-0106

9 and the September 2018 transaction where United Therapeutics

10 acquired the rights to develop and commercialize MannKind's

11 Treprostinil Technosphere; it's called "TreT."

12          As we noted in our brief, Your Honor, that

13 comparison is squarely contradicted by the evidence before

14 the Court, which lays out several meaningful differences

15 between TreT and VI-0106, and the inapplicability of the

16 MannKind transaction.

17          More specifically, Ms. Stratton testified that she

18 does not think that the TreT transaction was analogous to the

19 present facts on VI-0106.  She explained that the value

20 proposition in the TreT transaction was that the inhalation

21 technology, that is the delivery platform, not the drug

22 itself, and the drug, Treprostinil, was actually already

23 approved for the treatment of PAH and, in fact, United, the

24 company that was acquiring TreT already had its own

25 commercial drug, a different commercial drug in the market,

1   using Treprostinil to treat PAH.  So, it wasn't a new drug

2   development.

3         And the value proposition for the United -- in the

4   TreT deal was that they, one, could take out a direct

5   competitor of their own drug; two, it could acquire a

6   potentially superior form of delivery for that drug; and,

7   three, a potentially superior method of delivery for other

8   drugs.  Because of the way the transaction was structured,

9   they could also develop the delivery technology into other

10  therapies and drugs.

11        So, in conclusion, Ms. Stratton testified that

12  there is no such value proposition for VI-0106.  The two

13  transactions are very different.

14        In any event, Your Honor, all of this was covered

15  during prior hearings.  Mr. Dijkstra has offered no new

16  evidence or arguments than before; accordingly,

17  Mr. Dijkstra's arguments are unavailing, and we do not -- I'm

18  sorry -- and do not rebut the evidence in the present record

19  that the present value for VI-0106 is *de minimis* and the

20  debtors are insolvent.

21        Turning, then, to NOLs, Mr. Dijkstra argued that

22  the valuation analysis prescribed insufficient value to the

23  NOLs.  I believe he actually questions whether it ascribes

24  any value.  Again, Your Honor, I started with the record

25  (indiscernible), so I don't want to beat a dead horse, but I

1  will address the NOL-related arguments.

2          Historic in his objection, Mr. Dijkstra proposed

3  his own valuation.  He starts with the "sum of the parts"

4  valuation performed by Piper Sandler for all of the debtors'

5  commercial products, which came to 219, as you heard earlier,

6  and then adds the maximum possible tax savings for the NOLs,

7  130 million, and the debtors' current assets listed in the

8  liquidation analysis of 82 million, to reach the total

9  enterprise value of 431 million.

10          This valuation is flawed for a number of reasons,

11  including, one, as Ms. Stratton testified, the "sum of the

12  parts" analysis is not a common or customary way to value a

13  biopharma company like VIVUS on an enterprise basis.  Two,

14  Ms. Stratton and Mr. Pickering testified that NOLs cannot be

15  bought and sold.  So, just aggregating the NOL onto other

16  sale-based values inappropriately conflates valuation

17  methods; it's apples and oranges.  Three, Mr. Dijkstra offers

18  no support for his assumption that the debtors will realize

19  130 million in tax savings this year, and the testimony from

20  Ms. Stratton and Mr. Oki points firmly to the contrary, that

21  no tax savings will be realized this year or possibly anytime

22  soon.  Four, and we spent some time on this in cross, the 82

23  million of current assets are already included in the

24  estimated asset prices under the blackline "sum of the parts"

25  analysis.  Five, even if you were to include the 82 million

1  of current assets, you would also have to then go find what

2  the corresponding current liabilities are and make sure that

3  they set-off against each other to come to a better, albeit,

4  still imperfect conclusion.

5          Ultimately, Your Honor, all of this comes back to

6  the record.  Mr. Dijkstra's valuation does not rebut the

7  expert testimony of Ms. Stratton with respect to the debtors'

8  estimated enterprise value and insolvency, including the

9  appropriateness of her method for inclusion of NOLs in that

10 valuation.

11         And I already noted, and we'll just briefly flag

12 again, Your Honor, that per the declaration of

13 Mr. Boguslaski, the equity committee did consider the

14 potential value of NOLs and the best way as to extract that

15 value in the form of additional settlement consideration.

16         Next, Mr. Dijkstra suggests that the CARES Act may

17 unlock new value in the NOLs and that's not the case.  As I

18 mentioned during the earlier portion where I walked you

19 through the record, the CARES Act creates an additional

20 lookback period from five years for 2018, 2019, and 2020,

21 meaning the earliest you could carryback an NOL under the

22 CARES Act is 2013, but that to receive any immediate benefit

23 from that, we would have had to have had taxable or we would

24 have to have taxes that were paid during that time and the

25 debtors have not paid federal income tax since 2013, so there

1   is no tax savings that can be realized today.

2           And, finally, Your Honor, Mr. Dijkstra asserts

3   that the management could have structured a different

4   hypothetical deal to preserve the NOL by attracting an

5   investor who required less than 50 percent or just less than

6   50 percent of the equity in VIVUS.

7           As an initial matter, we have been hearing from

8   day one that prior to filing, this is what debtors were

9   trying to do; they were, indeed, in equity markets looking to

10  raise capital.  And the amount of capital they needed to

11  raise to refinance the debt, they were looking to issue more

12  than 50 percent of the equity, which would have impaired the

13  NOL, but the distinction, ultimately, is of no moment,

14  because as Mr. Oki explained, prior to filing, the debtors

15  were close enough to the threshold of an ownership change

16  that if a new, a single new shareholder obtained 5 percent or

17  more of the company, that might have triggered an ownership

18  change and significantly impaired the NOLs.

19          And Your Honor will remember very early on in this

20  case, we had the NOL order, the no-trade order.  I would also

21  note, and this is just sort of anecdotal, but I would just

22  note that we have received no notices under that order.  So,

23  so far, no one has requested it buy or sell anything that

24  would be triggered or become relevant to the order.

25          And that's not all Mr. Dijkstra argues, Your

1  Honor.  He does make a number of other assertions, but as I

2  said, didn't want to go tit-for-tat, line-by-line, but there

3  are two additional points that I just want to quickly touch

4  on.  And one is that it's clear from his objection that

5  Mr. Dijkstra is unhappy with the outcome here and his

6  frustration is somewhat disappointing because I would have

7  been much happier to tell you we were fully resolved and

8  consensual today, but it's not the basis for challenging the

9  good faith of the parties involved and we categorically

10 reject the characterization that the settlement process is

11 unfair.

12         Calling the process unfair does not make it so.

13 And I have already spent a fair amount of time talking about

14 the process here and the evidence in the record, in

15 particular, the Boguslaski and Dees declarations, which make

16 it clear that this process was conducted in good faith.

17         And the second, Your Honor, is in his objection,

18 Mr. Dijkstra includes a few criticisms of the royalty

19 construct.  Interestingly, the perpetual issue that he

20 mentioned on cross wasn't in his papers, but I would just

21 say, without dropping into them specifically -- although I'm

22 happy to if Your Honor would like -- it was a heavily

23 negotiated package and the construct was that, you know, to

24 Mr. McDermott's comment at the outset, you know, there's not

25 a term in here that wasn't considered, negotiated,

1  renegotiated, negotiated further, and it's reached sort of an

2  equilibrium that was the product of a lot of time, effort,

3  and hard-fought negotiation.

4           So, unless Your Honor wants me to sort of drop

5  into the specific points on the trust, I'm happy to just

6  leave it at that and say this is part of the package of the

7  settlement.

8           THE COURT:  I don't have any questions on that.

9           MR. MORGAN:  And that brings me sort of to the

10  end, and just to try and tie it altogether and make sure

11  identify given you a full record of argument, as an initial

12  matter, Your Honor, I note that no objections were filed to

13  the disclosure statement or the solicitation procedures,

14  which is why my argument today has focused exclusively on

15  confirmation.  Those are still relief that we're seeking

16  today, so I want to make sure that we flagged them.  And for

17  all the reasons in our initial brief and support, we submit

18  that the disclosure statement and the solicitation procedures

19  are appropriate, satisfy the applicable standards under the

20  Code, and should be approved.

21           And then, Your Honor, with respect to

22  confirmation, there are obviously a number of requirements

23  that we've not directly addressed or even indirectly

24  addressed today in argument, but I reference our initial

25  brief in support, as well as the declaration and testimony of

1  Mr. Pickering, both of which addressed each of the elements

2  for confirmation under the Code.

3          And unless Your Honor would like, which I'm

4  prepared to do, I don't plan to go through every element of

5  1129 --

6          THE COURT:  No, I don't need you to go through

7  every element.

8          MR. MORGAN:  Thank you, Your Honor.

9          One, and just, I sort of made the comment in

10  connection with Mr. Dijkstra's objection, but one particular

11  element to note is 1129(a)(3), and the record is very clear

12  on the point that the second amended plan is the product of

13  arm's-length, good faith negotiations among the debtors, the

14  equity committee, and the supporting noteholder.

15          The fact that parties objected to and opposed the

16  confirmation of the initial plan or the second plan does not

17  call into doubt the good faith in proposing the plan and

18  pursuing the plan.  And Section 1129(a)(3) is thoroughly

19  satisfied here, as the debtors have proposed the plan in good

20  faith in an effort to maximize value for the debtors, their

21  estates, and all stakeholders.

22          And one last sort of technical point, Your Honor,

23  is should the plan be confirmed, Your Honor, we request a

24  waiver of the stay of the confirmation order to avoid the

25  incurrence of additional administrative and professional

1   costs that we believe are unnecessary, in light of the

2   overwhelming support of the plan.

3          And with that, Your Honor, I'll briefly conclude

4   my remarks by saying we believe the combined testimony of the

5   eight declarants in support of the confirmation, all

6   supporting a finding today that the debtors have met their

7   burden by the preponderance of the evidence to show that the

8   debtors in the second amended plan have satisfied or complied

9   with each of the requirements for confirmation under the

10   Bankruptcy Code.

11          And that will be the conclusion of my affirmative

12   remarks, Your Honor.

13          THE COURT:  Thank you.

14          Let me hear from the equity committee.

15          MR. MCDERMOTT:  Good afternoon, Your Honor.

16          Again, for the record, Mark McDermott from Skadden

17   Arps, on behalf of the equity committee.

18          Your Honor, I have a few points that I was going

19   to make, but the reality is that Mr. Morgan hit them all and

20   then some.  I thought his presentation was very fulsome, very

21   complete, and very accurate.

22          But that said, I want to speak at a high level

23   about a few things.  You know, Chapter 11 rarely results in

24   everybody being happy.  The committee is and always has been,

25   very sensitive to the fact that a lot of (indiscernible) and

1 not insignificant amounts of money here, that they did not

2 turn out at all the way that they would have liked.

3        But there were a lot of considerations that the

4 committee, in exercise of its fiduciary duties, had to

5 consider.  Some of them were helpful to the committee's

6 cause.  Some of them were risks that were potential serious

7 risks, is the committee's position.

8        This drug, the committee has always believed, the

9 VI-0106, does have great potential for a value, but it's

10 potential and the range is broad.  And one pole of that

11 potential range is, in fact, zero.

12        We have a long ways to go is the reality before

13 any of that value might be unlocked.  The evidence that was

14 in the record that Mr. Morgan alluded to is that, I guess if

15 everything goes as (indiscernible), maybe it's two to three

16 years.  It could be seven years.

17        When we put together a trust agreement, Your

18 Honor -- "we," meaning primarily the lawyers and Teneo -- had

19 to make a decision about how long it might last before any

20 royalties might actually come into it.  It is going to have

21 administrative costs in there.

22        I don't want to disclose exactly how long we plan

23 for that to last.  I don't think it's helpful for the record,

24 but I would just say this:  we had to be conservative.  And

25 it is conservative.  You can't take anything for granted in

1  an exercise like this.

2          Another important consideration that Mr. Morgan

3  touched on is that it's going to take not only time, but a

4  lot of money to get this to the day when this drug is

5  commercialized.  It may not happen.

6          And it's not shareholders, respectfully, that are

7  putting up that money; it's just a reality of the facts of

8  this case, a thousand-some holders, like with a great

9  majority of retail holders, you're not going to have a rights

10 offering, and that had to be a very serious consideration in

11 appreciating the brute reality of the allocation of the risks

12 here and what was fair; a point that was made clear to us

13 more than once during the mediation with Judge Sontchi.

14         And, by the way, this would not have gotten done

15 without his help.

16         Last is, even putting all those things aside, just

17 the posture of the case, you know, we're in Chapter 11.  We

18 are nowhere near a clear day right now.  The potential

19 administrative costs and potential burden of DIP financing

20 weighed very heavily on the committee members from the word

21 "go."

22         As I said at the outset, a couple of those

23 committee members have never been through a Chapter 11.  It

24 was an education and stunning to see how expensive it really

25 can be.  It's, frankly, stunning to me after 30 years of

1  doing this.

2         There were genuine risks to try to fight about

3  valuation, fight about bidding procedures and the terms, et

4  cetera, et cetera, during a pandemic.  All those things came

5  together in an extremely tough, hard, and fast-paced

6  negotiation.  We were ready to start fighting if it came to

7  that, but I think everybody wisely saw that the continuation

8  of the hearing on the bid procedures motion for a few days

9  was wise; it was one of those opportunities or occasions when

10 continuous activity did help get things done.  And so after

11 an awful lot of discussion and consideration, including at

12 the mediation where all three members of the committee

13 participated, we actually felt pretty good about where we

14 came out on this agreement.

15        The one beauty about the royalty construct, it

16 really avoids having to pick a fixed number today and come

17 down on a value today or a number.  If it works -- excuse

18 me -- we get a percentage.  And we don't have to worry about

19 any particulars beyond that and that was really very

20 important to the committee.

21        There was a lot of skepticism around the original

22 CVR and I know that was not a view shared by IEH, but it

23 certainly was by our advisors, so to be able to get away from

24 that construct altogether and focus on the real thing that

25 actually did have great potential upside, was considered a

1 real win here.  And for that reason, Your Honor, we believe

2 very firmly -- I said it in our papers and I'll say it again

3 now -- we believe this settlement is fair, reasonable.  It

4 really is the best under the circumstances.

5      For what it's worth, I have fielded a lot of phone

6 calls from shareholders.  All but one has been pretty happy

7 and congratulatory with what was achieved.

8      And so, with that, Your Honor, I'll stop and see

9 if Your Honor has any questions and would otherwise stand on

10 the papers that we filed, and we ask that the Court confirm

11 the plan.

12      THE COURT:  Thank you, Mr. McDermott.  I don't

13 have any questions for you.

14      Mr. Pinkas?

15      MR. PINKAS:  Thank you, Your Honor.

16      Oscar Pinkas of Dentons on behalf of IEH.  Just a

17 couple of minutes, Your Honor, and I'll just want to make a

18 couple of points since I didn't do an opening.

19      It's a pleasure to be back in your courtroom here

20 on a largely consensual basis.  We obviously join in the

21 debtors' legal arguments and rely heavily on their and our

22 briefing in support of confirmation.  I think they address

23 all points at issue.

24      We also join in the debtors' arguments regarding

25 credibility, inadmissibility, limits on examinations, motions

1   to strike, et cetera, and, Your Honor, if she wishes, could

2   also take judicial notice of the SEC filings that everybody

3   cited to, which would support what's been presented today.

4   But that said, Your Honor, high-level, we're here before the

5   Court with a largely consensual plan.

6            Your Honor appointed an equity committee to

7   pressure-test the plan and they did just that, and you heard

8   that it was fast, and it was furious.  The structure for

9   treatment of stakeholders in the plan has not changed; it's

10  still a settlement, equity interests are still being

11  cancelled, due to what we would argue as the debtors'

12  insolvency and the asset-priority rule.

13           The shareholder settlement for the equity

14  committee's view is materially better; however, having traded

15  contingent payment rights in the CVR on the revenue-producing

16  drugs for a royalty in the developmental drug.  And recall,

17  Your Honor, that that was something that I said at the

18  confirmation hearing in August, IEH would be willing to do

19  and give shareholders contingent payment rights in VI-0106

20  and, in fact, that's where we landed.

21           As a result, the debtors, the committee, and IEH

22  are aligned and fully support the plan, which is obviously a

23  delicate balance, which you've heard.

24           There's only one objection from Mr. Dijkstra

25  focused solely on valuation.  The only evidence on valuation,

1   as you've heard, was put on by the debtors and shows that

2   they're clearly insolvent.  In addition, they addressed each

3   of the issues that Your Honor raised in her September 11th

4   ruling, and so by definition, then, we believe the debtors

5   have met their burden and the plan should be confirmed.

6           Regarding Mr. Dijkstra's objection, Your Honor,

7   just two points there.  He includes a proposed valuation.

8   You've heard from the debtors in their supplemental brief and

9   Mr. Oki's testimony why the calculation is incorrect.

10  Second, Mr. Dijkstra relies heavily on a potential

11  perspective value of VI-0106 that is, as you've heard, years

12  away and highly contingent.

13          In valuation, one doesn't just take the good with

14  the bad -- and leave the bad, excuse me.  If contingent value

15  is added, our position remains that the Exonics photochemical

16  case would require the Court to also consider contingent

17  liabilities.

18          And as Ms. Stratton made clear in August, with

19  respect to the Qsymia drug, which is the majority of the

20  debtors' revenue, the debtors are still required by the FDA

21  to perform what's called a "CVOT analysis," which could cost

22  up to $220 million.  The debtors have tried to avoid

23  performing that analysis for years and the FDA has not

24  consented to that.  So, there is a large, looming liability

25  here, as well.  Number two, there are generic drugs that may

1  usurp the market share of Qsymia, as you heard, which then is

2  a detriment impact to revenue and projections and that could

3  happen in just a few short years.

4           So, clearly, the negative impact of including

5  those two factors, which Ms. Stratton noted was a potential

6  ten-times multiplier on Qsymia's negative growth rate, would

7  significantly decrease valuation well in excess of any

8  current value of VI-0106.

9           With that, Your Honor, we also heard that we are

10 working on language with the SEC on the confirmation order.

11 We have to try and sync a couple of paragraphs with them in

12 the plan.  Resolution of that is critical, because it goes to

13 the core foundation of the agreement that -- with the equity

14 committee, that underpins the construct of the plan, thus

15 impacting the delicate balance that is being proposed today.

16          We do believe we will get there with the SEC and

17 we will be talking to the SEC again this afternoon.  We hope

18 to resolve those shortly and revert with a consensual order;

19 obviously, if not, we will let Your Honor know of any issues

20 and come back to you to help us resolve any concerns.

21          Finally, Your Honor, I'd be remiss if I didn't

22 note that as the other parties have, that negotiations here

23 were hard-fought and, at times, very contentious with the

24 equity committee, as you might expect.  That contention was

25 primarily driven by significant differences in our views of

1  the facts and circumstances and where this case could end up

2  if no agreement was reached.

3          Nevertheless, we, and the equity committee

4  persevered, and we got to settlement, and I applaud them and

5  their professionals for that, for their perseverance in

6  getting to that resolution.

7          We're also happy to be, at this point, with

8  predominate consensus, at the confirmation and wanted to

9  thank Your Honor, Judge Sontchi, and all the parties for

10  their fruitful efforts in getting us to this point.

11          That's all I have today for Your Honor.

12          THE COURT:  Thank you.

13          Mr. Dijkstra?

14          MR. DIJKSTRA:  Yes, Your Honor.  Thank you.  Just

15  a short statement from me, not really an argument, again.

16          I have to tell you that it's become very lonely

17  out here, and I know for a fact that this is -- it has

18  everything to do with the no-ask, no-object condition in the

19  stock settlement, so I would hope that just those settlement

20  conditions alone should be enough reasons to deny this plan.

21          When the case started, I always looked at it from

22  the perspective of how much value Icahn Enterprises is

23  receiving in its debt-for-equity swap and, basically, wiping

24  out existing shareholders.

25          So, Ms. Stratton's midpoint came to a little bit,

1  depending on the time frame, a number between 225 to 231

2  million.  That was, of course, without a value applied to the

3  telehealth platform; although, a debtor claimed a massive

4  spike in volume and share price because of a press release on

5  the 31st of March, a press release on that telehealth

6  platform.

7          Then we have the much-debated zero value for the

8  PAH pipeline, of which, to date, still nobody has put any

9  value on.

10         After Mr. Oki's testimony today, I'm still not

11  sure how much of the current assets are exactly integrated in

12  the enterprise valuation and the same goes for the other non-

13  current assets, but he did testify today that they could

14  potentially increase the NOLs with 114 million U.S. dollars.

15         I believe that if the debtor had not paid off the

16  close to 50 million U.S. dollars in October 2019, we would

17  have had a different outcome today.

18         And then, of course, we have the situations with

19  what I would call the "NOL shell."  It's not really a NOL

20  shell because the debtor still has assets as a going company,

21  but I'm trying to compare to it so that it explains on how

22  Icahn Enterprises will use them.

23         So, under the Tax Code, Section 38215, while being

24  the (indiscernible) creditor, the NOLs will stay fully intact

25  and unlimited for its uses.  And here's the thing, Icahn

1  Enterprises is the controlled group for tax laws, which means

2  the NOLs or deferred tax assets can pass-through this group.

3          Even as we are here today, I do not understand why

4  they should be given a zero valuation in the pre-packaged

5  plan.  Based on the Tax Code, Section 38215 rule, the debtors

6  has another option in the run-up to this horrible outcome for

7  shareholders because when they merge with another entity,

8  arranging a solution for the maturing 2020 debt, while being

9  under the protection of the Bankruptcy Court, and as long as

10 the existing shareholders would own at least 60 percent of

11 the company, emerging from the bankruptcy, the NOLs would

12 have also been unlimited and unrestricted.  So, I want to

13 emphasize that while being under Chapter 11, the standard

14 ownership "change in control" rules do not apply under

15 Section 38215 of the Tax Code.

16         Let us not forget that debtors shall file an

17 emergency NOL motion to protect them and mentioning the

18 Section 38215.

19         Mr. Oki testified that he has very limited

20 knowledge of the Section 38215 in the Tax Code.  Mr. King

21 testified that the NOLs were a very important subject, so I

22 can only conclude that management did not have a proper

23 understanding of the value of the NOLs to the Icahn

24 Enterprises control group, even though the debtors spent lots

25 of money on legal and financial advisory.

1          Then we have the settlement, as proposed in the

2    second amended plan.  I believe the royalty agreement, as

3    proposed, is a typical example of "it is too good to be true,

4    it probably is."  Royalty agreements in the biopharmaceutical

5    industry are not made this way; they are standardized with an

6    end date being an X amount of years after first commercial

7    launch or an X period after patent expiration.

8          So, I see the royalty agreement as nothing more

9    than a carrot being held in front of everybody here today in

10   making sure this pre-packaged plan is pushed through.  So, I

11   believe on that given, and the language that the perpetual

12   royalty agreement is made of, I am convinced the shareholders

13   will never receive anything out of it.

14         If the second amended plan will be confirmed,

15   Icahn Enterprises is receiving an early Christmas gift in the

16   vicinity of more than $140 million in the form of those

17   diligent effort tax assets.  The (indiscernible) shareholders

18   will receive 20 cents per share.

19         We have statements from the equity committee and

20   Teneo, their financial advisor, that time was of the essence

21   here.  I conclude that the equity was, indeed, under very

22   unreasonable pressure here, having the possibility of the

23   trigger pulled at them at any time, there, where it concerns

24   the motion of sale and the DIP lending.

25         So, I stand with my objection and I hope that

1  based on all the evidence that all the parties provided, Your

2  Honor will decide to not confirm this plan.  Thank you.

3            THE COURT:  Thank you.

4            Okay.  It is a 12:45 eastern time.  I am going to

5  take a break and collect my thoughts.  We will reconvene at

6  1:45 eastern time and I will rule.

7            Thank you for your arguments and we're in recess.

8            COUNSEL:  Thank you, Your Honor.

9       (Recess taken at 12:41 p.m.)

10      (Proceedings resumed at 1:46 p.m.)

11           THE COURT:  Okay.  This is Judge Silverstein.

12           We are back on the record and I am prepared to

13  rule.  Okay.  We are in the middle of the VIVUS confirmation

14  hearing.

15           As all parties know, on September 11th, after the

16  conclusion of evidence and argument on debtors' plan of

17  reorganization, I did not confirm the plan, neither did I

18  deny confirmation.

19           I held, based on the evidence presented as of that

20  date, the debtors had not met their burden under 1129(b) of

21  the Code to show that the treatment of equity committee,

22  which was cancellation of their interests, was fair and

23  equitable, and I did two things.  In an admittedly somewhat

24  unusual move, I left the record of the confirmation hearing

25  open so that additional evidence could be adduced if debtors

1    determined to seek confirmation of their plan and I ordered

2    that the Office of the United States Trustee appoint an

3    equity committee.

4          As I stated then, the equity committee is a

5    fiduciary to all stockholders and would be able to retain

6    professionals who could make an honest and fully informed

7    assessment of the plan after which they could object to or

8    support the plan.

9          As directed, the United States Trustee appointed

10   an equity committee consisting of three members.  The

11   committee retained two restructuring law firms as counsel and

12   it also retained a financial advisor, Teneo Capital, LLC.

13         As set forth in the declarations of the two senior

14   managers of Teneo, whose declarations were admitted into

15   evidence, they did their diligence, and the equity committee

16   began discussion with the debtors and IEH on the plan.

17   During the course of the discussions among the parties, I was

18   asked to approve a mediation, which I did, and with the help

19   of Chief Judge Sontchi as a mediator, the equity committee

20   negotiated what it considers to be a better and a fair deal

21   for equity holders, given all factors, including the value of

22   the company, the claims against the company, and the

23   realities of the company's financial position.

24         Based on the agreed-to deal, the debtors have

25   amended the plan, which, in its amended form, is still

1  supported by IEH and it's also supported by the equity

2  committee.  Because it supports the plan, the equity

3  committee had determined not to object to the plan and filed

4  the two declarations supporting the plan.

5          Under the second amended plan, the existing stock

6  settlement results in an increased up-front cash of

7  $6 million and the substitution of a perpetual royalty in the

8  net sales of VI-0106, after recoupment of expenses, for the

9  contingent value rights contained in the original plan.

10         Objections to the originally plan by Mr. Chlavin,

11 Mr. Makosky, and Dr. Manousiouthakis and Mr. Dijkstra were

12 all withdrawn, but Mr. Dijkstra did file an objection to the

13 second amended plan.

14         This morning, the confirmation hearing continued.

15 Three additional declarations were admitted into evidence:

16 Mr. Oki, Mr. Boguslaski, and Mr. Dees.  Each of them were

17 cross-examined.  I closed the evidentiary record and heard

18 argument.

19         I am going to confirm the second amended plan.  I

20 find that debtors have met their burden of proof,

21 preponderance of the evidence with respect to the second

22 amended plan.

23         First, I will approve the solicitation procedures

24 and disclosure statement.  There were no objections to

25 either, and I find and conclude that the classes that were

1   solicited received sufficient information to make an informed

2   decision on the plan.  Here, the only classes who were

3   solicited were Classes 3 and 4, which are the secured note

4   class and the convertible note class, and those claims are

5   held by IEH.

6            As to the confirmation standards, I will hit the

7   highlights.  Stretto's voting declaration shows that both

8   Class 3 and Class 4 accepted the plan and this, therefore,

9   also supports the conclusion that at least one impaired class

10  accepted the plan.

11           In terms of the best interests of creditors test,

12  no one challenged, in any significant way, Mr. Pickering's

13  liquidation analysis, which is credible.  So, I conclude that

14  holders of claims are receiving at least what they would

15  receive in a Chapter 7 case.

16           No one challenged feasibility and the evidence

17  presented was credible.  This factor is met, as well.

18           Good faith.  Mr. Dijkstra does challenge, to some

19  extent, the good faith, with respect to the plan.  The second

20  amended plan, which is the plan before me was clearly filed

21  in good faith and not for any improper purpose.  It is the

22  result of hard-fought negotiations among debtors, IEH, and

23  the equity committee, as facilitated by Chief Judge Sontchi

24  as the mediator.

25           To the extent that the agreement reached among the

1  parties is a settlement of issues, I conclude that it meets

2  the 9019 standard.  Those issues would be a potential

3  committee objection to the plan, the DIP financing, and the

4  sale process.  Clearly, each of those is a complex, time-

5  consuming issue and the alternative to settlement, full-

6  blown, expensive litigation makes the settlement reasonable

7  and a proper exercise of the debtors' business judgment and

8  it meets the Martin standards.

9        The debtor releases, I will approve them.  No

10  party objected to the debtor releases, as Ms. Frizzley's

11  declaration provides the evidentiary basis for them.

12        So, that takes us to 1129(b).  Is the plan fair

13  and equitable to claimants, and in particular, Class 7

14  interests and Class 8 subordinated claims?

15        No holder of a subordinated claim has objected to

16  the plan or its treatment under the plan and it's not clear

17  that there are any claims in this class.

18        As for holders of interests, first, the equity

19  committee has not chosen to dispute the evidence debtors put

20  forth with respect to solvency, leaving only the debtors'

21  solvency expert's declaration and testimony.  This is not to

22  say that Teneo agrees with every position taken by

23  Ms. Stratton.

24        Mr. Dees testified that VI-0106 has value and its

25  prospects are significant, and he specifically testified that

1  development-stage pharmaceutical transactions include

2  significant contingent consideration.  This view informed the

3  committee and led to the negotiation of the royalties, which

4  permits stockholders to participate in the upside of VI-0106.

5          So, the question on solvency comes down to whether

6  debtors have filled in the evidentiary gaps I previously

7  identified -- they have.  Debtors have filled in the open

8  gaps, with respect to Ms. Stratton's testimony through the

9  declaration and testimony of Mark Oki.

10         Mr. Oki has competently testified regarding

11 management's preparation of the financial projections, as

12 well as the June 2019 corporate presentation, and I am

13 satisfied with his explanations.  Based on Mr. Oki's

14 testimony, I find that the debtors' projection formed a sound

15 basis for Ms. Stratton's enterprise valuation analysis.

16         Mr. Dijkstra's main objections to the amended plan

17 are tied into this analysis, so I will run through them.  In

18 terms of the value of VI-0106, as everyone knows, a

19 significant amount of time was spent on the value of VI-0106

20 and its potential for treatment or cure of pulmonary arterial

21 hypertension.  To that end, there was significant testimony

22 on the delivery method for tacrolimus and whether the drug

23 could be delivered by way of inhalation.  Mr. Dijkstra has

24 persisted in his view that this may be a possibility, which

25 would translate into a greater value for VI-0106.

1           I do not have to decide whether or not an

2   inhalant-delivery system for tacrolimus is viable.  Even

3   assuming this is so, I have no solvency testimony, other than

4   Ms. Stratton's, and the testimony from Mr. Oki is now clear

5   that in a best-case scenario, the clinical-trial phase will

6   take two to three years at a cost of $52 million, which

7   includes the milestone payments required under the

8   acquisition-transaction documents and in a worst-case

9   scenario, it will likely take six to seven years to do the

10  clinical work at a cost of $100 million; of course, there are

11  other risks, as well, including competition.

12          As to the NOLs, Ms. Stratton did include the value

13  of the NOLs to the debtors in her enterprise valuation

14  analysis.  As I initially ruled, I am not certain that the

15  potential value of the NOLs to IEH or the Icahn Enterprises

16  is relevant to an enterprise valuation analysis for purposes

17  of Section 1129.

18          Neither of the Teneo declarants opined that it was

19  appropriate to include the value of the NOLs to IEH as part

20  of an enterprise valuation and no objector, whether this

21  morning or in August, presented legal authority for the

22  proposition that value to IEH in this scenario is

23  appropriately considered in the 1129 standard; no authority

24  on point or by analogy, or by basic extension of legal

25  authority, therefore, once again, I have no evidentiary or

1  legal basis to conclude that Ms. Stratton's enterprise value

2  analysis is incorrect.

3          Let me also note that in connection with the

4  second amended plan, which is the one before me and which was

5  negotiated with the equity committee, debtors' management's

6  view on value to IEH or how it may have been affected the

7  originally plan is moot.

8          Let me comment on the "sum of the parts" analysis.

9  I do not find it appropriate to add anything to

10 Ms. Stratton's "sum of the parts" analysis.  There was no

11 expert testimony that this was appropriate, and this was her

12 backup methodology.  It was one of five methodologies that

13 Ms. Stratton used, all of which put an enterprise value of

14 VIVUS at below the claims against it and support the solvency

15 or insolvency determination.  Based on all of this, I

16 conclude the debtors have met their burden of proof on the

17 solvency issue.

18         Let me turn to the third-party releases.  The

19 third-party releases granted by the shareholders in the plan,

20 I will approve, as they are consensual.  Each shareholder

21 will be able to opt-out, post-confirmation and they can

22 choose to accept the deal struck by the committee and provide

23 the release or not accept the deal and not give the release;

24 it is an individual choice.

25         As for the conditions shareholders must meet to

1  participate, I did express some hesitancy at the beginning of

2  the case regarding the breadth of the conditions, and there

3  was a modification of those conditions.  I will not find that

4  the existence of these conditions is a reason to deny

5  confirmation here, particularly where an equity committee was

6  ultimately appointed.

7          And I note, I reviewed Judge Walrath's opinion in

8  Washington Mutual.  Judge Walrath is no fan of third-party

9  releases, certainly not then, but she overruled in Washington

10 Mutual, the United States Trustee's objections to a plan that

11 conditioned the distribution upon providing a release,

12 finding that each claimant could make their own decision.

13         I'll admit I was a little surprised, given my

14 knowledge of Judge Walrath's position and, yet, she permitted

15 that.  I find the situation analogous.

16         So, that concludes my ruling.  I think I've ruled

17 on all the, at a high level, on all the 1129 standards, and,

18 certainly, I've ruled on the ones that were contested.  And

19 as I said, I find the debtors have met their burden.

20         I understand we have ongoing discussions with the

21 SEC on the form of order, but I'm happy to go through the

22 form of order, such as it is.  If there are -- if I can find

23 what I did with my copy.

24      (Pause)

25         MR. BARR:  Your Honor, while you're doing that --

1  this is Matt Barr from Weil -- first, thank you very much,

2  Your Honor.  It's obviously a relief for the company and all

3  of its employees and all the stakeholders, so thank you very

4  much for issuing your ruling so quickly.

5              Mr. Shapiro is prepared to go through, subject to,

6  as we mentioned, the continued conversations with the SEC

7  which, hopefully, then we could file under a certification of

8  counsel, hopefully within a few hours, a blackline showing

9  any changes that need to be made to handle those.

10             Mr. Shapiro is prepared to go through the

11 blackline of the confirmation order and any other suggestions

12 or comments that Your Honor may have, if that's appropriate

13 at this time.

14             THE COURT:  Yes.  And I did look at it, so let me

15 see.

16             Well, first, Mr. Shapiro, is there anything in

17 particular that you want to bring to my attention?

18             MR. SHAPIRO:  Hi.  Yeah, for the record, Zach

19 Shapiro of Richards, Layton & Finger.

20             There's a couple of items that I did want to bring

21 to your attention.  I'm happy to walk you through the

22 blackline that we filed, I believe it was on Tuesday, or I

23 can just point out some of the things that I think you may

24 care about.

25             THE COURT:  Why don't you point out what I may

1  care about.

2          MR. SHAPIRO:  Okay.  That's easy.

3          So, I'll just focus, kind of high level, on the

4  substance changes.  Initially, this order was actually on

5  file since August, believe it or not, so we're pushing three

6  months.  So, it started off a lot shorter than it is.  I've

7  been trying to keep these orders very short, just to

8  preventive you from straining your eyes.

9          But this one got a little longer, mostly because

10 of the settlement that was reached.  People wanted to put

11 some provisions in the order, and understandably so.

12         The first thing I'd like to point out is on Page 5

13 of the redline, if that's what you're looking at?

14         THE COURT:  Yes.

15         MR. SHAPIRO:  That language is consistent with

16 what was in the brief and filed on the docket in the

17 affidavit of service.  It's a finding that the notice of the

18 record date was provided to holders of existing stock.  In

19 addition to it being served on equity holders on or around

20 the 18th of November, we also issued a press release and

21 posted it through an 8-K.  So, we added a finding that that

22 notice was appropriate.

23         THE COURT:  Okay.

24         MR. SHAPIRO:  On the next page, Letter G, that's

25 an additional finding that just tracks what's in Section 12.4

1  of the plan and is consistent with 1129(d).  That was

2  important to some of our stakeholders, so we made it clear,

3  and wanted to add that.

4         THE COURT:  Paragraph G?

5         MR. SHAPIRO:  Paragraph 3(g), yes.

6         THE COURT:  Okay.  I'm okay with that.

7         MR. SHAPIRO:  Skipping ahead to Page 8 of the

8  redline, there we split up Letters O and P because now the

9  opt-out notice is going to be sent out after the fact --

10        THE COURT:  Uh-huh.

11        MR. SHAPIRO:  -- so it made sense to split them up

12 into separate findings.

13        THE COURT:  That's fine.

14        MR. SHAPIRO:  On Page 9 of the blackline, the

15 first paragraph, I'm not really sure that's necessary,

16 frankly.  As you noted, there are no objections or

17 reservations, with respect to the disclosure statement.  So,

18 that language was just added to be consistent with what's

19 later in the Paragraph 6.

20        THE COURT:  Okay.

21        MR. SHAPIRO:  In Paragraph 3, previously, it said

22 the opt-out notice was approved and that's not different; it

23 just shows up in the redline for some reason.  But we did add

24 a little bit of process on how that's going to work and so

25 that's the next couple of sentences there.

1        It includes an obligations within three business

2   days of entry of the order to serve out the opt-out notice

3   and it provides for a deadline by which equity holders can

4   return the opt-out notice or opt-out releases; that's

5   January 5th.

6        THE COURT:  Okay.  And the only question I had

7   about that was whether that's sufficient time to get through

8   the nominee or whoever you have to get through, but I assume

9   that the debtors will coordinate and that you know that this

10  is sufficient time for the notices to get to the shareholders

11  and back.

12       MR. SHAPIRO:  I think so, and if for some reason

13  there's delay in getting the order entered because the

14  deadline is keyed off of that, we, of course, will push it

15  out by a number of days, but we do think it is a sufficient

16  of time, yes.

17       THE COURT:  Okay.

18       MR. SHAPIRO:  All right.  So, now, we're kind of

19  getting into the fun stuff.

20       On Pages 11, 12, 13, and 14, this was very heavily

21  negotiated language between the stakeholders, and, in

22  substance, these are provisions that were pulled from the

23  plan and the trust agreements and were added to the orders to

24  give those parties comfort.

25       I'm happy to answer any questions that Your Honor

1  may have about them.

2         One thing I did want to flag, two things, in

3  particular, with respect to Paragraph 13, but I think unless

4  Your Honor has any questions about any of the other

5  paragraphs?

6         THE COURT:  No, I only had a question on

7  Paragraph 13.

8         MR. SHAPIRO:  Okay.  I think I probably know what

9  that is.  So, on Paragraph 13, one comment we got from the

10 Office of the United States Trustee -- well, let me take a

11 step back.

12         The purpose of Paragraph 13 is to, it's

13 essentially a limitation of liability so that the debtor

14 entities, the reorganized entities will not be liable for

15 claims relating to the trust and the trust interests.  That

16 was, I think, a very -- and Mr. Pinkas and others will chime

17 if I misstated anything -- but that was obviously a very

18 important part of this deal.

19         So, in Paragraph (ii) that goes on the next page,

20 the Office of the United States Trustee was concerned about

21 the scope of that potential release and wanted to make it

22 clear that to the extent there was a release, it was only

23 relating to holders of liquidating trust interests, it was

24 only in their capacities as such and not in any other

25 capacity.

1          THE COURT:  Okay.

2          MR. SHAPIRO:  Because the concern there was it

3  could be a release totally unrelated to the bankruptcy case,

4  which we thought was a fair concern.  And it's not reflected

5  in the blackline, but in the version that we will submit,

6  we're going to add after the paren "or any transferee

7  thereof" up at the very top of 14, "solely in their

8  capacities as such."

9          THE COURT:  Okay.

10          MR. SHAPIRO:  Now, the last sentence of that

11  paragraph, which is what I am guessing Your Honor has a

12  question about?

13          THE COURT:  Yes.

14          MR. SHAPIRO:  So, that's the topic of conversation

15  with the SEC.

16          THE COURT:  Okay.

17          MR. SHAPIRO:  So, you can rest assured that that

18  language, whatever it ends up being, will be something that

19  we have agreed to with them.

20          THE COURT:  Okay.

21          MR. SHAPIRO:  All right.  Not much left.

22          Skipping ahead to Page 16 of the redline.  Now,

23  this Paragraph 28, for some reason it was moved.  I'm not

24  really sure why.  I'm sure there was a reason at the time,

25  but I just wanted to point that out.  It's identical to what

1  was later on that you see on the next page.

2         Paragraphs 7 -- I'm sorry -- Page 17 into 18,

3  where we changed some of the language regarding the

4  administrative expense claims bar date, that was really more

5  of an oversight from the last version.  We have just

6  conformed it so that it matches the plan.

7         The most important change was we did want to

8  clarify that the admin expense bar date does not apply to

9  claims arising in the ordinary course of business, consistent

10 with the ride-through nature of the plan.

11         Okay.  So, Pages 21 and 22, that's Ms. Sleights'

12 (phonetic) language.  She couldn't make it today, although,

13 I'm sure she's very sad and says hello, but the language that

14 we added at the end of Page 21 that spills into 22, was

15 language that she requested.

16         Your Honor has probably seen it before many

17 times --

18         THE COURT:  It sounds like her.

19         MR. SHAPIRO:  Yes.  So, that was -- now, of

20 course, the one thing I should (indiscernible) for Your Honor

21 is if, as a result of any discussions that we have with the

22 SEC, to the extent we need to make changes to Paragraph 26,

23 we will, of course, involve Ms. Sleights.

24         THE COURT:  Uh-huh.  Yes.

25         MR. SHAPIRO:  All right.  So, Pages 22, 23, and I

 1 | think it's (indiscernible).  This is Paragraph 28.  It's

 2 | Sanofi, I think certain Sanofi matters.

 3 | And Mr. Fournier, I believe, is on the line or he

 4 | was earlier.  He can correct me if I misstate anything.

 5 | The changes reflected here were mostly the result

 6 | of the passage of time.  We negotiated this language back in

 7 | August and you'll see some of the dates in Letter B were

 8 | pushed out.  It's mostly because of that.

 9 | The one item I wanted to flag for you was

10 | Letter E.  In your draft, it's bracketed --

11 | THE COURT:  Uh-uh.

12 | MR. SHAPIRO:  -- that was because it was subject

13 | to negotiation.  We did reach agreement on that point.  There

14 | will be a couple very minor changes in the version that Your

15 | Honor will see.  I think we will delete the amount of API and

16 | a couple of other minor conforming changes.

17 | But we do have an agreement with Sanofi and the

18 | agreed language will be included in the version of the order

19 | that Your Honor will ultimately see.

20 | THE COURT:  Okay.

21 | MR. SHAPIRO:  All right.  So, Pages 25, 26,

22 | and 27.

23 | Now, this is -- if you read the language, it's

24 | actually written more like a stipulation, which I'm assuming

25 | Your Honor flagged, and that was why I thought you might be

1  (indiscernible) with it, because otherwise it looks probably

2  looks like a lot of gobbledygook.

3          But to the extent Your Honor has any questions

4  about that idea, the parties are obviously available to

5  answer them, but I thought given how it's drafted, it

6  wouldn't be something that Your Honor would have a problem

7  with.

8          THE COURT:  Yeah, I would question whether it has

9  to go in an order, but is it somewhere else or is this the

10  only place that it is?

11          Is it in a trust agreement?

12          MR. PINKAS:  Yeah, Your Honor, it's Mr. Pinkas.  I

13  can address that.

14          THE COURT:  Sure.

15          MR. PINKAS:  One of the structural issues that has

16  changed in the plan is that VI-0106 will be contributed to a

17  newly formed subsidiary on the effective date and the concern

18  from the equity committee that this language addresses is

19  that the royalty agreement will be executed by that new

20  company, but they appropriately recognized that some of the

21  work that relates to the development of VI-0106 will be done

22  by the parent company, where, for example, employees and

23  management will sit.

24          THE COURT:  Uh-huh.

25          MR. PINKAS:  And so, what this language does is

1  two things.  It requires the parent company to ensure the

2  subsidiary gets the revenue if VI-0106 is ever commercialized

3  and, number two, it requires the parent company to push down

4  any information that relates that the reporting requirements

5  that are contractual in the royalty agreement to the extent

6  that information is in a different entity because the people

7  are in a different entity.

8           And so, you can see it's stipulated language

9  because the parent company is not a signatory and it endures

10 for only so long as the subsidiary company has an obligation

11 under the royalty agreement.  The royalty agreement has

12 provisions that based upon a potential sale or licensing of

13 VI-0106, we have to transfer these obligations.

14           THE COURT:  Uh-huh.

15           MR. PINKAS:  And so, you'll see that that is the

16 con at the present time that I believe is captured in the

17 last paragraph.

18           So, Mr. McDermott can correct me if I've misstated

19 any of that, but that is conceptually what is happening here.

20           MR. MCDERMOTT:  For the record, it's Mark

21 McDermott.

22           Mr. Pinkas described it very well, Your Honor.

23 The concepts that he described were very important to the

24 committee.  It was also important to IEH that it be embodied

25 in the order so it would be binding on all of us, obviously,

1  but VIVUS, otherwise, is not a signatory to the actual

2  royalty agreement.

3              THE COURT:  Okay.  Well, fair enough.

4              And given that this is the central tenet of the

5  plan relative to the shareholders and that VIVUS is not a

6  signatory, I'll permit it to be in here and trust that the

7  parties have negotiated the appropriate language and that I

8  will never have to interpret it.

9              MR. PINKAS:  Thank you, Your Honor.

10             MR. SHAPIRO:  That's exactly what we were focused

11 on.

12             THE COURT:  Okay.

13             MR. PINKAS:  Thank you, Your Honor.

14             MR. SHAPIRO:  And then the last change is on the

15 next page.  It makes what's now Paragraph 32, subject to

16 Paragraph 13, and that was one of the negotiated paragraphs

17 that deals with the treatment and validity of trust

18 interests.

19             So, that's it for the confirmation order.  Unless

20 your has any other questions, there is one item that I just

21 flagged in the plan that we filed last night just for

22 purposes of the record, but that's it for purposes of the

23 confirmation order.

24             THE COURT:  Okay.  No, I don't have any other

25 questions on the confirmation order.

1          MR. SHAPIRO:  All right.  Just very, very quickly

2    on the plan, we did file -- and I don't know Your Honor had

3    an opportunity to review last night, a slightly modified

4    version, just to include some very technical modifications,

5    nothing really of too much significance.

6          There was, however, a typo that I just wanted to

7    bring to everyone's attention at the end of Paragraph 5.5(c).

8    There, there's a reference to Section 5.41.  That was just an

9    internal bust; it should actually be to 5.5.

10          So, we will, after the hearing, refile the plan

11    with that corrected, just for purposes of the record.

12          THE COURT:  Okay.

13          MR. SHAPIRO:  And that's it, Your Honor.

14          Unless Your Honor has any other questions, I think

15    that's it for the plan and the confirmation order.

16          THE COURT:  No, I do not have any other questions.

17          MR. BARR:  So, Your Honor, again, it's Matt Barr

18    for VIVUS.

19          So, what we're hoping is that we will be able to

20    file shortly under a certification of counsel, a final

21    confirmation order, which has the signoff from the SEC for

22    Your Honor's consideration and then hopeful approval and

23    entry onto the docket.

24          I'm kind of looking at the two frames of Mr.

25    Shapiro and Mr. Pinkas to tell you whether or not we think

1    it's a few hours or it's, you know, later today, but our goal

2    would be to have something to you today so that you can

3    consider it and consider entering the order either today or

4    first thing tomorrow.

5          I don't know, if either one of them could shake

6    their heads or give me a thumbs-up or something.

7          MR. SHAPIRO:  From my perspective, obviously,

8    today would be great, but, Your Honor, I will be in contact

9    with your chambers and make sure that obviously no one is

10   inconvenienced, and everyone is in the loop.  So, whatever

11   happens, I'll make sure they're updated.

12         THE COURT:  That would be perfect.

13         MR. BARR:  Okay.  And then lastly, Your Honor, I

14   know I speak for all of us, we thank you very much for your

15   guidance, your patience, your smarts and ability to leave

16   open the door and forecast -- and you don't need to admit

17   it -- to kind of where we would be today, based on,

18   hopefully, what we all envisioned.

19         It could have gone another way.  It could have

20   been that the equity committee believed that, you know, it

21   was worth having the fight and that would have been where we

22   are and Your Honor set that up, as well.

23         But your foresight to bring us here today was

24   amazing and we thank you for that.  And I know I'm thanking

25   you for everybody, but, in particular, the company, that this

1  is the watershed day for them and really important and we

2  appreciate all of you and your chambers' and your staff's

3  guidance, support, and patience.  So, thank you.

4         THE COURT:  Okay.  Well, I wish the company well

5  in the future.  I hope VI-0106 and all your other, all your

6  already commercialized products are very successful.

7         Mr. Murley, I see you pop up here.

8         MR. MURLEY:  Yes, Your Honor?

9         THE COURT:  I know I said I might have a ruling.

10         I have not had a chance to take a look at that,

11  but I will, and I will revert shortly on the request for

12  substantial contribution.

13         MR. MURLEY:  Thank you, Your Honor.

14         THE COURT:  Okay.  Anything else?

15     (No verbal response)

16         THE COURT:  Then we are adjourned.

17         COUNSEL:  Thank you, Your Honor.

18     (Proceedings concluded at 2:22 p.m.)

19

20

21

22

23

24

25

1

CERTIFICATION

2         I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9    /s/ William J. Garling                December 4, 2020

10   William J. Garling, CET**D-543

11   Certified Court Transcriptionist

12   For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25